## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| **FUSION ELITE ALL STARS**, **SPIRIT FACTOR LLC d/b/a FUEL ATHLETICS,** and **STARS AND STRIPES GYMNASTICS ACADEMY INC. d/b/a STARS AND STRIPES KIDS ACTIVITY CENTER,** Individually and on Behalf of All Others Similarly Situated,<br><br>      **Plaintiffs,**<br><br>v.<br><br>**VARSITY BRANDS, LLC; VARSITY SPIRIT, LLC; VARSITY SPIRIT FASHION & SUPPLIES, LLC;** and **U.S. ALL STAR FEDERATION, INC.,**<br><br>      **Defendants.** | Case No. _____<br><br><br><br>**COMPLAINT – CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

Page

I.      NATURE OF THE ACTION ..................................................................................1

II.     JURISDICTION AND VENUE ............................................................................7

III.    PARTIES ...............................................................................................................9

IV.     CLASS ALLEGATIONS ....................................................................................11

V.      AGENTS & CO-CONSPIRATORS....................................................................15

VI.     INTERSTATE TRADE & COMMERCE............................................................16

VII.    FACTUAL ALLEGATIONS ...............................................................................17

        A.      History & Background .............................................................................17

                1.      The Origins Of All-Star Cheer....................................................18

                2.      The Modern Era. ..........................................................................19

                3.      All-Star Apparel...........................................................................25

        B.      Varsity's Monopoly Power in the Two Relevant Antitrust Markets ...................26

                1.      Monopoly Power in the All-Star Competition Market (the Primary
                        Market)..........................................................................................26

                        a.      The Relevant All-Star Competition Market...................................26

                        b.      The Relevant Geographic Market. ..................................................30

                        c.      Varsity Has Monopoly Power as a Dominant Supplier in
                                the All-Star Competition Market. ...................................................30

                        d.      Barriers to Entry.............................................................................31

                                i.      Natural Barriers to Entry...................................................32

                                ii.     Barriers Created by the Exclusionary Scheme..................32

                2.      Monopoly Power in the All-Star Apparel Market (the Ancillary
                        Market)..........................................................................................33

                        a.      The Relevant All-Star Apparel Market...........................................33

|   | b. | The Relevant Geographic Market. | 34 |
|   | c. | Varsity Has Monopoly Power with Respect to Sales of All-Star Apparel. | 34 |
|   | d. | Barriers to Entry. | 35 |
|   |   | i. Natural Barriers to Entry. | 35 |
|   |   | ii. Barriers to Entry Imposed Through the Exclusionary Scheme. | 36 |

C. Varsity's Continuing Exclusionary Scheme to Maintain and Enhance Monopoly Power in the Primary and Ancillary Relevant Markets......................37

    1. Acquisitions of Rivals. ..............................................................37

        a. Varsity Acquired Spirit Celebrations.............................................37

        b. Varsity Acquired Epic Brands. ....................................................38

    2. Varsity's Exclusionary Contracts and Terms of Dealing with All-Star Gyms.......................................................................................38

    3. Varsity Leverages Its Monopoly Power in the All-Star Competition Market to Control the All-Star Apparel Market. ......................................40

    4. Use & Control of Governing Bodies. ......................................................42

        a. Varsity Controls the USASF.........................................................42

        b. Defendant USASF Limits Which All-Star Competition Producers Can Award Bids to All-Star Championships...............44

        c. Varsity Leverages Its Control of Defendant USASF to Exert Control Over All-Star Teams' Competition Schedules. ......................................................................45

D. The Exclusionary Scheme Foreclosed Competition in the Primary and Ancillary Relevant Markets .....................................................48

E. The Exclusionary Scheme Caused Plaintiffs and Members of the Class to Suffer Antitrust Injury & Damages.........................................49

F. The Exclusionary Scheme Caused Anticompetitive Effects in Both Relevant Markets With No Offsetting Procompetitive Efficiencies....................49

VIII. CLAIMS FOR RELIEF .................................................................51

COUNT I MONOPOLIZATION 15 U.S.C. § 2 (On Behalf of Plaintiffs and the Class and Against Varsity).................................................................................................51

COUNT II CONSPIRACY TO MONOPOLIZE  15 U.S.C. § 2 (On Behalf of Plaintiffs and the Class and Against Varsity and USASF)..................................................52

IX.   JURY TRIAL DEMANDED ..............................................................................54

PRAYER FOR RELIEF ...................................................................................54

Plaintiffs Fusion Elite All Stars ("Fusion"), Spirit Factor LLC d/b/a Fuel Athletics ("Spirit Factor"), and Stars and Stripes Gymnastics Academy Inc. d/b/a Stars and Stripes Kids Activity Center ("Stars & Stripes") (collectively, "Plaintiffs") file this action, individually on behalf of themselves and as a class action on behalf of all others similarly situated, against Defendants Varsity Brands, LLC ("Varsity Brands"); Varsity Spirit, LLC ("Varsity Spirit"); Varsity Spirit Fashion & Supplies, LLC ("Varsity Fashion") (collectively, "Varsity"),[1] and Defendant U.S. All Star Federation, Inc. ("USASF") (collectively, "Defendants") for damages, injunctive relief, and any and all other relief that is available pursuant to federal antitrust laws. Plaintiffs demand a trial by jury on all issues so triable and complain and allege as follows:

## I.   NATURE OF THE ACTION

1.     Cheerleading is a multi-billion-dollar sport with over 4 million participating child and student athletes nationwide. Varsity was founded by Jeffrey Webb in 1974. It has—through an anticompetitive scheme consisting of a series of intentional and methodical business maneuvers implemented in combination with the USASF—gained and maintained significant control of every aspect of "All-Star Cheer," a specialized form of competitive cheerleading.

2.     The USA Federation for Sport Cheering ("USA Cheer"), cheerleading's governing body,[2] defines "All-Star Cheer" as follows:

> All-Star Cheer is a discipline of cheer that involves athletes performing a 2 1/2 minute routine composed of tumbling, stunting, pyramids, [and] dance.

> All-Star Cheer differs from traditional school cheerleading [sideline cheering] in that its primary purpose is competition, while school cheer involves crowd leading and other school roles as well as the option for competition. All-Star cheer teams

---

[1] Varsity Brands is the parent company of Varsity Spirit and Varsity Fashion. Though these defendants are three separate corporate entities, they share a single corporate headquarters and hold themselves out to the public as a single entity.

[2] https://www.usacheer.org/about.

1

are most often organized and based out of a club and have teams who are open to all area athletes.[3]

3.      All-Star Cheer is distinct from "sideline cheerleading" in that, *inter alia*, the sole focus of All-Star Cheer is cheerleading itself, particularly the gymnastic and acrobatic elements of cheerleading; there is no other sporting event happening on the field. "All-Star Teams" are cheerleading squads that compete in All-Star Cheer.

4.      All-Star Cheer is a notoriously expensive team sport. A single season costs between $3,000 and $6,000 per All-Star Team member.

5.      All-Star Teams are fielded through privately owned and operated businesses ("All-Star Gyms" or "Gyms") that organize training and practices. All-Star Team membership is not conditioned on or related to enrollment in any particular school. All-Star Gyms coordinate the All-Star Teams' participation in "All-Star Competitions"[4]—paying registration fees, organizing schedules and logistics, and purchasing their All-Star Apparel.[5] All-Star Team members ("All-Star Cheerleaders") are highly skilled athletes who perform potentially dangerous gymnastic and acrobatic stunts. Team membership is highly coveted and competitive.

6.      All-Star Competitions are events produced and promoted specifically for the All-Star Teams and their spectators rather than, for example, accompanying football games with some designated space for sideline cheerleading.

---

[3] https://www.usacheer.org/allstar.

[4] "All-Star Competitions" are events at which several All-Star Teams compete against each other—above the "recreational" level—in the choreographed performance of routines comprised of combinations of stunts, pyramids, dismounts, tosses, and/or tumbling.

[5] "All-Star Apparel" includes clothing, shoes, accessories, and equipment purchased for use by All-Star Cheerleaders at All-Star Competitions and during All-Star Team practices and training.

7.      Plaintiffs Fusion and Spirit Factor are All-Star Gyms based in Florida and California. Until mid-2017, Plaintiff Stars & Stripes was an All-Star Gym based in Michigan.  All three Plaintiffs annually paid thousands of dollars directly to Varsity for All-Star Competitions and All-Star Apparel. Plaintiffs bring this case on their own behalf and on behalf of a proposed class of similarly situated persons and entities (the "Class" is defined in Paragraph 32 below).

8.      Plaintiffs claim that the conduct described herein violated, and continues to violate, Section 2 of the Sherman Antitrust Act, and that they and the members of the proposed Class were injured, and they and members of the proposed Class continue to be injured, by paying artificially inflated prices directly to Varsity for All-Star Competitions and All-Star Apparel. Plaintiffs seek equitable relief to stop Defendants' continuing anticompetitive conduct and to recover money damages for injuries in the form of paying artificially inflated prices to Varsity incurred as a result of Defendants' anticompetitive conduct alleged herein.

9.      Over the past 15 years, Varsity has, in combination with USASF, acquired, enhanced, and maintained monopoly power in the All-Star Competition Market (the "primary market") and the All-Star Apparel Market (the "ancillary market") (collectively, the "Relevant Markets") in the United States through an unlawful scheme (the "Scheme," the "Exclusionary Scheme," or the "Challenged Conduct") consisting of exploiting its substantial market power in the Relevant Markets to, without limitation:

(a)     impair and then buy up any actual or potential rivals that could possibly threaten Varsity's dominance in the Relevant Markets, including acquisitions of Varsity's biggest All-Star Competition Market competitors (and many of its smaller rivals) as well as several All-Star Apparel Market competitors;

3

(b)      deploy its monopoly power in the primary All-Star Competition Market to impose exclusionary agreements or terms on All-Star Gyms, causing Gyms to agree, on their own behalf and on behalf of their members, to patronize Varsity exclusively (or nearly exclusively) in the primary All-Star Competition Market as well as in the ancillary All-Star Apparel Market. These agreements or terms (i) directly require the largest, highest sale volume All-Star Gyms with the top Cheerleaders and Teams—necessary to put on successful All-Star Competitions—to purchase All-Star Apparel exclusively from Varsity and to fill the limited number of events comprising their competition seasons with Varsity's All-Star Competitions, to the exclusion of other All-Star Competition and All-Star Apparel companies; and (ii) condition the avoidance of paying penalty prices for goods and services in the All-Star Competition and All-Star Apparel Markets on exclusive or near exclusive patronage of Varsity in both Relevant Markets; and

(c)      leverage its control of All-Star Cheer's governing bodies, including USASF, to impair actual and potential rivals directly in the primary market and indirectly in the ancillary market, forcing many potential rivals out of business or relegating them to "B-league" status.

10.    Varsity continued a series of acquisitions that, together with other conduct alleged herein, allowed it to dominate the All-Star Competition Market. Varsity's systematic and continuing acquisition of All-Star Competition rivals, combined with one or more of the other anticompetitive conduct alleged herein, has allowed it to acquire, maintain, and enhance control over all three national championships of consequence in competitive cheer—the Cheerleading World Championships ("Worlds"), The Summit, and the U.S. Finals (collectively, "All-Star Championships").

