# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| FUSION ELITE ALL STARS et al., | |
| Plaintiffs, | **Civ. Action No. 2:20-cv-2600** |
| v. | |
| VARSITY BRANDS, LLC et al., | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF
## VARSITY DEFENDANTS' MOTION TO DISMISS

# **TABLE OF CONTENTS**

Introduction.................................................................................................................1

Statement of Facts........................................................................................................2

      A.     Varsity Creates and Grows All-Star Cheer...........................................2

      B.     Varsity Builds an Apparel Business .......................................................3

      C.     Varsity Provides Discounts to Gyms......................................................4

Argument .....................................................................................................................4

I.     A Complaint Must Be Supported By Plausible Factual Allegations.....................4

II.    Plaintiff Fails to Allege Monopolization.............................................................5

      A.     Plaintiff's Gerrymandered Market Definitions Are Implausible ...........5

             1.     "All-Star Apparel" is Not a Plausible Relevant Market...........6

             2.     "All-Star Competitions" is Not a Plausible Relevant Market....7

      B.     Plaintiffs' Allegations of Monopoly Power Fail ...................................9

      C.     Plaintiffs Fail to Allege Anticompetitive Conduct...............................10

             1.     Plaintiff Does Not Allege Illegal Bundled Discounts ..............11

             2.     Plaintiffs Do Not Allege Illegal Exclusive Dealing.................12

             3.     Plaintiffs Do Not Allege Illegal Acquisitions .........................13

             4.     Varsity's Relationship with the USASF is Not Illegal..............14

             5.     The USASF's Insurance Requirement is Not Illegal ................15

             6.     Plaintiffs' Other Allegations About Apparel Fail.....................15

             7.     Plaintiffs' Abuse Allegations Fail ..........................................16

III.   Plaintiff Fails to Allege a Conspiracy to Monopolize......................................18

Conclusion ................................................................................................................19

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)................................................................................12

*Atl. Richfield Co. v. USA Petroleum Co.,*
    495 U.S. 328 (1990)................................................................................12

*B&H Med., L.L.C. v. ABP Admin., Inc.,*
    526 F.3d 257 (6th Cir. 2008)................................................................13

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)............................................................................5, 10

*Brookins v. Int'l Motor Contest Ass'n,*
    219 F.3d 849 (8th Cir. 2000)............................................................15, 17

*Cascade Health Sols. v. PeaceHealth,*
    502 F.3d 895 (9th Cir. 2007)................................................................12

*Century Oil Tool, Inc. v. Prod. Specialties, Inc.,*
    737 F.2d 1316 (5th Cir. 1984)..............................................................20

*Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n,*
    95 F.3d 593 (7th Cir. 1996)..................................................................14

*Collins Inkjet Corp. v. Eastman Kodak Co.,*
    781 F.3d 264 (6th Cir. 2015)................................................................12

*Concord Assoc., L.P. v. Ent. Props. Trust,*
    817 F.3d 46 (2d Cir. 2016) ....................................................................9

*Copperweld Corp. v. Indep. Tube Corp.,*
    467 U.S. 752 (1984)..........................................................................19-20

*Eastman v. Quest Diagnostics Inc.,*
    724 F. App'x 556 (9th Cir. 2018)......................................................13, 15

*Est. of Smith ex rel. Richardson v. United States,*
    509 F. App'x 436 (6th Cir. 2012)............................................................5

*Feitelson v. Google Inc.*,
    80 F. Supp. 3d 1019 (N.D. Cal. 2015) ....................................................................................14

*Fraser v. Major League Soccer, LLC*,
    284 F.3d 47 (1st Cir. 2002) .........................................................................................13, 17

*Gianna Enters. v. Miss World (Jersey) Ltd.*,
    551 F. Supp. 1348 (S.D.N.Y. 1982) ...........................................................................................8

*Greenberg v. Life Ins. Co. of Va.*,
    177 F.3d 507 (6th Cir. 1999)....................................................................................................18

*Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*,
    407 F.3d 1027 (9th Cir. 2005)...................................................................................................20

*Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
    588 F. 3d 908 (6th Cir. 2009)......................................................................................................6

*Midwest Agency Servs., Inc. v. J.P. Morgan Chase Bank, N.A.*,
    No. 09-165, 2010 WL 935450 (E.D. Ky. Mar. 11, 2010) ........................................................13

*Nicolosi Distrib., Inc. v. Finishmaster, Inc.*,
    No. 18-CV-03587, 2019 WL 1560460 (N.D. Cal. Apr. 10, 2019)......................................9, 14

*Paladin Assocs., Inc. v. Mont. Power Co.*,
    328 F.3d 1145 (9th Cir. 2003)...................................................................................................19

*Prime Healthcare Servs. v. SEIU*,
    642 F. App'x 665 (9th Cir. 2016)..............................................................................................18

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997) ..................................................................................................6-8

*Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., Inc.*,
    812 F. Supp. 387 (S.D.N.Y. 1993) .........................................................................................7-8

*Richter Concrete Corp. v. Hilltop Concrete Corp.*,
    691 F.2d 818 (6th Cir. 1982)......................................................................................................5

*SPX Corp. v. Mastercool, U.S.A., Inc.*,
    No. 10 CV 1266, 2011 WL 3610094 (N.D. Ohio Aug. 17, 2011) ...........................................13

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961)..............................................................................................................6, 13

*Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross and Blue Shield*,
    552 F.3d 430 (6th Cir. 2008) ................................................................................5

*TV Commc'ns Network, Inc. v. Turner Network, Inc.*,
    964 F.2d 1022 (10th Cir. 1992) ............................................................................6

*United States v. E.I. DuPont de Nemours & Co.*,
    351 U.S. 377 (1956) ..............................................................................................9

*United States v. Phila. Nat'l Bank*,
    374 U.S. 321 (1963) ..............................................................................................7

*United States v. Syufy Enters.*,
    903 F.2d 659 (9th Cir. 1990) ..............................................................................14

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ..............................................................................5, 9, 11, 16

## INTRODUCTION

Varsity[1] invented a new form of cheerleading.  Varsity took what was once a comparatively sedate sideline activity ancillary to men's athletics, and created an exciting, athletic, and competitive endeavor in its own right by infusing it with energy and style. Competitive activities must have rules by which competitors are judged, and which teams qualify for higher level competitions.  Athletic endeavors must also have safety standards.  Varsity therefore founded and founded the USASF.  USASF regularizes rules, formulates safety standards, sanctions gyms and competitions, arranges for optional insurance for gyms, and performs related functions.  The result has been an explosive growth of cheerleading, with thousands of gyms sponsoring teams featuring hundreds of thousands of athletes.  Today, dozens of entities hold All-Star competitions, often in competition with Varsity, around the country, and many more have emulated the Varsity model of athletic cheer outside the strictures of USASF. The athletic tumbling, stunt and dance routines that have enlivened cheer required much more athletic apparel.  Varsity therefore built a cheer-related apparel business, bringing to it exciting fashion and functional innovation  as well, taking on the giant sports apparel companies like Adidas, Nike and Under Armour.

Plaintiffs are three disgruntled gyms that do not like the rules and structure Varsity has created.  In bringing this suit, they fundamentally misconstrue the antitrust laws.  The antitrust laws *encourage* the very sort of creative entrepreneurship that Varsity and USASF have demonstrated in nurturing and growing All-Star Cheer and expanding output from close to nothing to serving millions of young people today.  Moreover, the antitrust laws recognize that

---

[1] As used herein, "Varsity" refers to Defendants Varsity Brands, LLC, Varsity Spirit, LLC, and Varsity Spirit Fashions & Supplies, LLC.  Defendant United States All Star Federation is referred to as USASF.

without rules and organization, an activity is a pastime, not a competitive endeavor. Antitrust does not condemn or second guess a sports league or association in establishing the rules of the game.

As is demonstrated below, nothing Plaintiffs allege constitutes monopolization or conspiracy to monopolize. Before further draining the resources of the parties and the Court and thereby inevitably hurting the very parties that Plaintiffs purport to be trying to help, the Court must satisfy itself that Plaintiffs actually have a plausible antitrust case. The scattershot complaint before it does not meet this standard.

## STATEMENT OF FACTS

Varsity and USAF have not impeded the growth of All-Star Cheer and All-Star Apparel, but instead have fueled that growth to the benefits of thousands of gyms and millions of participants.

### A. Varsity Creates and Grows All-Star Cheer

As the Complaint recounts, beginning with its founding in 1974, Varsity vastly expanded cheerleading from traditional "sideline cheerleading" to an activity in which four million "child and student athletes nationwide" participate. (*Id.* ¶¶ 1, 3, 66.) Varsity's founder and former chief executive officer Jeff Webb brought numerous innovations to cheerleading, including "more focus on gymnastics-like skills and new tournaments created solely for cheer squads." (*Id.* ¶ 66.) This led to the emergence in the 1980s of "a number of cheerleading squads not associated with a school or sports league, whose main objective was competition." (*Id.* ¶ 67.) One set of competitions, analogous to a sports league, is known as "All-Star Competitions" (*id.* ¶ 67) and participating teams are referred to as "All-Star" teams (*id.*). With these innovations, by the early 2000's, Varsity "outgrew" its "only rival," the National Cheerleading Alliance or NCA. (*Id.* ¶ 69.)

In 2004, Varsity founded USASF "with the … goal of setting uniform rules and judging standards" for competitions.  (Compl. ¶ 71.)  According to the Complaint, Varsity "funded the USASF at its inception" and USASF has "always been captive to Varsity."  (*Id.* ¶ 73.)  With Varsity's support, USASF has expanded All-Star cheer by "sanction[ing] All-Star Competitions and provid[ing] a set of rules and regulations to govern those events."  (*Id.* ¶ 195.)  Indeed, although Varsity produces many competitions, there are at least *ten* other USASF-sanctioned All-Star Competition event providers besides Varsity.  (*Id.* ¶ 167-68; 208.)  By sanctioning competitions, USASF provides assurance that competitions will be conducted under standardized rules and appropriate safety and other standards.

Not surprisingly, the best teams and cheerleaders "desire the challenge and recognition that comes with competing against the very best …."  (Compl. ¶ 133.)  To meet this demand, in 2004 Varsity and USASF together created an event called "Worlds," which is held every year at Walt Disney World.  (*Id.* ¶¶ 89, 91.)  To make this event an opportunity to compete against "elite" teams, Varsity and USASF enable participants in certain USASF-sanctioned events *not* produced by Varsity to be eligible, including events produced by Varsity's competitors.  (*Id.* ¶¶ 91, 93, 208.)  Varsity also produces two other championship-style meets, called "the Summit" and "U.S. Finals" and selects the teams for these meets from among the participants in its other competitions.  (*Id.* ¶¶ 89, 95, 97, 99, 101.)

