# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| FUSION ELITE ALL STARS, SPIRIT FACTOR LLC d/b/a FUEL ATHLETICS, and STARS AND STRIPES GYMNASTICS ACADEMY INC. d/b/a STARS AND STRIPES KIDS ACTIVITY CENTER, on behalf of themselves and all others similarly situated<br><br>    Plaintiffs,<br> v.<br><br>VARSITY BRANDS, LLC, VARSITY SPIRIT, LLC, VARSITY SPIRIT FASHION & SUPPLIES, LLC, and U.S. ALL STAR FEDERATION, INC.,<br><br>    Defendants. | **Civ. Action No. 2:20-cv-02600-SHL-atc** |

**MEMORANDUM IN SUPPORT OF U.S. ALL STAR FEDERATION, INC.'S MOTION TO DISMISS**

# INTRODUCTION

Plaintiffs spend much of their 262-paragraph First Amended Complaint ("the Complaint") explaining the background and history of All Star Cheer. Despite this lengthy and largely irrelevant narrative, Plaintiffs' allegations fail to give rise to an antitrust claim and fail to connect U.S. All Star Federation, Inc. ("USASF") to the alleged antitrust violations. Plaintiffs claim that USASF "conspired" with Varsity to monopolize the "All Star Competition Market" and "All Star Apparel Market," but fail to properly define these markets as required to state a plausible antitrust claim. Further, Plaintiffs allege no anticompetitive conduct on the part of USASF and no specific intent to monopolize. Perhaps most glaringly, the Complaint alleges such significant control by Varsity over USASF that, taking the facts alleged as true, the Complaint cannot state a viable conspiracy between Varsity and USASF under *Copperweld* and the intracorporate conspiracy doctrine. At bottom, taking the allegations in the Complaint as true and viewing them in the light most favorable to Plaintiffs, Plaintiffs' allegations simply describe the fair growth and development of the sport of All Star Cheer. Having failed to state a plausible claim against USASF, Plaintiffs' Complaint against this Defendant must be dismissed pursuant to Rule 12(b)(6).

# STATEMENT OF FACTS

In 2004, Varsity[1] "created the USASF with the . . . goal of setting uniform rules and judging standards for All Star Competitions." (Compl. ¶ 71). USASF is a Tennessee non-profit corporation that promulgates and enforces rules governing All Star Competitions, and more broadly, the sport of All Star cheer and dance throughout the United States. (Compl. ¶ 39). USASF has expanded All Star cheer by "sanction[ing] All-Star Competitions and provid[ing] a set of rules and

---

[1] For purposes of this memorandum, "Varsity" refers to Varsity Brands, LLC; Varsity Spirit, LLC; and Varsity Spirit Fashion & Supplies, LLC. "USASF" refers to U.S. All Star Federation, Inc.

1

regulations to govern those events." (Compl. ¶ 195). Further, according to the Complaint, "USASF has always been captive to Varsity." (Compl. ¶ 73).

Plaintiffs bring one count against USASF, which asserts that USASF has conspired with Varsity to monopolize the All Star Competition and All Star Apparel markets in the United States. These claims against USASF are largely based on Plaintiffs' conclusory assertion that "Varsity, together with the USASF, has . . . foreclosed competition in both Relevant Markets by, *inter alia*, restricting access to the ability to award coveted bids to Worlds and other All Star Championship Bids, requiring adherence to restrictive rules and exclusionary insurance requirements, and other conduct alleged to be part of the Exclusionary Scheme in this Complaint." (Compl. ¶ 226). More specifically, as to USASF, Plaintiffs allege that USASF has conspired with Varsity to monopolize the cheerleading competition and apparel markets based on the following conduct: (1) USASF has a copyright registration for its competition rules and enforces its intellectual property rights (Compl. ¶ 255), (2) USASF rules governing apparel—which require athletes to wear sneakers, refrain from wearing overly revealing clothing, and prohibit certain accessories that present a safety risk—are somehow drafted in favor of Varsity apparel (Compl. ¶ 256), and (3) USASF limits the number of bids to Worlds (Compl. ¶ 254).

