**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**

| | |
|---|---|
| FUSION ELITE ALL STARS, et al., | |
| Plaintiffs, | Case No. 2:20-cv-02600-SHL-cgc |
| v. | |
| VARSITY BRANDS, LLC, et al., | **Jury Trial Demanded** |
| Defendants. | |

<u>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO STRIKE CLASS ALLEGATIONS AND SPURIOUS ALLEGATIONS
REGARDING SEXUAL ABUSE**</u>

## TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................. 1

II.   LEGAL STANDARD ...................................................................................... 5

III.  ARGUMENT .................................................................................................. 7

   A.   The Complaint Does Not Establish Any Conflicts of Interest .................................. 8

   B.   The Complaint Does Not Establish that Individual Issues Will Predominate ....... 12

   C.   The Complaint Does Not Negate Injunctive Relief .................................. 17

   D.   No Class Members Lack Standing .................................................................. 18

   E.   Plaintiffs' Sexual Abuse Allegations Are Relevant and Should Not Be Struck ...... 19

IV.  CONCLUSION ............................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Allen v. Andersen Windows, Inc.*,
  913 F. Supp. 2d 490 (S.D. Ohio 2012) ................................................................... 6

*Allstate Ins. Co. v. OMIC, LLC*,
  No. 17-13908, 2018 WL 8806551 (E.D. Mich. Sept. 24, 2018) ......................................... 7, 20

*Amchem Prod., Inc. v. Windsor*,
  521 U.S. 591  (1997) ..................................................................................... 1

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) ..................................................................................... 12

*Apple Inc. v. Pepper*,
  139 S. Ct. 1514 (2019) ................................................................................ 13, 14

*Brown & Williamson Tobacco Corp. v. United States*,
  201 F.2d 819 (6th Cir. 1953) ............................................................................ 7

*Castro v. Sanofi Pasteur Inc.*,
  134 F. Supp. 3d 820 (D.N.J. 2015) ................................................................ 10, 14, 15

*Cerjanec v. FCA US, LLC*,
  No. 17-cv-10619, 2018 WL 3729063 (E.D. Mich. Aug. 6, 2018)............................................. 7

*Coleman v. Gen. Motors Acceptance Corp.*,
  220 F.R.D. 64 (M.D. Tenn. 2004) ................................................................... 18, 19

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ................................................................................... 1, 17

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962) .................................................................................... 17

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*,
  502 F.3d 91 (2d Cir. 2007) .............................................................................. 12

*Cummings v. Connell*,
  316 F.3d 886 (9th Cir. 2003) ............................................................................. 9

*Daishowa Int'l v. N. Coast Exp. Co.*,
  No. 81-cv-00574, 1982 WL 1850  (N.D. Cal. May 24, 1982)................................................. 6

*Dodge Data & Analytics LLC v. iSqFt, Inc.*,
  183 F. Supp. 3d 855 (S.D. Ohio 2016) ................................................................... 19

ii

*Doe v. City of Memphis,*
  928 F.3d 481 (6th Cir. 2019) ........................................................................ 7, 8, 20

*Fishon v. Mars Petcare US, Inc.,*
  No. 3:19-cv-00816, 2020 WL 6826733 (M.D. Tenn. Nov. 20, 2020)........................................ 5

*FTC v. Ind. Fed'n of Dentists,*
  476 U.S. 447 (1986)........................................................................................ 19

*Galoski v. Stanley Black & Decker, Inc.,*
  No. 1:14-cv-00553, 2014 WL 4064016 (N.D. Ohio Aug. 14, 2014) ........................................ 6

*Gen. Tel. Co. v. Falcon,*
  457 U.S. 147 (1982)........................................................................................ 7

*Hanover Shoe, Inc. v. United Shoe Machinery Corp,*
  392 U.S. 481 (1968)................................................................................ 13, 16

*Hawaii v. Standard Oil Co. of Cal.,*
  405 U.S. 251 (1972)........................................................................................ 1

*Healey v. Jefferson Cnty. Ky Louisville Metro Gov't,*
  No. 3:17-cv-00071, 2018 WL 1542142 (W.D. Ky. Mar. 29, 2018)........................................ 5

*Hosp. Auth. of Metro. Gov't of Nashville & Davidson Cty., Tenn. v. Momenta Pharm., Inc.,*
  333 F.R.D. 390 (M.D. Tenn. 2019) ................................................................ 9, 16

*In re Capacitors Antitrust Litig.,*
  No. 17-md-02801-JD, 2018 WL 5980139 (N.D. Cal. Nov. 14, 2018) .................................. 15

*In re Cardizem CD Antitrust Litig.,*
  200 F.R.D. 297 (E.D. Mich. 2001) ........................................................................ 12

*In re Cardizem CD Antitrust Litig.,*
  332 F.3d 896 (6th Cir. 2003) ............................................................................ 13

*In re Cast Iron Soil Pipe and Fittings Antitrust Litig.,*
  No. 1:14-md-2508, 2015 WL 5166014 (E.D. Tenn. June 24, 2015)........................................ 6

*In re K-Dur Antitrust Litig.,*
  686 F.3d 197 (3d Cir. 2012) ...................................................................... 8, 9, 16

*In re Nexium Antitrust Litig.,*
  777 F.3d 9 (1st Cir. 2015)................................................................................ 15

*In re Packaged Ice Antitrust Litig.,*
  322 F.R.D. 276 (E.D. Mich. 2017) ........................................................................ 16

*In re Papa John's Empl. & Franchise Empl. Antitrust Litig.*,
   No: 3:18-cv-00825, 2019 WL 5386484 (W.D. Ky. Oct. 21, 2019)................................. 1, 5, 19

*In re Polyurethane Foam Antitrust Litig.*,
   314 F.R.D. 226 (N.D. Ohio 2014) ............................................................................. 8

*In re Scrap Metal Antitrust Litig.*,
   527 F.3d 517 (6th Cir. 2008) ................................................................................. 13

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
   292 F.R.D. 544 (E.D. Tenn. 2013)....................................................................... 13, 16

*In re Vitamins Antitrust Litig.*,
   209 F.R.D. 251 (D.D.C. 2002)................................................................................ 15

*In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*,
   722 F.3d 838 (6th Cir. 2013) .................................................................................. 1

*Int'l Union v. Ford Motor Co.*,
   Nos. 05-74730, 06-10331, 2006 WL 1984363 (E.D. Mich. July 31, 2006) .............................. 8

*J.B.D.L. Corp. v. Wyeth-Ayerst Labs. Inc.*,
   225 F.R.D. 208 (S.D. Ohio 2003) .................................................................... 10, 13, 14

*Loreto v. Procter & Gamble Co.*,
   No. 1:09-cv-00815, 2013 WL 6055401 (S.D. Ohio, Nov. 15, 2013) .................................. 8, 18

*Macy v. GC Servs. Ltd. P'ship*,
   318 F.R.D. 335 (W.D. Ky. 2017) ............................................................................. 18

*Meijer, Inc. v. Warner Chilcott Holdings Co. III*,
   246 F.R.D. 293 (D.D.C. 2007).............................................................................. 16

*Modern Holdings, LLC v. Corning Inc.*,
   No. 13-00405, 2015 WL 1481459 (E.D. Ky. Mar. 31, 2015) ............................................. 1, 6

