**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE**

| | |
|---|---|
| FUSION ELITE ALL STARS, et al., | |
| Plaintiffs, | Case No. 2:20-cv-02600-SHL-cgc |
| v. | |
| VARSITY BRANDS, LLC, et al., | **Jury Trial Demanded** |
| Defendants. | |

## PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION AND SUMMARY OF ALLEGATIONS ............................................ 1

II.   LEGAL STANDARD .................................................................................................. 6

III.  ARGUMENT ............................................................................................................... 7

  A.   Plaintiffs Plausibly Allege Monopoly Power in Both Relevant Markets .................. 7

  B.   Plaintiffs Plausibly Allege Anticompetitive Conduct ................................................ 16

    1.   Varsity Acquired Actual and Potential Rivals. ..................................................... 17

    2.   Varsity Engaged in Anticompetitive Exclusive Dealing. ...................................... 19

    3.   Varsity Conspired with USASF Among Other Anticompetitive Acts. ................. 24

    4.   Varsity Had Anticompetitive Intent. .................................................................... 26

  C.   Defendants' Conduct Caused Anticompetitive Harm ................................................ 26

  D.   Varsity and USASF Conspired ................................................................................. 28

    1.   Varsity and USASF Could Conspire as a Matter of Law. .................................... 28

    2.   USASF's Acts in Furtherance of the Conspiracy Show Specific Intent. ............. 30

IV.   CONCLUSION ............................................................................................................ 32

# TABLE OF AUTHORITIES

**Cases**

*A.G. Spalding & Bros, Inc. v. F.T.C.*,
    301 F.2d 585 (3d Cir. 1962) .................................................................................... 14

*Am. Ad Mgmt., Inc. v. GTE Corp.*,
    92 F.3d 781 (9th Cir. 1996) ..................................................................................... 26

*Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*,
    185 F.3d 606 (6th Cir. 1999) ................................................................................... 29

*Am. Needle, Inc. v. Nat'l Football League*,
    560 U.S. 183 (2010) ..................................................................................... 6, 28, 29

*Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*,
    456 U.S. 556 (1982) ................................................................................................ 24

*Am. Tobacco Co. v. United States*,
    147 F.2d 93 (6th Cir. 1944) ........................................................................ 23, 24, 27

*Amateur Softball Ass'n of Am. v. United States*,
    467 F.2d 312 (10th Cir. 1972) ................................................................................. 25

*Arandell Corp. v. Centerpoint Energy Servs*,
    900 F.3d 623 (9th Cir. 2018) ....................................................................... 6, 30, 31, 32

*Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*,
    917 F.2d 1413 (6th Cir. 1990) ................................................................................. 17

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................. 3, 6

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985) ......................................................................................... *passim*

*Atl. Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990) ................................................................................................ 19

*Barr Labs., Inc. v. Abbott Labs.*,
    978 F.2d 98 (3d Cir. 1992) ...................................................................................... 24

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................. 3, 6

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
    603 F.2d 263 (2d Cir. 1979) ........................................................................ 18

*Boulevard Souvenirs v. Elvis Presley Enters., Inc.*,
    No. 2:07-cv-02300, 2007 WL 9705982 (W.D. Tenn. Oct. 2, 2007) ........................................ 30

*Brookins v. Int'l Motor Contest Ass'n*,
    219 F.3d 849 (8th Cir. 2000) ...................................................................... 25

*Byars v. Bluff City News Co.*,
    609 F.2d 843 (6th Cir. 1979) ............................................................... *passim*

*Caribbean Broad Sys. Ltd. v. Cable & Wireless PLC*,
    148 F.3d 1080 (D.C. Cir. 1998) .................................................................. 16

*Cascade Health Sols. v. PeaceHealth*,
    502 F.3d 895 (9th Cir. 2007) ................................................................ 19, 20

*Castro v. Sanofi Pasteur Inc.*,
    134 F. Supp. 3d 820 (D.N.J. 2015) .......................................................... 4, 22

*Century Oil Tool, Inc. v. Prod. Specialties, Inc.*,
    737 F.2d 1316 (5th Cir. 1984) ............................................................. 29, 30

*Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*,
    95 F.3d 593 (7th Cir. 1996) ....................................................................... 9

*Clarett v. Nat'l Football League*,
    306 F. Supp. 2d 379 (S.D.N.Y. 2004) ........................................................ 13

*Collins Inkjet Corp. v. Eastman Kodak Co.*,
    781 F.3d 264 (6th Cir. 2015) ..................................................................... 19

*Commonwealth of Ky. v. Marathon Petroleum Co., LP*,
    191 F. Supp. 3d 694 (W.D. Ky. 2016) ............................................... 19, 21, 22, 23

*Concord Assoc., L.P. v. Ent. Props. Trust*,
    817 F.3d 46 (2d Cir. 2016) ........................................................................ 16

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962) ..................................................... 17, 23, 27, 32

*Conwood Co. v. United States Tobacco Co.*,
    290 F.3d 768 (6th Cir. 2002) .......................................................... *passim*

*Copperweld Corp. v. Indep. Tube Corp.*,
    467 U.S. 752 (1984) ................................................................ 28, 29

*Cornwell Quality Tools Co. v. C.T.S. Co.*,
    446 F.2d 825 (9th Cir. 1971) ................................................ 22

*Cupp v. Alberto-Culver USA, Inc.*,
    310 F. Supp. 2d 963 (W.D. Tenn. 2004) .............................. 12

*Defiance Hosp. v. Fauster-Cameron, Inc.*,
    344 F. Supp. 2d 1097 (N.D. Ohio 2004) ......................... 26, 30

*Deutscher Tennis Bund v. ATP Tour, Inc.*,
    610 F.3d 820 (3d Cir. 2010) .................................................. 28

*Dial Corp. v. News Corp.*,
    No. 13-cv-06802, 2016 WL 462515 (S.D.N.Y. Jan. 15, 2016) ................................. 24

*Directv, Inc. v. Treesh*,
    487 F.3d 471 (6th Cir. 2007) ............................................. 3, 6

*Downs v. Insight Communs. Co., L.P.*,
    No. 3:09-cv-00093, 2011 WL 1100456 (W.D. Ky. Mar. 22, 2011) ......................................... 17

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
    637 F.3d 435 ......................................................................... 23

*Eastman v. Quest Diagnostics Inc.*,
    724 F. App'x 556 (9th Cir. 2018) ........................................ 23

*Eastman Kodak v. Image Tech. Servs.*,
    504 U.S. 451 (1992) ...................................................... 9, 13, 16

*F.T.C. v. Ind. Fed'n of Dentists*,
    476 U.S. 447 (1986) ......................................................... 9, 27

*F.T.C. v. Staples, Inc.*,
    970 F. Supp. 1066 (D.D.C. 1997) ........................................ 14

*Feitelson v. Google Inc.*,
    80 F. Supp. 3d 1019 (N.D. Cal. 2015) ................................. 23

*Fraser v. Major League Soccer, LLC*,
    284 F.3d 47 (1st Cir. 2002) .................................................. 25

*General Indus. Corp. v. Hartz Mountain Corp.*,
   810 F.2d 795 (8th Cir. 1987) ................................................................. 14

*Gianna Enters. v. Miss World (Jersey) Ltd.*,
   551 F. Supp. 1348 (S.D.N.Y. 1982) ........................................................ 12

*Guzman v. U.S. Dep't of Homeland Sec.*,
   679 F.3d 425 (6th Cir. 2012) ................................................................... 6

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
   392 U.S. 481 (1968) ................................................................................ 18

*Image Technical Servs. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997) ............................................................... 14

*In re Cardizem CD Antitrust Litig.*,
   332 F.3d 896 (6th Cir. 2003) ................................................................. 26

*In re Cox Enters., Set-Top Cable TV Box Antitrust Litig.*,
   No. 09-ML-2048, 2010 WL 5136047 (W.D. Okla. Jan. 19, 2010) .......... 17

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
   375 F. Supp. 3d 1058 (N.D. Cal. 2019) ................................................. 26

*In re Papa John's Empl. & Franchisee Empl. Antitrust Litig.*,
   No. 3:18-cv-00825, 2019 WL 5386484 (W.D. Ky. Oct. 21, 2019) .............. 8, 26, 27

*In re Se. Milk Antitrust Litig.*,
   555 F. Supp. 2d 934 (E.D. Tenn. 2008) ............................................ 18, 31

*In re Se. Milk Antitrust Litig.*,
   739 F.3d 262 (6th Cir. 2014) ............................................................. 9, 10

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
   No. 1:12-md-02343, 2013 WL 2181185 (E.D. Tenn. May 20, 2013) ............................ *passim*

*Int'l Boxing Club of New York, Inc. v. U.S.*,
   358 U.S., 242 (1959) .............................................................................. 13

*Jack Russell Terrier Network of Northern Cal. v. American Kennel Club, Inc.*,
   407 F.3d 1027 (9th Cir. 2005) ............................................................... 29

*JBL Enters., Inc. v. Jhirmack Enters., Inc.*,
   698 F. 2d 1011 (9th Cir. 1983) .............................................................. 14

*Klehr v. A.O. Smith Corp.*,
  521 U.S. 179 (1997) ............................................................................ 18

*Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
  588 F.3d 908 (6th Cir. 2009) ........................................................... 9, 10

*Le v. Zuffa, LLC*,
  216 F. Supp. 3d 1154 (D. Nev. 2016) ............................................... 19

*LePage's Inc. v. 3M*,
  324 F.3d 141 (3d Cir. 2003) ............................................................. 24

*Los Angeles Mem. Coliseum Com'n v. Nat'l Football League*,
  726 F.2d 1381 (9th Cir. 1984) .......................................................... 25

*Luria Bros. & Co. v. F.T.C.*,
  389 F.2d 847 (3d Cir. 1968) ............................................................. 22

*Meijer, Inc. v. 3M*,
  No. 04-cv-05871, 2005 WL 1660188 (E.D. Pa. July 13, 2005) ............... 18

*Midwest Agency Servs., Inc. v. JP Morgan Chase Bank, N.A.*,
  No. 09-165, 2010 WL 935450 (E.D. Ky. Mar. 11, 2010) ...................... 23

*N. Am. Soccer League v. Nat'l Football League*,
  670 F.2d 1249 (2d Cir. 1982) ........................................................... 28

*Nashville Cmty. Bail Fund v. Gentry*,
  446 F. Supp. 3d 282 (M.D. Tenn. 2020) ............................................. 6

*Nat'l Collegiate Athletic Ass'n v. Board of Regents*,
  468 U.S. 85 (1984) ........................................................................... 26

*Natchitoches Par. Hosp. Serv. Dist. v. Tyco Int'l, Ltd*,
  247 F.R.D 253 (D. Mass. 2008) ............................................... 5, 21, 22

*Natchitoches Par. Hosp. Serv. Dist. v. Tyco Int'l, Ltd*,
  262 F.R.D. 58 (D. Mass. 2008) ..................................................... 4, 5

*Nat'l Hockey League Players Ass,n v. Plymouth Whalers Hockey Club*,
  419 F.3d 462 (6th Cir. 2005) ........................................................... 25

*Nelson v. Monroe Reg'l Med. Ctr.*,
  925 F.2d 1555 (7th Cir. 1991) .......................................................... 17

*Nicolosi Distrib., Inc. v. Finishmaster, Inc.*,
   No. 18-cv-03587, 2019 WL 1560460 (N.D. Cal. Apr. 10, 2019)............................................ 16

*Nilavar v. Mercy Health Sys. W. Ohio*,
   142 F. Supp. 2d 859 (S.D. Ohio 2000) ................................................................................. 8, 19

*Northbay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*,
   No. 18-cv-16769, 2020 WL 7233105 (9th Cir. Dec. 8, 2020)................................................. 26