11.     Varsity has used its control of the primary All-Star Competition Market to acquire, enhance, and maintain monopoly power in the ancillary All-Star Apparel Market by impairing and/or excluding actual and potential All-Star Apparel rivals through the Exclusionary Scheme alleged herein. The All-Cheer Competitions are, in part, market-dominant trade shows, and Varsity forbids or severely restricts its All-Star Apparel rivals from displaying wares in those events' "showrooms." Moreover, Varsity rewards All-Star Gyms that purchase Varsity's All-Star Apparel for their All-Star Cheerleaders to use in Varsity's market-dominant All-Star Competitions, with extra points awarded at All-Star Competitions. Given that Varsity's competitions are the dominant events and comprise the majority of an All-Star Team's schedule, and that it would be prohibitively expensive for most participants to purchase multiple competition uniforms for a season, Varsity's exclusion of competing sellers of All-Star Apparel has a powerful exclusionary effect. Varsity's conduct blocks rivals from a key marketing channel that comprises the main, if not only reason, All-Star Gyms buy All-Star Apparel in the first place—for use at All-Star Competitions.

12.     Further, Varsity employs two types of exclusionary contracts with All-Star Gyms, which it calls the "Network Agreement" and the "Family Plan," to maintain its dominance in the All-Star Competition Market and to acquire, enhance, and maintain monopoly power in the All-Star Apparel Market. Varsity focuses its exclusionary conduct on All-Star Gyms because these Gyms recruit, train, organize, and maintain All-Star Teams. All-Star Gyms also select the All-Star Competitions to attend and make purchasing decisions regarding the All-Star Apparel to be used by their Teams. As such, All-Star Gyms are a key input for producing a successful All-Star Competition and the primary and necessary distribution channel for All-Star Apparel.

13.     Varsity imposes its most exclusionary contracts, called Network Agreements, on the big-money and most prestigious All-Star Gyms whose attendance is critical to putting on

successful All-Star Events and a key distribution channel for All-Star Apparel. Under these Network Agreements, All-Star Gyms are required to commit to near exclusive attendance at All-Star Competitions and completely exclusive patronage by the Gyms and their Team members of All-Star Apparel. Varsity also imposes restrictive terms on all of the other All-Star Gyms through the Family Plan, which makes access to non-penalty prices on All-Star Competitions and All-Star Apparel contingent on All-Star Gyms attending Varsity All-Star Competitions for the vast majority of their seasons, and purchasing the vast majority of their and their members' All-Star Apparel requirements from Varsity.

14.     During the Class Period (defined below), Varsity collectively controlled approximately 90% of the All-Star Competition Market and 80% of the All-Star Apparel Market. Varsity has used its dominant market power in the Relevant Markets to substantially foreclose competition in both markets and thereby maintain and enhance its dominance in both markets. In so doing, Varsity's Exclusionary Scheme has led to reduced output, supracompetitive prices, and reduced choice in both Relevant Markets. During the period relevant to this case, for instance, the number and variety of All-Star Competitions have fallen, the number of rivals in both Relevant Markets has dropped, and prices in both markets have risen.

15.     Today, Varsity describes itself as "the worldwide leader" in "cheerleading…apparel, educational camps and competitions"[6] and "a leader in uniform innovation, as well as educational camps, clinics and competitions, impacting more than a million athletes each year."[7] Varsity's Exclusionary Scheme, as alleged herein, is intentional and systematic. As Varsity's founder stated in a recent interview:

---

[6] https://www.varsity.com/about/.

[7] https://www.varsitybrands.com/spirit.

"[W]e were positioning ourselves to provide all the products and services that that affinity group [All-Star Cheer participants] utilized. Not only did we have the number one position in those three segments [competitions, apparel, and camps], but then we developed a cross-marketing model where we could promote [the segments within each other] and to be honest with you, it took off."[8]

16.     As a direct and proximate result of Varsity's unlawful and anticompetitive Exclusionary Scheme, Plaintiffs and the Class (defined below) have paid higher prices for All-Star Competitions, All-Star Apparel, and related goods and services bought directly from Varsity than they would have paid in a competitive marketplace absent the Exclusionary Scheme, and have thereby suffered, and continue to suffer, antitrust injury.

## II.    JURISDICTION AND VENUE

17.     Plaintiffs and the Class bring this action against Defendants under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, seeking equitable and injunctive relief and actual and exemplary damages against Varsity for violating Section 2 of the Sherman Act, 15 U.S.C. § 2. Plaintiffs and the Class also seek attorneys' fees, costs, and all other expenses allowed under federal law.

18.     This Court has jurisdiction over the subject matter of this action pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), Section 2 of the Sherman Act (15 U.S.C. § 2), and 28 U.S.C. §§ 1331 and 1337.

19.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and Defendants are licensed

---

[8] Varsity Brands Founder On The Big Business Of Cheerleading, *Chief Executive Magazine* (Oct. 29, 2018), *available at* https://chiefexecutive.net/varsity-brands-big-business-cheerleading/ .

to do business in, are doing business in, had agents in, or are found or transact business in this District.

20.     This Court has *in personam* jurisdiction over Defendants because they, either directly or through the ownership and/or control of their subsidiaries, *inter alia*: (a) transacted business in the United States, including in this District; (b) directly sold or marketed goods and services in the Relevant Markets throughout the United States as a whole, including in this District; (c) had substantial aggregate contacts within the United States, including in this District; or (d) engaged in an illegal scheme to maintain and enhance monopoly power that was directed at, and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants also conduct business throughout the United States, including in this District, and they have purposefully availed themselves of the laws of the United States.

21.     Defendants engaged in conduct inside the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

22.     Defendants' activities were within the flow of, and were intended to and did have a substantial effect on, interstate commerce of the United States. Defendants' products and services are sold in the flow of interstate commerce.

23.     By reason of the unlawful activities hereinafter alleged, Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiffs and the geographically dispersed Class members. Defendants, directly and through their agents, engaged in activities affecting all states to obtain and maintain monopolistic power in the

Relevant Markets and charge supracompetitive prices to Plaintiffs and the Class for All-Star Competitions and All-Star Apparel, unreasonably restrained trade, and adversely affected the above-described markets.

## III.   PARTIES

24.     Plaintiff Fusion is incorporated in the State of California and has its primary place of business in Hollister, California. Plaintiff Fusion is, and all relevant times hereto has been, an All-Star Gym sponsoring an All-Star Team. Plaintiff Fusion directly and repeatedly purchased All-Star Apparel manufactured and sold by Varsity during the Class Period (defined below). Plaintiff Fusion directly and repeatedly paid Varsity for enrollment in All-Star Competitions during the Class Period. Plaintiff Fusion paid artificially inflated prices for goods and services purchased directly from Varsity in both of the Relevant Markets and thus has suffered, and will continue to suffer, economic harm and damages as a direct and proximate result of Varsity's unlawful conduct.

25.     Plaintiff Spirit Factor is incorporated in the State of Florida and has its primary place of business in Altamonte Springs, Florida. Plaintiff Spirit Factor is, and all relevant times hereto has been, an All-Star Gym sponsoring an All-Star Team. Plaintiff Spirit Factor directly and repeatedly purchased All-Star Apparel manufactured and sold by Varsity during the Class Period (defined below). Plaintiff Spirit Factor directly and repeatedly paid Varsity for enrollment in All-Star Competitions during the Class Period. Plaintiff Spirit Factor paid artificially inflated prices for goods and services purchased directly from Varsity in both of the Relevant Markets, and thus has suffered and will continue to suffer economic harm and damages as a direct and proximate result of Defendants' unlawful conduct.

26.     Plaintiff Stars & Stripes is incorporated in Michigan and has its primary place of business in Clarkston, Michigan. Plaintiff Stars & Stripes directly and repeatedly purchased All-Star Apparel manufactured and sold by Varsity during the Class Period (defined below). Plaintiff

Stars & Stripes directly and repeatedly paid Varsity for enrollment in All-Star Competitions during the Class Period. Plaintiff Stars & Stripes paid artificially inflated prices for goods and services purchased directly from Varsity in both of the Relevant Markets, and thus has suffered economic harm and damages as a direct and proximate result of Defendants' unlawful conduct.

27.     Defendant Varsity Brands—formally known as Varsity Brands, Inc.—is a Delaware corporation with its principal place of business in Memphis, Tennessee. It is the parent company of Defendants Varsity Spirit and Varsity Fashion. Varsity Brands—directly and/or through its affiliates, which it wholly owned and/or controlled—organized, promoted, produced, and/or managed All-Star Competitions throughout the United States, including in this District at all times relevant to this Complaint. Varsity Brands—directly and/or through its affiliates, which it wholly owned and/or controlled—manufactured, distributed, marketed, and/or sold All-Star Apparel that was sold and purchased throughout the United States, including in this District, at all times relevant to this Complaint.

28.     Defendant Varsity Spirit—formally known as Varsity Spirit Corp.—is a Tennessee corporation with its principal place of business in Memphis, Tennessee. Varsity Spirit—directly and/or through its affiliates, which it wholly owned and/or controlled—organized, promoted, produced, and/or managed All-Star Competitions throughout the United States, including in this District at all times relevant to this Complaint. Varsity Spirit—directly and/or through its affiliates, which it wholly owned and/or controlled—manufactured, distributed, marketed, and/or sold All-Star Apparel that was sold and purchased throughout the United States, including in this District at all times relevant to this Complaint.

29.     Defendant Varsity Fashion—formally known as Varsity Spirit Fashion & Supplies Inc.—is a Minnesota corporation with its principal place of business in Memphis, Tennessee.

10

Varsity Fashion—directly and/or through its affiliates, which it wholly owned and/or controlled—organized, promoted, produced, and/or managed All-Star Competitions throughout the United States, including in this District, at all times relevant to this Complaint. Varsity Fashion—directly and/or through its affiliates, which it wholly owned and/or controlled—manufactured, distributed, marketed, and/or sold All-Star Apparel that was sold and purchased throughout the United States, including in this District at all times relevant to this Complaint.

30.     Varsity has been privately held since 2003. It was acquired by its current owner, Bain Capital, LP, in 2018 for approximately $2.5 billion.

31.     Defendant USASF is a Tennessee non-profit corporation with its principal place of business in Memphis, Tennessee. USASF—directly and/or through its affiliates, which it wholly owns and/or controls—has promulgated and/or enforced rules governing All-Star Competitions and, more broadly, the sport of All-Star Cheer throughout the United States, including in this District at all times relevant to this Complaint. USASF—directly and/or through its affiliates, which it wholly owns and/or controls—organized, promoted, produced, and/or managed All-Star Competitions throughout the United States, including in this District at all times relevant to this Complaint.

## IV.   CLASS ALLEGATIONS

32.     Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief, as well as damages, on behalf of the following class (the "Class"):

> All natural persons or entities in the United States that directly paid Varsity or any wholly or partially owned Varsity subsidiary from May 26, 2016 until the continuing Exclusionary Scheme alleged herein ends (the "Class Period") for: (a) registration, entrance, or other fees and expenses associated with participation by an All-Star Team or Cheerleader in one or more All-Star Competitions; and/or (b) All-Star Apparel.

11

33.     Excluded from the Class are Defendants, their parent companies, subsidiaries, affiliates, franchisees, officers, executives, and employees; any entity that is or has been partially or wholly owned by one or more Defendants or their respective subsidiaries; States and their subdivisions, agencies and instrumentalities; and any judicial officer presiding over this matter and his or her staff.

34.     While Plaintiffs do not know the exact number of Class members, there are (at least) thousands of members in the Class, who are geographically dispersed throughout the United States.