### B.    Varsity Builds an Apparel Business

Varsity's vision for a new and energetic cheerleading included an exciting and updated look, conducive to the athleticism of the activity.  Varsity designed and launched a line of apparel and equipment for cheerleaders, including such things as shoes, uniforms, warm-ups, bows, and backpacks.  (Compl. ¶¶ 106-07, 142.)  Plaintiffs refer to these myriad items as "All Star Apparel."  (*Id.* ¶ 102.)  Varsity does not mandate that its apparel be used at any competition,

including its own.  Not surprisingly, Varsity does generally exclusively sell its own apparel at its *own* competitions.  (*Id.* ¶ 107.)  There are no allegations, however, that other manufacturers cannot sell apparel at other competitions or, as is far more common, directly though gyms that sponsor All-Star teams or through myriad other distribution channels.

### C.      Varsity Provides Discounts to Gyms

Varsity offers discounts to gyms based on participation in Varsity events.  (Compl. ¶¶ 173-77; 179-82.)  Any gym may join Varsity's Family Plan.  (*Id.* ¶ 179.)  Under the Family Plan, a gym that is willing to commit to attend six Varsity competitions a year receives discounts on its entry fees and any apparel it chooses to purchase from Varsity.  (*Id.* ¶¶ 180-81)  Varsity invites a limited number of gyms to participate in its separate Network Agreements.  (*Id.* ¶ 174.)  Under the Network Agreement, a gym agrees to attend at least five Varsity competitions a year and to purchase All-Star Apparel exclusively from Varsity for three years.  (*Id.* ¶¶ 174, 176.)  As with any endorsement model, Varsity offers these extra discounts in an effort to have its apparel worn by the cheerleaders from the "most significant and big-money All Star Gyms" (*Id.* ¶ 174) so as to "draw[] smaller All Star gyms into attending Varsity's All-Star Competitions and wearing Varsity's All-Star Apparel."  (*Id.* ¶ 177.)

### ARGUMENT

Plaintiffs assert two antitrust counts against Varsity, comprising four distinct claims: Count 1, which asserts that Varsity has monopolized two separate alleged relevant markets—All-Star Competitions in the United States and All-Star Apparel in the United States; and Count 2, which asserts that Varsity has conspired with USASF to monopolize the same two markets.

## I.  A Complaint Must Be Supported by Plausible Factual Allegations

"For a complaint to survive a motion to dismiss, the non-conclusory 'factual content' and reasonable inferences from that content, must be 'plausibly suggestive' of a claim entitling a

plaintiff to relief." *Est. of Smith ex rel. Richardson v. United States*, 509 F. App'x 436, 439 (6th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009)).  A complaint that does not plead enough facts, as distinct from mere legal conclusions, to show that the claim is "plausible on its face" must be dismissed.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558-59, 570 (2007).

To sustain a claim of monopolization, a complaint must contain plausible factual allegations that the defendant "possess[es] . . . monopoly power in [a] relevant market" and the "willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).  To sustain a claim of conspiracy to monopolize, a complaint must contain plausible factual allegations of (1) the "existence of conspiracy" and (2) the "specific intent to monopolize."  *Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 827 (6th Cir. 1982).

**II. Plaintiff Fails to Allege Monopolization**

**A.     Plaintiff's Gerrymandered Market Definitions Are Implausible**

"The Supreme Court requires plaintiffs to identify the relevant product and geographic markets so the district court can assess what the area of competition is, and whether the alleged unlawful acts have anticompetitive effects in that market."  *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross and Blue Shield*, 552 F.3d 430, 437 (6th Cir. 2008) (internal quotation marks omitted) (affirming dismissal of complaint based on lack of proper relevant market allegations).  "The essential test for ascertaining the relevant product market" is the "reasonable interchangeability standard."  *Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F. 3d 908, 917 (6th Cir. 2009) (quotation marks omitted).  "Reasonable interchangeability is assessed by considering (1) product uses (whether the substitute products can perform the same function), and/or (2) consumer response (also known as 'cross-elasticity'),

defined as consumer sensitivity to price levels at which they elect substitutes for the defendant's

product or service." *Id*. (quotation marks omitted).  The relevant geographic market is the area

"in which the seller operates, and to which the purchaser can practicably turn for supplies."

*Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961).

"Where the plaintiff fails to define its proposed relevant market with reference to the rule

of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant

market that clearly does not encompass all interchangeable substitute products even when all

factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a

motion to dismiss may be granted."  *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d

430, 436 (3d Cir. 1997) (affirming dismissal on this basis); *see also TV Commc'ns Network, Inc.*

*v. Turner Network, Inc.*, 964 F.2d 1022, 1025 (10th Cir. 1992) (same).

### 1.    "All-Star Apparel" is Not a Plausible Relevant Market

Plaintiffs' alleged market includes "uniforms, warm-up outfits, and team jerseys; and

specialized accessories such as hair bows and headbands; and specialized equipment such as

backpacks and shoes."  (Compl. ¶ 142.)  Plaintiff further alleges that "specialized apparel and

equipment for practice" are part of this sprawling "market."  (*Id*. ¶ 141.)  Plaintiffs' alleged

market thus includes products that are not reasonably interchangeable with each other (*e.g.*, pom

poms and shoes), while creating an artificial distinction between apparel, such as warm-up gear,

used for "All-Star" teams, and the functionally identical apparel used for other athletic

endeavors.  It therefore fails to satisfy the requirements that a relevant product market must

include all substitutes and exclude non-substitutes.  *See, e.g.*, *Queen City Pizza*, 124 F.3d at 436-

37 (requiring products within a product market to be "reasonably interchangeable").