## LAW AND ARGUMENT

As a threshold matter, Defendant USASF incorporates and adopts herein by reference the entirety of Varsity's Memorandum of Law in Support of its Motion to Dismiss. Of particular relevance to USASF are Varsity's arguments that Plaintiffs fail to state a plausible antitrust claim because they do not adequately plead (a) the relevant markets, (b) the specific intent of each Defendant to achieve a monopoly as required to support a conspiracy, or (c) the existence of a viable conspiracy between USASF and Varsity. Additionally, because Plaintiffs fail to state a claim

for monopolization, Plaintiffs have no basis to allege a conspiracy to monopolize against USASF. USASF submits this Memorandum in further support of these arguments.

## I.     Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558-59, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "Determining whether a complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

The Sixth Circuit has instructed that courts are to be "'reasonably aggressive' in weeding out meritless antitrust claims at the pleading stage," where the costs of discovery are excessive. *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007) (quoting *Valley Prods. Co. v. Landmark*, 128 F.3d 398, 403 (6th Cir. 1997); *see also Twombly*, 550 U.S. at 546 ("It is one thing to be cautious before dismissing an antitrust claim in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive" "with the right to do so representing an in terrorem increment of the settlement value."). In this case, Plaintiffs have already served 117 requests for production, which contain numerous discrete subparts, on USASF. The parties have agreed to 55 depositions per side, which reflects a significant reduction from Plaintiffs' original proposal. If the claims against USASF are permitted to proceed, USASF—a Tennessee nonprofit membership organization—expects to be subjected to massive and expensive discovery. In light of the admonitions of the Supreme Court and Sixth Circuit, Plaintiffs should not be permitted to proceed with "a largely groundless claim" against USASF.

3

II.     **Plaintiffs Fail to State a Plausible Antitrust Claim Under 15 U.S.C. § 2.**

Plaintiffs' antitrust claims fail for numerous reasons. Not only do Plaintiffs fail to properly define the relevant markets, *see* Varsity Mem. at 6-9, but Plaintiffs also do not plead the existence of any anticompetitive conduct by USASF or any specific intent of USASF to achieve a monopoly. Further, taking the allegations in the Complaint as true, Plaintiffs cannot allege a viable conspiracy to monopolize because the claim is barred by the intracorporate conspiracy doctrine.

A.      **Plaintiffs Fail To Properly Define the Relevant Markets.**

"A plaintiff must first define the relevant market in order to state a claim under the antitrust statutes." *Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963, 969 (W.D. Tenn. 2004); *see also United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966); *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 782 (6th Cir. 2002) ("The first step in any action brought under § 2 of the Sherman Act is for the plaintiff to define the relevant product and geographic markets in which it competes with the alleged monopolizer . . . ."). "Determining the relevant market enables the court to assess whether the defendant has monopoly power in that market, what the area of competition is, and whether the allegedly unlawful acts have anticompetitive effects in that market." *Cupp*, 310 F. Supp. 2d at 969.

Relevant markets have a product and geographic dimension. As the Sixth Circuit has recognized, "[t]he essential test for ascertaining the relevant product market" is the "reasonably interchangeability standard." *Kentucky Speedway, LLC v. National Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 917 (6th Cir. 2009) (internal quotation marks omitted). "Reasonable interchangeability is assessed by considering (1) the product uses (whether the substitute products or services can perform the same function), and/or (2) consumer response (also known as 'cross-elasticity'); defined as consumer sensitivity to price levels at which they elect substitutes for the defendant's product or service." *Id.* (internal quotation marks omitted). "The court determines the

4

geographic market by assessing the market area in which the seller operates and to which the buyer can practicably turn for supplies." *Cupp*, 310 F. Supp. 2d at 970.

"Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) (affirming dismissal on this basis); *see also TV Commc'ns Network v. Turner Network*, 964 F.2d 1022, 1025 (10th Cir. 1992) (same).

Plaintiffs allege two "relevant markets": the "All Star Competition Market" and the "All Star Apparel Market."

### 1. *The Proposed All Star Competition Market is Invalid.*

With respect to the alleged All Star Competition Market, Plaintiffs purport to define this market as "events at which All Star Teams perform time-limited routines composed of tumbling, stunting, pyramids, and dance segments." (Compl. ¶ 111). In other words, Plaintiffs define the relevant market of All Star Competition as events sanctioned by USASF and for which USASF serves as the governing body (Compl. ¶ 116), i.e., a single-brand market. Such a market cannot support an antitrust claim as a matter of law. *See, e.g.*, *Queen City Pizza*, 124 F.3d at 438 (finding that plaintiffs did not plead a valid relevant market when the proposed relevant market constituted a single-brand market).

Further, this definition fails to properly account for reasonable interchangeability and cross-elasticity of demand. Plaintiffs themselves distinguish between various USASF-sanctioned competitions that they allege are not substitutes for one another. Specifically, Plaintiffs allege that

5

there are "three recognized championships for All Star Cheerleading," those competitions "that offer Bids to an All Star Championship event, which are "much more attractive," and at some lower echelon, all other competitions. (*See* Compl. ¶ 86). If these allegations are taken as true, Plaintiffs are pleading that the proposed relevant market is comprised of various "All Star Competitions" that are not reasonable substitutes for one another. *See, e.g.*, *Queen City Pizza*, 124 F.3d at 437 (holding that products not alleged to be reasonably interchangeable are not in the same product market).

Moreover, Plaintiffs improperly exclude "recreational level" events and "recreational programs such as Pop Warner and Bill George Youth." (Compl. ¶¶ 6 n.4, 118). Plaintiffs also exclude or fail to consider sports such as dance, gymnastics, ice skating, synchronized swimming, and other types of competitive cheerleading, all of which represent reasonable alternatives to athletes with skills in tumbling, stunting, pyramids, and dance segments.

Having failed to take into account cross-elasticity of demand and reasonable alternatives in their proposed relevant market of All Star Competitions, Plaintiffs fail to identify a valid product market as is required to state an antitrust claim. *See Cupp*, 310 F. Supp. 2d at 969-70.

Even more, as discussed in Varsity's Memorandum at pages. 9-10, Plaintiffs also fail to properly define the relevant geographic market. Plaintiffs' attempt to limit the geographic market to only those competitions in the United States is nonsensical. This deficiency provides yet another basis for finding that Plaintiffs have failed to properly define the relevant market at this stage.

### 2. *The Proposed All Star Apparel Market is Even More Deficient.*

With respect to the All Star Apparel Market, Plaintiffs' deficiencies are even more pronounced. Plaintiffs purport to define this market as "includ[ing] clothing, shoes, accessories, and equipment purchased for use by All Star Cheerleaders at All Star Competitions and during All

6

Star Team practices and training." (Compl. ¶ 102). Plaintiffs explain that these goods include "lightweight, breathable athletic wear typically made of spandex, microfiber, or cotton materials," such as sweatshirts, jackets, sweatpants, shorts, leggings, t-shirts, tank tops, long-sleeved shirts, and sports bras. (Compl. ¶ 103). Plaintiffs also assert that their definition of the "All Star Apparel Market" includes backpacks and duffle bags, hair bows, uniforms, and soft-soled shoes. (Compl. ¶¶ 104-105). Again, the proposed relevant market consists of a variety of products that are not reasonably interchangeable with each other and, therefore, fails on its face. *See Queen City Pizza*, 124 F.3d at 437.