*Natchitoches Par. Hosp. Serv. Dist. v. Tyco Int'l, Ltd*,
   262 F.R.D. 58 (D. Mass. 2008)...................................................................... 10, 11, 14

*Nathitoches Parish Hosp. Serv. Dist. v. Tyco Int'l Ltd.*,
   247 F.R.D. 253 (D. Mass. 2008)................................................................................ 4, 9

*Nilavar v. Mercy Health Sys. W. Ohio*,
   142 F. Supp. 2d 859 (S.D. Ohio 2000) ...................................................................... 19

*Phipps v. Wal-Mart Stores, Inc.*,
   No. 3:12-01009, 2016 WL 10649206  (M.D. Tenn. Nov. 18, 2016)......................................... 6

*Pilgrim v. Universal Health Card, LLC,*
    660 F.3d 943 (6th Cir. 2011) .................................................................. 7, 8

*Progressive Health & Rehab Corp. v. Quinn Med., Inc.,*
    323 F.R.D. 242 (S.D. Ohio 2017) ............................................................ 6

*Reiter v Sonotone Corp.,*
    442 U.S. 330 (1979)................................................................................. 1, 19

*Rikos v. Procter & Gamble Co.,*
    No. 1:11-cv-226, 2012 WL 641946 (S.D. Ohio Feb. 28, 2012) ........................ 5, 6, 8

*Rikos v. Procter & Gamble Co.,*
    799 F.3d 497 (6th Cir. 2015) .................................................................. 12

*Romberio v. Unumprovident Corp.,*
    385 F. App'x 423 (6th Cir. 2009) ............................................................ 19

*Ross v. Bank of Am., N.A.,*
    524 F.3d 217 (2d Cir. 2008).................................................................... 19

*Sanders v. Apple Inc.,*
    672 F. Supp. 2d 978 (N.D. Cal. 2009) .................................................... 8

*Sherrod v. Enigma Software Grp. USA, LLC,*
    No. 2:13-cv-00036, 2016 WL 25979 (S.D. Ohio Jan. 4, 2016)................. 6

*Shumacher v. State Auto. Mut. Ins. Co.,*
    No. 1:14-cv-00232, 2015 WL 421688 (S.D. Ohio Feb. 2, 2015) ............ 8

*Sutton v. St. Jude Med. S.C., Inc.,*
    419 F.3d 568 (6th Cir. 2005) .................................................................. 18

*Swan ex rel. v. Bd. of Educ. of City of Chicago,*
    No. 13 C 3623, 2013 WL 404734 (N.D. Ill. Aug. 9, 2013)..................... 17

*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.,*
    350 F.3d 1181 (11th Cir. 2003) .............................................................. 16

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011)................................................................................. 1

*Woodall v. DSI Renal, Inc.,*
    No. 11-2590, 2012 WL 1038626 (W.D. Tenn. Mar. 27, 2012)................. 2

**Rules and Statutes**

Fed. R. Civ. P. 12 ........................................................................................................ *passim*

Fed. R. Civ. P. 23 ........................................................................................................ *passim*

15 U.S.C. §15(a) .................................................................................................................. 20

**Other Authorities**

6 NEWBERG ON CLASS ACTIONS (4th ed. 2002) ............................................................... 1

7AA CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE (3d ed. 2005) ......... 6

## I.      INTRODUCTION

Motions to strike class allegations are rarely filed and even more rarely granted.[1] Indeed, Defendants' Memorandum of Law ("Mem.") in support of their Motion to Strike ("Motion") does not cite to a single opinion granting such a motion in a monopolization case. For good reason. In such litigation, the *same law* applies to all class members' claims, the *same conduct* is at issue, *all* class members are aligned in seeking to recover the overcharges that are a predictable consequence of monopoly, and *all* class members seek to stop the same anticompetitive conduct. These cases are ideal for class certification. *See Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) ("Predominance is a test readily met in certain cases alleging . . . violations of the antitrust laws.").[2]

The burden for a motion to strike class allegations is particularly high. When pursuing an extraordinary Rule 12 motion, rather than opposing an ordinary Rule 23 motion, a defendant must accept all of plaintiffs' allegations as true and must show that the complaint itself establishes that no evidence *could possibly* support class certification. Meanwhile, analyzing class certification almost always requires evidence.[3] That is why both parties stipulated, and the

---

[1] "[S]triking a plaintiff's class allegations prior to discovery and a motion for class certification is a rare remedy." *In re Papa John's Empl. and Franchise Empl. Antitrust Litig.*, 2019 WL 5386484, at *11 (W.D. Ky. Oct. 21, 2019) (denying motion to strike class allegations) (quoting *Modern Holdings, LLC v. Corning Inc.*, 2015 WL 1481459, at *2 (E.D. Ky. Mar. 31, 2015).

[2] Such cases are also an important part of this country's antitrust enforcement mechanism. *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 262 (1972) (noting importance of antitrust class actions); *Reiter v Sonotone Corp.*, 442 U.S. 330, 344 (1979) (same); 6 NEWBERG ON CLASS ACTIONS, §18.1 at 5 (5th ed. 2002) ("[C]ourts have long noted that antitrust cases are well suited for class certification and that the goals of antitrust law are best served through such aggregate litigation.").

[3] The Supreme Court has repeatedly emphasized that "the 'class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *Comcast v. Behrend*, 569 U.S. 27, 34 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)). "Ordinarily . . .  the class determination should be predicated on evidence presented by the parties concerning the maintainability of the class action." *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 851 (6th

Court ordered, that class certification in this case would be adjudicated *after the close of all fact and expert discovery*. *See* ECF No. 61 at 3. It is thus unsurprising that Defendants do not cite any opinion granting a motion to strike class allegations in an antitrust case.

This case involves "All Star Cheer," an elite, competitive, and distinctive type of cheerleading. Compl. ¶3. Plaintiffs seek to represent a class (the "Class") of All Star gyms ("Gyms") and parents of All Star cheerleaders against the dominant seller of All Star competitions ("Competitions") and All Star apparel ("Apparel")—Varsity—and also against the main regulatory body for the sport, U.S. All Star Federation, Inc. ("USASF").[4] The Class members directly paid Varsity for: (a) registration, entrance, spectator, or other fees associated with participation in All Star Competitions; or (b) All Star Apparel. *Id.* at ¶40.

Plaintiffs allege that Varsity and USASF conspired to establish and maintain Varsity's dominance in the markets for All Star Competitions and Apparel (the "Relevant Markets"). The challenged anticompetitive conduct (the "Scheme") includes:

(a) <u>Acquisitions</u>: Varsity acquired rivals in the Competition and Apparel markets;

(b) <u>Exclusionary Agreements</u>: Varsity imposed exclusionary agreements on Gyms, requiring them to buy from Varsity in the Relevant Markets exclusively or nearly so; and

(c) <u>Conspiracy with USASF</u>: Varsity conspired with USASF to impair Varsity's rivals in the Relevant Markets.

---

Cir. 2013) (citations omitted). *Accord Woodall v. DSI Renal, Inc.,* 2012 WL 1038626, at *9 (W.D. Tenn. Mar. 27, 2012) ("Whether the requirements of Rule 23 are satisfied cannot be resolved on the pleadings alone. Fact-finding is required.").