*Nurse Midwifery Assocs. v. Hibbett*,
   918 F.2d 605 (6th Cir. 1990) .................................................................................................. 30

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*,
   7 F. Supp. 3d 955 (N.D. Cal. 2014) ........................................................................................ 13

*Palmer v. BRG of Georgia, Inc.*,
   498 U.S. 46 (1990).................................................................................................................. 32

*Phila. World Hockey Club, Inc. v. Phila. Hockey Club, Inc.*,
   351 F. Supp. 462 (E.D. Pa. 1972) ........................................................................................... 13

*Piazza v. Major League Baseball*,
   831 F. Supp. 420 (E.D. Pa. 1993) ........................................................................................... 25

*Poindexter v. Bank of Am., N.A.*,
   No. 11-cv-02663, 2012 WL 13020819 (W.D. Tenn. Apr. 10, 2012) ....................................... 28

*Prime Healthcare Servs. v. SEIU*,
   642 F. App'x 665 (9th Cir. 2016) ............................................................................................ 32

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997).................................................................................................... 12

*Radovich v. Nat'l Football League*,
   342 U.S. 445 (1957)................................................................................................................ 26

*Re/Max Intern., Inc. v. Realty One, Inc.*,
   173 F.3d 995 (6th Cir. 1999) ........................................................................................... 7, 9, 26

*Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., Inc.*,
   812 F. Supp. 387 (S.D.N.Y. 1993) .......................................................................................... 12

*Richter Concrete Corp. v. Hilltop Concrete Corp.*,
   691 F.2d 818 (6th Cir. 1982) .............................................................................................. 7, 30

*Rock v. Nat'l Collegiate Athletic Ass'n,*
    No. 1:12-cv-01019, 2013 WL 4479815 (S.D. Ind. Aug. 16, 2013) ........................................ 13

*Schuylkill Health Sys. v. Cardinal Health 200, LLC,*
    No. 12-cv-07065, 2014 WL 3746817 (E.D. Pa. July 30, 2014) .............................. 26

*Shields v. Fed'n Internationale de Natation,*
    419 F. Supp. 3d 1188 (N.D. Cal. 2019) .............................................................. 28, 29

*Smith v. Pro Football, Inc.,*
    593 F.2d 1173 (D.C. Cir. 1978) ......................................................................... 15, 26

*SPX Corp. v. Mastercool, U.S.A., Inc.,*
    No. 10-cv-1266, 2011 WL 3610094 (N.D. Ohio Aug. 17, 2011)............................. 23

*Standard Oil Co. of Cal. v. U.S.,*
    337 U.S. 293 (1949)............................................................................................ 22, 23

*Tampa Elec. Co. v. Nashville Coal Co.,*
    365 U.S. 320 (1961)............................................................................................ 19, 21

*Tondas v. Amateur Hockey Ass'n of U.S.,*
    438 F. Supp. 310 (W.D.N.Y. 1977) .......................................................................... 25

*Total Benefits Plan Agency, Inc. v. Anthem Blue Cross and Blue Shield,*
    552 F.3d 430 (6th Cir. 2008) ................................................................................... 12

*TV Commc'ns Network, Inc. v. Turner Network, Inc.,*
    964 F.2d 1022 (10th Cir. 1992) ............................................................................... 12

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.,*
    676 F.2d 1291 (9th Cir. 1982) ................................................................................. 22

*TYR Sport Inc. v. Warnaco Swimwear Inc.,*
    679 F. Supp. 2d 1120 (C.D. Cal. 2009) ...................................................... 11, 15, 24

*United States v. Coop. Theatres of Ohio, Inc.,*
    845 F.2d 1367 (6th Cir. 1988) ................................................................................. 32

*United States v. Dentsply Int'l, Inc.,*
    399 F.3d 181 (3d Cir. 2005)....................................................................... 19, 20, 24

*United States v. E. I. Du Pont de Nemours & Co.,*
    353 U.S. 586 (1957)................................................................................................. 23

*United States v. Grinnell Corp.*,
384 U.S. 563 (1966) .................................................................................. 14, 16, 17

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) ............................................................................. 24

*United States v. Phila. Nat'l Bank*,
374 U.S. 321 (1963) ......................................................................................... 14

*United States v. Phillipsburg Nat'l Bank & Trust Co.*,
399 U.S. 350 (1970) ......................................................................................... 15

*United States v. Syufy Enters.*,
903 F.2d 659 (9th Cir. 1990) .............................................................................. 9

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004) ......................................................................................... 17

*Volvo North Am. Corp. v. Men's Intern. Prof'l Tennis Council*,
857 F.2d 55 (2d Cir. 1988) ..................................................................... 24, 26, 28

*Weiss v. York Hosp.*,
745 F.2d 786 (3rd Cir. 1984) ............................................................................. 14

*Williams v. Kleaveland*,
534 F. Supp. 912 (W.D. Mich. 1981) .................................................................. 30

*ZF Meritor, LLC v. Eaton Corp.*,
696 F.3d 254 (3d Cir. 2012) .............................................................................. 21

**Other Authorities**

KINTNER ET AL., FEDERAL ANTITRUST LAW: A TREATISE ON THE ANTITRUST LAWS OF THE
UNITED STATES (2d ed. 2002) ........................................................................... 17

## I.   <u>INTRODUCTION AND SUMMARY OF ALLEGATIONS</u>

"All Star Cheer" is an elite, competitive, and distinctive type of cheerleading. Compl. ¶3. This is an antitrust class action on behalf of All Star gyms ("Gyms") and parents of All Star cheerleaders ("Cheerleaders") against Varsity Brands—the dominant producer of All Star competitions ("Competitions") and All Star apparel ("Apparel")—and U.S. All Star Federation, Inc. ("USASF")— the main regulatory body for the sport.[1] Plaintiffs seek to represent a proposed class (the "Class") of entities and natural persons that directly paid Varsity for: (a) registration, entrance, spectator, or other fees and expenses associated with participation in or attendance at one or more All Star Competitions or (b) All Star Apparel. *Id.* at ¶40.

Teams that participate in All Star Cheer ("All Star Teams" or "Teams") do not cheer to support another athletic team from the sidelines but instead compete against each other in time-limited choreographed routines at Competitions. *Id.* at ¶¶4, 7, 81-82, 111-14, 117. Teams are fielded through privately-owned and operated All Star Gyms. Gyms coordinate the Cheerleaders' participation in Competitions—paying registration fees, organizing logistics, and purchasing necessary Apparel, that is, uniforms, shoes, and equipment. *Id.* at ¶6. Parents of Cheerleaders also purchase Apparel for athletes and pay spectator fees to attend Competitions. *Id.* at ¶¶32-34.

Varsity is the dominant producer of All Star Competitions and Apparel in the U.S. Varsity created and funded Defendant USASF as a non-profit entity with the purpose of setting uniform rules and judging standards for Competitions. *Id.* at ¶¶71, 73, 197. However, despite USASF's legal purpose as a neutral regulator, it conspired with Varsity to use anticompetitive

---

[1] The defendants are Varsity Brands, LLC; Varsity Spirit, LLC; Varsity Spirit Fashions & Supplies, LLC (collectively, "Varsity"); and U.S. All Star Federation, Inc. ("USASF") (Varsity and USASF together, "Defendants"). The plaintiffs are three All Star Gyms and three parents of current and former All Star Cheerleaders (collectively, "Plaintiffs"). *See* Compl. ¶¶29-39.

conduct to establish and maintain Varsity's dominance in the markets for Competitions and

Apparel (the "Relevant Markets") in violation of Section 2 of the Sherman Act. *Id*. at ¶¶248-61.

The challenged anticompetitive conduct (the "Scheme") includes, among other things:

a) <u>Acquisitions</u>: acquiring actual and potential rivals in the Competition and Apparel markets, *id*. at ¶¶156-69;

b) <u>Exclusionary Agreements</u>: imposing exclusionary agreements on All Star Gyms, causing them to agree, on their own behalf and on behalf of their members, to patronize Varsity in both Relevant Markets exclusively, or nearly so, *id*. at ¶¶170-85; and

c) <u>Conspiring with USASF</u>: leveraging Varsity's control of All Star Cheer's governing bodies, including USASF, to impair actual and potential rivals and foreclose competition in both Relevant Markets. *Id*. at ¶¶195-222, 226. As a result of the Scheme, Class members paid substantially higher prices for Competitions and Apparel purchased directly from Varsity. *Id*. at ¶¶227-33.

The Scheme had additional anticompetitive effects. It decreased the number, size, and

significance of rival Competition producers and Apparel manufacturers. *Id.* at ¶¶16, 234-35. As a

result, there are fewer Competitions and Apparel sources, reducing options and inflating prices.

*Id*. The Scheme also allowed Varsity and USASF to ignore sexual misconduct, leaving Gym

owners, parents, and children powerless to demand reform absent a realistic threat to take their

business elsewhere. *Id.* at ¶¶237-41.

Plaintiffs' allegations are far more systematic than the evidence that sufficed to sustain a

jury verdict for a plaintiff challenging exclusionary conduct under Section 2 of the Sherman Act.

*See Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002). In *Conwood*, one

manufacturer of moist snuff, Conwood, accused another manufacturer, USTC, of various

exclusionary practices, such as destroying Conwood's display racks and discouraging retail

stores from carrying Conwood's products. *Id*. at 775-80. Conwood won at trial even though it did

not establish how common these practices were or the percentage of the market that was subject

to them; it merely offered evidence from which the jury could infer that they were not "isolated

2

and sporadic," *id*. at 784, but rather were "widespread." *Id*. at 785. The Sixth Circuit held such evidence—plus evidence that the conduct caused "an increase in prices, reduced sales and limited choice," and prevented Conwood's market share from growing as quickly as it otherwise would have, *id*. at 788—could establish unlawful monopolization. *Id*. at 785-86.

Yet Defendants have moved to dismiss Plaintiffs' First Amended Complaint (the "Complaint") for failure to state a claim (respectively, the "Varsity Motion" or "VMTD" and the "USASF Motion" or "UMTD," and together the "Motions"). In doing so, they have misstated Plaintiffs' allegations and the law, improperly making their own factual allegations. Defendants argue in effect that if Plaintiffs' allegations are construed as Defendants would prefer, then Plaintiffs fail to state a claim. But, of course, that is not the appropriate legal standard. To the contrary, the Court should accept Plaintiffs' allegations as true, draw all reasonable inferences in Plaintiffs' favor, and determine whether the allegations plausibly state a claim for relief. *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).

Plaintiffs allege that Varsity together with the USASF used a series of exclusionary practices enabling Varsity to exercise monopoly power over a distinct sport. Plaintiffs further allege that All Star Cheer is not reasonably interchangeable with other sports—such as sideline cheerleading, dance, or gymnastics. Compl. ¶¶115, 117-21. Defendants in effect argue that Plaintiffs' allegations are mistaken. *See* VMTD at 7-8; UMTD at 6.

Defendants will have the opportunity to test Plaintiffs' evidence later in this litigation. At this point, however, Plaintiffs need only show that their allegations state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). It need merely be plausible—as Plaintiffs allege—that Athletes and Gyms stuck with All Star Competitions even though the prices Varsity charged were elevated

above competitive levels. Compl. ¶115. It need merely be plausible that any substitutes, like dance, gymnastics, or recreational cheerleading, were inadequate to prevent Varsity from profitably inflating its prices. *Id.* at ¶¶117-21. Whether Plaintiffs are correct on these points should be decided on the evidence, not on Defendants' contrary assertions.