35.     Common questions of law and fact exist as to all members of the Class. Defendants' anticompetitive Exclusionary Scheme commonly implicated and was generally applicable to all the Class members, thereby making class-wide adjudication and relief appropriate. Such questions of law and fact common to the Class include, but are not limited to:

(a)     whether the All-Star Competition and All-Star Apparel Markets are appropriate relevant markets for analyzing the claims in this case;

(b)     whether the relevant geographic market is the United States;

(c)     whether Varsity possesses monopoly power in the Relevant Markets;

(d)     whether Varsity willfully acquired, maintained, and/or enhanced monopoly power in the Relevant Markets;

(e)     whether Varsity and USASF conspired to assist Varsity in maintaining and/or enhancing dominance in the Relevant Markets;

(f)     whether Varsity and USASF engaged in overt acts furthering their conspiracy to maintain and enhance Varsity's dominance in the Relevant Markets;

(g)     whether Defendants engaged in unlawful exclusionary conduct to impair the opportunities of actual or potential rivals in the Relevant Markets and thereby foreclosed substantial competition in those markets;

(h)     whether Defendants' Exclusionary Scheme maintained or enhanced Varsity's monopoly power in one or more of the Relevant Markets;

(i)     whether Defendants' Exclusionary Scheme violated Section 2 of the Sherman Act, 15 U.S.C. § 2;

(j)     whether Defendants' Exclusionary Scheme had anticompetitive effects in one or more of the Relevant Markets;

(k)     whether Defendants' actions alleged herein caused injury to Plaintiffs and the Class members by causing them to pay artificially inflated prices in Relevant Markets during the Class Period;

(l)     the appropriate measure of damages; and

(m)     the propriety of declaratory and injunctive relief.

36.     The Class members are so numerous and geographically dispersed that joinder of all members is impracticable. Although the precise number of such individuals, organizations, and businesses is currently unknown, Plaintiffs believe that the number of Class members is, at minimum, in the thousands, and that the members reside or are located throughout the United States, including in this District.

37.     Plaintiffs' claims are typical of those of the Class they seek to represent. Plaintiffs, like all other Class members, have been injured by Defendants' Exclusionary Scheme and Varsity's illegally obtained monopoly power that resulted in artificially inflated prices in the Relevant Markets.

38.     Plaintiffs are more than adequate representatives of the Class, and their chosen class counsel (the undersigned) are more than adequate attorneys. Plaintiffs have the incentive and commitment to prosecute this action for the benefit of the Class. Plaintiffs have no interests that are antagonistic to those of the Class. Plaintiffs have retained counsel highly experienced in antitrust and class action litigation.

39.     This action is maintainable as a class action under Fed. R. Civ. P. 23(b)(2) because Defendants have acted and refused to act on grounds that apply generally to the Class, and final injunctive and declaratory relief is appropriate, and necessary, with respect to the Class as a whole.

40.     This action is maintainable as a class action under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment of this case as a class action will permit a large number of similarly situated persons, organizations, and businesses to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by many class members who otherwise could not afford to litigate an antitrust claim such as that asserted in this Complaint. Plaintiffs are aware of no difficulties that would render this case unmanageable.

41.     Plaintiffs and the members of the Class have all suffered antitrust injury and damages as a result of Defendants' Exclusionary Scheme and Varsity's acquisition, enhancement, or maintenance of monopoly power in the Relevant Markets. Such antitrust injury and damages are ongoing.

42.     Plaintiffs are not suing as part of this case, on behalf of themselves or any proposed Class member, to enforce any rights or provisions in any particular contracts they had with Varsity or USASF. Nor are Plaintiffs in this matter claiming, as part of this case, on behalf of themselves or any proposed Class member, that their Varsity or USASF contract, standing alone, violates or violated the antitrust laws. Rather, Plaintiffs allege that the Varsity contracts with All-Star Gyms—and one or more of the exclusionary provisions therein—taken together form part of Varsity's Exclusionary Scheme to impair actual or potential rivals and enhance its monopoly power in both Relevant Markets. Cumulatively, the exclusionary contractual provisions, together with other aspects of the Scheme, deprived Varsity's would-be rivals of access to critical inputs and to customers in both Relevant Markets, and thereby foreclosed competition, and caused anticompetitive effects in both markets.

## V.      AGENTS & CO-CONSPIRATORS

43.     The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' business or affairs.

44.     Various persons and/or firms not named as defendants herein may have participated as co-conspirators in the Exclusionary Scheme alleged herein and may have performed acts and made statements in furtherance thereof. Plaintiffs reserve the right to name some or all of these persons as defendants at a later date.

45.     At all times relevant to this Complaint, Varsity and USASF conspired to facilitate Varsity's monopolization of the Relevant Markets.

46.     Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively

engaged in the management, direction, control, or transaction of the corporation's business or affairs.

47.     Each defendant acted as the principal, agent, or joint venturer of, or for, other defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiffs.

48.     Individuals alleged to have engaged in misconduct in violation of the federal laws listed herein are alleged to have done so on behalf of all members of their corporate family, *i.e.*, Varsity. Individuals within the companies and customers did not know or did not distinguish between the corporate affiliations of different individuals. Varsity Brands, Varsity Spirit, and Varsity Fashion all affirmatively and collectively represent themselves as one corporate family, rather than separate subsidiaries and parents. For instance, and without limitation, the Varsity Brands website states "WE ARE…Varsity Spirit."

## VI.     INTERSTATE TRADE & COMMERCE

49.     Defendants' anticompetitive and unlawful conduct as alleged herein has taken place in and affected the continuous flow of interstate trade and commerce in the United States by:

(a)     organizing, promoting, and managing All-Star Competitions throughout the United States; and

(b)     manufacturing, distributing, marketing, and selling All-Star Apparel throughout the United States.

50.     The Challenged Conduct alleged herein affected billions of dollars of commerce. During the Class Period, Varsity collectively controlled approximately 90% of the All-Star Competition Market and 80% of the All-Star Apparel Market in the United States. Plaintiffs and the proposed Class members collectively paid hundreds of millions of dollars directly to Varsity for All-Star Competitions and Apparel. Defendants have inflicted antitrust injury by foreclosing competition by actual and potential rivals and artificially inflating prices paid by Plaintiffs and the

16

Class members, all of whom have been engaged in commerce, in both Relevant Markets, within the Class Period.

## VII.   FACTUAL ALLEGATIONS

### A.   History & Background.

51.     Between 100,000 and 450,000 athletes participate in All-Star Cheer.[9] All-Star Cheer is athletically rigorous and technically challenging. It requires a significant amount of strength, flexibility, endurance, effort, coordination, and cooperative teamwork. All-Star Team membership typically costs between $3,000 and $6,000 per season for a single All-Star Cheerleader.

52.     All-Star Competitions are typically one- or two-day events hosted on weekends. The All-Star Teams often travel great distances, either regionally or nationally, depending on the event. All-Star Cheerleaders practice for multiple hours a week, all year long, to perfect their performances for about half a dozen of these events each year.

53.     The number of All-Star Teams that attend All-Star Competitions can vary from 50 to 500 teams. Varsity alone puts on over 600 cheerleading competitions across the country annually. The events attract some 900,000 participants, including hundreds of All-Star Gyms.[10] Varsity hosts one event in Myrtle Beach, for example, that brings in 500 teams annually. Two-day events tend to have more teams than one-day events, which typically have between 50 and 100 teams. The maximum number of All-Star Cheerleaders that can participate on one All-Star Team at a competition depends on the division and age group, but can be as high as 38 people.

---

[9] USA Cheer STUNT NCAA Proposal 2011 at 43, *available at* https://files.varsity.com/uploads/pdfs/USACheer_STUNT_videolinkSM.pdf.

[10] https://www.investors.com/news/management/leaders-and-success/varsity-brands-jeff-webb-rebranded-cheerleading-with-focus-on-athleticism-entertainment/.

54.     All-Star Competition producers such as Varsity charge All-Star Gyms registration fees to enter the Gyms' All-Star Teams in All-Star Competitions. While these participation fees often are calculated on a per-Cheerleader basis, they are charged to—and paid directly by—All-Star Gyms. Varsity also leverages the participation of All-Star Teams in its All-Star Competitions into additional revenue streams, including All-Star Apparel sales, spectator fees, kickbacks from partner hotels, and music licensing-related fees.

### 1.     The Origins of All-Star Cheer.

55.     Lawrence Herkimer, known as the father of modern cheerleading, founded the National Cheerleaders Association ("NCA") in 1948. Herkimer patented the pom-pom and created the "Herkie jump," one of the earliest athletic components added to cheer, while attending Southern Methodist University. Under Herkimer, the NCA ran cheer camps and sold sweaters and skirts. At the time, there were no cheerleading competitions, nor did All-Star Cheer exist.[11]

56.     Jeff Webb, Varsity's founder and former CEO, went to work at the NCA after completing his cheerleading career at the University of Oklahoma in the late 1960s. Webb quickly rose up the ranks, but his view of cheerleading's future differed from Herkimer's. While Herkimer explained to Sports Illustrated in 1991 that "[o]ur people are teachers, not showoffs," Webb "hired hot dogs." In 1974, Webb left the NCA and took some of Herkimer's top employees with him to form his own cheerleading business, the Universal Cheerleaders Association ("UCA"), which was similar to the NCA but with Webb's own added twists: more focus on gymnastics-like skills and new tournaments created solely for cheer squads.[12]

---

[11] https://www.houstonpress.com/news/varsity-brands-owns-cheerleading-and-fights-to-keep-it-from-becoming-an-official-sport-7606297.

[12] *Id.*

57.     During the early 1980s, a number of cheerleading squads not associated with a school or a sports league, whose main objective was competition, began to emerge. The first organization to call its participants "All-Stars" and go to competitions was the Q94 Rockers from Richmond, Virginia, founded in 1982. Prior to 1987, the NCA placed All-Star Teams into the same divisions as teams that represented schools and sports leagues. In 1986, the NCA created a separate division for teams lacking a sponsoring school or athletic association, calling it the All-Star Division and debuting it at its 1987 cheer competitions. As the popularity of this type of "All-Star" team grew, more and more of them were formed, attending competitions sponsored by many different organizations and companies, each using its own set of rules, regulations, and divisions.[13]

### 2.     The Modern Era.

58.     Webb's new business, the UCA, ultimately became Varsity, and soon outgrew its only rival, Herkimer's NCA.

59.     In 2003, cheerleading coaches formed an independent 501(c)(3) organization, called the National All-Star Cheerleading Coaches Congress (NACCC), to establish uniform rules for All-Star Cheer. In 2004, Varsity—along with the NCA, CheerSport, and America's Best—created the USASF with the same goal of setting uniform rules and judging standards for All-Star Competitions.[14] Defendant USASF soon thereafter acquired NACCC in 2005. USASF hosts the Worlds, which was held for the first time on April 24, 2004.[15]

---

[13] Smith, Jennifer Renèe, "The All-Star Chronicles," American Cheerleader, 13 (1): 40-42 (Feb. 2007).

[14] Varsity was operating as the UCA when it founded USASF. Since USASF's formation, Varsity has acquired all of USASF's founders—NCA, CheerSport, and America's Best.

[15] http://www.usasf.net/worlds/championship/.

60.     USASF has always been captive to Varsity. Varsity funded the USASF at its inception with a $1.8 million interest-free loan. USASF previously shared a corporate address with Varsity. Varsity owned the USASF trademarks until 2017. Until recently, USASF employees worked at Varsity's headquarters in Tennessee, and USASF's office is currently still mere miles away from Varsity's headquarters.

61.     For at least some period of time, USASF's and Varsity's finances were intermingled such that USASF employees received their paychecks from Varsity. In accordance with the explicit bylaws of USASF, a permanent majority of USASF's voting board members are allocated to seven All-Star Competition brands (UCA, CheerSport, NCA, USA, American Cheerleaders Association, Universal Dance Association, and JAMFest). Varsity currently owns *all* of these brands.