As to geographic market, Plaintiffs provide only two sentences in support of their

assertion that the market is the entire United States:  "All performances in the primary market

[the All-Star Competition market] occur within the United States and are regulated by USASF standards set in the United States.  As such, nearly all of the targeted customers for All-Star Apparel reside in the United States."  (Compl. ¶ 143.)  But the geographic scope of customers of a particular product (or, as here, a myriad of products) does not define a geographic market.  Plaintiffs make no allegations of where geographically gyms could turn to acquire apparel, which are required to sustain a viable geographic market.  *See United States v. Phila. Nat'l Bank*, 374 U.S. 321, 359 (1963).

### 2.    "All-Star Competitions" is Not a Plausible Relevant Market

Plaintiffs' alleged "All-Star Competitions" market similarly excludes substitutes and includes products which are not, according to Plaintiffs' own allegations, substitutes.  Plaintiffs apparently exclude all non-USASF sanctioned cheerleading competitions from the market.  (*See* Compl. ¶ 80 (alleging that only "most," but not all or virtually all, competitions are sanctioned by USASF).)  In doing so, Plaintiffs propose a single-brand market, which is not cognizable as a matter of law.  *See, e.g.*, *Queen City Pizza*, 124 F.3d at 438 (holding that on motion to dismiss market cannot be limited to one brand where Plaintiff chose to operate a franchise within that brand); *Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., Inc.*, 812 F. Supp. 387, 391 (S.D.N.Y. 1993) ("[T]he law is clear that the distribution of a single brand, like the manufacture of a single brand, does not constitute a legally cognizable market.") (citation omitted); *Gianna Enters. v. Miss World (Jersey) Ltd.*, 551 F. Supp. 1348, 1354 (S.D.N.Y. 1982) (dismissing claim because alleged market was limited to certain beauty pageants and excluded "other state and national beauty pageants").

Moreover, even within the subset of USASF-sanctioned competitions, Plaintiffs affirmatively allege that the various competitions are *not* substitutes for one another.  Instead, Plaintiffs distinguish the "three recognized championship" meets from other meets (Compl.

¶ 86); allege that meets at which bids to these three meets can be procured are distinguished from meets where no such bids are awarded (*Id*. ¶ 88); and allege that there is a "B League" level of meets, with different companies running meets at that level (*Id*. ¶ 169).  These allegations, if true, would demonstrate that all "All-Star Competitions" (sanctioned or otherwise) are *not* in the same relevant product market.  *See, e.g.*, *Queen City Pizza*, 124 F.3d at 437 (holding that products not alleged to be reasonably interchangeable are not in the same product market).

Finally, Plaintiffs provide no basis to distinguish competitions at the "recreational level" (Compl. ¶ 6 n.4), from "All-Star Competitions," other than the allegation that "All-Star Competitions" are "above" the recreational level.  Plaintiffs concede, however, that individual athletes move from recreational to All-Star teams.  (*Id*. ¶ 118.)  If so-called recreational competitions were included, the market would be larger and include "recreational programs such as Pop Warner and Bill George Youth."  (*Id*.)  *See also Re-Alco*, 812 F. Supp. at 391 (rejecting an overly narrow market definition).

Plaintiffs' assertion that the relevant geographic market for meets is national likewise makes no sense.  Plaintiffs allege that "All Star Teams compete nationwide to receive Bids to attend All-Star Championships" (Compl. ¶ 122), which is to say that All-Star Teams are dispersed around the country.  But Plaintiffs do not allege that price differences between competitions in different areas of the country would attract teams from outside an area where lower prices prevail.  Without such allegations, there is no basis to credit Plaintiffs' nationwide geographic market for competitions.  *See, e.g.*, *Concord Assoc., L.P. v. Ent. Props. Trust*, 817 F.3d 46, 53 (2d Cir. 2016) (affirming dismissal of Section 2 case because the plaintiffs' geographic market was implausible).  Moreover, Plaintiffs allege that international competitions are not substitutes for competitions in the United States because of the "expense of international

travel." (*Id*. ¶ 123.)  But domestic travel can be as expensive as international travel (for example, to Canada), depending on the origin and destination.  It makes no sense to exclude international events from the relevant geographic market on the basis of travel costs while disregarding domestic travel costs in defining the area of competition.  *See, e.g., Nicolosi Distrib., Inc. v. Finishmaster, Inc.*, No. 18-CV-03587, 2019 WL 1560460, at *3-4 (N.D. Cal. Apr. 10, 2019) (rejecting geographic market definition on motion to dismiss).

### B.  Plaintiffs' Allegations of Monopoly Power Fail

Plaintiffs' factual allegations do not support the assertion that Varsity has "monopoly power in [either of] the relevant market[s]," which is an essential element of its monopolization claim.  *Trinko*, 540 U.S. at 407.  "Monopoly power is the power to control prices or exclude competition."  *United States v. E.I. DuPont de Nemours & Co.*, 351 U.S. 377, 391-92 (1956).