Moreover, despite identifying fairly generic athletic apparel and equipment, Plaintiffs conversely allege that the All Star Apparel Market "is restricted to specialized" clothing and equipment. (Compl. ¶¶ 141-142). Plaintiffs effectively allege that the All Star Apparel Market consists of Varsity apparel to the exclusion of all other athletic wear and equipment. This fails to properly define the relevant market and does not account for the numerous other massive companies in the athletic apparel and equipment industry, such as Nike, Adidas, Under Armor, and so on, all of which can and do sell "lightweight, breathable athletic wear," backpacks, and soft-soled shoes. Plaintiffs' attempt to create an artificial distinction between "specialized" apparel and equipment used for "All Star" teams and the functionally identical apparel used for athletic endeavors should be rejected.

Yet again, Plaintiffs improperly limit the geographic scope of the proposed relevant market to the United States. Plaintiffs make no allegations of where geographically gyms could turn to acquire apparel, which are required to sustain a viable geographic market. *See Phila. Nat'l Bank*, 374 U.S. at 359; *see also* Varsity Mem. at 7.

7

### B.   Plaintiffs Fail to Plead That USASF Has Specific Intent to Monopolize.

Section 2 of the Sherman Act prohibits monopolization, attempted monopolization, and conspiracies to monopolize. *Energy Conversion Devices Liquidation Trust v. Trina Solar Ltd.*, 833 F.3d 680, 684 (6th Cir. 2016) (citing 15 U.S.C. § 2). To plead a conspiracy to monopolize, Plaintiffs must allege both the existence of a conspiracy and specific intent to monopolize. *Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 827 (6th Cir. 1982).

There are *no* allegations in the Complaint, however, that USASF had a "specific intent to monopolize." *Scooter Store, Inc. v. SpinLife.com, LLC*, 777 F. Supp. 2d 1102, 1116 (S.D. Ohio 2011) (quoting *Conwood*, 290 F.3d at 782). As a result, the Complaint cannot state a plausible conspiracy to monopolize claim.

### C.   Plaintiffs Do Not Plead Any Conduct From Which Specific Intent of USASF To Monopolize Could be Inferred.

Even taking all of the allegations in the Complaint as true and viewing them in the light most favorable to Plaintiffs, Plaintiffs fail to allege any conduct from which the Court could reasonably infer that USASF had a specific intent to monopolize to support a Section 2 claim.

For example, Plaintiffs complain about various USASF policies. None of these policies, however, suggest a specific intent to monopolize on the part of USASF or otherwise give rise to an antitrust violation. *See NCAA v. Board of Regents*, 468 U.S. 85, 117 (1984) (recognizing that "most of the regulatory controls of the NCAA are justifiable means of fostering competition among amateur athletic teams and therefore procompetitive because they enhance public interest in intercollegiate athletics"). As discussed in Varsity's Memorandum, Plaintiffs complain about how Varsity and USASF award bids to "Worlds." *See* Varsity Mem. at 15-16. Not every USASF member will like every rule promulgated and enforced. Regardless, there must be some mechanism to award bids to the higher-level competitions that it holds, in other words, to

8

determine what teams qualify to those meets, and competitions must have rules. *Accord National Hockey Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 474 (6th Cir. 2005) (affirming conclusion that rule allegedly restraining athletic competition among hockey leagues did not support a cognizable claim under the Sherman Act); *Brookins v. Int'l Motor Contest Ass'n*, 219 F.3d 849, 853 (8th Cir. 2000) (noting that rules will necessarily involve exclusions which are an "incidental and inevitable byproduct of defining the game"). The existence of this legitimate mechanism does not suggest in any way that USASF has a specific intent to monopolize.

Plaintiffs also complain about USASF's requirement that member All Star gyms have liability insurance. (Compl. ¶ 220). There is no allegation, however, that K&K Insurance is affiliated with or controlled by USASF, or that USASF has any control over K&K Insurance's rates or policy terms. There is simply no legal basis to assert that USASF's alleged insurance requirement—which is such an obvious benefit to the athletes—could possibly give rise to an inference that USASF has a specific intent to monopolize.