[4] The "Defendants" are Varsity Brands, LLC; Varsity Spirit, LLC; Varsity Spirit Fashions & Supplies, LLC (collectively, "Varsity"); and U.S. All Star Federation, Inc. ("USASF"). The plaintiffs are three All Star Gyms and three parents of current and former All Star Cheerleaders (collectively, "Plaintiffs"). *See* Compl. ¶¶29-39.

The Complaint's allegations should be accepted as true that the Scheme substantially foreclosed competition in both Relevant Markets and caused all Class members to pay Varsity artificially inflated prices for Competitions and Apparel. *Id*. at ¶¶227-33.

Defendants' Motion focuses on Varsity's so-called "rebate" agreements. Varsity charges higher prices to Gyms unless they agree to participate exclusively or nearly exclusively in Varsity's Competitions and to purchase exclusively or nearly exclusively Varsity's Apparel. Compl. ¶¶174-85. Varsity calls the differences in its prices "rebates." Plaintiffs allege that the differences are really penalties. *Id*. at ¶¶139, 180-81, 188, 192. Plaintiffs also allege these so-called rebate programs conscript Class members into helping Varsity exclude its competitors from the Competition and Apparel markets. *Id*. at ¶¶170-85, 224-25.

Varsity's exclusionary contracts come right out of the monopolist's standard playbook. Their contracts offer Class members two options:

(1) Monopoly Prices. Make all (or nearly all) of their purchases from Varsity and pay prices inflated by Varsity's monopoly power; or

(2) Penalty Prices (Monopoly Prices Plus Penalties). Patronize Varsity's competitors and pay Varsity its Monopoly Prices *plus penalties*.

*Id*. ¶¶139, 180-81, 188, 192. This strategy is ingenious because it causes each direct purchaser to contribute to its own exploitation. Any single purchaser faces a stark choice: buy (almost) exclusively from Varsity or pay penalties. *Id*. From the perspective of narrow self-interest, that is no meaningful choice at all. These individual, rational decisions, however, have a terrible cumulative effect. They confer on Varsity the monopoly power that it uses to inflate all of its prices above competitive levels. As a result of the Scheme, *all* direct purchasers pay Varsity higher prices than they would in a more competitive market. *Id*. at ¶¶227-33. As Plaintiffs allege—and their allegations should be taken as true, *infra* at II (citing cases)—Varsity's

exclusionary contracts give it a vice-like grip on the Competition and Apparel markets. This is especially so given the effects of Varsity's acquisitions of rivals and its conspiracy with USASF.

Nevertheless, Defendants argue that Class members receiving so-called rebates must have benefited from Varsity's Scheme. Otherwise, Defendants contend, the Class members would not have agreed to Varsity's exclusionary contracts. So, the argument continues, there is a conflict between Class members who received so-called rebates and would like to continue to do so and Class members who did not receive rebates and may have been harmed.

But Defendants' argument conflicts with the allegations in the Complaint and misunderstands economics. Pretending that penalties are "rebates" does not make them so. Courts and academic experts have long debunked that double-speak in analogous cases.[5] They recognize sellers with monopoly power, like Varsity, often charge supra-competitive prices to *all* their customers and then charge supra-competitive prices *plus penalties* to customers that shop around. *Infra* at 9-10 (citing cases). In any case, Defendants have not established, as they must to prevail on the Motion, that the evidence *cannot possibly* support Plaintiffs' theory.

The same is true for Defendants' other arguments in support of their Motion. To prevail here they must show that the evidence *cannot possibly* support Plaintiffs' allegations and class certification. But Defendants merely speculate that the evidence *might not* do so.

---

[5] *See, e.g.*, *Nathitoches Parish Hosp. Serv. Dist. v. Tyco Int'l Ltd.*, 247 F.R.D. 253, 272 (D. Mass. 2008) ("*Tyco I*") ("'What causes the purchaser's injury is not whether it was individually 'coerced,' but the effect the marketwide foreclosure has on [defendant]'s market power and market prices.' He responds that as a matter of standard antitrust economics, 'buyers have incentives to agree to exclusionary contracts even when they have an anticompetitive effect because most of the harm of individual agreements is externalized onto those who are not party to that particular agreement.'") (quoting Prof. Elhauge) (citations omitted); *see also infra* 9-10.

Defendants also contend that the Court should strike Plaintiffs' allegations that the Scheme resulted in lower quality goods and services—a well-recognized effect of monopolization—including inadequately protecting athletes from sexual predation. Mem. at 13. In this regard, Defendants take inconsistent positions: (1) Plaintiffs should not have made such detailed allegations about the harms from Varsity's monopoly power, and (2) Plaintiffs should have made more detailed allegations. In reality, Plaintiffs struck a careful balance in light of the seriousness of sexual abuse. Plaintiffs recognized the importance of including this anticompetitive harm, but did not include any salacious details. It is sad but true that monopoly power can degrade quality. It is sadder but also true that the degradation can result not only in mundane harms—*e.g.*, Apparel not lasting as long as it should—but also grave harms—*e.g.*, insufficient efforts to protect youths from sexual predators. The gravity of sexual abuse is not a reason to ignore that it can result from an antitrust violation.

## II.   LEGAL STANDARD

A court should strike class allegations only if it appears from the face of a complaint—taking the allegations as true—that plaintiffs *cannot possibly* meet their burden at class certification. Defendants have "the burden of demonstrating from the face of the . . . complaint that it will be *impossible* to certify the class as alleged, regardless of the facts plaintiffs may be able to prove." *Fishon v. Mars Petcare US, Inc.*, 2020 WL 6826733, at *13 (M.D. Tenn. Nov. 20, 2020) (emphasis added) (citations omitted). *Accord Papa John's*, 2019 WL 5386484, at *12 (to win a motion to strike class allegations, defendant must "demonstrate[e] from the face of the [complaint] that it will be impossible to certify the class as alleged" regardless of facts that may be elicited in discovery); *Healey v. Jefferson Cnty. Ky Louisville Metro Gov't*, 2018 WL 1542142, at *2 (W.D. Ky. Mar. 29, 2018) (same). Such a motion should be granted only "where the *complaint itself* demonstrates that the requirements for maintaining a class action cannot be

met." *Rikos v. Procter & Gamble Co.*, 2012 WL 641946, at *3 (S.D. Ohio Feb. 28, 2012)

(emphasis added). "Because striking a portion of the pleading is a drastic remedy and often used

as a dilatory tactic, motions under Federal Rule of Civil Procedure 12(f) are infrequently granted.