The same is true for the specialized Apparel that Varsity makes for competing in—and preparing for—Competitions. It is plausible, as Plaintiffs allege, that such uniforms are designed specifically for Competitions and that such Apparel is subject to special rules imposed by USASF. *Id.* at ¶¶102-06, 140-42, 151. It is also plausible, as Plaintiffs allege, that Cheerleaders are willing to pay and did pay supra-competitive prices for Varsity's Apparel rather than switch to other apparel that does not conform to USASF's standards or otherwise give Athletes' a competitive edge. *Id.* at ¶142. Defendants' factual assertions to the contrary do not provide an appropriate basis for granting a Rule 12 motion. *See* VMTD at 6; UMTD at 6-7.

Nor should the Court accept Defendants' claim that the challenged conduct benefited some Class members. *See* VMTD at 4, 11-12. Plaintiffs allege that Varsity used its monopoly power to charge *all* of its customers—including Gyms and parents—higher prices than it otherwise could have, even after so-called "rebates." Compl. at ¶¶227-33. Plaintiffs also allege that the Class Members who did not receive the so-called "rebates" in reality paid monopoly prices *plus penalties*. *See id.* at ¶¶139, 180-81, 188, 192. Case law and economists recognize this as a plausible economic outcome of Varsity's behavior, one that can give rise to liability for monopolization. *See, e.g., Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 847-49 (D.N.J. 2015) (finding common evidence established that defendant's allegedly exclusionary agreements with class members, which provided rebates to "loyal" but not so-called "non-loyal" customers, suppressed competition and raised prices for all customers); *Natchitoches Par. Hosp. Serv. Dist.*

*v. Tyco Int'l, Ltd*, 262 F.R.D. 58, 70 (D. Mass. 2008) ("*Tyco II*") (antitrust class action challenging exclusionary agreements with class members (and others) that offered more rebates to some than to others, citing "compelling evidence that a more competitive market would likely bring down the negotiating range for all purchasers").

Myriad cases have accepted the plausibility—and common reality—of this dynamic. A dominant seller, like Varsity, can use its market power to force its purchasers to accept exclusionary agreements. The agreements offer so-called "rebates" if a buyer makes all or nearly all of its purchases from the dominant seller. Each buyer faces a stark choice. One option is to accept and abide by the exclusionary terms and receive "rebates"—which really means paying supra-competitive prices. The other option is to forego the rebates—which really means paying supra-competitive prices *plus a penalty*. Buyers have no meaningful choice at all. The cumulative effect is to allow the dominant seller to exclude or impair rivals, enhancing its monopoly power, and enabling it to impose supra-competitive prices across the market.[2]

The same problems beset Defendants' other contentions—which should be rejected for similar reasons. One additional argument they make, however, warrants addressing up front. Defendants assert that USASF is not a separate entity from Varsity for antitrust purposes and therefore the two entities cannot have conspired. *See* VMTD at 18-19; UMTD at 10-12. That is not what Plaintiffs allege. Instead, Plaintiffs claim that Varsity and USASF have distinct legal existences, distinct legitimate purposes, and distinct economic interests, *see* Compl. ¶¶35-37, 39,

---

[2] *Natchitoches Par. Hosp. Serv. Dist. v. Tyco Int'l, Ltd*, 247 F.R.D. 253, 272 (D. Mass. 2008) ("*Tyco I*") (approving plaintiffs' expert's analysis and stating, "'What causes the purchaser's injury is not whether it was individually 'coerced,' but the effect the marketwide foreclosure has on [defendant]'s market power and market prices.' . . . [A]s a matter of standard antitrust economics, 'buyers have incentives to agree to exclusionary contracts even when they have an anticompetitive effect because most of the harm of individual agreements is externalized onto those who are not party to that particular agreement'") (citations omitted).

71, 116, 195, and would have acted independently in the absence of the Scheme. Taken as true, those allegations establish that Varsity and USASF are capable of conspiring. *See Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195 (2010). Further, even if Varsity and USASF did qualify as a single entity for antitrust purposes, then USASF's actions in furtherance of the challenged conduct would render it liable for monopolization. *See Arandell Corp. v. Centerpoint Energy Servs*, 900 F.3d 623, 631-32 (9th Cir. 2018).[3] Thus, USASF's single entity argument, even if correct, should not immunize it for violating federal antitrust law.

## II.   <u>LEGAL STANDARD</u>

A court should deny a Rule 12(b)(6) motion if a complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 678. The Court is to "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv*, 487 F.3d at 476 (citation omitted). "The court must determine only whether the claimant is entitled to offer evidence to support the claims, not whether the plaintiff can ultimately prove the facts alleged." *Nashville Cmty. Bail Fund v. Gentry*, 446 F. Supp. 3d 282, 295 (M.D. Tenn. 2020) (internal citations and quotations omitted); *see also Guzman v. U.S. Dep't of Homeland Sec*., 679 F.3d 425, 429 (6th Cir. 2012) (dismissal appropriate "only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief").

In the Sixth Circuit, at the pleading stage, claims for monopolization and conspiracy to monopolize ultimately turn on whether plaintiffs plausibly allege:

1)   <u>Monopoly Power</u>: a defendant had monopoly power—or conspired with a defendant that did;

---

[3] *See* UMTD at 11 (USASF admitting for purposes of the Motions that it "has no independent decision-making or economic purpose and is completely beholden to Varsity").

2) <u>Willful Acquisition, Maintenance, or Use of that Power through Anticompetitive Conduct</u>: a defendant deliberately achieved or maintained that monopoly power other than by competing on the merits—or conspired with the specific intent to monopolize and took overt actions to support monopolization;

3) <u>Causation of Anticompetitive Harm</u>: a defendant used the resulting monopoly power to increase prices above competitive levels, impair competitors, decrease output below competitive levels, decrease quality, or impose other anticompetitive harms; and

4) <u>Concerted Action</u>: a defendant collaborated with another to harm competition (required only for a conspiracy to monopolize, not for monopolization).

*Conwood*, 290 F.3d at 782, 788-89 (elements of monopolization claim); *Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 827 (6th Cir. 1982) (elements of claim for conspiracy to monopolize). Plaintiffs' allegations satisfy each element.

## III.   ARGUMENT

### A.   Plaintiffs Plausibly Allege Monopoly Power in Both Relevant Markets

Plaintiffs plausibly allege Varsity's monopoly power with respect to Competitions and Apparel. The definition of monopoly power is simply the capacity to cause anticompetitive harm. *Conwood*, 290 F.3d at 782 (monopoly power consists of "the power to control prices or exclude competition"); *Re/Max Intern., Inc. v. Realty One, Inc.,* 173 F.3d 995, 1016 (6th Cir. 1999) (citing *Byars v. Bluff City News Co.*, 609 F.2d 843, 850 (6th Cir. 1979)) (same). Thus, Plaintiffs can establish monopoly power (1) *directly* by alleging that a defendant caused anticompetitive harm, such as by inflating prices above competitive levels, or (2) *circumstantially* by making allegations that support an *inference* of monopoly power, such as by maintaining a high market share in a relevant market. *Re/Max,* 173 F.3d at 1016 (quoting *Byars,* 609 F.2d at 850) (two ways to prove monopoly power: "The first is by presenting direct evidence 'showing the exercise of actual control over prices or the actual exclusion of competitors.' The second is by presenting circumstantial evidence of monopoly power by showing a high market share within a defined market"). Plaintiffs here have properly alleged both. Either suffices.

Plaintiffs make the following allegations establishing monopoly power:

- <u>Anticompetitive Effects</u>. Varsity's monopoly power enabled it to: charge higher prices than it otherwise could have charged, Compl. ¶¶230-33, exclude actual and potential rivals from the market, *id.* at ¶¶135-39, 153-55, 188-91, 206-11, 223-26, 229, restrict output compared to what it otherwise would have been, *id.* at ¶¶16, 234-36, and degrade the quality of the services and goods it provided. *Id.* at ¶¶237-41.[4]

- <u>Market Definitions</u>. All Star Competitions in the U.S. form a distinct level of competition in a distinct sport, *id.* at ¶¶111-25, and the specialized All Star Apparel in the U.S. is distinct from other apparel. *Id.* at ¶¶140-43.

- <u>High Market Percentages</u>. Varsity controls 90% of the market for All Star Competitions, *id.* at ¶¶16, 58, 128, 223, 244, and 80% of the market for All Star Apparel used at All Star Competitions and to prepare for those Competitions. *Id.* at ¶¶16, 58, 107, 147, 223, 244.[5]

<u>Direct Allegations</u>. Plaintiffs plausibly allege that the Scheme elevated prices above competitive levels, excluded actual and potential rivals from the relevant market, decreased output, and degraded quality. *Id.* at ¶¶223-41.[6] Indeed, Defendants do not dispute that "Varsity 'has raised prices associated with All Star Competitions and All Star Apparel above competitive levels.'" VMTD at 12 (quoting Compl. ¶230). These allegations establish monopoly power.

---

[4] A decrease in quality is an anticompetitive effect. *In re Papa John's Empl. & Franchisee Empl. Antitrust Litig.*, 2019 WL 5386484, at *9; *Nilavar v. Mercy Health Sys. W. Ohio*, 142 F. Supp. 2d 859, 874 (S.D. Ohio 2000) (allegations of "higher prices, lower quality services, and less choice for consumers … constitute the kind of injuries that the antitrust laws were enacted to prevent"); *Ross v. Bank of Am., N.A.*, 524 F.3d 217, 223-24 (2d Cir. 2008) (same). Lack of protection against sexual predation is a decrease in the quality of Competitions. So Varsity is wrong that such allegations are irrelevant to Plaintiffs' antitrust claims. VMTD at 16-18.

[5] Plaintiffs also allege that there are high barriers to entry into the Relevant Markets, even without the Scheme, Compl. ¶¶132-34 (Competitions), *id.* ¶¶149-52 (Apparel), and also because of the Scheme. *Id.* at ¶¶135-39 (Competitions), *id.* at ¶¶153-55 (Apparel).

[6] *Byars*, 609 F.2d at 853 n.26 (credible evidence "that when [defendant] took over servicing [plaintiff]'[s] former small retail customers, the result was inferior service at greater cost which the small retailers were forced to bear since they had nowhere else to turn" would "lend[ ] strong support to plaintiff's contention that [defendant] possesses monopoly power").

*Byars*, 609 F.2d at 850 ("[T]he simplest way of showing monopoly power is to marshal evidence showing the exercise of actual control over prices or the actual exclusion of competitors.").[7]

Circumstantial Allegations. Plaintiffs also make allegations plausibly defining relevant markets and establishing dominant shares of those markets. In defining a relevant market, the pivotal issue is the capacity to impose anticompetitive harm. It follows—as a matter of case law and economic theory—that a good or service forms a relevant market if it is sufficiently distinct, such that controlling it enables a defendant to profit from charging above-competitive prices or to cause other harms from excluding competitors. *Re/Max*, 173 F.3d at 1016; *Byars*, 609 F.2d at 850. Market definition is a question of fact best resolved by a jury at trial, not by a court at summary judgment—much less on a motion to dismiss. *In re Se. Milk Antitrust Litig.* ("*Milk 2*"), 739 F.3d 262, 282-83 (6th Cir. 2014) ("Multiple courts of appeal have held that market definition is a question of fact . . . [that] is better left for a jury to decide.") (internal citations omitted).