62.     There are three recognized championships for All-Star Cheerleading ("All-Star Championships"): Worlds, The Summit, and the U.S. Finals. The Summit and U.S. Finals are owned, produced, and promoted by Varsity. The Worlds is owned, produced, and promoted by USASF, which is controlled by Varsity. The Worlds is held at Walt Disney World every April for the best All-Star Teams. While a scattering of teams from other countries attend the event, the teams from the United States have largely dominated attendance at the competition.

63.     "Bids" are highly coveted formal invitations to compete in these All-Star Championships. All-Star Teams cannot attend the All-Star Championships without one. Thus, earning Bids to All-Star Championships (particularly Worlds), and ultimately succeeding at those All-Star Championships, is the primary goal of All-Star Teams. All-Star Teams earn these Bids by attending and succeeding at All-Star Competitions.

64.     Bids can be Fully Paid which, as the name implies, means the All-Star Competition producer pays the All-Star Team's entry fees and all travel and hotel costs; Partially Paid, meaning the All-Star Competition producer pays only a partial amount (typically covering entry fees but not travel or hotel costs); or At-Large, meaning the All-Star Team can compete but must pay its own way. All-Star Competition producers with the rights to confer the Bids determine how those Bids are awarded. Typically, Fully Paid Bids are awarded to first place winners of major USASF-sanctioned All-Star Competitions. Partially Paid and At-Large Bids are earned by All-Star Teams at other USASF-sanctioned All-Star Competitions.

65.     USASF, under the control of Varsity, decides which All-Star Competitions have the right to award Bids to Worlds. Varsity and USASF severely restrict competition in the All-Star Competition Market by limiting the number of All-Star Competitions that can produce Bids to Worlds at 42. Varsity owns 33 of the All-Star Competitions with the right to award Bids to Worlds. USASF also allocates the *number* of Bids that each of those 42 All-Star Competitions may award, and each All-Star Competition may award 2 to 8 Bids. USASF has awarded Varsity the vast majority, so Varsity controls 80% of Worlds' Bids.

66.     Varsity decides which All-Star Competitions have the authority to award Bids to The Summit and the U.S. Finals. Varsity uses its market dominance to restrict competition by allocating 100% of The Summit and U.S. Finals Bids to the All-Star Competitions it owns and operates.

67.     Varsity uses its dominance of the All-Star Competition Market, its control of USASF, and its control of All-Star Championship Bids, combined with the other conduct that is part of the Exclusionary Scheme, to ensure that All-Star Teams will attend Varsity's entry-level All-Star Competitions rather than those owned and produced by Varsity's competitors.

68.     Varsity also uses its control of USASF, among other ways, to direct judges at All-Star Competitions to modify penalties and scoring for competitors at All-Star Competitions, and thereby to assist those All-Star Gyms that agree to patronize Varsity exclusively to win events and secure coveted Bids to All-Star Championships.

69.     USASF is a "member" of USA Cheer.[16] USA Cheer shares its address and telephone number with Varsity and does not have any employees. Instead, it contracts with Varsity Spirit to use Varsity's employees as needed. The USA Cheer President, Bill Seely, is also the President of Varsity Spirit. Two of the three USASF Vice Presidents and the Executive Director are current and former Varsity employees.

70.     According to USA Cheer, "most" All-Star Gyms, All-Star Teams, and All-Star Competitions "are under the umbrella of" USASF,[17] meaning that USASF rules govern most All-Star Gyms, All-Star Teams, and All-Star Competitions. USASF uses that control to require that All-Star Gyms, All-Star Cheerleaders, and All-Star Team coaches join USASF and pay annual membership dues to participate in USASF-sanctioned All-Star Competitions, primarily those owned and produced by Varsity.

71.     In 2004, Varsity bought the National Spirit Group, thereby acquiring ownership and control of Herkimer's NCA.[18]

72.     In 2007, Varsity founded the nonprofit International Cheer Union ("ICU"), which acts as cheerleading's international governing body. ICU was created to assist and encourage

---

[16] https://www.usacheer.org/allstar.

[17] *Id.*

[18] https://www.houstonpress.com/news/varsity-brands-owns-cheerleading-and-fights-to-keep-it-from-becoming-an-official-sport-7606297.

global development of cheerleading. Varsity provided the initial financial support for the launch of the ICU, similar to how it initially funded USASF.[19]

73.     Prior to 2016, The JAM Brands was an Independent Event Producer ("IEP") in the United States and Varsity's chief competitor. The JAM Brands produced All-Star Competitions that included divisions for high school, college, and All-Star Teams, as well as recreational divisions. The JAM Brands owned Cheerleaders of America ("COA"), a major IEP in Ohio. The JAM Brands also owned America's Best, an IEP in Texas.

74.     The JAM Brands produced many of the largest and most popular All-Star Competitions in the United States, including The MAJORS and The U.S. Finals, one of the most coveted All-Star Championships.  It also owned All-Star Competitions that awarded 24 of the Bids to Worlds. Moreover, The JAM Brands produced an All-Star Competition branded as "JAMFest Cheer Super Nationals," at which over 550 All-Star Teams competed.  In addition, The JAM Brands was a disruptive and aggressive competitor, introducing new event concepts that competed directly with Varsity's All-Star Competitions.  Prior to its acquisition by Varsity, The JAM Brands generally offered free admission to event spectators, many of whom are the parents and other family members of the Cheerleaders.

75.     Varsity and The JAM Brands announced their pending merger in November 2015. In a letter to All-Star Gym owners, Varsity assured them, "For you as a customer, nothing will change."  Plaintiffs and the Class saw increases in All-Star Competitions registration fees a year later.

76.     In addition, with the acquisition of The JAM Brands, Varsity also gained control over The JAM Brands' board seats on the USASF and the International All Star Federation

---

[19] *Id.*

("IASF"), solidifying Varsity's control over the major sanctioning bodies that regulate competitive

All-Star Cheer and allowing Varsity to use those regulating bodies to foreclose competitors from

the Relevant Markets, as discussed below.

77.    One article described the situation as follows:

The Alliance's birth coincided with one of Varsity's most audacious moves—and
for [rival All-Star Apparel manufacturer] Rebel, its most shattering. In October,
Varsity—in a deal widely criticized on industry chat boards—acquired JAM
Brands, the second-largest event producer and by far Rebel's most important
marketing partner. Just a few months earlier, JAM Brands co-owner Dan Kessler
had explained why his company had chosen Rebel to be its exclusive uniform
sponsor. "They were edgy. The look was real," said Kessler. "We felt there was
some good synergy there."

That synergy vanished last fall, while Rebel was negotiating to renew the
partnership. "Suddenly those talks just fell apart," says Noseff Aldridge. A few
weeks later, Varsity and JAM Brands announced their union. JAM Brands ran most
of the high-profile competitions that Varsity doesn't own. Together, they control
roughly 90 percent of the major events, say competitors.[20]

78.    Prior to Varsity's spate of All-Star Competition acquisitions, there were still a

number of "independent" All-Star Competition producers, known as "Independent Event

Producers" or "IEPs," left in the All-Star Competition Market, including: All Star Challenge;

Aloha Productions; America Cheer Express; American Spirit Championships; Cheer America;

Cheer Ltd.; CheerSport; Cheer Tech; COA Cheer & Dance; Connecticut Spirit Association;

Golden State Spirit Association; JAMZ Cheer and Dance; Mardi Gras Spirit Events; Nation's Best;

Pac West Spirit Group; Spirit Cheer; Universal Spirit; UPA; US Spirit; Valley of the Sun; WCA;

Worldwide Spirit Association; and Xtreme Spirit. Now, as a result of Defendants' Scheme, which

included, *inter alia*, acquisitions of The JAM Brands and other independent event producers,

Varsity owns at least twelve of these All-Star Competitions and has relegated the rest to "B

---

[20] https://slate.com/business/2016/02/rebel-wants-to-disrupt-the-surprisingly-entrenched-cheerleader-uniform-industry.html.

League" status through the Exclusionary Scheme, rendering the remaining potential rivals in the All-Star Competition Market incapable of challenging Varsity's dominance.

### 3. All-Star Apparel.

79. All-Star Apparel is an important aspect of All-Star Competitions. USASF rules govern every detail of what All-Star Cheerleaders may wear in a competition.[21] Soft-soled shoes— like those Varsity manufactures and sells—are required. Skirts, briefs, and shorts must meet inseam guidelines. Exposed midriffs are forbidden for certain age groups, and tops must be secured over at least one shoulder. Bows cannot be "excessive size," jewelry is forbidden, and makeup must be "uniform and appropriate."

80. Varsity entered the All-Star Apparel Market in 1980. Since then, Varsity has, through its Exclusionary Scheme, gained an 80% share of the All-Star Apparel Market. As part of the Scheme, Varsity has used its monopoly power in the All-Star Competition Market to: (a) cause All-Star Gyms to enter into exclusive dealing agreements and rebate programs—including Varsity's Family Plan and Network Agreements—which make buying from non-Varsity All-Star Apparel competitors prohibitively expensive; (b) exclude All-Star Apparel competitors from the merchandise showrooms at their All-Star Competitions; (c) acquire (and often dissolve) All-Star Apparel competitors; and (d) through its influence with the captured USASF, cause the judges to advantage All-Star Teams that wear Varsity apparel.

81. As one article describes, "Thanks to an aggressive campaign of acquisitions, rebate plans that make it expensive for gym owners to switch suppliers, and other strategies, Varsity

---

[21] http://rules.usasfmembers.net/wp-content/uploads/2019/08/USASF_Cheer_Rules_Overview_19-20.pdf?__hstc=138832364.efed7d8f1c830aa60b7954df8534ed2a.1587669506683.1587669506683.1587746180666.2&__hssc=138832364.3.1587746180666&__hsfp=612696179.

Spirit, the corporation's cheer division, commands north of 80 percent of the uniform market, as estimated by competitors. The company also wields outsize influence in virtually every aspect of the industry, including the camps and—most important—the competitions, which also serve as merchandise showrooms for apparel vendors."[22]

### B.      Varsity's Monopoly Power in the Two Relevant Antitrust Markets.

#### 1.      Monopoly Power in the All-Star Competition Market (the Primary Market).

##### a.      The Relevant All-Star Competition Market.

82.      All-Star Competitions are events at which All-Star Teams perform time-limited routines composed of tumbling, stunting, pyramids, and dance segments. Tumbling involves gymnastic skills like cartwheels and back handsprings. Stunting refers to a group of two or more individuals that elevate another cheerleader in the air. Pyramids are a form of interconnected stunting that involve a large group. Dance is a portion of a routine that consists of choreographed high energy dance moves. The routines are performed and scored against other All-Star Teams at various local, regional, national, and worldwide competitions.[23]

83.      All-Star Competitions involve All-Star Teams with participants from a wide variety of age groups, from preschool through college and beyond. But, importantly, All-Star Competitions do not involve sideline cheerleading, and they are not sponsored by, or associated with, particular schools or school associations (like the NCAA). All-Star Competitions, instead, are organized by All-Star Gyms, which are central to the sport. The participants typically compete in divisions defined by the USASF.

---

[22] https://slate.com/business/2016/02/rebel-wants-to-disrupt-the-surprisingly-entrenched-cheerleader-uniform-industry.html.

[23] https://usasf.net.ismmedia.com/ISM2/ParentsActionCommittee/Cheer_Parents_101.pdf.

84.     Suppliers in the All-Star Competition Market are All-Star Competition producers. Varsity is the primary supplier in the All-Star Competition Market. According to the Varsity website, it offers "over 40 brands" of All-Star Competitions and "over 500 regional, national, and end-of-season events."[24] Varsity's All-Star Competitions are all sanctioned by USASF.