As to the so-called "All-Star Competition" market, Plaintiffs concede that there are at least *ten* other providers of USASF-sanctioned All-Star Competitions alone (Compl. ¶¶ 167-68), plus providers of so-called "recreational" competition such as Pop Warner and Bill George Youth (*Id.* ¶ 118).  Other than conclusory assertions, there are no allegations that Varsity controls market-wide prices for competitions or how it would even go about doing so, given the myriad of other producers.  Instead, Plaintiffs allege that Varsity controls access to its *own* competitions and controls which competitions will be allowed to award bids to competitions *that Varsity produces*.  It is axiomatic that every producer controls access to and pricing of its own product, but that does not a monopoly make.  There is nothing to stop a competitor from creating its own structure and offering its own meets.  In that regard, Plaintiffs affirmatively allege that "USASF does not contractually bar its members from participating in non-USASF events." (*Id.* ¶ 216.)

The same is true for All-Star Apparel.  There are no non-conclusory allegations that Varsity controls market-wide prices for apparel that can be used in All-Star competitions or

which companies can sell such apparel.  Instead, the Complaint identifies several other suppliers,

demonstrating that there is significant competition in the marketplace.  (*See* Compl. ¶ 190-91.)

Plaintiffs assert that Varsity has many copyrights, but do not allege that the use of uniforms

covered by Varsity's copyrights are needed to compete.  (*Id.* ¶ 145.)  Beyond that, Plaintiffs

implausibly assert that judges at Varsity's competitions are instructed to cheat in favor of teams

that use Varsity apparel.  (*Id.* ¶ 146.)  The Court need not accept such fantastical allegations even

in a motion to dismiss.  *See Twombly*, 550 U.S. at 546 (holding that a court must interpret the

allegations before it "in light of common economic experience").  Indeed, there is nothing to stop

any gym, including Plaintiffs' gyms, from purchasing from whatever source it chooses to.  There

is therefore no plausible allegation that Varsity can exclude competitors for or control prices in

the alleged All-Star Apparel market.

### C.      Plaintiffs Fail to Allege Anticompetitive Conduct

Plaintiffs also fail to allege anticompetitive conduct, which is a critical element of its

claim, as the Supreme Court elucidated in *Trinko*.  *See* 540 U.S. at 407 ("To safeguard the

incentive to innovate, the possession of monopoly power will not be found unlawful unless it is

accompanied by an element of anticompetitive *conduct*.").  The Supreme Court cautioned courts

to be wary of monopolization claims in cases like this, where the claim is based on criticism of a

defendant's success:

> Firms may acquire monopoly power by establishing an infrastructure that
> renders them uniquely suited to serve their customers.  Compelling such
> firms to share the source of their advantage is in some tension with the
> underlying purpose of antitrust law, since it may lessen the incentive for
> the monopolist, the rival, or both to invest in those economically beneficial
> facilities.  Enforced sharing also requires antitrust courts to act as central
> planners, identifying the proper price, quantity, and other terms of
> dealing—a role for which they are ill-suited.

*Id.* at 407-08.

The Supreme Court's admonition is particularly apt in this case. Varsity vastly expanded cheerleading. It created an ecosystem where, through the USASF sanctioning process, participants can be assured that events—even those not run by Varsity—will meet appropriate standards. It created events for the best teams to satisfy the cheerleaders' desire to "compet[e] against the best in the sport" (Compl. ¶ 133). It launched an apparel business that has been hugely successful by elevating cheer attire beyond the staid tradition of sideline cheering to a contemporary fashion statement attractive to competitors and gyms. Ultimately, Plaintiffs think that Varsity is not running its business the way Plaintiff would like, but that is exactly the sort of complaint that the Supreme Court cautioned against in affirming dismissal in *Trinko*. As the Court admonished, merely labelling business practices "exclusionary" is not enough to survive a motion to dismiss. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

### 1. Plaintiff Does Not Allege Illegal Bundled Discounts

Plaintiffs' central allegation of anticompetitive conduct relates to Varsity's pricing structure, by which Varsity offers discounts and rebates based on a gym's volume of purchases and commitment to attend Varsity events. Contrary to Plaintiffs' suggestion, however, bundled discounts do *not* violate the antitrust laws; far from it: "Bundled discounts are pervasive, and examples abound. … Bundled discounts generally benefit buyers because the discounts allow the buyer to get more for less." *Cascade Health Sols. v. PeaceHealth*, 502 F.3d 895, 905-06 (9th Cir. 2007). "Price cutting is a practice the antitrust laws aim to promote." *Id*. at 906.

As the Ninth Circuit held in *PeaceHealth*, because of the pro-competitive nature of discounting, the *only* situation where bundled discounts can violate the antitrust laws is where the seller prices *below its cost*. 502 F.3d at 913-14 ("[W]e hold that the exclusionary conduct

element of a claim arising under § 2 of the Sherman Act cannot be satisfied by reference to bundled discounts unless the discounts result in prices that are below an appropriate measure of the defendant's costs."); *accord Collins Inkjet Corp. v. Eastman Kodak Co.,* 781 F.3d 264, 272-74 (6th Cir. 2015) (endorsing *PeaceHealth* and extending below-cost test to tying arrangements "enforced solely through differential pricing"); *see also Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990) ("Low prices benefit consumers regardless of how prices are set, and so long as they are above predatory levels, they do not threaten competition.").