Additionally, Plaintiffs complain about USASF's uniform rules. (Compl. ¶ 106). Yet even Plaintiffs cannot identify any particular uniform rule that requires some Varsity-specific article of clothing. To the contrary, as pleaded by Plaintiffs, USASF's rules are remarkably generic, requiring only that athletes wear sneakers, not wear overly revealing clothing, and not wear accessories and use props that impact safety. (*Id.*). Plaintiffs' complaints about USASF rules simply do not involve any anticompetitive conduct and fail to establish any specific intent to monopolize on the part of USASF. *See, e.g.*, *Brookins*, 219 F.3d at 854 ("So long as IMCA made game-defining rules decisions based upon its purposes as a sports organization, an antitrust court need not be concerned with the rationality or fairness of those decisions.").

9

### D. Plaintiffs Fail To Plead A Viable Conspiracy Between Varsity and USASF Under *Copperweld* and the Intracorporate Conspiracy Doctrine.

Taking the allegations in the Complaint as true, Varsity and USASF, are essentially one and the same. As a result, these entities are legally incapable of conspiring with each other under Section 2 of the Sherman Act. *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769, 771 (1984) (finding that a wholly-owned subsidiary could not form a conspiracy with its parent corporations because such agreements "do not suddenly bring together economic power that was previously pursuing divergent goals" and are not within the concern of the antitrust conspiracy statutes); *see also Nurse Midwifery Assocs. v. Hibbett*, 918 F.2d 605, 612 (6th Cir. 1990) (noting that "a corporation cannot ordinarily conspire with its agents or employees" in violation of the Sherman Act); *Boulevard Souvenirs v. Elvis Presley Enters., Inc.*, 2007 WL 9705982, at *3-4 (W.D. Tenn. Oct. 2, 2007) (holding that intracorporate conspiracy doctrine precluded claim under both § 1 and § 2 of the Sherman Act).

Among other things, Plaintiffs allege that Varsity "created the USASF" (Compl. ¶ 71); that "USASF has always been captive to Varsity" (*id.* ¶ 73); that "Varsity funded the USASF at its inception with a $1.8 million interest-free loan" (*id.*); that Varsity controls a "permanent majority of USASF's voting board members" (*id.* ¶ 76; *see also id.* ¶ 203); that USASF is "under the control of Varsity" (*id.* ¶ 92; *see also id.* ¶¶ 72, 73, 90, 94, 116, 129, 201, 206, 209, 213); and that Varsity employees serve as "USASF Vice Presidents and the Executive Director" (*id.* ¶ 204); that "the USASF's offices were located at Varsity's corporate address'" (*id.* ¶ 198); that "Varsity submitted the original trademark application for the marks 'U.S. All Star Federation' and 'USASF,' listing itself as owner" (*id.* ¶ 197); that "[u]ntil recently, USASF employees worked at Varsity's headquarters in Tennessee" and that "USASF's office is currently still mere miles from Varsity's headquarters" (*id.* ¶ 73); that "[f]or at least some period of time USASF's and Varsity's finances

10

were intermingled" (*id.* ¶ 76); that "the USASF employees received their paychecks from Varsity" (*id.*); that "Varsity cashed checks issued to USASF" (*id.* ¶ 74); that a "Varsity representative answered the phone for USASF" (*id.* ¶ 198); that Varsity owns USASF's website URL (*id.* ¶ 205).

According to Plaintiffs, USASF has no independent decision-making or economic purpose and is completely beholden to Varsity. In other words, as in *Copperweld*, taking Plaintiffs' allegations as true, USASF and Varsity are not "separate economic actors pursuing separate economic interests" and, therefore, "agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals." *Copperweld*, 467 U.S. at 769; *see also American Council of Certified Podiatric Physicians and Surgeons v. American Board of Podiatric Surgery, Inc.*, 185 F.3d 606, 620 (6th Cir. 1999) (holding that defendant corporation could not conspire with its members for purpose of Sherman Act § 2 claim); *Nurse Midwifery Assocs.*, 918 F.2d at 614 (holding that intracorporate conspiracy doctrine precluded claim under the Sherman Act that hospital defendants had conspired with their staff and physician agents); *Century Oil v. Prod. Specialties*, 737 F.2d 1316, 1317 (5th Cir. 1984) (holding that *Copperweld* applied to two corporations under common control as "a contract between them [would] not join formerly distinct economic units" because, "[i]n reality they have always had a unity of purpose or a common design").