Courts have even less sympathy for them in antitrust litigation." *Daishowa Int'l v. N. Coast Exp.*

*Co.*, 1982 WL 1850, at *2 (N.D. Cal. May 24, 1982) (citations omitted). Motions to strike class

allegations before completion of discovery and before plaintiffs file a motion for class

certification are particularly disfavored because they "require[] a reviewing court to

preemptively terminate the class aspects of . . . litigation, solely on the basis of what is alleged in

the complaint, and before plaintiffs are permitted to complete the discovery to which they would

otherwise be entitled on questions relevant to class certification." *Modern Holdings*, 2015 WL

1481459, at *2 (internal quotation marks and citation omitted).[6] "When the defendant challenges

class certification based solely on the allegations in the complaint, the standard is the same as

---

[6] *See also Phipps v. Wal-Mart Stores, In*c., 2016 WL 10649206, at *4 (M.D. Tenn. Nov. 18, 2016) (same); *Progressive Health & Rehab Corp. v. Quinn Med., Inc.*, 323 F.R.D. 242, 244-45 (S.D. Ohio 2017) ("[C]ourts should exercise caution when striking class action allegations based solely on the pleadings, because class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.") (citation and quotations omitted); *Sherrod v. Enigma Software Grp. USA, LLC*, 2016 WL 25979, at *2 (S.D. Ohio Jan. 4, 2016) ("[S]triking class allegations before the class-discovery stage is disfavored, and courts generally defer the decision until after class discovery."); *In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*, 2015 WL 5166014, at *42 (E.D. Tenn. June 24, 2015) (declining to strike allegations because "class discovery will clarify whether Plaintiffs are able to meet" Rule 23(b) requirements, ruling on motion to strike "could only be considered premature"); *Galoski v. Stanley Black & Decker, Inc.*, 2014 WL 4064016, at *5 (N.D. Ohio Aug. 14, 2014) (denying motion to strike as "premature" and noting that scope of class definition would be "better determined" after completion of class discovery, when it also could be modified); *Allen v. Andersen Windows, Inc*., 913 F. Supp. 2d 490, 516 (S.D. Ohio 2012) ("[T]he Court deems it prudent to assess the propriety of class certification in the context of a fully briefed class certification motion …."); 7AA CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1785.3 (3d ed. 2005) (collecting cases ruling that discovery must be undertaken before deciding class certification).

that applied in deciding a motion to dismiss under Rule 12(b)(6)." *Cerjanec v. FCA US, LLC*, 2018 WL 3729063, at *7 (E.D. Mich. Aug. 6, 2018) (citation and internal quotation marks omitted). Plaintiffs allegations in the complaint should be accepted as true. *Id.*

Nor should the Court strike the allegations of sexual abuse unless they have "no possible relation to the controversy," *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953), or are "both irrelevant to the subject matter of the litigation and prejudicial." *Allstate Ins. Co. v. OMIC, LLC*, 2018 WL 8806551, at *6 (E.D. Mich. Sept. 24, 2018).

## III.    ARGUMENT

None of the legal precedents on which Defendants rely involved antitrust claims or in any way resemble this action. Instead, they are fraud and false advertising cases involving laws of multiple jurisdictions and individualized factual issues, such as reliance. Notably, the only Sixth Circuit opinion Defendants cite, *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943 (6th Cir. 2011) (Mem. at 4), cautioned that a motion for an early decision on class certification "does not free the district court from the duty of engaging in a 'rigorous analysis' of the [certification] question, and 'sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question.'" *Id.* at 949 (quoting *Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 161, 160 (1982)). *Pilgrim* affirmed striking class allegations only because plaintiffs' deceptive advertising claims involved individualized factual issues that varied by location and were governed by state laws that differed in material ways. *Id.* at 947-49. Those concerns are absent here. All Plaintiffs and all Class members assert the same conduct, the same federal antitrust claims and the same harm—paying overcharges as a result of the Scheme. *See Doe v. City of Memphis*, 928 F.3d 481, 497 (6th Cir. 2019) (reversing order striking class allegations,

finding "there is no choice of law issue, nor any other sort of 'prototypical factual issue that will vary from place to place and from region to region' that the *Pilgrim* Court emphasized").[7]

A.     **The Complaint Does Not Establish Any Conflicts of Interest**

Defendants speculate about various potential intra-class conflicts. The rationale for avoiding such conflicts is to protect class members, whereas Defendants' interests are antagonistic to class members. *Eggleston v. Chicago Journeymen Plumbers' Local 130*, 657 F.2d 890, 895 (7th Cir. 1981) (relying on defendants to identify class conflicts "is a bit like permitting a fox, although with pious countenance, to take charge of the chicken house"). So courts place a heavy burden on defendants to show a conflict is fundamental, central to a lawsuit, and non-speculative. *See Int'l Union v. Ford Motor Co.*, 2006 WL 1984363, at *19-20 (E.D. Mich. July 13, 2006) ("only a conflict that goes to the very subject matter of the [claims] will defeat a party's claim to representative status"); *In re Polyurethane Foam Antitrust Litig.*, 314 F.R.D. 226, 238-41 (N.D. Ohio 2014) ("to forestall class certification the intra-class conflict must be so substantial as to overbalance the common interests of the class members as a whole"); *In re K-*

---

[7] Defendants' other cases are similarly inapposite. *See Shumacher v. State Auto. Mut. Ins. Co.*, 2015 WL 421688, at *2-3 (S.D. Ohio Feb. 2, 2015) (multistate fraud action; class membership not determinable objectively; classwide proceeding would not generate common answers to central questions; additional discovery could not cure deficiencies in class definition); *Loreto v. Procter & Gamble Co.*, 2013 WL 6055401, at *2-4 (S.D. Ohio, Nov. 15, 2013) (false advertising; uncontroverted evidence that challenged representation was never part of advertising or packaging for products at issue); *Sanders v. Apple Inc.*, 672 F. Supp. 2d 978, 983, 991 (N.D. Cal. 2009) (fraudulent concealment, breach of express warranty, statutory fraud, and unjust enrichment; nationwide class included everyone owning computer model so necessarily included people who had not purchased the product, did not see or were not deceived by advertisement, and suffered no damages; inability to establish reliance through common evidence); *Rikos*, 2012 WL 641946 (false advertising; due process, statutory provisions, and variations in state laws prevented certification of nationwide class; court granted leave to amend to establish single-state classes, which were later certified).

*Dur Antitrust Litig.,* 686 F.3d 197, 223 (3d Cir. 2012) ("Only a fundamental conflict will defeat adequacy of representation.").[8]

Defendants in this action have failed to carry their burden. They do not even really try. Instead, they just list a series of potential differences between class members, suggesting without explanation that each might somehow cause a cognizable conflict of interest. Defendants' main contention is that Varsity's rebate programs benefit Gyms that receive rebates and so create a conflict with Gyms that do not. Mem. at 5-6. As explained above, however, Plaintiffs allege that Varsity's so-called rebates are illusory. Compl. ¶¶139, 180-81, 188, 192. What Varsity actually does—as monopolists often do—is charge Monopoly Prices to all of its customers and then demand Penalty Prices—the Monopoly Prices plus penalties—to customers that make non-trivial purchases from Varsity's rivals. *Id.* The purpose of the penalties—what Varsity calls rebates—is to shore up Varsity's monopoly power, allowing it to charge *all* of its customers supra-competitive prices. *Id.* at ¶¶227-33. Stopping the Scheme, then, would benefit all Class members in that they all would pay Varsity less. The resulting competitive prices would be substantially lower than Varsity's Monopoly Prices and even more substantially lower than Varsity's Penalty Prices. This litigation thus serves all Class members' interests.