Plaintiffs adequately define the relevant markets and allege that Varsity exercises control over those markets. As Defendants concede, the test for goods or services that fall within a single antitrust market is "reasonable interchangeability." VMTD at 5 (quoting *Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 918 (6th Cir. 2009)). Goods or services that are reasonably interchangeable are part of the same market. *Ky. Speedway*, 588 F.3d

---

[7] *See also Re/Max*, 173 F.3d at 1018 ("We agree that an antitrust plaintiff is not required to rely on indirect evidence of a defendant's monopoly power, such as high market share within a defined market, when there is direct evidence that the defendant has actually set prices or excluded competition."); *Eastman Kodak v. Image Tech. Servs.*, 504 U.S. 451, 477-78 (1992) (direct evidence suffices to establish market power); *F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986) (same); *Conwood*, 290 F.3d at 782 (same).
　　　Defendants' reliance on *Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 95 F.3d 593, 597 (7th Cir. 1996) (VMTD at 13-14), fails because here, unlike there, plaintiffs allege inflated prices *and* reduced output. So too for *United States v. Syufy Enters.*, 903 F.2d 659, 673 (9th Cir. 1990) (VMTD at 14), which merely noted that acquisitions are not anticompetitive in a *competitive* market—which is unlike the alleged non-competitive market here.

at 918. That test is defined, as are most antitrust concepts, by economics. Goods or services are reasonably interchangeable for antitrust purposes if a sufficient number of purchasers would switch from one to the other to render anticompetitive conduct unprofitable. *Milk 2*, 739 F.3d at 278-83. If, on the other hand, dominating the market for one good or service is enough to charge supra-competitive prices or cause other anticompetitive effects, it is a distinct market and other goods or services are not reasonably interchangeable. *Id.*

Courts and economists often express this point by using the so-called "SSNIP" test: Product 2 is in the same market as Product 1 if Product 2 prevents the seller of Product 1 from profitably imposing a "small but significant non-transitory increase in price." *Id.* at 278-83; *Ky. Speedway*, 588 F.3d at 918. If a significant price increase in Product 1 would cause enough buyers to switch quickly enough to Product 2 to drive prices back down for Product 1, then the products are in the same market. *Milk 2*, 739 F.3d at 278. Otherwise, they are not.[8]

Plaintiffs plausibly allege Competition and Apparel as relevant markets in the U.S. Compl. ¶¶111-25, 140-43. No substitutes are sufficiently similar to All Star Competitions to prevent Varsity from profitably inflating its prices above competitive levels. *Id.* at ¶115. Competitions are distinct events at which All Star Teams compete against one another in time-limited choreographed routines. *Id.* ¶¶81-82, 111-17. All Star Teams attend a limited number of Competitions per season and generally set their event schedule with the goal of maximizing their chances to earn a Bid to one or more of three recognized championships: Worlds, The Summit,

---

[8] Indeed, even if *some* buyers would switch from Product 1 to Product 2 in such a circumstance, they would only be in the same relevant antitrust market if enough would switch to cause the price of Product One to fall to competitive levels. *Id.* The holding of *Kentucky Speedway* (cited at VTMD 5; UMTD 4) is inapposite because there, on summary judgment, the court found that the expert had improperly "used his own version" of, and not the actual, SSNIP test. 588 F.3d at 916.

and the U.S. Finals (collectively, "All Star Championships" or "Championships"). *Id.* ¶¶85-101. Bids are formal invitations to compete in these Championships and are obtained only by attending and succeeding at particular Competitions. *Id.* ¶87. Because an All Star Team cannot attend a Championship without a Bid, the limited number of Bids and Bid-qualifying events make them coveted and prestigious. *Id.* ¶88. The Bid system and Championships form a key part of a distinctive sport. So it is perfectly plausible that too few Cheerleaders would switch to dance, gymnastics, or recreational cheerleading—which are not part of this system—to stop Varsity from imposing above-competitive prices. *See* Compl. ¶¶115, 117-21.

The same is true for All Star Apparel. It is distinct. In Competitions, Cheerleaders must wear specialized All Star Apparel uniforms, composed of high-performance clothing, shoes, accessories, and equipment. *Id.* ¶¶102, 104-06, 140-42. All Star Teams are required to wear matching sets of All Star Apparel, including warm up outfits (jackets, sweatshirts, and sweatpants) and hair bows for female athletes. *Id.* ¶105. Each piece of Apparel that makes up the All Star uniform—including the athletes' backpacks or duffle bags—is team- or gym-branded. *Id.* ¶104. Cheerleaders similarly require specialized uniforms for practice. *Id.* ¶¶103, 104, 141. All Star uniforms are a key component of Competitions in particular, and USASF rules govern every detail of Apparel. *Id.* ¶¶105-06, 140. USASF also requires specific "soft-soled shoes" for Competitions and bars use of other footwear such as "dance shoes/boots, and/or gymnastics slippers." *Id.* ¶106. Gyms and their Team members could not shift to more generic athletic uniforms in response to a small but significant and non-transitory increase in the price of All Star uniforms. Compl. ¶142. Analogous cases have used these factors to define relevant markets.[9]

---

[9] *See, e.g.*, *TYR Sport Inc. v. Warnaco Swimwear Inc.*, 679 F. Supp. 2d 1120, 1129 (C.D. Cal. 2009) (finding that plaintiff's relevant market of "high-end competitive swimwear . . . is well-

Defendants make a set of contrary assertions. They claim that various other sports—such as dance, gymnastics, and others kinds of cheerleading—are in the same market as All Star Competitions. *See* VMTD at 8; UMTD at 6. They also contend that All Star Apparel is not as specialized as Plaintiffs allege. *See* VMTD at 6; UMTD at 6-7. But, again, on a motion to dismiss, Defendants' assertions should be disregarded.[10]

Defendants also argue that Plaintiffs improperly allege a "single brand" market. VMTD at 7; UMTD at 5. That argument fails on the facts and the law. As to the facts, Plaintiffs allege Varsity controls 90% of the All Star Competitions market and 80% of the All Star Apparel market, not 100% of those markets. Compl. ¶¶16, 58, 107, 128, 147, 223, 244. Neither market is limited to the Varsity brand.[11]

---

recognized in the industry"); *id.* (noting "that competitive swimmers would not switch to casual swimsuits simply because of a price increase in high-end swimwear").

[10] Defendants cite inapposite cases in which the plaintiffs failed to allege or prove relevant markets with reference to interchangeability. *See Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross and Blue Shield*, 552 F.3d 430, 437 (6th Cir. 2008) (VMTD at 5) (plaintiff failed to identify even the product at issue and alleged no relevant market); *Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963, 971 (W.D. Tenn. 2004) (UMTD 4-6) (plaintiff "neglect[ed] to define a relevant market in any meaningful way[,]" failing to allege the composition of the market or lack of interchangeability); *Gianna Enters. v. Miss World (Jersey) Ltd.*, 551 F. Supp. 1348, 1354 (S.D.N.Y. 1982) (VMTD 7) (plaintiff defined the product with "no rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand for potential substitute products"); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997) (VMTD 6-8; UMTD 5-7) (holding on summary judgment that plaintiff improperly defined the relevant market explicitly excluding reasonably interchangeable products); *Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., Inc.*, 812 F. Supp. 387, 391 (S.D.N.Y. 1993) (VMTD 7-8) (plaintiff "fail[ed] to allege facts regarding substitute products, to distinguish among apparently comparable products"); *TV Commc'ns Network, Inc. v. Turner Network, Inc.*, 964 F.2d 1022, 1025 (10th Cir. 1992) (VMTD 6; UMTD 5) (markets defined without reference to interchangeability).

[11] *See* Compl. ¶¶167-69, 208, 211 (discussing non-Varsity event producers); *id.* ¶¶138, 216-17, 219 (discussing non-USASF sanctioned events); VMTD at 9 ("there are at least *ten* other USASF-sanctioned All-Star Competition event providers besides Varsity") (emphasis original).

It is also not true that antitrust law rejects all single brand markets. The issue turns on economic realities, not arbitrary technicalities. If a single brand offers a good or service that has no adequate substitutes—and confers the power to inflate prices above competitive levels or cause other anticompetitive effects—the brand's good or service can form a market unto itself. *See Eastman Kodak*, 504 U.S. at 482 ("prior cases support the proposition that in some instances one brand of a product can constitute a separate market").

This is often true for sports. Courts in sports antitrust cases routinely recognize that markets may be limited not only to a single sport or, in light of quality and other distinctions *within sports*, to particular leagues, divisions (*i.e.*, "majors" vs. "minors"), or other groupings.[12] There thus may be no adequate substitute for the NFL, the NBA, the NHL, or MLB. It may be that fans would not readily watch games played in inferior leagues or that athletes would not readily compete for those inferior leagues. If so, the law would not force a court to ignore that these single brands each constitute a separate market for antitrust purposes. The same is true for All Star Competitions—which Varsity admits "are analogous to a sports league." VMTD at 2. Whether that "league" constitutes a market distinct from competitive dance, gymnastics, or recreational cheering—as Plaintiffs allege, *see* Compl. ¶¶115, 117-21—depends on the evidence.

---

[12] *See, e.g.*, *Int'l Boxing Club of N.Y., Inc. v. U.S.*, 358 U.S., 242, 250-52 (1959) (market limited to "championship" boxing contests); *Rock v. Nat'l Collegiate Athletic Ass'n*, 2013 WL 4479815, at *10-13 (S.D. Ind. Aug. 16, 2013) (distinguishing Division I football from Division II and Division III); *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 7 F. Supp. 3d 955, 966-68 (N.D. Cal. 2014) (top division college football and basketball are separate markets from lower divisions), *aff'd in part*, *vacated in part*, 802 F.3d 1049 (9th Cir. 2015); *Clarett v. Nat'l Football League*, 306 F. Supp. 2d 379, 383-84, 403 (S.D.N.Y. 2004) (NFL is separate market from other professional football leagues, such as Arena Football), *rev'd on other grounds*, 369 F.3d 124 (2d Cir. 2004); *Phila. World Hockey Club, Inc. v. Phila. Hockey Club, Inc.*, 351 F. Supp. 462, 501 (E.D. Pa. 1972) (NHL is separate market from semi-professional and amateur hockey leagues).

Defendants also claim that Plaintiffs' definition of the Apparel market is too broad because many products within the Apparel market are not reasonably interchangeable with one another—*e.g.*, All Star uniform pants are not substitutable with uniform shoes. *See* VMTD at 6; UMTD at 7. But courts routinely uphold relevant markets consisting of groups of related products—*e.g.*, uniforms—that are used by the same types of customers and distributed through the same channels.[13] Moreover, the "commercial realities" of All Star Cheer are such that Gyms and athletes must purchase entire kits of matching Apparel—*i.e.*, uniforms. Often they either do not or cannot purchase items piecemeal. Compl. ¶¶104-05; *see U.S. v. Grinnell Corp.*, 384 U.S. 563, 572-73 (1966) ("We see no barrier to combining in a single market a number of different products or services where that combination reflects commercial realities.").[14] In any case,

---

[13] *See U.S. v. E. I. Du Pont de Nemours & Co.*, 353 U.S. 586, 595 (1957) (upholding relevant market consisting of automotive finishes *and* fabrics); *Image Technical Servs. v. Eastman Kodak Co.,* 125 F.3d 1195, 1202-07 (9th Cir. 1997) (finding relevant market in photocopier parts and rejecting argument that each part is its own market because it is not interchangeable in use with any other party); *General Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 805-06 (8th Cir. 1987) (affirming relevant market of "pet supplies," consisting of non-interchangeable goods, as "pragmatic and realistic description of the level at which [antitrust defendant's products and plaintiff's products] were in competition"); *Weiss v. York Hosp.,* 745 F.2d 786, 826-27 (3rd Cir. 1984) (finding relevant market in health care services); *F.T.C. v. Staples, Inc.,* 970 F. Supp. 1066, 1075-76 (D.D.C. 1997) (relevant market in consumable office supplies, notwithstanding lack of interchangeability between, *e.g.,* paper clips and print cartridges).