85.     All-Star Gyms directly pay All-Star Competition producers, either Varsity or Independent Event Producers, registration fees to enter All-Star Competitions leading up to All-Star Championships. From the perspective of All-Star Gyms, All-Star Competitions lack close economic substitutes that could constrain their pricing, for, *e.g.*, entry fees and other associated costs, to competitive levels.

86.     All-Star Cheerleaders train vigorously for All-Star Competitions that showcase their unique combination of talents, which draw from cheerleading, dance, and gymnastic routines. All-Star Gyms and their All-Star Teams would not redeploy their talents to competitive gymnastics, sideline cheer, dance, or any other sport or pastime, in response to a small but significant non-transitory increase in the price of attending All-Star Competitions. Thus, a hypothetical monopoly seller or producer of All-Star Competitions would not need to control gymnastics, dance events, other kinds of cheer events (including, *e.g.*, sideline cheerleading), or other pastimes, to raise the registration fees and other associated costs for attending All-Star Competitions profitably above competitive levels.

87.     The USASF—controlled by Varsity—serves as the governing body that recommends and implements rules and regulations for All-Star Competitions. According to

---

[24] https://www.varsity.com/all-star/competitions/why-varsity-competitions/.

USASF rules, All-Star Competitions are segmented into levels and divisions. Levels are based purely based on skill, not on age.[25]

88.     Sideline cheerleading is not a functional or economic substitute for All-Star Competitions. The main difference between sideline cheerleading and All-Star Competitions is that a sideline cheerleading squad's primary purpose is to support a local school's sports team and keep the crowd excited. Membership on a sideline team is conditioned on enrollment at the school with which it is affiliated. All-Star Teams do not cheer for games or for other teams. The sideline team competitions are also separate and distinct from All-Star Competitions. They typically take place on a non-spring-loaded floor, often on the sidelines of hardwood basketball courts or football fields, rather than the open spring-loaded floors used by All-Star Teams and involve fewer stunts and less rigorous tumbling, so the skill set required for All-Star Competitions is much more advanced than that required for sideline cheerleading.[26] There is also a crowd-leading component to sideline cheer not present at All-Star Competitions.

89.     Other recreational cheerleading programs such as Pop Warner and Bill George Youth Football are not functionally or economically substitutable with All-Star Competitions. Cheerleaders in these other programs are taught the basics of cheer and compete only occasionally against other recreation teams within the same program. Often, the more talented cheerleaders from these programs "graduate" to an All-Star Team in search of a more challenging cheer environment that focuses more on their skills and accomplishments, rather than the standing of their relative football teams.[27]

---

[25] https://usasf.net.ismmedia.com/ISM2//Member%20Documents%2009_10_Age_Grid.pdf.

[26] https://usasf.net.ismmedia.com/ISM2/ParentsActionCommittee/Cheer_Parents_101.pdf.

[27] *Id.*

90.     Gymnastic competitions are not functional or economic substitutes for All-Star Competitions. All-Star Competitions involve multiple athletes performing synchronized movements in a confined area that limits the types of movements that can be performed by participants, requiring an emphasis on different skills than gymnastics. In addition, All-Star Teams consist of various body types and have different positions that require different skill sets, such as the base, the flyer, the spotter, and the tumbler. Most athletes will be taller than the average gymnast—providing opportunities to compete for individuals who do not possess classic gymnast bodies.[28]

91.     College-level competitive dance and acrobatic events, such as Varsity-backed STUNT and NCATA-backed Acrobatics & Tumbling, are not functional or economic substitutes for All-Star Competitions. By seeking to create NCAA-sanctioned sports, Varsity and the National Collegiate Acrobatics and Tumbling Association ("NCATA") have identified such college-level competitive dance and acrobatic events as complements to All-Star Competitions rather than substitutes. As one USA Cheer publication explained, "STUNT should grow the total number of young people participating in all forms of Cheer…once STUNT is fully adopted as an NCAA sport, the number of collegiate scholarships available to Cheer athletes should increase more than tenfold. This will potentially create huge interest in skill development and competitive experience, and All-Star Gyms have a tremendous opportunity to provide these services." In addition, unlike All-Star Cheer, STUNT and Acrobatics & Tumbling only involve female athletes as they are both "Emerging Sports" seeking full protection under Title IX.

92.     In addition, STUNT is essentially owned by Varsity. It was started in 2011, funded by Varsity, and is run by USA Cheer—another Varsity-controlled organization.

---

[28] https://usagym.org/pages/home/publications/technique/2002/7/cheergymnastics.pdf.

### b.    The Relevant Geographic Market.

93.    The relevant geographic market is the United States. All-Star Teams compete nationwide to receive Bids to attend All-Star Championships.

94.    While there is an international division in USASF that can produce Bids to Worlds, U.S. All-Star Gyms do not regularly send teams to All-Star Competitions abroad, in part due to the expense of international travel. When All-Star Gyms do compete internationally, it is not a part of the regular season, but rather, a special event put on to give children and young adults an opportunity to travel (similar to an exchange program).

95.    International cheer competitions are also subject to different rules than U.S. competitions, making participants far less likely to attend them.

96.    International cheer competitions are not functional or economic substitutes for U.S. All-Star Competitions. A small but significant and non-transitory increase in the price of participating in U.S. All-Star Competitions would not cause participants to seek out international competitions.

### c.    Varsity Has Monopoly Power as a Dominant Supplier in the All-Star Competition Market.

97.    Varsity has, at all relevant times, possessed monopoly power in the market for the production of All-Star Competitions.

98.    Varsity has maintained and enhanced its monopoly power in the market for the production of All-Star Competitions through the anticompetitive conduct alleged herein. Varsity possesses the ability to control, maintain, and increase prices associated with the production of All-Star Competitions above competitive levels and the ability to impair and exclude competitors from producing All-Star Competitions. Varsity has elevated prices charged for registering for and attending Varsity All-Star Competitions substantially above competitive levels, and restricted

output in the All-Star Competition Market, during the Class Period. Varsity has the ability to foreclose, and has in fact foreclosed, actual and would-be rivals from competing in the market for producing All-Star Competitions.

99.     In 2010, Varsity controlled approximately 50% of the revenues in the All-Star Competition Market.[29] After Varsity acquired The JAM Brands in 2015, it controlled approximately 90% of the revenues in that market for All-Star Competitions in the United States. As detailed in the magazine *Inc.*, prior to the merger, "JAM Brands ran most of the high-profile competitions that Varsity doesn't own. Together, they control roughly 90 percent of the major events, say competitors."

100.    In addition, Varsity controls two of the three All-Star Championships in the United States. It also controls the USASF board that decides how Bids are awarded to the third All-Star Championship, Worlds. All-Star Teams from the top All-Star Gyms seek coveted Bids to these championship events, and Varsity controls the vast majority of the All-Star Competition producers that have been granted rights by the USASF to disburse such Bids.

101.    Varsity's tag line illustrates its dominance: "We are cheerleading."[30]

### d.      Barriers to Entry.

102.    The All-Star Competition Market has high barriers to entry that were reinforced and bolstered by the Exclusionary Scheme as alleged herein.

---

[29] Webb testimony in *Biediger vs. Quinnipiac*, June 22, 2010.

[30] "The Business of Cheer," Fortune (Dec. 21, 2012).

### i.   Natural Barriers to Entry.

103.    An All-Star Competition event producer must have access to capital in order to rent venues, perform adequate marketing, and pay employees, travel costs, and the variety of other expenses associated with the All-Star Competition business.

104.    An All-Star Competition producer must also have access to a critical mass of All-Star Teams, particularly the best All-Star Teams, as All-Star Cheerleaders desire the challenge and recognition that comes with competing against the best in the sport.

105.    All-Star Competition producers must also have access to judges, in order to hold their competitions, and advertising, in order to carry out all of its other functions.

### ii.   Barriers Created by the Exclusionary Scheme.

106.    As alleged herein, Varsity has used the Exclusionary Scheme to erect insurmountable barriers to entry which, together with the natural barriers, insulate Varsity from competition. To enter the All-Star Competition Market, event producers must have access to the uniform set of rules used by other competitions in the league, as no All-Star team wants to learn a new set of rules to compete in just one competition. However, USASF refuses non-member IEPs, Varsity's competitors, from having access to its rules, claiming as a pretext that the rules are subject to trademark and copyright protections.

107.    To be viable in the All-Star Competition Market, event producers must also be able to offer Bids to the All-Star Championships. However, USASF and Varsity have conspired to limit the number of All-Star Competitions that can award these Bids. Varsity owns and controls 33 of the 42 All-Star Competitions that can award Bids to Worlds and to all of the All-Star Competitions that can award Bids to The Summit and U.S. Finals. As a result, a new competitor in the All-Star Competition Market is unlikely to be able to offer Bids and thus immediately would be rendered competitively irrelevant.

108.    All-Star Gyms must be members of the USASF in order to compete in USASF-sponsored All-Star Competitions. This accreditation carries with it a requirement that the All-Star Gyms report all events they attend to USASF. Varsity and USASF representatives then pressure the All-Star Gyms to go only to USASF-sanctioned events, 42% of which are produced by Varsity.

109.    The access of any IEP to All-Star Gyms is further restricted by the USASF-preferred insurer, K&K, which charges All-Star Gyms thousands of dollars more, per year, for its insurance, if Gyms attend non-USASF events. In addition, K&K requires covered All-Star Gyms to be USASF members. The rates for USASF member Gyms are between $19 and $24.55 per All-Star Cheerleader, but they increase to $34 per Cheerleader if the All-Star Gym enters its All-Star Team in even a single competition that is not sanctioned by USASF.

110.    As alleged further below, IEP access to All-Star Gyms is further limited by the Network Agreement and Family Plan, which require Gyms to devote a large share of their allotted competitive season to Varsity's All-Star Competitions and also to spend a certain sum (usually tens of thousands of dollars) on Varsity All-Star Apparel each year to qualify for non-penalty prices on Varsity competitions and apparel.

### 2. Monopoly Power in the All-Star Apparel Market (the Ancillary Market).

#### a. The Relevant All-Star Apparel Market.

111.    All-Star Cheerleaders are required to wear specialized apparel and use specialized equipment in order to compete in All-Star Competitions. USASF rules govern every detail of this apparel, including minutia such as what direction hair bows must face and how large those bows can be.

112.     All-Star Cheerleaders also require specialized apparel and equipment for practice, and All-Star Gyms require specialized apparel and equipment for membership on their All-Star Teams.

113.     There is a relevant All-Star Apparel Market that is restricted to specialized clothing such as uniforms, warm-up outfits, and team jerseys; and specialized accessories such as hair bows and headbands; and specialized equipment such as backpacks and shoes. Because All-Star Competitions require that participants dress and accessorize in accordance with USASF rules, All-Star Gyms and their associated All-Star Team members could not shift to more generic athletic apparel in response to a small but significant and non-transitory increase in the price of All-Star Apparel. Thus, a hypothetical monopoly supplier of All-Star Apparel would not need to control any suppliers of non-All-Star Apparel in order to increase the price of All-Star Apparel substantially above competitive levels profitably.

### b.     The Relevant Geographic Market.

114.     The relevant geographic market is the United States. All performances in the primary market occur within the United States and are regulated by USASF standards set in the United States. As such, nearly all of the targeted customers for All-Star Apparel reside in the United States.

### c.     Varsity Has Monopoly Power with Respect to Sales of All-Star Apparel.

115.     Varsity has, at all relevant times, possessed monopoly power in the market for All-Star Apparel. Varsity has maintained and enhanced, and continues to maintain and enhance, its monopoly power in this market through the Challenged Conduct (as alleged in this Complaint). Varsity possesses the ability to control, maintain, and increase prices in the All-Star Apparel Market above competitive levels profitably, and the ability to impair and exclude competitors from

this Relevant Market. Varsity has in fact inflated prices of its All-Star Apparel above competitive levels during the Class Period. Varsity has the ability to foreclose, and has in fact foreclosed, would-be rivals from the All-Star Apparel Market.