Here, Plaintiffs do not allege that the bundles that Varsity offers are below its costs in any sense, nor could they. Quite the opposite: they allege that Varsity "has raised prices associated with All Star Competitions and All Star Apparel above competitive levels." (Compl. ¶ 230.)

## 2.      Plaintiffs Do Not Allege Illegal Exclusive Dealing

The same holds for Plaintiffs' vague assertions of exclusive dealing. Even a monopolist may have exclusive contracts with customers or suppliers. *See, e.g., Fraser v. Major League Soccer, LLC*, 284 F.3d 47, 68 (1st Cir. 2002). Only in the limited circumstances where a significant portion of the market is bound in exclusive deals for a significant period of time are such contracts even potentially suspect from an antitrust perspective. *Tampa Elec. Co.*, 365 U.S. at 327, 335 (holding that exclusive dealing contract is only actionable under Section 2 if it is probable that "the contract will foreclose competition in a substantial share" of the relevant market). "[F]oreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent." *B&H Med., L.L.C. v. ABP Admin., Inc.*, 526 F.3d 257, 266 (6th Cir. 2008)

Plaintiffs make no such allegations. Rather, they assert that "Varsity requires exclusive purchasing of Varsity's All Star Apparel" for "All-Star Gyms participating in its Network Agreement." (Compl. ¶ 188.) But nowhere do Plaintiffs allege how many gyms have a Network Agreement or what percentage of the alleged market these gyms represent, which allegations are

12

required to avoid dismissal.  *See, e.g.*, *SPX Corp. v. Mastercool, U.S.A., Inc.*, No. 10 CV 1266, 2011 WL 3610094, at *2 (N.D. Ohio Aug. 17, 2011) (on motion for reconsideration, affirming dismissal because, like here, "[plaintiff] does not allege [defendant] has exclusivity arrangements with all its distributors, or even a majority of them"); *Midwest Agency Servs., Inc. v. J.P. Morgan Chase Bank, N.A.*, No. 09-165, 2010 WL 935450, at *6 (E.D. Ky. Mar. 11, 2010) (dismissing complaint where plaintiff alleged only that a substantial amount of commerce was foreclosed and failed to provide "percentages or other evidence supporting this statement"); *see also Eastman v. Quest Diagnostics Inc.*, 724 F. App'x 556, 559 (9th Cir. 2018) (affirming dismissal of Section 2 claim based on exclusive dealing because plaintiffs failed to allege the "particular portion of the [relevant] market [that] was foreclosed as a result of exclusive dealing"); *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1031-32 (N.D. Cal. 2015) (holding that exclusive-dealing foreclosure allegations limited to a portion of the market were insufficient to survive motion to dismiss); *Nicolosi Distrib.*, 2019 WL 1560460, at *6 (dismissing exclusive dealing claim because plaintiff failed, among other things, to "provide any details concerning … what proportion of [defendant's] sales are as a result of such agreements").

### 3.    Plaintiffs Do Not Allege Illegal Acquisitions

Plaintiffs' effort to spin a few acquisitions that Varsity has made into exclusionary conduct under Section 2 likewise fails.  The only acquisitions that Plaintiffs mention that could be within the four-year statute of limitations period are of Spirit Celebrations in "2016 or 2017" (Compl. ¶ 165) and of Epic Brands in January 2018 (*Id.* ¶ 166).  Plaintiffs do not allege that either of these acquisitions caused an increase in market-wide prices or decreased output.  *See, e.g.*, *Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 95 F.3d 593, 597 (7th Cir. 1996) ("The core question in antitrust is output.  [Without a] reduc[tion in] output in some market, to the detriment of consumers, there is no antitrust problem.  A high price is not itself a violation of

the Sherman Act."); *see also United States v. Syufy Enters.*, 903 F.2d 659, 673 (9th Cir. 1990) (holding that, "in a competitive market, buying out competitors is not merely permissible, it contributes to market stability and promotes the efficient allocation of resources"). Plaintiffs merely allege that, after Varsity acquired Spirit Celebrations, it "increased registration fees substantially" to *one* event that Spirit previously had run (the "second largest All-Star Competition in Texas" (*Id*. ¶ 165)) and less teams competed in that one event as a result (*Id*. ¶ 165). Plaintiffs allege nothing about Epic Brands other than that it had the "largest presence in Chicago and the Northeast." (*Id*. ¶ 166.) Plaintiffs do not allege the acquisition of a specific apparel supplier at all. *See also Eastman*, 724 F. App'x at 559 (upholding dismissal of Section 2 claim based on exclusive dealing and competitor acquisition where the acquisitions "were both relatively insubstantial").

### 4.     Varsity's Relationship with the USASF is Not Illegal

Plaintiffs also allege that Varsity, through acquisitions, has indirectly obtained additional seats on the board of USASF. But Varsity founded USASF and, according to the Complaint, "USASF has *always been* captive to Varsity." (Compl. ¶ 73 (emphasis added)). Accepting that allegation as true, Varsity's acquiring additional board seats cannot have had any effect, much less an anticompetitive one.