In *Jack Russell Terrier Network of Northern Ca. v. Am. Kennel Club*, the Ninth Circuit rejected a similar theory that the Jack Russell Terrier Club of America conspired with its regional affiliates. 407 F.3d 1027, 1035 & n.15 (9th Cir. 2005). The court determined that the Plaintiffs had "not alleged sufficient facts to support a claim that the JRTCA and its affiliates are separate entities pursuing different economic goals, capable of conspiring for Sherman Act purposes." *Id.* at 1035. Because the court was bound to "assume the truth of the facts alleged in the complaint,"

11

it could not "assume any facts necessary to the [plaintiffs'] claim that they have not alleged." *Id.* In *Jack Russell*, the complaint alleged that the national club and its affiliates shared a common goal and economic interests, the affiliates were extensions of the national club, and the affiliates did not compete with the national club. *Id.* The Court of Appeals thus applied the *Copperweld* rule and found that the plaintiffs could not state a viable antitrust claim. *Id.*

As in *Jack Russell*, the Complaint here does not allege that USASF and Varsity are separate actors pursuing independent economic interests. Rather, the Complaint alleges that USASF is an extension of Varsity. There is no suggestion—nor could there be—that USASF competes with Varsity. Following the logic of the Ninth Circuit in *Jack Russell*, this Court should similarly find that based on the allegations in the Complaint, the relationship between USASF and Varsity cannot, as a matter of law, constitute a conspiracy to monopolize under *Copperweld*. *See Jack Russell*, 407 F.3d at 1035 & n.15 (holding that *Copperweld* applied to national breed club and dog registry and its regional affiliates that, although not under common ownership, had an "identical economic interest"); *Century Oil Tool Co.*, 737 F.2d 1317 (holding that two corporations were incapable of conspiring because they were under the "common ownership and control" of three individuals).

E. **Plaintiffs' Claims Against USASF Fail For the Additional Reason That Plaintiffs Fail to State a Viable Monopolization Claim.**

Varsity's Memorandum delves further into whether various allegations in the Complaint state a plausible monopolization claim. Of note, at pages 11-19 of its Memorandum, Varsity explains at length why Plaintiffs have not identified any anticompetitive conduct sufficient to state a monopolization claim. Because Plaintiffs have brought only a conspiracy to monopolize claim against USASF, and not a monopolization claim, USASF does not repeat those arguments in their entirety here. Nevertheless, as stated above, Varsity's arguments are adopted by USASF and incorporated by reference. Absent a plausible claim for monopolization against Varsity, Plaintiffs

have no basis to allege a conspiracy to monopolize against USASF. *See, e.g.*, *Prime Healthcare Servs. v. SEIU*, 642 F. App'x 665, 666-67 (9th Cir. 2016) (affirming dismissal of monopolization and conspiracy to monopolize because plaintiff failed to allege "possession of monopoly power in [a] relevant market").

## CONCLUSION

For the foregoing reasons, Defendant USASF respectfully requests that the Court dismiss all claims against USASF with prejudice.

December 1, 2020                              Respectfully submitted,

                                                  *s/ Nicole D. Berkowitz*
Grady Garrison (TN #008097)
Nicole D. Berkowitz (TN #35046)
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ
165 Madison Avenue, Suite 2000
Memphis, TN 38103
Phone: (901) 526-2000
Fax: (901) 577-0866
ggarrison@bakerdonelson.com
nberkowitz@bakerdonelson.com

*Attorneys for U.S. All Star Federation, Inc.*

14