This analysis is not novel. Courts have relied on the same economic reasoning to certify classes in numerous antitrust cases based on analogous exclusionary contracts with class members. *See Tyco I*, 247 F.R.D. at 272 (rejecting argument in antitrust cases involving

---

[8] *See also Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 2003) (rejecting "denial of class certification on the basis of speculative conflicts"); *Hosp. Auth. of Metro. Gov't of Nashville & Davidson Cty., Tenn. v. Momenta Pharm., Inc.,* 333 F.R.D. 390, 405 (M.D. Tenn. 2019) ("Defendants' argument asserts a merely speculative class conflict that is insufficient to challenge adequacy."). *Stout v. J.D. Byrider*, 228 F.3d 709, 717 (6th Cir. 2000) (Mem. at 6) is not to the contrary. It relied on evidence under Rule 23—not Rule 12—that defendants had offered relief to the named plaintiffs unavailable to absent class members.

challenge to allegedly exclusionary rebate contracts with class members that "committed" buyers benefited from scheme and so had fundamental conflict with "uncommitted" buyers); *Natchitoches Par. Hosp. Serv. Dist. v. Tyco Int'l, Ltd*, 262 F.R.D. 58, 70 (D. Mass. 2008) ("*Tyco II*") (certifying class, citing "compelling evidence that a more competitive market would likely bring down the negotiating range for *all* purchasers") (emphasis added); *Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 847-49 (D.N.J. 2015) (certifying class, and holding that common evidence established that defendant's exclusionary contracts, which allegedly divided market into those customers who got rebates and those who did not, suppressed competition and raised prices for all customers); *J.B.D.L. Corp. v. Wyeth-Ayerst Labs. Inc.*, 225 F.R.D. 208, 218 (S.D. Ohio 2003) (certifying class and finding alleged anticompetitive conduct would artificially raise base price on which rebates were based).

Defendants' other asserted conflicts mischaracterize the Complaint. For instance, Defendants suggest a conflict of interest between Gyms that received fully-paid trips to higher-level Competitions and Gyms that did not. Mem. at 6 (citing Compl. ¶88). Defendants imply that Plaintiffs are seeking to end the practice of offering such fully-paid trips, *id*. at 7, and thus this suit could harm Class Members who benefit from them. That is false. Plaintiffs claim neither that the Scheme is responsible for the fully-paid trips nor that without it those trips would disappear. Defendants' suggestion to the contrary is pure speculation.

The same is true for Defendants' contention of a conflict between Gyms that went to higher-level meets and those that did not. Mem. at 7 (asserting "Plaintiffs seek to attack" "the system" that allowed some Gyms to attend the higher-level meets). Plaintiffs do not challenge the practice of splitting competitions by quality level. Nor do Defendants offer any reason to think that without the Scheme higher-level meets would no longer exist.

Similar flaws beset Defendants' assertion that there are conflicts of interest between Gym Class members and some individual (parent) Class members. Defendants claim that Plaintiffs challenge Varsity's practice of charging parents spectator fees to watch its events. Mem. at 7 (citing Compl. ¶230). They then hypothesize that, without spectator fees, Gyms *might* pay higher entry fees to participate in those events. *Id*. But Defendants offer no reason to conclude that, if Varsity had *less* monopoly power, it could somehow compensate for lower spectator fees by charging Gyms *more*. That is not how economics works. *E.g.*, *Tyco II*, 262 F.R.D. at 70 ("compelling evidence that a more competitive market would likely bring down the negotiating range for all purchasers"). And, in fact, Plaintiffs allege the opposite—that competition would force Varsity to lower its spectator fees *and* its Gym entry fees. Compl. ¶¶229-30, 233. Indeed, Defendants themselves seem to recognize how speculative their position is, claiming only that without admission fees "gyms *could* pay more in entry fees." Mem. at 7 (emphasis added).

Speculation also dooms Defendants' tentative suggestion that eliminating the so-called rebates *might* cause Gyms to charge more for their All Star programs. *Id*. Defendants muse that eliminating the Gyms' rebates "*could* be to the detriment of their customers, who *could* have to pay more for participation in the gyms' All-Star cheerleading programs." *Id*. (emphasis added). But Defendants' speculations are inconsistent with Plaintiffs' allegations—that eliminating the Scheme would *decrease* the prices that *all* Gyms pay Varsity. Compl. ¶¶227-33.

The same rejoinders apply to Defendants' contentions—again, unsupported by any analysis—that there are conflicts between different natural person Class members, mainly Cheer parents. Mem. at 7. Some of them, Defendants declare, participate in higher-level Competitions or receive subsidized trips to them, while others do not. *Id*. Again, Defendants' arguments are vague and speculative. Moreover, as explained above, Plaintiffs do not challenge the existence of

11

higher-level Competitions. Nor do Plaintiffs claim that eliminating the Scheme would alter which individuals participate in those Competitions or which individuals receive travel subsidies to do so. So there are no conflicts.[9]

### B.    The Complaint Does Not Establish that Individual Issues Will Predominate

Defendants' arguments about predominance largely repeat their unsuccessful claims about conflicts of interest and fail for essentially the same reasons. In antitrust cases, the crux of class certification decisions is ordinarily whether common issues predominate over individual issues, as required by Federal Rule of Civil Procedure 23(b)(3). Courts in antitrust cases routinely find predominance if Plaintiffs show common evidence is *capable of* establishing that defendants' conduct caused widespread harm across class members (*i.e.*, a "common impact").[10]

In antitrust cases brought by direct purchasers, Plaintiffs are injured by paying overcharges—*i.e.*, the amount of a price that is inflated due to the anticompetitive conduct at issue—and their harm is measured as the full extent of that overcharge. *See Apple Inc. v. Pepper*,

---

[9] Varsity also implies that there is a conflict between "gyms associated with sex offenders and gyms that were not." Mem. at 7. It offers no explanation for this contention. Gyms and parents alike would benefit if Varsity and USASF had a greater incentive to protect cheerleaders from sexual predation. Plaintiffs do not see why any Gym has an interest in permitting sexual predation. If Defendants have a contrary view, they should have explained it.

[10] *Rikos*, 799 F.3d at 522 (Mem. at 8) (plaintiffs need only show they "can prove" common impact, "not that they have in fact proven that injury"). To be clear, common impact is not necessary to establish predominance. Impact is only one element of antitrust claims. Common issues can predominate in an antitrust case as a whole, even if the element of impact involves individualized issues. *See Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 107–08 (2d Cir. 2007) (holding common issues can predominate for purposes of class certification in antitrust case even if impact is not common to the class); *see also Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013) (holding common issues need to predominate in case as a whole for predominance under Rule 23(b)(3), not as to each element). Indeed, the predominant issues in monopolization and conspiracy to monopolize cases generally are common, including whether defendants did what plaintiffs allege, whether that conduct violated federal antitrust law, and whether the conduct generally caused anticompetitive effects. These issues are all by their nature common to the class. *See Cardizem,* 200 F.R.D. at 307 ("The predominance requirement is satisfied unless it is clear that individual issues will overwhelm the common questions and render the class action valueless.").

139 S. Ct. 1514, 1519 (2019) ("A claim that a monopolistic retailer . . . has used its monopoly to overcharge consumers is a classic antitrust claim."); *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 910-11 (6th Cir. 2003) ("[P]aying higher prices for a product due to a lack of competition" is "the type of injury the antitrust laws were meant to prevent.").[11] So proof of common impact here would involve classwide evidence capable of showing that the vast majority of class members paid at least a single overcharge on a single product or service due to the conduct at issue. *See infra* at 15 (citing cases). To establish common impact, plaintiffs in comparable cases routinely rely on economic evidence—primarily defendants' internal documents and econometric analyses of transactional data. In direct purchaser antitrust cases, plaintiffs often succeed in establishing common impact and courts frequently grant class certification. *See infra* at n.12 (citing cases). But whether granting certification is appropriate in any particular case *requires an analysis of the evidence*. *See supra* at n.3 (citing cases). That can explain why Defendants have failed to cite a single case in which a court granted a motion to strike class allegations in direct purchaser antitrust case.