[14] *See U.S. v. Phillipsburg Nat'l Bank & Trust Co.*, 399 U.S. 350, 360 (1970) (holding that "it is the cluster of products and services that full-service banks offer that as a matter of trade reality makes commercial banking a distinct line of commerce"); *JBL Enters., Inc. v. Jhirmack Enters., Inc.,* 698 F. 2d 1011, 1016-17 (9th Cir. 1983) (affirming relevant market as "beauty products;" noting "the fact that face creams and shampoos do not have the same use for the consumer is not as relevant as whether a 'cluster' or 'product line' of one manufacturer is reasonably interchangeable for that of another by the salon that is making the purchase"); *A.G. Spalding & Bros, Inc. v. F.T.C.*, 301 F.2d 585, 603-05 (3d Cir. 1962) (relevant market was "athletic goods industry;" finding that the products were "grouped together for distribution" by manufacturers which "integrated [ ] products for promotion by way of national advertising, adoption contracts and endorsements by prominent figures in the athletic world resulting in competitive interrelationships between the product lines of commerce").

whether the different forms of All Star Apparel were all affected by an antitrust violation is appropriately addressed based on the evidence, not the pleadings.

Defendants also contend that the relevant geographic markets should not be defined as the U.S., as Plaintiffs allege. *See* VMTD at 6-9; UMTD at 6-7; *cf.* Compl. ¶¶122-25, 143. But all performances in the Competition market occur within the United States, and nearly all of the targeted customers for All Star Apparel reside in the United States. The season culminates in three primary events that take place in the U.S. and attract Teams, Cheerleaders, and spectators from across the U.S. Compl. ¶¶86-101, 122. So the relevant geographic markets include Competitions in the U.S. and Apparel designed and purchased for those Competitions.[15] Varsity is also wrong that the U.S. geographic market is justified only by travel costs of travel. VMTD at 9. It also reflects legal travel restrictions, cultural differences, language barriers, and the like. Few All Star Teams from outside the U.S. participate; nor do Gyms in the U.S. regularly send teams abroad, as international competitions are subject to different rules and are frequently held as special events rather than as part of a regular All Star Cheer season. *Id.* ¶¶123-25. Courts routinely limit relevant product markets to the U.S. in antitrust cases involving sports, especially where such distinctions are widely recognized within the industry.[16]

---

[15] Defendants' own case, *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 358 (1963), (VMTD 7; UMTD 7) makes clear that the relevant geographic market should account for the conveniences and practicalities of doing business in the market.

[16] *See*, *e.g.*, *Smith v. Pro Football*, 420 F. Supp. 738, 741 n.1 (D.C. Cir. 1978) (upholding trial judgment that "the relevant market for this action is professional major league football in the United States;" finding that the employment in the Canadian Football League was not reasonably interchangeable with the NFL); *see also supra* n.12 (citing cases); *TYR Sport Inc.*, 679 F. Supp. 2d at 1130 (approving U.S. market where "industry participants. . . recognize the United States as a distinct geographic market for competitive swimwear").

Defendants offer no clear geographic market definition at all. *See* VMTD at 8-9; UMTD at 6-7. They hint that the relevant markets could be local, regional, or international, without explaining why smaller or larger markets than the U.S. are plausible but a U.S. market is not.[17]

Given Plaintiffs' plausible relevant markets, it is similarly plausible that, throughout the Class Period (May 26, 2016 through the present, Compl. ¶40), Varsity maintained 90% of the Competition market and 80% of the Apparel market. Compl. ¶¶16, 58, 107, 128, 147, 223, 244. Such market domination establishes monopoly power.[18] Defendants do not assert otherwise.

### B.  Plaintiffs Plausibly Allege Anticompetitive Conduct

Varsity's Scheme involves willful acquisition or maintenance of monopoly power "by anti-competitive or exclusionary means as opposed to 'growth or development resulting from a superior product, business acumen, or historic accident.'" *Conwood*, 290 F.3d at 782 (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 595-96 (1985)).[19] Varsity

---

[17] Defendants cite inapposite cases. *See Concord Assoc., L.P. v. Ent. Props. Trust*, 817 F.3d 46, 53-54 (2d Cir. 2016) (VMTD 8) (rejecting entirely arbitrary geographic markets alleged without any economic justification at all, and making clear that "market definition is a 'deeply fact-intensive inquiry' not ordinarily subject to dismissal at the pleadings stage"); *Nicolosi Distrib., Inc. v. Finishmaster, Inc.*, 2019 WL 1560460, at *5 (N.D. Cal. Apr. 10, 2019) (VMTD at 9) (plaintiff's alleged geographic market provided no justification for excluding firms "that were only 8 miles away, while including others that were over 60 miles away").

[18] *See, e.g., Grinnell*, 384 U.S. at 571 (defendant's 87% market share left "no doubt" that it had monopoly power); *Kodak*, 504 U.S. at 481 (evidence that defendant's market share was at least 80% was sufficient to survive summary judgment); *Conwood*, 290 F.3d at 783 n.2 (monopoly power established where evidence at trial showed defendant "enjoyed 74 to 77 percent market power nationwide in the moist snuff industry"). The presence of other sellers in the market responsible for a small percentage of sales does not support the contrary position, as Defendants imply. *See* VMTD at 9-10.

[19] Anticompetitive conduct is behavior that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way. *Conwood*, 290 F.3d at 783 (citing *Aspen*, 472 U.S. at 595-97). "'Anticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties." 290 F.3d at 784 (quoting *Caribbean Broad Sys. Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C. Cir. 1998)).

engaged in various forms of well-recognized anticompetitive conduct to obtain and retain its monopoly power. It acquired rivals. It entered exclusive dealing agreements. And it engaged in other improper exclusionary conduct, including conspiring with the main standard-setting body, USASF. That conduct should be assessed as a whole, not broken into distinct parts and analyzed separately. *See Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).

### 1.   Varsity Acquired Actual and Potential Rivals.

Varsity has engaged in a pattern of acquiring and then either integrating or dissolving its competitors in the Relevant Markets. *See* Compl. ¶¶156-69. As the number of rivals in both Relevant Markets has dropped, prices have risen. *Id.* at ¶157. Such "mergers to monopoly" violate Section 2, resulting in unlawful power to inflate prices and exclude competitors. *See*, *e.g.*, *Grinnell*, 384 U.S. at 576 (competitor acquisitions constitute exclusionary conduct under antitrust laws).[20]

---

Defendants cite *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004), VMTD at 10, to claim that Plaintiffs have not alleged anticompetitive conduct. *Trinko*, however, is a factually inapposite refusal to deal case that multiple courts have found distinguishable from and inapplicable to other antitrust claims. *See Downs v. Insight Communs. Co., L.P.*, 2011 WL 1100456, at *5 (W.D. Ky. Mar. 22, 2011) (citing *In re Cox Enters., Set-Top Cable TV Box Antitrust Litig.*, 2010 WL 5136047, at *4-5 (W.D. Okla. Jan. 19, 2010) (distinguishing *Trinko*, which found that antitrust laws cannot be used to enforce a regulatory scheme created by Congress, with cases seeking to enforce antitrust laws with claims that would exist absent some regulation).

[20] *See also Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 917 F.2d 1413, 1439-40 (6th Cir. 1990) ("acquisitions by defendants of quarry sites coupled with the use of lengthy non-competition agreements and other circumstances did foreclose production and efficient use of such quarries and limestone by [plaintiff] and others as competitors of defendants"); *Nelson v. Monroe Reg'l Med. Ctr.*, 925 F.2d 1555, 1565 (7th Cir. 1991) ("a marketplace rendered non-competitive by its merger with a competitor is an injury that can be said to be directly caused by an absence of competition, the kind of injury the antitrust laws were intended to prevent and redress"); KINTNER ET AL., FEDERAL ANTITRUST LAW: A TREATISE ON THE ANTITRUST LAWS OF THE UNITED STATES §14.13 (2d ed. 2002) ("The conduct element of the monopolization offense can be satisfied by a merger (or series of mergers) to monopoly[.]").

Before Varsity's spate of All Star Competition acquisitions, there were still a number of "independent" Competition producers— known as Independent Event Producers—left in the Competition market. Compl. ¶167. Varsity systematically acquired twelve of these once-independent competitions. *Id.* ¶168. After Varsity's buying spree, only one of the remaining Independent Event Producers has a qualifying event for Worlds, and none offers participants the ability to qualify for The Summit. *Id.* at ¶168. Consequently, the few remaining potential rivals in the Competition market are incapable of challenging Varsity's dominance. Relevant acquisitions include The JAM Brands ("JAM") in November 2015, Spirit Celebrations in February 2017, and Epic Brands in January 2018. *Id.* ¶¶159-66.

Varsity claims that the only relevant acquisitions within the four-year statute of limitations period are the Spirit and Epic acquisitions. *See* VMTD at 13. But "it has long been held that 'a purchaser suing a monopolist for overcharges paid within the previous four years may satisfy the conduct prerequisite to recovery by pointing to anticompetitive actions taken before the limitations period.'" *Meijer, Inc. v. 3M*, 2005 WL 1660188, at *3-4 (E.D. Pa. July 13, 2005) (quoting *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 296 (2d Cir. 1979)); *see also Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (same); *In re Se. Milk Antitrust Litig.* ("*Milk I*"), 555 F. Supp. 2d 934, 947 (E.D. Tenn. 2008) (same).[21] Plaintiffs allege that Varsity's Scheme constitutes continuing conduct, with some acquisitions and other acts in furtherance of the Scheme occurring during the statutory period. *See, e.g.*, Compl. ¶228; *see also id.* at ¶¶164-

---

[21] *See also Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968) ("[W]e are dealing with conduct which constituted a continuing violation of the Sherman Act and which inflicted continuing and accumulating harm on Hanover. Although Hanover could have sued in 1912 for the injury then being inflicted, it was equally entitled to sue in 1955.").

66, 170-222. Under established law on continuing violations, Varsity is liable for all of the overcharges its Scheme imposed during the statutory period.[22]

### 2. Varsity Engaged in Anticompetitive Exclusive Dealing.

Exclusive dealing is a standard antitrust violation by a seller with monopoly power. *See Tampa Elec. Co. v. Nashville Coal Co*., 365 U.S. 320, 328 (1961). An exclusive contract by a market actor with monopoly power has the practical effect of requiring a buyer to make most or all of its purchases from the monopolist, foreclosing those sales from actual or potential rivals. *Id*.; *see also U.S. v. Dentsply Int'l, Inc*., 399 F.3d 181, 191 (3d Cir. 2005).

Each buyer enters the contract because it has no viable alternatives. The cumulative effect of the contracts is to foreclose substantial competition and enhance a dominant seller's market power, allowing it to charge higher prices than it otherwise could. Alleging that this has occurred—as Plaintiffs do here—states a claim under federal antitrust law. *See, e.g*., *Commonwealth of Ky. v. Marathon Petroleum Co., LP*, 191 F. Supp. 3d 694, 702 (W.D. Ky. 2016); *Nilavar*, 142 F. Supp. 2d at 874.[23]

---

[22] *See In re Skelaxin (Metaxalone) Antitrust Litig.*, 2013 WL 2181185, at *29 (E.D. Tenn. May 20, 2013) ("even if most or all of the overt acts alleged as part of the continuing conspiracy occurred outside the limitations period—Plaintiffs have sufficiently alleged those acts resulted in Plaintiffs being overcharged for metaxalone well into the limitations period"); *Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154, 1169 (D. Nev. 2016) (rejecting defendant's argument that claim was barred by statute of limitations because "all but one of the acquisitions that Plaintiffs discuss occurred outside the applicable four-year statute of limitations" given that the conduct and its effects continued into the limitations period).