116.    Varsity has assembled at least 200 copyrights on uniform design, which create a barrier to entry by subjecting potential entrants in the All-Star Apparel market to the threat of copyright lawsuits. Varsity aggressively enforces its copyrights against actual and potential rivals through trademark litigation.

117.    Varsity also maintains an opaque scoring system, where judges complete score sheets and submit them to Varsity employees for review. On information and belief, Varsity instructs judges at its competitions to reward All-Star Teams fielded by "High-Dollar" All-Star Gyms with higher scores for spending more money on Varsity's All-Star Competitions and Apparel.

118.    Varsity has gained and maintained at least an 80% share of the All-Star Apparel Market through acquisitions, exclusive dealing arrangements, and other anticompetitive and exclusionary conduct that is part of the Exclusionary Scheme alleged herein.

### d.    Barriers to Entry.

119.    There are a number of barriers to entry into the All-Star Apparel Market, including many barriers imposed and reinforced as part of the Exclusionary Scheme.

### i.    Natural Barriers to Entry.

120.    Apparel-manufacturing and marketing facilities require significant investments of capital to design, manufacture, and promote their shoes, clothing, and accessories. Equipment needed to manufacture this apparel and warehousing needed to store and distribute it are both extremely expensive and require a significant amount of sunk costs.

121.    Manufacture and sale of All-Star Apparel also requires an established distribution chain, which, if it does not already exist, takes a significant amount of time to get up and running.

122.    Designs for the All-Star Apparel are specific to that market and require specially-trained designers to create and specialty equipment to manufacture.

123.    Intellectual property provides another barrier. Any designer of All-Star Apparel must take care not to infringe the designs of any competitors who hold copyrights or trademarks, or else risk litigation. Varsity has assembled almost 200 copyrights protecting its designs and aggressively enforces those rights against actual and potential rivals.

### ii.  Barriers to Entry Imposed Through the Exclusionary Scheme.

124.    All-Star Apparel manufacturers must have a venue to showcase and sell their apparel. In the All-Star Apparel Market, the main and critical venue is All-Star Competitions. However, Varsity denies its actual and potential competitors access to the showrooms at its market-dominant All-Star competitions, depriving them of this necessary distribution venue.

125.    All-Star Apparel manufacturers must also have the ability to sell apparel that complies with All-Star Competition rules (the primary venue for such apparel). However, the USASF tailors its rules to allow the type of apparel Varsity manufactures and sells, to the exclusion of competitors' apparel. Further, USASF judges often award extra points to All-Star Teams wearing Varsity apparel, thus discouraging them from wearing the apparel of competitors.

126.    As alleged further below, Varsity's Exclusionary Scheme includes restrictive contracts with the largest-dollar volume and most prestigious All-Star Gyms that require such gyms to exclusively purchase All-Star Apparel from Varsity, foreclosing access by apparel rivals to these important customers and their All-Star Team members—who comprise a significant share

of market sales. Varsity also provides terms for all other All-Star Gyms that make it economically

unfeasible for most of them to purchase All-Star Apparel from potential rivals.

### C. Varsity's Continuing Exclusionary Scheme to Maintain and Enhance Monopoly Power in the Primary and Ancillary Relevant Markets.

#### 1. Acquisitions of Rivals.

127.     Varsity has engaged in a pattern of acquiring and then either integrating or

dissolving its competitors in the Relevant Markets for decades. These acquisitions have bolstered

Varsity's control over the All-Star Competition market as well as over significant organizations

like USA Cheer and USASF that regulate All-Star Competitions. As an open letter dated June 30,

2019 from an organization of independent gyms and coaches explained:

> The governing body [the USASF] didn't immediately turn south but it wasn't long
> after the formation that the biggest EP [Event Producer] started gobbling up smaller
> companies that had limited power in the industry. And with the companies they
> gobbled up, the more power they got within the governing body. Then the 2nd
> biggest EP [JAM Brands] started gobbling up companies to compete against the
> biggest EP [Varsity]. Then the 3rd biggest EP [Epic Brands] started gobbling up
> companies to compete against the 2nd biggest EP. Then #2 was gobbled up by #1.
> Then #3 was gobbled up by #1. All the while, any sense of independence and
> control that governing body had was gone. One company held all the cards.

#### a. Varsity Acquired Spirit Celebrations.

128.     Spirit Celebrations was an IEP that produced the second largest All-Star

Competition in Texas, called the Dallas Cowboys Cheerleader Championship.

129.     Varsity acquired Spirit Celebrations in late 2016 or 2017. After Varsity acquired

Spirit Celebrations, Varsity increased registration fees substantially. As a result of those increased

fees, participation in the Dallas Cowboys Cheerleader Championships dropped from 400 teams to

150 teams.

### b.    Varsity Acquired Epic Brands.

130.    Varsity acquired Epic Brands, the second largest IEP in the U.S., in January 2018. Epic had the largest presence in Chicago and the Northeast. Epic also had the right to distribute 12 Bids to the Worlds.

### 2.    Varsity's Exclusionary Contracts and Terms of Dealing with All-Star Gyms.

131.    Varsity uses its dominance of the All-Star Competition Market to maintain and enhance its control over the All-Star Competition Market as well as to acquire, enhance, and maintain its monopoly power in the All-Star Apparel Market.

132.    One of the main means by which Varsity maintained and enhanced its monopoly power in the Relevant Markets is by imposing exclusionary contracts and terms of dealing on All-Star Gyms. All-Star Gyms recruit, train, organize, and maintain All-Star Cheer Teams. All-Star Gyms also select the All-Star Competitions to attend and make purchasing decisions regarding the All-Star Apparel to be used by their teams. As such, All-Star Gyms are a key input for producing a successful All-Star Competition, and the primary and necessary distribution channel for All-Star Apparel.

133.    Moreover, there are certain All-Star Gyms that, because of their reputations and size, are more significant players in the industry than others. Varsity knew that by inducing All-Star Gyms to agree to buy from Varsity exclusively or nearly so, Varsity could lock up the All-Star Gym distribution channel, and thereby maintain monopoly power in the All-Star Competition Market and the All-Star Apparel Market. Varsity also knew that, if it could induce the top, most successful Gyms, to enter into long-term exclusive deals, it would be able to erect an impenetrable barrier to entry and substantially foreclose competition in both Relevant Markets. And that is what Varsity did with its so-called "Network Agreements" and "Family Plan."

134.   Varsity economically induces the most significant and big-money All-Star Gyms, which are necessary to put on successful All-Star Competitions and collectively comprise the most important All-Star Apparel distribution channel, to exclusionary three-year Network Agreements. These Network Agreements require Gyms to have their All-Star Teams attend at least five Varsity-produced All-Star Competitions per season and spend at least $30,000 on registration fees for Varsity events. Moreover, Varsity's Network Agreements provide increasing rebate percentages for Gyms that spend above $30,000 per year on Varsity registration fees. Given that All-Star Gyms often attend only six All-Star Competitions per season, Varsity's contractual requirements make it extremely difficult if not impossible for these All-Star Gyms to attend IEPs' All-Star events, and thus effectively require exclusive dealing.

135.   The Network Agreement also provides additional relief from the non-Network penalty registration fees it charges for every dollar an All-Star Gym spends on Varsity competition registration fees over and above the required $30,000 minimum. Thus, once a Gym has spent the required threshold amount, it becomes economically and practically infeasible for such Gyms to attend non-Varsity events. Further, the Network Agreements explicitly require all of these big-money and most prominent All-Star Gyms to purchase and use Varsity All-Star Apparel exclusively, foreclosing a key distribution channel and critical group of customers from being accessed by All-Star Apparel rivals.

136.   Because the Network Agreement is offered to the largest and most successful All-Star Gyms, the All-Star Gyms with the most talented All-Star Cheerleaders are guaranteed to attend Varsity's All-Star Competitions and wear Varsity's All-Star Apparel. This, in turn, draws the smaller All-Star Gyms into attending Varsity's All-Star Competitions and wearing Varsity's All-Star Apparel.

137.    For All-Star Gyms that are not induced to execute Network Agreements, Varsity offers terms under its "Family Plan." The Family Plan is offered to every All-Star Gym in the country, meaning that Varsity has the potential to engage 100% of the All-Star Gyms in the Market in its exclusionary programs.

138.    The Family Plan requires that an All-Star Gym attend a certain number of Varsity's All-Star Competitions in one year in order to obtain a small amount of relief from Varsity's penalty pricing on All-Star Apparel and All-Star Competitions. Under the Family Plan, Gyms must go to at least six Varsity events per year. Because All-Star Teams often attend only six All-Star Competitions in a season (excluding The Summit and U.S. Finals), All-Star Gyms must devote all or the vast majority of their All-Star Competition season to Varsity events to obtain relief from Varsity's penalty pricing. The amounts All-Star Gyms must spend to obtain a particular percentage of monetary relief from Varsity's penalty pricing has increased over the years.

139.    The Family Plan rebates typically involve providing rebates referred to as "Varsity Fashion Dollars." These Varsity Fashion Dollars may only be used on future purchases from Varsity. As a result, the All-Star Gyms are trapped in an endless cycle with Varsity, as foregoing these future rebates and doing business with Varsity's competitors becomes prohibitively expensive the more they patronize Varsity events and purchase Varsity apparel.

### 3.    Varsity Leverages Its Monopoly Power in the All-Star Competition Market to Control the All-Star Apparel Market.

140.    Varsity has additionally leveraged its monopoly power in the All-Star Competition Market to gain, maintain, and enhance its monopoly power in the All-Star Apparel Market.

141.    For the critical big-money All-Star Gyms participating in its Network Agreement, Varsity requires exclusive purchasing of Varsity's All-Star Apparel. As a result, no All-Star apparel rival could possibly compete with Varsity without also dominating the All-Star

Competition Market. Moreover, Varsity ties discounts on Varsity's All-Star Apparel and attendance at Varsity All-Star Competitions, such that All-Star Gyms must both spend a minimum amount annually on Varsity's All-Star Competitions and attend a minimum number of Varsity's All-Star Competitions to qualify for non-penalty prices on Varsity's All-Star Apparel.

142.    Varsity also bars competing All-Star Apparel manufacturers from selling their All-Star Apparel at Varsity All-Star Competitions. Varsity controls access to the showrooms at its All-Star Competitions. It forbids the display and sale of non-Varsity All-Star Apparel at those All-Star Competition showrooms. For example, rival All-Star Apparel manufacturer Rebel had previously displayed and sold All-Star Apparel at JAM Brands' events. Its contract with The JAM Brands was terminated when Varsity acquired The JAM Brands, and Varsity excluded Rebel from all subsequent JAM Brands events. As one article observed, quoting Rebel's founder:

> The JAM Brands competitions had been Rebel's most effective platform for marketing to elite cheer teams. "Not partnering with an event company is one thing," says Noseff Aldridge [founder of Rebel Athletic]. "But being locked out of partnering with an event company—knowing that a competitor is now going to be in your booth space showing its product—it's a double whammy."[31]

143.    Further, as mentioned above, certain of Varsity's contracts and terms with All-Star Gyms combine rebates for attending Varsity's All-Star Competitions with agreements requiring All-Star Gyms to purchase their All-Star Apparel exclusively from Varsity. Thus, All-Star Gyms bound by the Network Agreement cannot access non-penalty prices for All-Star Competitions unless they also agree to exclusively buy their All-Star Apparel from Varsity.