Plaintiffs' other complaints about USASF mainly reduce to complaints about how the rules for competition are set, which are not antitrust violations. For example, Plaintiffs complain about how Varsity and USASF award bids to Worlds, which Varsity has produced since its inception in 2004. But Varsity is not required to set its rules to Plaintiffs' liking. There must be some mechanism to award bids to the higher-level competitions that it holds—in other words, to determine what teams qualify to those meets—and competitions must have rules. Disagreements about such things do not give rise to federal antitrust claims. *See, e.g.*, *Brookins v. Int'l Motor*

14

*Contest Ass'n*, 219 F.3d 849, 854 (8th Cir. 2000) ("So long as IMCA made game-defining rules

decisions based upon its purposes as a sports organization, an antitrust court need not be

concerned with the rationality or fairness of those decisions.").

### 5.      The USASF's Insurance Requirement is Not Illegal

Plaintiffs' effort to twist the USASF requirement that, to receive a USASF sanction, a

gym must have insurance into an antitrust violation likewise fails.  Plaintiffs assert that the

insurer, K&K, charges more to gyms that choose to compete in non-USASF-sanctioned events

(Compl. ¶¶ 138, 220-21), but that is silly.  First, Plaintiffs do not allege that USASF requires its

members to acquire insurance from K&K.  (*Id*. ¶¶ 138, 220 (alleging only that K&K is USASF's

"encourage[d]" or "preferred insurer")).  Second, the obvious explanation for any higher rates is

that K&K perceives the risk at non-USASF sanctioned events to be higher, presumably because

USASF requires adherence to well-defined safety requirements, that might not be followed at

non-USASF-sanctioned events.  The fact that Varsity and USASF have provided safer

competitions as reflected in lower insurance rates is hardly anticompetitive.

### 6.      Plaintiffs' Other Allegations About Apparel Fail

Plaintiffs' allegation that Varsity does not permit other apparel manufacturers to sell

apparel at Varsity's meets does not support Plaintiffs' monopolization claim.  Varsity has no duty

to allow its competitors to sell their goods at its events, any more than the Grizzlies are required

to allow competing vendors of caps to sell inside the Fedex Forum.  *See, e.g.*, *Trinko*, 540 U.S. at

407-08 (rejecting duty to facilitate competition with competitors).

Moreover, Plaintiffs do not allege the share of apparel that is sold at these meets or

otherwise explain why sales at these meets, which it conclusorily refers to as "market-dominant

trade shows" (Compl. ¶ 11), are particularly important.  Plaintiffs make no allegations that other

manufacturers (such as, for example, Nike, Under Armour, and Adidas) do not have numerous

other channels to reach gyms and competitors, including through retail stores, online outlets, sales through gyms, and other trade shows and events held proximate to Varsity's competitions. Indeed, directly contradicting the importance of sales at Varsity meets, Plaintiffs affirmatively allege that the gyms, not the athletes, buy the needed apparel for their athletes from the manufacturers.  (*Id*. ¶ 6.)  There is no allegation that gyms purchase apparel at meets or that other apparel vendors do not have access to gyms.

Plaintiffs' sensational allegation that Varsity in essence rigs its events to favor its apparel customers (Compl. ¶¶ 107, 146, 154, 194), unsupported by a single specific example, should be dispatched for two reasons.  First, such unfounded allegations, transparently intended to cast aspersions, do not constitute monopolization.  To the contrary, if true they would create an opportunity for rivals to hold their own unbiased competitions.  *See, e.g.*, *Brookins*, 219 F.3d at 854 ("Irrational decisions and unfair treatment of suppliers will result in an unpopular game, and players and spectators will take their entertainment dollars elsewhere."); *Fraser*, 284 F.3d at 61 (a league's using its monopoly power to underpay its players "ought to spur, rather than impair, competition from rival leagues").  The antitrust laws are not the way to remedy perceived unfairness in sports competitions.  Second, there is no allegation that anyone has ever purchased Varsity apparel because of this supposed issue.

Finally, Plaintiffs do not allege any anticompetitive effects related to All-Star Apparel. Although Plaintiffs make conclusory assertions of "higher prices" and "lower output," there are no actual non-conclusory allegations pertaining to apparel.  (*See* Compl. ¶¶ 230, 234.)  To the contrary, casual observation reveals no shortage of athletic wear competitors.

### 7.      Plaintiffs' Abuse Allegations Fail

In their most recent Complaint, Plaintiffs sling mud by adding five paragraphs at the very end (Compl. ¶¶ 237-41) relating to a recent article in USA Today about individuals who,

according to the Complaint "continue to work unrestricted in the All Star cheerleading industry [and] have been convicted of sex crimes against minors." (*Id.* ¶ 238.)  Plaintiffs make the conclusory and implausible assertion that "Varsity, through USASF, refused to take action because its market share and lack of effective competition allowed it to resist calls for a more rigid, restrictive, and expensive background check system." (*Id.* ¶ 241.)  Plaintiffs further allege that "Participants in the cheerleading industry were powerless to demand reform without a realistic threat to take their business elsewhere." (*Id.*)

These allegations make no sense and certainly do not support Plaintiffs' antitrust claims. The article that Plaintiffs cite[2] describes how cheerleading *gyms*—in other words, putative class members in this case—allowed convicted sex offenders to work with their cheerleaders *despite* USASF-mandated background checks.  Plaintiffs therefore indict themselves and members of the putative class they seek to represent for failing to act.  At the same time, Plaintiffs provide no basis to infer that Varsity's alleged monopoly power stopped gyms from acting on background checks or from being appropriately vigilant with their own employees.  There are no allegations that Varsity, USASF or anyone else required Plaintiffs or members of the putative close to employ abusers or in any way encouraged their employment, or in any way interfered with any effort that a gym chose to undertake to background check its employees or act on those checks. In sum and substance, Plaintiffs allegations are that Varsity should have forced Plaintiffs and the