Defendants nonetheless argue that common issues *cannot possibly* predominate in this litigation, rehashing the arguments they made in trying to establish conflicts. This case, they say,

---

[11] It does not matter whether a direct purchaser attempted to mitigate the harm, by, for example, increasing the prices it charged its own customers. *See Hanover Shoe, Inc. v. United Shoe Machinery Corp*, 392 U.S. 481, 494 (1968) (plaintiff "proved injury and the amount of its damages for the purposes of its treble-damage suit when it proved that [defendant] had overcharged it during the damage period and showed the amount of the overcharge"); *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008) (affirming district court's analysis that because "allegations of price-fixing and market allocation . . . will not vary among class members . . . the 'fact of damages' was a question common to the class even if the amount of damages sustained by each individual class member varied"); *In re Skelaxin (Metaxalone) Antitrust Litig.*, 292 F.R.D. 544, 553 (E.D. Tenn. 2013) ("damages in this type of anti-trust litigation are not measured by lost profits; they are measured purely by overcharges"); *J.B.D.L.*, 225 F.R.D. at 216 (antitrust injury "is considered complete when the direct purchaser pays an illegal overcharge" and ability to pass on overcharge is "irrelevant to the inquiry").

is unlike "garden-variety price fixing cases, where all purchasers will have paid more as a result of the price fixing [because] here the heart of Plaintiffs' claim is their allegation that Varsity *discounted* to some class members but not others, had a system of bids to prestigious events that *were awarded* to some class members but not others, and charged for spectator admission at some events but not at others." Mem. at 8-9. Defendants are wrong on every point—for the same reasons they are wrong about the alleged class conflicts.

As to individual issues purportedly arising because some Class members benefit from Varsity's so-called discounts and some do not, that position mischaracterizes Plaintiffs' theory and the allegations in the Complaint. As explained above, Plaintiffs allege that Varsity's discounts are illusory and that Varsity actually charges only Monopoly Prices and even higher Penalty Prices. Compl. ¶¶139, 180-81, 188, 192, 227-33. That is consistent with standard economic theory and various precedents. *See supra* at 9-10. Talk of "discounts" and "rebates" is just Defendants' spin. Again, Plaintiffs allege that all Class members would pay lower prices without the Scheme. Compl. ¶¶227-33. So, as in multiple past antitrust cases certifying similar classes, there are no individual issues, let alone individual issues that will predominate.[12]

Defendants also assert without support that rebate programs must benefit the Class members that agree to them. Mem. at 10. As explained above, that too is false. It is true that—*given the Scheme*—many Gyms did better by participating in the so-called rebate programs than they otherwise would have done. They paid Monopoly Prices instead of Penalty Prices. But the apt comparison here is between a world with the Scheme and a world without the Scheme.

---

[12] *See Tyco II*, 262 F.R.D. at 70 (certifying class in antitrust cases involving challenge to allegedly exclusionary rebate contracts with class members); *Castro*, 134 F. Supp. 3d at 847-49 (certifying class, and holding that common evidence established that defendant's exclusionary contracts raised prices for all customers); *J.B.D.L.*, 225 F.R.D. at 218 (certifying class).

Plaintiffs allege that absent the Scheme—*i.e.*, in the so-called "but for world"— all Gyms would pay competitive prices rather than Monopoly Prices *or* Penalty Prices. So taking away the "rebate" programs—*i.e.*, penalty programs—would benefit *all* Class members.

Defendants are also wrong that Plaintiffs challenge the bidding system. Mem. at 8-9, 10-11. What Plaintiffs contest is Varsity's *use* of the bidding system—in concert with USASF—to exclude competitors, depriving Varsity's rivals of the opportunity to offer Gyms and Teams access to bids. But Plaintiffs do not challenge the use of bids in a competitive market in which Varsity has to compete for sales and customers.

Defendants also assert—without citation to any precedent—that individual issues predominate in cases that involve "numerous products and services that some class members have purchased or utilized while many others did not." Mem. at 9. They are wrong. Antitrust cases—including "garden-variety price fixing cases," *id*. at 8—routinely involve class members who bought only a handful of the hundreds or even thousands of non-interchangeable products or services at issue. *See, e.g.*, *In re Capacitors Antitrust Litig.*, 2018 WL 5980139, at *8 (N.D. Cal. Nov. 14, 2018) (common impact satisfied and class certified where complaint alleged single overarching conspiracy involving well over 100,000 different types of non-interchangeable products sold to thousands of class members each of whom bought only a narrow range of such products); *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 264 (D.D.C. 2002) (same). In establishing common impact, Plaintiffs are aided by the rule of law that payment of a *single overcharge*—even if on only a single good or service—establishes impact on a class member. *In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015) (citation omitted); *Castro*, 134 F. Supp.

15

3d at 847 (same).[13] As a result, common evidence of widespread impact in antitrust cases is quite common, and so is class certification.[14]

Defendants' final predominance argument involves an even greater imaginative excess. They assert—without citation to the Complaint—that Plaintiffs allege that Varsity, without the Scheme, "would have taken steps to put gyms that were associated with sexual abusers out of business, which of course would have harmed those gyms as putative class members in terms of antitrust injury." Mem. at 11. Varsity's economic reasoning is unclear and its factual claim is pure invention. The Complaint never suggests that Varsity would put Gyms out of business without the Scheme. Defendants merely would be forced to wake from their monopolistic complacency and seek to protect cheerleaders from sexual abuse.

---

[13] This litigation is much simpler than many antitrust cases. There are only two main categories of purchasers, Gyms and Parents. Gyms pay Varsity for entry fees and directly buy the full range of Apparel. Parents generally only pay spectator fees, but may on occasion buy Apparel directly.

[14] *See, e.g.*, *Hosp. Auth. of Metro. Gov't of Nashville & Davidson Cty.*, 333 F.R.D. at 404 (certifying class including entities with "divergent economic incentives" because of the common interest in challenging defendants' "alleged anticompetitive conspiracy to reduce generic competition in the enoxaparin market and reap the benefits of the resulting overcharges"); *In re Packaged Ice Antitrust Litig.*, 322 F.R.D. 276, 285 (E.D. Mich. 2017) (certifying class where diverse class members' claims were based on the alleged anticompetitive conspiracy); *see also supra* at n.12.

      Defendants' reliance on *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.,* 350 F.3d 1181 (11th Cir. 2003), Mem. at 6, is unavailing for several reasons. First, as explained above, the Scheme harmed all Class members, whereas the court in *Valley Drug* found based on *evidence* that the conduct at issue there benefited some class members and harmed others. *See Valley Drug*, 350 F.3d at 1190. Second, *Valley Drug* involved a Rule 23 motion, not a Rule 12 motion, so the court there could make factual findings contrary to plaintiffs' allegations. Third, *Valley Drug* is not governing law, and courts in this Circuit and elsewhere have rejected its conflict of interest analysis. *See, e.g.*, *K-Dur*, 686 F.3d at 223 (rejecting *Valley Drug* and holding that "requiring plaintiffs to show that no class member benefited in the form of greater profits is contrary to the Supreme Court's decision in *Hanover Shoe*," explaining that "because *Hanover Shoe* sets the amount of the overcharge as plaintiffs' damages, all of the class members have the same financial incentive for purposes of the litigation—*i.e.*, proving that they were overcharged and recovering damages based on that overcharge"); *Skelaxin*, 292 F.R.D. at 553 (same, noting that *Valley Drug* "has not been widely embraced"); *Meijer, Inc. v. Warner Chilcott Holdings Co. III*, 246 F.R.D. 293, 303 (D.D.C. 2007) (disagreeing with *Valley Drug*).