[23] Defendants assert that Plaintiffs' "central allegation of anticompetitive conduct" is about illegal bundled discounts. VMTD at 11. It is not. If contracts have the practical effect of excluding competitors—as Plaintiffs allege Varsity's contracts do—they qualify as exclusive dealing. *See Tampa Elec.*, 365 U.S. at 326 ("[E]ven though a contract does not contain specific agreements not to use the [goods] of a competitor, if the practical effect . . . is to prevent such use, it comes within the condition of the section as to exclusivity."). Illegal exclusive dealing does not become legal because it does not also violate some other antitrust doctrine, whether it be the ban on some bundled discounts, tying arrangements, vertical restraints, *etc*. Defendants' position to the contrary is like asserting a criminal defendant is innocent of embezzlement

Varsity imposed exclusionary contracts and anticompetitive loyalty programs on Gyms. Compl. ¶¶170-85. Varsity focused on Gyms because they assemble the All Star Teams, select the Competitions to attend, and make Apparel purchasing decisions. *Id*. at ¶172. Accordingly, Gyms are both key inputs for producing successful All Star Competitions and also the primary and necessary distribution channel for All Star Apparel. *Id.* Varsity understood that if it could lock up the Gyms, it would control the Relevant Markets.[24]

Varsity employs two types of exclusionary contracts with Gyms: the "Network Agreement" and the "Family Plan." *Id*. at ¶172. Varsity induces the most significant Gyms to enter exclusionary three-year Network Agreements. *Id*. at ¶¶173-78. They require Gyms to register their Teams for at least five Varsity-produced Competitions per season and spend at least $30,000 on registration fees for Varsity events. *Id.* at ¶174. Gyms typically attend only five to eight All Star Competitions per season, so Varsity's contractual requirements are calibrated to

---

because he did not also commit breaking and entering.

    Further, Defendants' only citations regarding bundling cases are to factually inapposite competitor cases, *see* VMTD at 11-12, but competitors are not harmed in the same way as purchasers. *See, e.g.*, *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 272-74 (6th Cir. 2015) (finding in favor of plaintiffs); *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990). They also ignore that a case they cite, *Cascade Health Sols. v. PeaceHealth*, 502 F.3d 895 (9th Cir. 2007) (cited at VMTD 11)—a competitor case and not a purchaser case—notes that "it is possible. . . for a firm to use a bundled discount to exclude an equally or more efficient competitor and thereby reduce consumer welfare in the long run." *Id*. at 906.

[24] Varsity claims that it "has no duty to allow its competitors to sell their goods at its events." VMTD at 15. But that misunderstands Plaintiffs' claim. Plaintiffs' plausible allegation is that the Scheme enabled Varsity to dominate the Competition market and *thus foreclose* other sellers of All Star Apparel from the 90 percent of All Star Competitions that Varsity was able to control. It is Varsity's illegal domination of venues for the sale of All Star Apparel—not merely its refusal to allow competitors to sell at its Competitions—that Plaintiffs challenge. Compl. ¶¶189-91; *see Conwood*, 290 F.3d at 784-85, 788 (affirming antitrust violation where defendant substantially excluded competitor from retail stores as key channel of distribution for moist snuff); *Dentsply*, 399 F.3d at 191 (same for dealers of artificial teeth); *cf. Aspen Skiing*, 472 U.S. at 603 (affirming finding of antitrust violation where defendant discontinued participation in jointly offered ski lift ticket with competitor).

prevent Gyms from attending non-Varsity events. *Id.* at ¶175. Further, every dollar spent above the required $30,000 minimum annual expenditure increases the discount for attending additional Varsity events in that season. *Id.* at ¶176. Thus, once a Gym has spent $30,000, it becomes infeasible for such a Gym to attend non-Varsity events.[25] Varsity's Network Agreements also require Gyms to purchase and use Varsity All Star Apparel exclusively (or nearly so), foreclosing this critical group of customers from Apparel rivals. *Id.* at ¶¶176, 224.

For all Gyms that do not execute Network Agreements, Varsity offers a Family Plan. *Id.* ¶¶179-85, 225. The Family Plan requires a Gym to pay registration fees for at least six Varsity Competitions in one year to obtain so-called "rebates" on Competitions and Apparel. *Id.* at ¶¶180-81. Again, in reality this means that Gyms must devote all or most of their Competition season to Varsity events to avoid paying penalties on top of supra-competitive pricing.

Under the Family Plan, Gyms are also incentivized to purchase their athletes' Apparel exclusively from Varsity. Compl. ¶183. The Family Plan provides so-called "rebates" referred to as "Varsity Fashion Dollars," which can be used only on future purchases from Varsity. *Id.* at ¶¶183-84. As a result, the Gyms are trapped in an endless cycle, as the more a Gym patronizes Varsity events and purchases Varsity Apparel, the more prohibitively expensive foregoing these future so-called rebates and doing business with Varsity's competitors becomes.

Defendants assert that Gyms would not agree to these exclusionary contracts if they did not benefit from them. *See* VMTD at 11-12. But that position defies economic logic and

---

[25] These provisions make the Network Agreements exclusive for all intents and purposes. *See Tampa Elec.*, 365 U.S. at 326 ("[E]ven though a contract does not contain specific agreements not to use the [goods] of a competitor, if the practical effect . . . is to prevent such use, it comes within the condition of the section as to exclusivity."); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012) ("[Courts] look past the terms of the contract to ascertain the relationship between the parties and the effect of the agreement in the real world."); *Commonwealth of Ky.*, 191 F. Supp. 3d at 704 (same).

common sense. It has been rejected by courts and commentators alike. As one court explained, a

dominant seller can set a price—say $20—that is well above competitive levels—say $10. *Tyco*

*I*, 247 F.R.D. at 272. It can then confront buyers with a stark choice:

- Option 1: Buy exclusively or almost exclusively from the dominant seller to receive a so-called discount or rebate—say 10%, for a net price of $18.

- Option 2: Buy from the dominant seller's competitors and pay the full $20.

*Id*. Buyers choosing Option 1 pay $8 more than the competitive price. *Id*. Buyers choosing

Option 2 pay that same $8 overcharge plus a $2 penalty. *Id*. There are no real discounts or

rebates—just inflated prices and penalties on top of those inflated prices. *Id*.

   This example illustrates the incentive of each buyer to comply with the exclusionary

contracts, even though the cumulative effect is to inflate prices across the market. *See also supra*

n.2. Multiple courts have recognized this dynamic in analogous exclusionary agreement cases.

*See, e.g.*, *Tyco I*, 247 F.R.D. at 272; *Castro*, 134 F. Supp. 3d at 847-49; *Commonwealth of Ky.*,

191 F. Supp. 3d at 703-04 (plaintiffs' theory of market foreclosure should be accepted on motion

to dismiss and defendant's business justifications should be ignored until after discovery).

   Defendants also claim that Plaintiffs have not alleged substantial foreclosure. *See* VMTD

at 12-13. That is not true. Defendants admit that foreclosure of 30-40% of a market qualifies as

substantial. *Id.* at 12; *see also Standard Oil Co. of Cal. v. U.S.*, 337 U.S. 293, 305 (1949) (6.7%

market foreclosure sufficient); *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d

1291, 1301 (9th Cir. 1982) (24%); *Cornwell Quality Tools Co. v. C.T.S. Co.*, 446 F.2d 825, 831-

32 (9th Cir. 1971) (10%-15%); *Luria Bros. & Co. v. F.T.C.*, 389 F.2d 847 (3d Cir. 1968) (21%-

34%). Plaintiffs have alleged that all Gyms are subject to exclusionary contracts—either

Network Agreements or Family Plans. Compl. ¶¶174-85, 224-25. Given that Varsity controls

90% of the Competitions market and 80% of the Apparel market, *id.* at ¶¶16, 58, 107, 128, 147,

223, 244, the exclusionary contracts cover 90% of the Competitions market and 80% of the Apparel market—more than double the minimum percentage. *Id.* at ¶223.

Moreover, Varsity's argument is inconsistent with *Conwood*. There, the plaintiff proved a monopolist's exclusionary acts were widespread, but did not attempt to establish the percentage of the market that was subject to them or that was foreclosed. 290 F.3d at 784-85. The Sixth Circuit held that what mattered was that the *cumulative effect* of the conduct was to limit the market share of a competitor, inflate prices above competitive levels, and limit consumer choice. *Id.* at 788. Plaintiffs allege the same effects here. Compl. ¶¶223-41; *see also Standard Oil*, 337 U.S. at 305 (accepting inferential evidence of substantial foreclosure).[26]

Varsity's argument also incorrectly assumes that each aspect of the Scheme—such as the exclusionary contracts—should be assessed separately. But the law is clear that a monopolistic Scheme and its effects should be analyzed as a whole, not piece by piece. *Cont'l Ore*, 370 U.S. at 699; *Am. Tobacco Co. v. U.S.*, 147 F.2d 93, 106 (6th Cir. 1944), *aff'd*, 328 U.S. 781 (1946);

---

[26] *See also E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 452, n. 12 (4th Cir. 2011) ("it would be problematic to reject [a monopolization claim], with its extensive factual allegations, solely on that basis at the pre-discovery, motion-to-dismiss stage, when [the plaintiff] likely has insufficient information to calculate a precise number"); *Commonwealth of Ky.*, 191 F. Supp. 3d at 703, 705 ("It would be improper to dismiss this claim at the pleading stage for a failure to show substantial foreclosure. At this stage, 'a finding of domination of the relevant market by the lessor or seller [is] sufficient to support the inference that competition had or would be substantially lessened by the contracts involved'") (citation omitted).

The cases on which Defendants rely do not support their argument here. *SPX Corp. v. Mastercool, U.S.A., Inc.*, 2011 WL 3610094 (N.D. Ohio Aug. 17, 2011) (VMTD at 13) (involving at-will contracts that did not apply to most of the market without any allegations of anticompetitive harm); *Midwest Agency Servs., Inc. v. JP Morgan Chase Bank, N.A.*, 2010 WL 935450, at *6 (E.D. Ky. Mar. 11, 2010) (VMTD at 13) (holding plaintiff had not alleged contracts were exclusive); *Eastman v. Quest Diagnostics Inc.*, 724 F. App'x 556, 558-59 (9th Cir. 2018) (VMTD at 13) (holding plaintiffs had not alleged how conduct had any appreciable effect on the market or any basis for inferring substantial foreclosure); *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1032 (N.D. Cal. 2015) (VMTD at 13) (plaintiffs alleged substantial foreclosure of only a sub-market, not of the relevant market).

*Skelaxin*, 2013 WL 2181185, at \*12. The Sixth Circuit established long ago that acts by a monopolist that would be legal if taken individually can together violate federal antitrust law. *Am. Tobacco*, 147 F.2d at 106-07 ("Where the several acts charged are lawful, nevertheless, if bound together as parts of a single plan, the plan may make the parts unlawful.").[27]

### 3.      Varsity Conspired with USASF Among Other Anticompetitive Acts.

Defendants engaged in additional anticompetitive conduct, including Varsity's conspiracy with USASF, which is supposed to set independent safety and other standards for All Star cheerleading. Compl. ¶¶195-222. Courts have condemned similar conspiracies between market participants and third-party governing bodies—especially in the context of sports rule-making. *See Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 571 (1982) ("standard-setting organization . . . can be rife with opportunities for anticompetitive activity").[28]

Varsity and USASF committed overt acts in furtherance of the Scheme, including:

- combined efforts to limit the number of Bids available to Independent Event Producers, Compl. ¶¶93, 136, 206-10, 219;

---

[27] *See also Dial Corp. v. News Corp.*, 2016 WL 462515, at \*8 (S.D.N.Y. Jan. 15, 2016) (citing *U.S. v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001)) (monopolist's use of exclusive dealing may violate antitrust law even though arrangement forecloses less of the market than is usually required); *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 110-12 (3d Cir. 1992) (same); *Dentsply*, 399 F.3d at 187 ("Behavior that otherwise might comply with antitrust law may be impermissibly exclusionary when practiced by a monopolist"); *LePage's Inc. v. 3M*, 324 F.3d 141, 151-52 (3d Cir. 2003) ("a monopolist is not free to take certain actions that a company in a competitive (or even oligopolistic) market may take, because there is no market constraint on a monopolist's behavior").