144.    Judges at Varsity's All-Star Competitions also often award more points to All-Star Teams wearing Varsity's All-Star Apparel, and the rules governing USASF and Varsity All-Star

---

[31] https://www.inc.com/magazine/201603/leigh-buchanan/rebel-athletic-custom-cheerleading-uniforms-startup.html.

Competitions regarding All-Star Apparel are frequently written to favor Varsity's latest All-Star Apparel designs. These practices make the wearing of Varsity All-Star Apparel an important element for success at All-Star Competitions, further impairing the ability of rival All-Star Apparel manufacturers to gain significant sales.

### 4. Use & Control of Governing Bodies.

145. Defendant USASF is a governing body that sanctions All-Star Competitions and provides a set of rules and regulations to govern those events. The organization credentials coaches, certifies safety judges, sanctions events, and maintains safety guidelines. The USASF also produces and sanctions the Worlds All-Star Championship. When it first established the Worlds, the USASF offered Varsity a no-contest bid to produce the event, and it did not allow any other IEPs to compete for the right to produce the event. While All-Star Gyms are not technically required to belong to the USASF, a USASF membership is required to compete for the All-Star Championships, and so All-Star Gyms have no choice but to join the USASF if they wish to be viewed as high-quality organizations.[32]

### a. Varsity Controls the USASF.

146. Varsity founded the USASF in 2003 and funded this effort by extending the USASF a $1.8 million interest-free loan. Varsity submitted the original trademark application for the marks "U.S. All Star Federation" and "USASF," listing itself as owner. For at least the first 15 years of its existence, the USASF's offices were located at Varsity's corporate address, a Varsity representative answered the phone for the USASF, USASF employees were paid directly by Varsity, and Varsity cashed checks issued to the USASF.

---

[32] https://usasf.net.ismmedia.com/ISM2/ParentsActionCommittee/Cheer_Parents_101.pdf.

147.     Varsity controls the USASF board of directors. The USASF board is empowered to set policy for the USASF. The board is composed of 13 voting members, one seat each for the seven All-Star Competition producers that started the USASF, the USASF Chairman, a senior USASF staff member, and four program owner members, including the Chairman of the National All Stars Connection.[33] Two USASF board seats are permanent and are held by representatives named by the Chairman of the USASF.[34] As Varsity has acquired more and more of the USASF's founding event producers, it has continued to build its presence on the USASF board. Since the acquisition of The JAM Brands and Epic Brands, Varsity has control over 75% of the USASF board seats.

148.     The USASF's website is located at www.usasf.net, a URL owned by Varsity—although Varsity now seeks to conceal its ownership and control of the URL behind the registration of "PERFECT PRIVACY, LLC."[35]

149.     In response to a survey administered by "Cheer Industry Insights" in 2012, All-Star Gyms called for "a separation of [USASF] Board Members affiliated with Varsity Brands to allow for more representation among IEPs, large and small Gym Owners, and other entities within the industry."[36] That separation has not occurred. On the contrary, as Varsity has acquired additional IEPs, it has gained control of additional seats on the USASF board. By the time it completed its acquisition of Epic Brands in January 2018, the vast majority of the USASF board was affiliated with Varsity, more than enough for Varsity to dictate USASF policy.

---

[33] http://www.usasf.net/organization/bod/bod_overview/.

[34] http://www.usasf.net/organization/about/bylaws/.

[35] https://cheergyms.activeboard.com/t5660100/who-really-has-the-power-in-usasf/.

[36] ASGA Reaction to USASF Rule Changes Report – 2012.

b. **Defendant USASF Limits Which All-Star Competition Producers Can Award Bids to All-Star Championships.**

150. Varsity has used its control over the USASF, and conspired with the USASF, to foreclose and impair rival IEPs from getting traction in the Relevant Markets. Varsity used its control of the USASF to limit the number of coveted All-Star Championship Bids that All-Star Competition producers can award to All-Star Teams.

151. The USASF controls which All-Star Competitions producers can provide Bids to these high-profile All-Star Championships. According to USASF rules, only "Tier 1" All-Star Competition producers can offer Fully-Paid Bids to Worlds. USASF rules also limit the number of Tier 1 All-Star Competition producers to 42.

152. Prior to its acquisition of The JAM Brands and Epic Brands, Varsity owned 21 of the 42 All-Star Competitions permitted to offer fully-paid Bids to Worlds. Today, Varsity owns 33 of the 42 Tier 1 All-Star Competitions. Conversely, only 9 of the 54 IEPs credentialed by USASF can offer Bids to Worlds.

153. In addition, while the number of Tier 1 All-Star Competitions is fixed, the number of Bids, Fully-Paid and otherwise, that any one of those All-Star Competition producers may distribute can change. And Varsity consistently uses its control of the USASF to increase the number of Bids available at its All-Star Competitions after Varsity acquires them and they are producing events under the Varsity banner. Varsity distributes well over 80% of all Worlds Bids.

154. Access to Tier 1 status and the ability to offer Fully-Paid Bids to Worlds is critical for an IEP to gain sufficient traction in the All-Star Competition Market and seriously challenge Varsity's monopoly power. That is because the primary goal of most All-Star Teams is to win All-Star Competitions to gain Fully-Paid or Partially-Paid Bids to All-Star Championships such as

Worlds. If an IEP cannot offer such Bids, it cannot attract participation from the most successful All-Star Gyms, which will reduce the IEP's appeal, reach, and prestige.

155.    Furthermore, the USASF will not let an All-Star Competition producer hold a Bid-qualifying All-Star Competition within 500 miles of another Bid-qualifying competition. This makes it nearly impossible for an IEP to expand and compete further with Varsity. The ultimate result is that the only way for an All-Star Competition producer to gain additional Bids to Worlds is to acquire an existing All-Star Competition producer that controls such Bids. Since Varsity's acquisition of Epic Brands in January 2018, there are few such producers left outside of Varsity's hands.

### c.    Varsity Leverages Its Control of Defendant USASF to Exert Control Over All-Star Teams' Competition Schedules.

156.    All Varsity-sponsored events are USASF-sanctioned. To enter All-Star Teams in USASF-sanctioned events, All-Star Gyms, All-Star Cheerleaders, and All-Star Team coaches must become USASF members and pay annual membership dues to USASF. These membership dues are USASF's primary revenue source, and it collected over $5 million in membership dues in 2017.[37]

157.    Though Defendant USASF does not contractually bar its members from participating in non-USASF events, it does require its member Gyms to report their full competition schedules for the year, including USASF-sanctioned and non-sanctioned, Varsity and IEP. USASF shares this information with Varsity, and both Varsity and USASF representatives

---

[37] https://usasfmain.s3.amazonaws.com/Organization/docs/annual/USASF_AnnualReport_2017.pdf.

then pressure the All-Star Gyms to go only to USASF-sanctioned events, 40% of which are produced by Varsity.

158.     USASF also copyrighted its All-Star Competition rules in 2016, and it forbids All-Star Competition producers that have not paid USASF membership dues from using those rules at their events. Since Varsity's dominance in the All-Star Competition Market ensures that all or almost all All-Star Teams will fill the majority of their schedules with USASF-sanctioned events, USASF's refusal to allow non-USASF IEPs to use the same rules provides a strong disincentive for All-Star Teams to include such IEPs in their schedules. Doing so would require All-Star Teams to learn and compete by a different set of rules for a small share of their yearly competitions. USASF aggressively enforces this scheme through the threat of copyright litigation.

159.     The USASF also uses its competition rules to assist Varsity in maintaining and enhancing its dominance in the All-Star Apparel Market. USASF rules governing apparel are drafted to favor the newest All-Star Apparel designs being marketed and sold by Varsity.

160.     Bids to Worlds and The Summit are also not awarded at non-USASF events, further discouraging All-Star Teams from putting these IEPs on their limited competition schedules. In any event, there are not enough IEPs for an All-Star Team to plan a full season around non-USASF events without attending Varsity (and thus USASF-sanctioned) events.

161.     USASF also requires member All-Star Gyms to have and report their liability insurance. USASF encourages All-Star Gyms to purchase insurance from a particular insurance carrier—K&K Insurance—and, on occasion, will deny All-Star Gyms' attempts to use other insurance carriers. While K&K is not affiliated with Varsity, K&K both (i) requires All-Star Gyms to be USASF members before it will provide them coverage, and (ii) charges significantly higher

annual premiums to All-Star Gyms that enter their All-Star Teams in even a single All-Star Competition that is not sanctioned by USASF.

162.    All-Star Gyms pay K&K between $19 and $24.55 per All-Star Cheerleader, but those rates increase to $34 per Cheerleader if the All-Star Gym enters its All-Star Team in even a single competition that is not sanctioned by USASF. For one small All-Star Gym, that amounts to a $2,300 difference in annual insurance premiums. This insurance arrangement dissuades All-Star Gyms from attending non-USASF-sanctioned All-Star Competitions. Most All-Star Gyms have K&K insurance, and they are afraid that scheduling non-USASF-sanctioned All-Star Competitions will lead either to higher premiums or to being considered out of compliance and thus having a coverage lapse.

163.    Varsity also takes steps to prevent any rival sanctioning organizations from creating non-Varsity-controlled All-Star Championships that could undermine Varsity's dominance. For example, in October 2011, the USASF and IASF issued a joint letter to member All-Star Gyms, All-Star Competitions, and All-Star Team coaches stating that it is "the policy of the USASF/IASF that no athlete, coach, judge, or official is permitted to participate in any way in any event that claims to be a World or International Championship, other than the ICU [International Cheer Union] World Championships for National teams, or the USASF/IASF Worlds for All-Star teams. This stipulation applies to any regional international championship affiliated with an organization claiming to operate a World Championship, other than the ICU and USASF/IASF. Failure to comply with this rule is grounds for disqualifying any athlete, coach, judge, or official from participating in the ICU and USASF/IASF World Championships."

164.    The USASF membership rules specify that members are not permitted to affiliate, partner with, or own non-USASF-sanctioned IEPs, and that every All-Star Gym that wishes to

attend USASF events must become a USASF member. Thus, all Gyms that attend at least one USASF event per year agree to these exclusionary terms.

### D. The Exclusionary Scheme Foreclosed Competition in the Primary and Ancillary Relevant Markets.

165.    Varsity's Exclusionary Scheme has successfully impaired and foreclosed a substantial share of each of the Relevant Markets from competitors. The Exclusionary Scheme has also created significant entry barriers for would be competitors in the Relevant Markets. As a direct and proximate result, Varsity collectively controls approximately 90% of the All-Star Competition Market and 80% of All-Star Apparel Market in the United States.

166.    Varsity has foreclosed from access to competitors in both Relevant Markets the most significant All-Star Gyms in its exclusionary Network Agreements. Varsity's "Network" Gyms collectively comprise a critical source of top-level talent and fees for its All-Star Competitions and the most important distribution channel for its All-Star Apparel. The remainder of the All-Star Gyms are offered the Family Plan, which as set forth above, impairs the ability of actual and potential rivals in both Relevant Markets to get access to the vast majority of customers in both Relevant Markets. These exclusionary agreements, together with the other conduct alleged to be part of the Exclusionary Scheme, have blocked and impaired rivals from accessing the vast majority of the participants and customers in both Relevant Markets. Varsity, together with the USASF, has also foreclosed competition in both Relevant Markets by, *inter alia*, restricting access to the ability to award coveted Bids to Worlds and other All-Star Championship Bids, requiring adherence to restrictive rules and exclusionary insurance requirements, and other conduct alleged to be part of the Exclusionary Scheme in this Complaint.