---

[2] *See* Kwiatkowski and Nadolny, "Cheerleading Has a List of People Banned From the Sport.  It Was Missing 74 Convicted Sex Offenders," USA Today (Sept. 21, 2020), *available at* https://www.usatoday.com/in-depth/news/investigations/2020/09/18/cheerleading-cheer-investigation-sexual-misconduct-sex-offender-banned-list/3377622001/; Declaration of Steven J. Kaiser, attached as Exhibit 1.  Because Plaintiffs cite the document in their Complaint, it may properly be considered in assessing Defendants' motion to dismiss.  *See, e.g.*, *Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir. 1999).

putative class they seek to represent to not employ sex offenders.  By any measure, that is a twist of the antitrust laws beyond all recognition.

## III.        Plaintiff Fails to Allege a Conspiracy to Monopolize

Because Plaintiffs have not plausibly alleged monopolization, its claim of conspiracy to monopolize necessarily fails.  *See, e.g.*, *Prime Healthcare Servs. v. SEIU*, 642 F. App'x 665, 666-67 (9th Cir. 2016) (affirming dismissal of monopolization and conspiracy to monopolize because plaintiff failed to allege "possession of monopoly power in [a] relevant market").  In addition, neither Varsity nor USASF are alleged to have had "the specific intent to monopolize," a required element of a conspiracy to monopolize claim.  *See, e.g.*, *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003).

In addition, Plaintiffs' conspiracy claim should be dismissed because Plaintiffs allege that Varsity and USASF are essentially one and the same and, taking those allegations as true, they are therefore not legally capable of conspiring with one another.  *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984).  Among other things, Plaintiffs allege that Varsity "created the USASF" (Compl. ¶ 71); that "USASF has always been captive to Varsity" (*id.* ¶ 73); that "Varsity funded the USASF at its inception with a $1.8 million interest-free loan" (*id.*); that "Varsity submitted the original trademark application for the marks 'U.S. All Star Federation' and 'USASF,' listing itself as owner" (*id.* ¶ 74; *see also id.* ¶ 197); that "[f]or years, USASF's offices were located at Varsity's corporate address," (*id.* ¶ 75); that "[u]ntil recently, USASF employees worked at Varsity's headquarters" and "USASF's office is currently still mere miles from Varsity's headquarters" (*id.* ¶ 73); that "[f]or at least a period of time USASF's and Varsity's finances were intermingled" (*id.* ¶ 76 ); that "USASF employees received their paychecks from Varsity" (*id.*; *see also id.* ¶ 76); and that "Varsity cashed checks issued to USASF" (*id.* ¶ 74); that a "Varsity representative answered the phone for USASF" (*id.* ¶ 198);

that Varsity owns USAFS's website URL (*id.* ¶ 74); that Varsity controls a "permanent majority of USASF's voting board members" (*id.* ¶ 76); that USASF is "under the control of Varsity" (*id.* ¶ 92; *see also id.* ¶¶ 65, 66, 85, 98, 144, 148, 197-99, 201, 206, 209); that Varsity employees serve as "USASF Vice Presidents and the Executive Director" (*id.* ¶ 79); and that Varsity has "captured USASF" (*id.* ¶ 107).

As is evident from these allegations, according to Plaintiffs, USASF is completely captive to Varsity and always has been, does not compete with Varsity and never has, has no independent decision-making or economic purpose. They are therefore incapable of conspiring with Varsity under *Copperweld*. *See also Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1035 & n.15 (9th Cir. 2005) (holding that *Copperweld* applied to national breed club and dog registry and its regional affiliates that, although not under common ownership, had an "identical economic interest"). The only thing that plausibly can be inferred from Plaintiffs' allegations is that Varsity and USASF are not, and never have been "separate economic actors pursuing separate economic interests" and therefore "agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals." *Copperweld*, 467 U.S. at 769; *Century Oil Tool, Inc. v. Prod. Specialties, Inc.*, 737 F.2d 1316, 1317 (5th Cir. 1984) (holding that *Copperweld* applied to two corporations under common control as "a contract between them [would] not join formerly distinct economic units" because, "[i]n reality they have always had 'a unity of purpose or a common design'") (quoting *Copperweld*, 467 U.S. at 771).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the claims against Varsity in their entirety.

Dated: December 1, 2020

Respectfully submitted,

s/ Matthew S. Mulqueen

George S. Cary*
Mark W. Nelson*
Alexis Collins*
Steven J. Kaiser*
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Phone: (202) 974-1500
Fax: (202) 974-1999
gcary@cgsh.com
mnelson@cgsh.com
alcollins@cgsh.com
skaiser@cgsh.com

* Admitted *pro hac vice*

Matthew S. Mulqueen (TN #28418)
Adam S. Baldridge (TN #23488)
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ
165 Madison Avenue, Suite 2000
Memphis, TN 38103
Phone: (901) 526-2000
Fax: (901) 577-0866
mmulqueen@bakerdonelson.com
abaldridge@bakerdonelson.com

*Attorneys for Defendants Varsity Brands, LLC, Varsity Spirit, LLC, and Varsity Spirit Fashions & Supplies, LLC*