Moreover, Plaintiffs do not seek any damages based on any acts of sexual predation. Plaintiffs will rely on Defendants' failure to police sexual abuse as evidence of the Scheme's anticompetitive effects—which supports the conclusions that Varsity has monopoly power and that the Scheme violated the antitrust laws. Those issues are equally relevant to the claims of all Class members. As a result, evidence of sexual abuse and its causal relationship to the Scheme is entirely common to the Class.[15]

### C.      The Complaint Does Not Negate Injunctive Relief

Defendants' arguments about injunctive relief are a reprise of their unsuccessful arguments about conflicts of interest and predominance. They incorrectly claim classwide injunctive relief is inappropriate because it would not benefit all Class members. Mem. at 11-12. But, as already explained, all of Varsity's prices are above competitive levels and so ending the Scheme—and thereby depriving Varsity of its monopoly power—would decrease its prices to *all* Class members.[16]

---

[15] Defendants are also wrong in the arguments they make—only in a footnote—regarding *Comcast Corp. v. Behrend*, 569 U.S. 27, 34-38 (2013). Mem. at 10 n.1. They assert—again, without legal citation—that, to certify a class, Plaintiffs must show which Class members were injured by which illegal acts and to what extent. and that Plaintiffs will have to prove that all of the acts at issue were illegal. Incorrect. It is settled law that the Court should assess Defendants' conduct as a whole, not each act separately, as Defendants claim. *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962) ("the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole") (citations omitted).

[16] At minimum, any assessment of Varsity's arguments would require an analysis of *evidence*. That may be why Defendants do not cite a single case granting a motion to strike class allegations for injunctive relief. What they cite instead is a single, unreported, out-of-circuit, non-antitrust trial court opinion denying class certification under Rule 23(b)(2), a provision that applies to so-called injunctive relief classes. Mem. at 12 (citing *Swan ex rel. v. Bd. of Educ. of City of Chicago*, 2013 WL 4047734, at *13) (N.D. Ill. Aug. 9, 2013). That opinion noted that Rule 23 does not involve "a mere pleading standard." *Swan*, 2013 WL 4047734, at *4. So the court there considered *evidence*—not just the pleadings—in deciding whether to certify a class.

17

### D.      No Class Members Lack Standing

Defendants' argument about standing is no more successful. One reason—sufficient by itself—is that, as explained above, the Complaint alleges that Defendants' conduct caused antitrust injury to *all* members of the proposed Class in the form of unlawful overcharges. Compl. ¶¶227-33. Such allegations establish all Class members were injured and all have Article III standing.[17] *See Sutton*, 419 F.3d at 575 (holding that requiring plaintiff to *prove* injury-in-fact at pleading stage to confer standing "is to prematurely evaluate the merits of her claims").

Further, courts generally hold, including in the Sixth Circuit, that plaintiffs need to show standing only for class representatives, not for absent class members. *See, e.g.*, *Macy v. GC Servs. Ltd. P'ship*, 318 F.R.D. 335, 338 (W.D. Ky. 2017), *aff'd*, 897 F.3d 747 (6th Cir. 2018) ("the vast majority of courts, including several within this circuit, have held that no showing of standing need be made as to putative class members"); *Coleman v. Gen. Motors Acceptance*

---

[17] Under the only Sixth Circuit precedent that Defendants cite, *Sutton v. St. Jude Med. S.C., Inc.*, 419 F.3d 568, 570 (6th Cir. 2005), Mem. at 12, all that a "class representative" must allege to have Article III standing is "an individual, personal injury." *Id.* at 570. Further, such an allegation should be taken as true on a Rule 12 motion. *Id. Sutton* was a more challenging case than this one because the class representative there had alleged only "an increased risk of a future harm" from a medical device, *id.* at 574, not a past harm. The Sixth Circuit nevertheless held that the class representative *had* Article III standing, reversing the trial court's grant of a Rule 12 motion. *Id.* at 574-76. This case is much easier than *Sutton*. Here, all of the potential class representatives allege that they paid overcharges as a result of Defendants' unlawful conduct. Compl. ¶¶29-34. And they allege that all Members of the proposed class paid overcharges too. *Id.* at ¶¶227-33. Article III standing is thus a non-issue. *Contrast Loreto*, 2013 WL 6055401, at **1, 4 (Mem. at 12) (plaintiff class challenged allegedly false advertisements that did not in fact contain the statement at issue so a majority of class members were never even exposed to the challenged statement and could not have been harmed).

Nor are Defendants right that *Loreto* holds a "class cannot contain be certified with unharmed members." Mem. at 12 (citing *Loreto*, 2013 WL 6055401, at *3). *Loreto* actually discussed Article III standing. *See Loreto*, 2013 WL 6055401, at *3. And Article III does not require an evidentiary showing of harm but merely "allegations" of "individual, personal injury." *Sutton*, 419 F.3d at 570. Plaintiffs have alleged such injuries here.

*Corp.*, 220 F.R.D. 64, 88 (M.D. Tenn. 2004) ("In a class action, the standing question is resolved with regard to the representative plaintiffs.").[18]

### E.    Plaintiffs' Sexual Abuse Allegations Are Relevant and Should Not Be Struck

Defendants move to strike Plaintiffs' allegations regarding sexual abuse under Rule 12(f) as "immaterial, impertinent, or scandalous." But they relate directly to an essential issue for Plaintiffs' § 2 claims—whether the Scheme had anticompetitive effects. *Dodge Data & Analytics LLC v. iSqFt, Inc.*, 183 F. Supp. 3d 855, 863-64 (S.D. Ohio 2016). Anticompetitive effects can establish monopoly power and can support finding an antitrust violation. *Id.* at 864; *Papa John's*, 2019 WL 5386484, at *9 (citing *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460 (1986)). Defendants thus miss the point when they cite law addressing the kinds of injuries that support a federal antitrust *damages claim*. *Id.* (citing 15 U.S.C. §15(a); *Reiter*, 442 U.S. at 339).[19] Adverse economic effects are relevant to more than just the measure of antitrust damages.

One relevant anticompetitive effect is a decrease in quality.[20] The failure to adopt standards to protect cheerleaders from sexual abuse is an egregious flaw in the quality of the

---

[18] In contrast to this case, in *Romberio v. Unumprovident Corp.*, 385 F. App'x 423 (6th Cir. 2009), Mem. at 12, the plaintiffs did not challenge payment of overcharges, but rather defendant's alleged practice of wrongfully denying disability benefits. The court held that class members would each need to prove not only a denial of benefits, but that the benefits were *wrongfully* denied, which would require individualized fact-finding. *Id.* at 429.