[28] *See Volvo North Am. Corp. v. Men's Intern. Prof'l Tennis Council*, 857 F.2d 55, 74 (2d Cir. 1988) (finding that Men's International Professional Tennis Council, its chairman, and its administrator conspired to monopolize the market for men's professional tennis); *TYR Sport Inc.*, 679 F. Supp. 2d at 1130-31 (denying motion to dismiss "an alleged conspiracy between a market participant (Speedo) and a third party (USA Swimming) which is in a position to greatly influence the relevant market as an NGB . . . [where] the market participant allegedly used its infiltration of the third party to manipulate the relevant market for the benefit of the market participant").

- joint efforts to prevent rival sanctioning organizations from creating their own Championships, *id.* at ¶213;

- collaborative efforts to pressure Gyms to attend only USASF-sanctioned events, *id.* at ¶¶137, 216; and

- USASF enacting a rule prohibiting event producers from holding Bid-qualifying events within 500 miles of any other Bid-qualifying event, *id.* at ¶211;[29]

- USASF enforcing restrictive rules and insurance requirements that favor Varsity. *Id.* at ¶¶138, 154, 218, 220-22.

Defendants argue that Plaintiffs' dissatisfaction with USASF's rules does not form the proper basis for an antitrust case. *See* VMTD at 14-16; UMTD at 8-9. If Plaintiffs merely disliked USASF's rules that might be true, but Plaintiffs allege that USASF's rules had the purpose and effect of enhancing Varsity's monopoly power, inflating prices above competitive levels, and causing other kinds of economic harms. Antitrust law applies to use of a sport's rules to cause *economic* injuries. *Los Angeles Mem. Coliseum Com'n v. Nat'l Football League*, 726 F.2d 1381, 1398 (9th Cir. 1984) (upholding jury determination that NFL and its member teams combined to unreasonably restrain trade through rule requiring unanimous approval of NFL teams for franchises seeking to relocate in the home territory of another team); *Piazza v. Major League Baseball*, 831 F. Supp. 420, 441 (E.D. Pa. 1993) (denying motion to dismiss complaint against MLB and individual baseball teams under Sections 1 and 2 of the Sherman Act).[30]

---

[29] This particular territorial restriction effectively blocks the entry of all new Bid-qualifying events and locks in Varsity's dominance, given that existing events are currently geographically dispersed around the country. Compl. ¶211.

[30] *See also Tondas v. Amateur Hockey Ass'n of U.S.*, 438 F. Supp. 310, 313 (W.D.N.Y. 1977) (citing *Amateur Softball Ass'n of Am. v. U.S.*, 467 F.2d 312 (10th Cir. 1972)) ("Even though an amateur athletic association's primary purpose is non-commercial, its subsequent actions in carrying out its laudable objectives could trigger the applicability of the Sherman Act if such conduct restrained interstate trade or commerce in an unreasonable manner. Thus, a non-profit athletic association formed for the purpose of promoting amateur athletics. . . may be found to be engaging in conduct which results in an unreasonable restraint of trade or commerce.").

### 4.     Varsity Had Anticompetitive Intent.

As to intent, the Sixth Circuit has held that "improper exclusion (exclusion not the result of superior efficiency) is always deliberately intended." *Conwood*, 290 F.3d at 782 (quoting *Aspen*, 472 U.S. at 602) (internal citations, amendments, and quotation marks omitted); *see also Byars*, 609 F.2d at 860 (anticompetitive conduct allows inference of specific intent in antitrust cases); *Defiance Hosp. v. Fauster-Cameron, Inc.*, 344 F. Supp. 2d 1097, 1116 (N.D. Ohio 2004). Varsity's extensive anticompetitive conduct establishes its anticompetitive intent to monopolize and its specific intent to conspire with USASF.

### C.     Defendants' Conduct Caused Anticompetitive Harm

Conduct causes anticompetitive harm for antitrust purposes if it results in inflated

---

Varsity cites *Brookins v. Int'l Motor Contest Ass'n*, 219 F.3d 849, 854 (8th Cir. 2000) and *Fraser v. Major League Soccer, LLC*, 284 F.3d 47, 61 (1st Cir. 2002), for the proposition that "[t]he antitrust laws are not the way to remedy perceived unfairness in sports competitions." VMTD at 16. *See also* UMTD at 9 (citing *National Hockey Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 474 (6th 2005)) (making the same argument). However, what Plaintiffs allege is not general "unfairness" in sports but rather *economically* anticompetitive conduct, which is properly subject to federal antitrust law. *See, e.g.*, *Radovich v. Nat'l Football League*, 342 U.S. 445, 454 (1957) (reversing dismissal of complaint alleging that NFL conspired with its member teams to monopolize and control organized professional football); *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1109 (N.D. Cal. 2019), *aff'd*, 958 F.3d 1239 (9th Cir. 2020) (holding that NCAA and its member conferences violated federal antitrust law by limiting compensation college athletes could receive in exchange for their athletic services); *Volvo*, 857 F.2d at 70-74 (denying motion to dismiss where complaint alleged conspiracy to monopolize the market for first-rate men's tennis events); *Smith*, 593 F.2d at 1189 (upholding finding that NFL and Washington Redskins team unreasonably restrained trade in violation of Section 1 of the Sherman Act through NFL draft). USASF is thus wrong to rely on the general statement in *Nat'l Collegiate Athletic Ass'n v. Board of Regents*, 468 U.S. 85, 117 (1984) (UMTD at 8) that some rules governing sports are procompetitive. The rules Plaintiffs challenge here are not.

prices,[31] excluded rivals,[32] reduced output, *or* decreased quality.[33] *See Papa John's*, 2019 WL 5386484, at *9 (quoting *Ind. Fed'n of Dentists*, 476 U.S. at 460) ("anticompetitive effects . . . such as reduced output, increased prices, or decreased quality in the relevant market[s]'"). In assessing anticompetitive harm, the Court should consider Defendants' conduct as a whole. *Skelaxin*, 2013 WL 2181185, at *12 (citing *Cont'l Ore Co.*, 370 U.S. at 699; *Am. Tobacco*, 147 F.2d at 106). Defendants cannot prevail by speculating, contrary to Plaintiffs' allegations, that a few strands of the Scheme may not have caused distinct anticompetitive harms. Plaintiffs allege the Scheme inflated prices, excluded rivals, reduced output, *and* degraded quality:

- Inflated Prices: Prices were higher than they otherwise would have been for, *e.g.*, entry fees, spectator fees, and All-Star apparel, Compl. ¶¶127, 144, 157, 160-61, 165, 230-33;

- Excluded Competitors: Some rivals were acquired and exclusive contracts deprived others of Athletes and attendees, *id.* at ¶¶139, 155-85, 188, 224-25;

- Restricted Output: Numerous Gyms were forced to close and exit the market, *id.* ¶234, attendance at some independent events dropped by over 60%, *id.* ¶¶164-65, the number, size, and significance of rival All Star Apparel manufacturers and All Star Competition producers decreased, and there are fewer All Star Competitions produced overall and fewer participants in the sport, *id.* ¶¶16, 234-35; and

- Degraded Quality: Varsity sold a lower quality of services and goods than it otherwise would have, including failing to protect athletes from sexual predation. *Id.* ¶¶237-41.

---

[31] *See In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 910, 911 (6th Cir. 2003) (holding that "paying higher prices for a product due to a lack of competition" is "the type of injury the antitrust laws were meant to prevent"); *Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 791 (9th Cir. 1996) ("[I]t is difficult to image [sic] a more typical example of anti-competitive effect than higher prices."); *Schuylkill Health Sys. v. Cardinal Health 200, LLC*, 2014 WL 3746817, at *4 (E.D. Pa. July 30, 2014) ("Paying higher prices is the quintessential form of antitrust injury.").

[32] *Conwood*, 290 F.3d at 782; *Re/Max,* 173 F.3d at 1016; *Byars,* 609 F.2d at 850.

[33] *See Northbay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*, 2020 WL 7233105, at *2 (9th Cir. Dec. 8, 2020) (finding that where actions were taken that "prevent[ed plaintiff] from completing major investments in its facilities, which would have improved the quality of services[, s]uch disruption could, as alleged, diminish the quality of services for the public and thus fall under the type of protection the antitrust laws were intended to afford").

D.      **Varsity and USASF Conspired**

1.      **Varsity and USASF Can Conspire as a Matter of Law.**

Defendants in effect argue that Plaintiffs' allegations of a conspiracy are too strong—that the connections between Varsity and USASF are so extensive that they render the two a single entity for antitrust purposes. *See* VMTD at 18-19; UMTD at 10-12. That argument is based on a legal error. The relevant inquiry is whether there is a perfect alignment between entities' *lawful* economic interests, not their *unlawful* economic interests. Otherwise, the more successful and thorough an anticompetitive conspiracy, the more likely courts would find co-conspirators are immune from the federal antitrust liability. The Supreme Court has thus held that aligning economic interests through *anticompetitive* behavior *supports* a finding of a conspiracy; it does not *preclude* the possibility of a conspiracy. *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 761 (1984) ("affiliation 'flowing from an illegal conspiracy' would not avert [antitrust] sanctions"); *Am. Needle*, 560 U.S. at 198 ("illegal restraints often are in the common interests of the parties to the restraint, at the expense of those who are not parties").

An example involves separate entities in a sports league—such as the NFL and the NFL teams—that have distinct lawful economic interests and are capable of acting independently but instead act in concert. *Id*. at 191. When the NFL and the NFL teams coordinated to sell exclusive rights in connection with sales of apparel, the Supreme Court held those entities did *not* constitute a single entity under antitrust doctrine and that they engaged in concerted conduct. *Id*. at 196-97. That result is common in competitive sports, like the sport at issue here.[34]

---

[34] *See Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 837 (3d Cir. 2010) n.14 (collecting cases); *Volvo*, 857 F.2d at 71; *N. Am. Soccer League v. Nat'l Football League*, 670 F.2d 1249, 1257 (2d Cir. 1982); *Shields v. Fed'n Internationale de Natation*, 419 F. Supp. 3d 1188, 1220-21 (N.D. Cal. 2019).

Varsity and USASF do not have the same *lawful* economic interests. Varsity is a for-profit entity that dominates the markets for Competitions and Apparel. Compl. ¶¶85, 113-14. USASF is a non-profit standard-setting entity that is supposed to provide independent rules to ensure competitive fairness and safety. *Id.* at ¶¶39, 71, 116.[35] Ordinarily their lawful economic interests would diverge—with Varsity seeking to maximize its profits and USASF seeking to maintain the safety and integrity of All Star Cheerleading. USASF's *legal* purpose is not to benefit Varsity financially at the expense of its competitors and the credibility and safety of All Star Competitions. And its ownership of The Worlds, an All Star Championship that "is the final end-of-season event for senior level elite All Star Teams," places it in direct competition with Varsity, which owns and produces two other separate All Star Championships. Compl. ¶91; *see also* ¶¶89-90, 95, 99. Hence, Varsity and USASF are separate entities with distinct lawful economic interests, just as the lawful economic interests of the NFL and its member teams are sufficiently distinct regarding sales of sports apparel that they do not count as a single entity for antitrust purposes. *Am. Needle*, 560 U.S. at 196-97; *see also Shields*, 419 F. Supp. 3d at 1221 ("the potential to compete in the relevant market" destroys economic unity); *accord Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 620 (6th Cir. 1999) (cited at UMTD 11) (alleged conspirators were "not independent legal entities" for purposes of antitrust).