E. **The Exclusionary Scheme Caused Plaintiffs and Members of the Class to Suffer Antitrust Injury & Damages.**

167.    As a direct and proximate result of Varsity's Exclusionary Scheme, as alleged herein, Plaintiffs and the Class members have suffered antitrust injury in that they paid artificially inflated prices for goods and services that they purchased directly from Varsity in one or both of the Relevant Markets during the Class Period. The full amount of such damages Plaintiffs and the Class suffered will be calculated after discovery and upon proof at trial.

168.    The conduct comprising Varsity's Exclusionary Scheme is continuing and so are the injuries and damages suffered by Class members, including Plaintiffs Fusion Elite and Spirit Factor.

F. **The Exclusionary Scheme Caused Anticompetitive Effects in Both Relevant Markets with No Offsetting Procompetitive Efficiencies.**

169.    Defendants' Exclusionary Scheme has substantially foreclosed competition in the Relevant Markets and allowed Varsity to obtain, maintain, and/or enhance monopoly power in both of the Relevant Markets. As a result of the Exclusionary Scheme, prices in both Relevant Markets have been artificially inflated above competitive levels, output in each of the Relevant Markets has fallen below competitive levels, and All-Star Gyms and All-Star Cheerleaders have less choice in both Relevant Markets.

170.    **Higher Prices**: Due to the Exclusionary Scheme, Varsity has raised prices associated with All-Star Competitions and for All-Star Apparel above competitive levels. For instance, participation fees for Varsity All-Star Competitions have increased substantially over the Class Period. Varsity also began charging spectator admission fees to legacy-JAM Brands events in 2016. Varsity has steadily increased those admission fees during the Class Period. In events such as JAMFest Bam JAM, admission fees for adults doubled between late 2016 and 2019, and

each parent now pays a $20 spectator fee to watch his or her child perform a two- or three-minute routine.

171.    Varsity has further exploited its monopoly power by steadily increasing the number of "Stay-to-Play" events. At a "Stay-to-Play" event, each All-Star Team member is required to book lodging and stay at a Varsity-approved "Housing Partner" hotel.[38] These "stay-to-play" hotels generally charge substantially more than the competitive rate charged to other guests, since the All-Star Cheerleaders are a captive audience. Varsity makes significant supracompetitive profits from its Stay-to-Play program by either working with the hotels to pass a mark-up to the All-Star Team members and then taking a kick-back, or using Stay-to-Play to get discounted or free venues for hosting its All-Star Competitions. If an All-Star Competition participant stays at a hotel outside the "Stay-to-Play" consortium, that participant's All-Star Team is barred from participating in the All-Star Competition. If Varsity learns of this rule violation after the All-Star Competition, it fines the All-Star Gym that fielded that participant's All-Star Team for the violation.

172.    Varsity also used the monopoly power gained and maintained through the Scheme to charge supracompetitive prices to Plaintiffs and the Class members for All-Star Apparel.

173.    **Lower Output**: The Exclusionary Scheme has eliminated and impaired rivals in the Relevant Markets and blocked the entry and growth of others potential rivals. As a result, the number, size, and significance of All-Star Apparel manufacturers and All-Star Competition producers have been reduced, and fewer people participate as All-Star Cheerleaders. At least 35 All-Star Gyms closed in 2019 as compared to a normal rate of 5 to 10 such closings in previous years.

---

[38] https://www.varsity.com/home/stay-smart/.

174.     During the Class Period, Varsity shut down many of its own All-Star Competitions in addition to eliminating rival IEPs and these rivals' events.

175.     There are no legitimate procompetitive justifications or efficiencies for the conduct alleged as part of the Exclusionary Scheme.

## VIII.   CLAIMS FOR RELIEF

**COUNT I**
**MONOPOLIZATION**
**15 U.S.C. § 2**
**(On Behalf of Plaintiffs and the Class and Against Varsity)**

176.     Plaintiffs incorporate by reference all of the preceding and ensuing paragraphs as if fully alleged herein.

177.     The Relevant Markets are the markets for All-Star Competitions and All-Star Apparel in the United States.

178.     Varsity controls 90% of the All-Star Competition Market and 80% of the All-Star Apparel Market, and it possesses monopoly power in the Relevant Markets. Varsity has obtained, enhanced, and maintained monopoly power in the Relevant Markets through the Exclusionary Scheme alleged herein, which conduct is continuing. Varsity has substantially foreclosed competition and has abused and continues to abuse its power to maintain and enhance its market dominance in the Relevant Markets through its Exclusionary Scheme.

179.     As a direct and proximate result of this continuing violation of Section 2 of the Sherman Act, Plaintiffs and the Class members have suffered injury and damages in the form of artificially inflated prices paid directly to Varsity for All-Star Competitions and All-Star Apparel.

180.     Plaintiffs, on behalf of themselves and other Class members, seek money damages from Varsity for these violations. Varsity Brands, Varsity Spirit, and Varsity Fashion are jointly and severally liable for the full amount of the damages. Damages will be quantified on a class-

wide basis. Plaintiffs' and Class Members' injuries are of the type the antitrust laws were designed to prevent and flow directly from Varsity's unlawful conduct as alleged herein.

181.    Plaintiffs, on behalf of themselves and the Class, seek injunctive relief barring Varsity from engaging in the anticompetitive Scheme alleged herein. The violations set forth above, and the effects thereof, are continuing and will continue unless injunctive relief is granted.

## COUNT II
## CONSPIRACY TO MONOPOLIZE
### 15 U.S.C. § 2
### (On Behalf of Plaintiffs and the Class and Against Varsity and USASF)

182.    Plaintiffs incorporate by reference all of the factual averments in the preceding paragraphs as if fully alleged herein.

183.    The Relevant Markets are the All-Star Competition Market and the All-Star Apparel Market in the United States.

184.    Varsity controls 90% of the All-Star Competition Market and 80% of the All-Star Apparel Market, and it has monopoly power in both Relevant Markets.

185.    USASF has conspired with Varsity to assist Varsity in maintaining and enhancing dominance in the Relevant Markets through the Exclusionary Scheme alleged herein, which conduct is continuing.

186.    Defendants use USASF rules governing All-Star Competitions to require and reward use of Varsity's All-Star Apparel.

187.    The USASF requires All-Star Gyms, All-Star Cheerleaders, and All-Star Team coaches who enter USASF All-Star Competitions, including those owned and produced by Varsity, to be USASF members.

188.    Defendants limit All-Star Competitions through which Bids can be obtained to the Worlds All-Star Championship, with the vast majority of such All-Star Competitions being Varsity owned.

189.    USASF prevents competing non-member IEPs from using the USASF rules, at times with threats of litigation. Competitors are often unable or unwilling to learn multiple sets of rules, and are therefore disincentivized from attending non-USASF All-Star Competitions.

190.    USASF also creates rules governing All-Star Apparel that align with Varsity's latest All-Star Apparel designs, disincentivizing All-Star Teams from purchasing non-Varsity All-Star Apparel.

191.    Defendants have abused and continue to abuse their power to maintain and enhance Varsity's market dominance in the Relevant Markets, and enrich USASF, through Varsity's Exclusionary Scheme.

192.    USASF and Varsity have each knowingly and willingly engaged in overt acts as part of their conspiracy for Varsity to gain, enhance, and maintain monopoly power in the Relevant Markets. By engaging in one or more of the overt acts alleged herein, USASF and Varsity intentionally and knowingly facilitated Varsity's Exclusionary Scheme. At the same time, USASF and Varsity drove increasing numbers of All-Star Gyms, All-Star Cheerleaders, and All-Star Team coaches to pay USASF its membership fees in order to participate in Varsity's All-Star Competitions. USASF has used the Exclusionary Scheme to collect more than $5 million in membership dues annually from All-Star Gyms, All-Star Cheerleaders, and All-Star Team coaches.

193.    As a direct and proximate result of this continuing violation of Section 2 of the Sherman Act, Plaintiffs and the Class members have suffered injury and damages in the form of artificially inflated prices paid directly to Varsity for All-Star Competitions and All-Star Apparel.

194.    Plaintiffs, on behalf of themselves and other Class members, seek money damages from Defendants for these violations. Defendants are jointly and severally liable for the full amount of the damages. Damages will be quantified on a class-wide basis for the Class. Plaintiffs' and Class members' injuries are of the type the antitrust laws were designed to prevent and flow directly from Defendants' unlawful conduct.

195.    Plaintiffs, on behalf of themselves and the Class, seek injunctive relief barring Defendants from engaging in the anticompetitive scheme alleged herein. The violations set forth above, and the effects thereof, are continuing and will continue unless injunctive relief is granted.

## IX.    JURY TRIAL DEMANDED

196.    Pursuant to Fed. R. Civ. P. 38(c), Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class, respectfully ask the Court for a judgment that:

A.    Certifies the Class pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and (b)(3) and appoints Plaintiffs and their attorneys as class representatives and class counsel, respectively;

B.    Awards Plaintiffs and the Class treble the amount of damages actually sustained by reason of the antitrust violations alleged herein, plus the reasonable costs of this action including attorneys' fees;

C.    Orders such equitable and injunctive relief as is necessary to correct for the anticompetitive market effects caused by Defendants' unlawful conduct;

D.     Awards Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees as provided by law;

E.     Enters judgment against Defendants, holding them jointly and severally liable for the antitrust violations alleged herein; and

F.     Directs such further relief as it may deem just and proper.

Dated: August 13, 2020                          Respectfully submitted,

                                                s/ J. Gerard Stranch, IV
                                                J. Gerard Stranch, IV (TN BPR #23045)
                                                Benjamin A. Gastel (TN BPR #28699)
                                                **BRANSTETTER, STRANCH &
                                                JENNINGS, PLLC**
                                                223 Rosa Parks Ave. Suite 200
                                                Nashville, TN 37203
                                                Tel: (615) 254-8801
                                                gerards@bsjfirm.com
                                                beng@bsjfirm.com


                                                H. Laddie Montague, Jr.*
                                                Eric L. Cramer*
                                                Mark R. Suter*
                                                **BERGER MONTAGUE PC**
                                                1818 Market Street, Suite 3600
                                                Philadelphia, PA 19106
                                                Tel: (215) 875-3000
                                                hlmontague@bm.net
                                                ecramer@bm.net
                                                msuter@bm.net

                                                Jonathan W. Cuneo*
                                                Katherine Van Dyck*
                                                Victoria Sims*
                                                **CUNEO GILBERT & LADUCA LLP**
                                                4725 Wisconsin Avenue NW, Suite 200
                                                Washington, DC 20016
                                                Tel: (202) 789-3960
                                                jonc@cuneolaw.com
                                                kvandyc@cuneolaw.com
                                                vicky@cuneolaw.com

                                                Benjamin D. Elga*
                                                **JUSTICE CATALYST LAW, INC.**
                                                81 Prospect Street
                                                Brooklyn, NY 11201
                                                Tel: (518) 732-6703
                                                belga@justicecatalyst.org

Brian Shearer*
Craig L. Briskin*
**JUSTICE CATALYST LAW, INC.**
718 7th Street NW
Washington, DC 20001
Tel: (518) 732-6703
brianshearer@justicecatalyst.org
cbriskin@justicecatalyst.org

Roberta D. Liebenberg*
Jeffrey S. Istvan*
Mary L. Russell*
**FINE KAPLAN AND BLACK, R.P.C**
One South Broad St., 23rd Floor
Philadelphia PA  19107
Tel: (215) 567-6565
rliebenberg@finekaplan.com
jistvan@finekaplan.com
mrussell@finekaplan.com

*Pro Hac Vice* application forthcoming

*Attorneys for Plaintiffs and the Proposed Class*