[19] *Reiter* addressed the kinds of damages claims plaintiffs may bring under federal antitrust law. It recognized that a harm qualifies as an injury to "business or property" as specified in the Clayton Act—and hence can support a damages claim under federal antitrust law—not only if it involves a *commercial enterprise* paying overcharges but also if it involves a *consumer* paying overcharges. *Id.* at 342. The proposed Class comprises businesses and consumers who allegedly paid overcharges. Plaintiffs seek damages only based on those overcharges, not based on any harm from sexual abuse. *Reiter* confirms the propriety of the damages Plaintiffs seek.

[20] *See Papa John's*, 2019 WL 5386484, at *9; *Nilavar v. Mercy Health Sys. W. Ohio*, 142 F. Supp. 2d 859, 874 (S.D. Ohio 2000) (allegations of "higher prices, lower quality services, and less choice for consumers … constitute the kind of injuries that the antitrust laws were enacted to prevent"); *Ross v. Bank of Am., N.A.*, 524 F.3d 217, 223-24 (2d Cir. 2008) (allegations of reduced choice and diminished quality sufficiently alleged Article III injury). The cases Defendants cite are inapposite because they involved allegations that were in fact not relevant to

services that Defendants offer. If Varsity faced greater competition, it and USASF would have incentive to strengthen the standards. Compl. ¶¶237-41. Thus, lax rules for protecting cheerleaders from sexual predation are a potential manifestation of Varsity's monopoly power.

Defendants suggest three other reasons to strike allegations that the Scheme caused sexual abuse. First, they assert that Plaintiffs have not made specific enough allegations. Mem. at 13. Second, they imply that such allegations are scandalous. *Id*. Third, they claim the allegations regarding sexual abuse implicate Class members. *Id*. at 13-14. Defendants' first two points are inconsistent. Plaintiffs avoided making overly specific allegations of improper sexual conduct to minimize any potential scandal. They can provide more details, including the involvement of Defendants' employees and the acts they committed. But those details may prove provocative.

Finally, Defendants are wrong that the allegations of sexual abuse should be struck because employees at some Gyms may have been culprits. Mem. at 14. Plaintiffs have already addressed this argument in discussing conflicts of interest and predominance. *See supra* at 12 n.9, 16-17. All Varsity's customers, including Gyms, lack any interest in harboring sexual predators.[21]

## IV.   CONCLUSION

For the foregoing reasons, the Court should deny the Motion to Strike.

---

plaintiffs' claims. *See* Mem. at 13 (citing *Llewellyn-Jones v. Metro Prop. Grp., LLC*, 22 F. Supp. 3d 760, 777 (E.D. Mich. 2014); *Allstate Ins. Co. v. OMIC, LLC*, 2018 WL 8806551, at *3-4 (E.D. Mich. Sept. 24, 2018)).

[21] Nor do unresolved discovery disputes (Mem. at 14) warrant a premature ruling on class certification. *Doe v. City of Memphis*, 928 F.3d 481, 496-97 (6th Cir. 2019).

Dated: January 15, 2021                /s Benjamin A. Gastel            

J. Gerard Stranch, IV (TN BPR #23045)
Benjamin A. Gastel (TN BPR #28699)
**BRANSTETTER, STRANCH &
JENNINGS, PLLC**
223 Rosa Parks Ave. Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
gerards@bsjfirm.com
beng@bsjfirm.com

*Counsel for Plaintiffs and Liaison Counsel for the
Proposed Direct Purchaser Class*

H. Laddie Montague, Jr.*
Eric L. Cramer*
Mark R. Suter*
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19106
Telephone: (215) 875-3000
hlmontague@bm.net
ecramer@bm.net
msuter@bm.net

Jonathan W. Cuneo*
Katherine Van Dyck*
Victoria Sims*
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Avenue NW, Suite 200
Washington, DC 20016
Telephone: (202) 789-3960
jonc@cuneolaw.com
kvandyc@cuneolaw.com
vicky@cuneolaw.com

Gregory S. Asciolla*
Karin E. Garvey*
Veronica Bosco*
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
gasciolla@labaton.com

21

kgarvey@labaton.com
vbosco@labaton.com

*Counsel for Plaintiffs and Interim Co-Lead Counsel
for the Proposed Direct Purchaser Class*

Benjamin D. Elga**
**JUSTICE CATALYST LAW, INC.**
81 Prospect Street
Brooklyn, NY 11201
Telephone: (518) 732-6703
belga@justicecatalyst.org

Brian Shearer**
Craig L. Briskin*
**JUSTICE CATALYST LAW, INC.**
718 7th Street NW
Washington, DC 20001
Telephone: (518) 732-6703
brianshearer@justicecatalyst.org
cbriskin@justicecatalyst.org

Roberta D. Liebenberg*
Jeffrey S. Istvan*
Mary L. Russell*
**FINE KAPLAN AND BLACK, R.P.C.**
One South Broad St., 23rd Floor
Philadelphia, PA 19107
Telephone: (215) 567-6565
rliebenberg@finekaplan.com
jistvan@finekaplan.com
mrussell@finekaplan.com

Nathan A. Bicks (TN BPR #10903)
Frank B. Thacher III (TN BPR #23925)
**BURCH, PORTER, & JOHNSON, PLLC**
130 North Court Ave.
Memphis, TN 38103
Telephone: (901) 524-5000
nbicks@bpjlaw.com
fthacher@bpjlaw.com

Aubrey B. Harwell, Jr. (TN BPR #002559)
Charles Barrett (TN BPR #020627)
Aubrey B. Harwell III (TN BPR #017394)
**NEAL & HARWELL, PLC**

22

1201 Demonbreun St., Suite 1000
Nashville, TN 37203
Telephone: (615) 244-1713
aharwell@nealharwell.com
cbarrett@nealharwell.com
tharwell@nealharwell.com

\* Admitted *pro hac vice*
\*\* *Pro hac vice* application forthcoming

*Counsel for Plaintiffs and the Proposed Direct
Purchaser Class*

## CERTIFICATE OF SERVICE

I, Benjamin A. Gastel, hereby certify that on the 15th day of January 2021, I served a copy of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Strike Class Allegations and Spurious Allegations Regarding Sexual Abuse via electronic mail upon the following Counsel:

Adam S. Baldridge
Matthew S. Mulqueen
**BAKER DONELSON BEARMANN**
**CALDWELL & BERKOWITZ**
165 Madison Ave
Ste 2000
Memphis, TN 38103
Tel: 901-526-2000
abaldridge@bakerdonelson.com
mmulqueen@bakerdonelson.com

George S. Cary
Mark W. Nelson
Alexis Collins
Steven J. Kaiser
**CLEARY GOTTILEB STEEN &**
**HAMILTON LLP**
2112 Pennsylvania Avenue NW
Ste 1000
Washington, DC 20037
Tel: 202-974-1500
gcary@cgsh.com
mnelson@cgsh.com
alcollins@cgsh.com
skaiser@cgsh.com

*Attorneys for Defendants Varsity Brands,*
*LLC, Varsity Spirit Fashions & Supplies, Inc.,*
*and Varsity Spirit, LLC*

Grady M. Garrison
Nicole D. Berkowitz
**BAKER DONELSON BEARMAN**
**CALDWELL & BERKOWITZ, P.C.**
165 Madison Ave.
Ste. 2000
Memphis, TN 38103
Tel: 901-526-2000
ggarrison@bakerdonelson.com
nberkowitz@bakerdonelson.com

*Attorneys for Defendant U.S. All Star*
*Federation, Inc.*

24