Without a "complete unity of economic interest," the argument that Defendants cannot conspire fails as a matter of law. *Shields*, 419 F. Supp. 3d at 1221. Had USASF acted properly—had it not conspired with Varsity to suppress competition—it would have established rules that

---

[35] The relevant portion of USASF's website is referenced in the Consolidated Complaint, Compl. ¶202 n.50 & ¶215 n.55, and "may be properly considered for purposes of Rule 12(b)(6)." *Poindexter v. Bank of Am., N.A.*, 2012 WL 13020819, at *2 (W.D. Tenn. Apr. 10, 2012).

fostered competition between companies selling All Star Competitions and Apparel. Only the anticompetitive Scheme fully aligned Varsity and USASF's economic interests—a reason to find concerted conduct, not to rule it out. *Copperweld*, 467 U.S. at 761; *Am.*, 560 U.S. at 196-97.[36] Finally, if Defendants are a single-entity, Plaintiffs would request leave to amend the Complaint to add a claim against USASF for monopolization. *Arandell*, 900 F.3d at 632.

### 2.    USASF's Acts in Furtherance of the Conspiracy Show Specific Intent.

Specific intent to monopolize is an element of a claim for conspiring to monopolize. *See Skelaxin*, 2013 WL 2181185, at *11 (citing *Richter,* 691 F.2d at 827); *Williams v. Kleaveland*, 534 F. Supp. 912, 922 (W.D. Mich. 1981). The Sixth Circuit instructs courts assessing specific intent to assess "not the monopolist's state of mind, but the overall impact of the monopolist's practices." *Byars*, 609 F.2d at 860; *see also Defiance Hosp. v. Fauster-Cameron, Inc.*, 344 F. Supp. 2d 1097, 1116 (N.D. Ohio 2004) ("Specific intent to monopolize may be inferred from anticompetitive conduct, but not from legitimate business practices aimed at succeeding in competition."). Anticompetitive impact is tantamount to specific intent: "[N]o monopolist

---

[36] Defendants here, like those in *Shields*, point to *Jack Russell Terrier Network of Northern California v. American Kennel Club, Inc.*, 407 F.3d 1027 (9th Cir. 2005), to argue that an organization cannot conspire with its members. *See* VMTD at 19; UMTD at 11-12. But *American Needle* holds otherwise for sports entities and the regulatory bodies they create. *American Needle*, 560 U.S. at 196-97. As *Shields* points out, "*Jack Russell* is not on all fours with this case[.]" 419 F. Supp. 3d at 1222. *Jack Russell* held that the defendants there were not "independent economic actors." 407 F.3d at 1035. Here, Varsity and USASF are independent economic actors and have acted otherwise only because of an *unlawful* conspiracy. Defendants fare no better under the remaining cases they cite. The corporations in *Century Oil Tool, Inc. v. Production Specialties, Inc.* (cited at VMTD 19; UMTD 12), were owned by the same three men, operated from the same physical plant, and manufactured and sold the same products. 737 F.2d 1316, 1317 (5th Cir. 1984). Unlike here, *Boulevard Souvenirs v. Elvis Presley Enters., Inc.*, 2007 WL 9705982 at **3-4 (W.D. Tenn. Oct. 2, 2007) (UMTD at 10), involved an alleged conspiracy between an employer and an employee, which the Sixth Circuit has rejected. In *Nurse Midwifery Assocs. v. Hibbett* (cited at UMTD 10-11), the Sixth Circuit found that an insurer and its members had separate lawful economic interests and *could* conspire to monopolize. 918 F.2d 605, 616 (6th Cir. 1990).

monopolizes unconscious of what he is doing. Thus, improper exclusion (exclusion not the result of superior efficiency) is always deliberately intended." *Conwood*, 290 F.3d at 782 (quoting *Aspen*, 472 U.S. at 602-03) (internal citations, amendments, and quotation marks omitted).

Defendants vaguely argue that Plaintiffs fail to plead USASF's specific intent. *See* VMTD at 18; UMTD at 8. That position—that Defendants cannot conspire because they *always* share a "unity of purpose" and yet USASF did not intend to support Varsity's anticompetitive purpose—is internally inconsistent. *See Arandell*, 900 F.3d at 631-32 ("Defendants cannot have the *Copperweld* doctrine both ways. It would be inconsistent to insist both (1) that two affiliates are incapable of conspiring with each other for purposes of Section 1 of the Sherman Act because they 'always' share 'unity of purpose,' and (2) that one affiliate may escape liability for its own conduct—conduct necessary to accomplish the illegal goals of the scheme—by disavowing the anticompetitive intent of the other, even where the two acted together."). USASF admits that it "has no independent decision-making or economic purpose and is completely beholden to Varsity." UMTD at 11. That confirms its specific intent to support the Scheme.

In any case, Plaintiffs allege a multitude of coordinated anticompetitive activities that demonstrate USASF's specific intent. As noted above, USASF collaborated with Varsity to limit the number of Bids available to Independent Event Producers and to prevent rival sanctioning bodies from creating their own Championships, including by issuing threatening letters to USASF-member Gyms. Compl. ¶¶93, 136, 206-10, 213, 219. *See Milk 1*, 555 F. Supp. 2d at 943 ("cutting off access to bottling plants" and "punishing independent cooperatives and bottlers in an effort to eliminate or control those entities as competitive outlets" was evidence of intent). As also noted above, USASF also facilitated Varsity's monopolization of the Relevant Markets by requiring member Gyms to report their event schedules, collaborating with Varsity to pressure

Gyms to attend only USASF-sanctioned events, *id.* at ¶¶137, 216, and imposing restrictive rules and exclusionary insurance requirements that favor Varsity Apparel and attendance at Varsity and USASF-sanctioned events. *Id.* at ¶¶138, 154, 218, 220-22.

Particularly egregious is USASF's rule prohibiting event producers from holding Bid-qualifying events within 500 miles of each other. Compl. ¶211. Five hundred miles is a huge geographic range—for perspective, the distances from Memphis to Dallas and from Nashville to Chicago are both less than 500 miles. The provision is flagrantly anticompetitive whether it protected Varsity from competition from other Bid-qualifying events or allocated the market between Varsity and its few remaining rivals.[37]

The above allegations establish that USASF conspired with Varsity to enhance Varsity's monopoly power. USASF argues otherwise by asserting an alternative set of facts. *See* UMTD at 8-9. But USASF's assertions are not appropriately before this Court. In the alternative, if Varsity and USASF constitute a single entity for antitrust purposes, USASF would be no more capable of escaping liability for "coordinated activity in furtherance of the anticompetitive scheme of" Varsity than a wholly owned subsidiary could for acts committed to aid its parent company. *Arandell*, 900 F.3d at 632. Plaintiffs would then request an opportunity to plead a monopolization claim against USASF.[38]

IV.   **CONCLUSION**

For the foregoing reasons, the Motions should be denied.

---

[37] *See Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49 (1990) (market allocation between competitors is *per se* illegal); *Cont'l Ore*, 370 U.S. at 708 (same); *U.S. v. Coop. Theatres of Ohio, Inc.*, 845 F.2d 1367, 1372-73 (6th Cir. 1988) (same).

[38] For the reasons explained above, *see supra* II.A, Defendants are also wrong that Plaintiffs have failed to allege monopoly power and so have failed to allege a conspiracy to monopolize. *See* VMTD at 19; UMTD at 13 (citing *Prime Healthcare Servs. v. SEIU*, 642 F. App'x 665, 666-67 (9th Cir. 2016) for the requirement of monopoly power).

Dated: January 15, 2021                    /s Benjamin A. Gastel

J. Gerard Stranch, IV (TN BPR #23045)
Benjamin A. Gastel (TN BPR #28699)
**BRANSTETTER, STRANCH &
JENNINGS, PLLC**
223 Rosa Parks Ave. Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
gerards@bsjfirm.com
beng@bsjfirm.com

*Counsel for Plaintiffs and Liaison Counsel for the
Proposed Direct Purchaser Class*

H. Laddie Montague, Jr.*
Eric L. Cramer*
Mark R. Suter*
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19106
Telephone: (215) 875-3000
hlmontague@bm.net
ecramer@bm.net
msuter@bm.net

Jonathan W. Cuneo*
Katherine Van Dyck*
Victoria Sims*
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Avenue NW, Suite 200
Washington, DC 20016
Telephone: (202) 789-3960
jonc@cuneolaw.com
kvandyc@cuneolaw.com
vicky@cuneolaw.com

Gregory S. Asciolla*
Karin E. Garvey*
Veronica Bosco*
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
gasciolla@labaton.com

33

kgarvey@labaton.com
vbosco@labaton.com

*Counsel for Plaintiffs and Interim Co-Lead Counsel
for the Proposed Direct Purchaser Class*

Benjamin D. Elga**
**JUSTICE CATALYST LAW, INC.**
81 Prospect Street
Brooklyn, NY 11201
Telephone: (518) 732-6703
belga@justicecatalyst.org

Brian Shearer**
Craig L. Briskin*
**JUSTICE CATALYST LAW, INC.**
718 7th Street NW
Washington, DC 20001
Telephone: (518) 732-6703
brianshearer@justicecatalyst.org
cbriskin@justicecatalyst.org

Roberta D. Liebenberg*
Jeffrey S. Istvan*
Mary L. Russell*
**FINE KAPLAN AND BLACK, R.P.C.**
One South Broad St., 23rd Floor
Philadelphia, PA 19107
Telephone: (215) 567-6565
rliebenberg@finekaplan.com
jistvan@finekaplan.com
mrussell@finekaplan.com

Nathan A. Bicks (TN BPR #10903)
Frank B. Thacher III (TN BPR #23925)
**BURCH, PORTER, & JOHNSON, PLLC**
130 North Court Ave.
Memphis, TN 38103
Telephone: (901) 524-5000
nbicks@bpjlaw.com
fthacher@bpjlaw.com

Aubrey B. Harwell, Jr. (TN BPR #002559)
Charles Barrett (TN BPR #020627)
Aubrey B. Harwell III (TN BPR #017394)
**NEAL & HARWELL, PLC**

34

1201 Demonbreun St., Suite 1000
Nashville, TN 37203
Telephone: (615) 244-1713
aharwell@nealharwell.com
cbarrett@nealharwell.com
tharwell@nealharwell.com

\* Admitted *pro hac vice*
\*\* *Pro hac vice* application forthcoming

*Counsel for Plaintiffs and the Proposed Direct
Purchaser Class*

## CERTIFICATE OF SERVICE

I, Benjamin A. Gastel, hereby certify that on the 15th day of January 2021, I served a

copy of Plaintiffs' Consolidated Memorandum of Law in Opposition to Defendants' Motion to

Dismiss via electronic mail upon the following Counsel:

Adam S. Baldridge
Matthew S. Mulqueen
**BAKER DONELSON BEARMANN
CALDWELL & BERKOWITZ, P.C.**
165 Madison Ave
Ste 2000
Memphis, TN 38103
Tel: 901-526-2000
abaldridge@bakerdonelson.com
mmulqueen@bakerdonelson.com

George S. Cary
Mark W. Nelson
Alexis Collins
Steven J. Kaiser
**CLEARY GOTTILEB STEEN &
HAMILTON LLP**
2112 Pennsylvania Avenue NW
Ste 1000
Washington, DC 20037
Tel: 202-974-1500
gcary@cgsh.com
mnelson@cgsh.com
alcollins@cgsh.com
skaiser@cgsh.com

*Attorneys for Defendants Varsity Brands,
LLC, Varsity Spirit Fashions & Supplies, Inc.,
and Varsity Spirit, LLC*

Grady M. Garrison
Nicole D. Berkowitz
**BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, P.C.**
165 Madison Ave.
Ste. 2000
Memphis, TN 38103
Tel: 901-526-2000
ggarrison@bakerdonelson.com
nberkowitz@bakerdonelson.com

*Attorneys for Defendant U.S. All Star
Federation, Inc.*

36