**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| FUSION ELITE ALL STARS, et al., | ) | |
| Plaintiffs, | ) ) | |
| v. | ) | No. 2:20-cv-02600-SHL-cgc |
| VARSITY BRANDS, LLC, et al., | ) ) | |
| Defendants. | ) ) | |

**ORDER DENYING THE DEFENDANTS VARSITY BRANDS, LLC,
VARSITY SPIRIT, LLC, VARSITY SPIRIT FASHION & SUPPLIES, LLC, AND
U.S. ALL STAR FEDERATION, INC.'S MOTIONS TO DISMISS**

Before the Court are Defendants Varsity Brands, LLC, Varsity Spirit, LLC, and Varsity Spirit Fashions & Supplies, LLC's ("Varsity Defendants" or "Varsity") Motion to Dismiss (ECF No. 83), filed December 1, 2020, and co-Defendant U.S. All Star Federation, Inc.'s ("USASF") Motion to Dismiss (ECF No. 84), filed December 1, 2020. Plaintiffs filed a Response in Opposition to both Defendants' Motions to Dismiss on January 15, 2021. (ECF No. 91.) The Varsity Defendants and co-Defendant USASF jointly filed a Reply in Support of Defendants' Motions to Dismiss on February 15, 2021. (ECF No. 96.) Defendants then jointly filed a Notice of Supplemental Authority on June 29, 2021, notifying the Court of the recent development of antitrust law in New York v. Facebook, Inc., No. 20-cv-03589, 2021 WL 2643724 (D.D.C. June 28, 2021). (ECF No. 134.) Plaintiffs filed a Response to Defendants' Notice of Supplemental Authority on July 1, 2021. (ECF No. 135.) For the reasons stated below, the Court **DENIES** the Varsity Defendants' Motion to Dismiss and the co-Defendant USASF's Motion to Dismiss.

# BACKGROUND[1]

Varsity is a prominent host of cheerleading competitions.  (ECF No. 56 at PageID 387.)
The company pioneered the modern style of cheer, which is a sport for its own sake—not just
support for men's sports.  (Id. at PageID 371.)  As competitive cheerleading grew, Varsity
established a non-profit regulating body, co-Defendant U.S. All-Star Federation, Inc.
("USASF").  (Id. at PageID 418.)  The competitions governed by this regulating body are
referred to as "All-Star Cheer," and they are regarded as the most elite and competitive in the
United States.  (Id. at PageID 370-71.)  Varsity holds a controlling number of board seats of
USASF.  (Id. at PageID 419.)  According to Plaintiffs, together Varsity and USASF have: (1)
limited the number of championship-qualifier events that Independent Event Producers ("IEPs")
can put on, (2) prevented rivals from creating their own championship events, (3) pressured
teams to attend only USASF-sanctioned competitions, (4) prohibited certain competitions within
500 miles of each other, and (5) enforced restrictive rules that favor Varsity.  (Id. at PageID 420-
22.)

All-Star Cheer Competitions are very popular, and gyms across the country compete to
get into the All-Star Cheer championship event, "The Worlds," ("Worlds"), every year.  (ECF
No. 56 at PageID 394.)  Worlds is hosted by Varsity.  (Id.)  Varsity is not the only host of All-
Star Cheer competitions, but it has become the largest.  (Id. at PageID 393.)  In 2015, it merged
with rival The JAM Brands, which was the second largest event host.  (Id. at PageID 409.)  It
next acquired Spirit Celebrations, Epic Brands, and seven other Independent Event Producers
("IEPs").  (Id. at PageID 410-11.)  As Varsity acquired a total of twelve IEPs, the market prices

---

[1] This recitation of facts is based on Plaintiffs' Amended Complaint, (ECF No. 56), and assumed
to be true for the purposes of this Order.

for admission fees to All-Star Cheer competitions went up.  (Id.)  Currently, there is only one IEP event that allows competitors to qualify for Worlds; Varsity hosts all other Worlds-qualifier events.  (ECF No. 56 at PageID 411.)

Varsity also sells cheerleading apparel and gear, both through stores and at its competitions.  (ECF No. 56 at PageID 396.)  It does not allow other retailers to sell apparel or gear at competitions hosted by Varsity.[2]  (Id. at PageID 407.)  Further, Varsity offers two allegedly exclusive apparel "plans": (1) the "Family Plan," under which cheerleading teams or "gyms" receive a discount and rebate for apparel if they agree to attend at least six Varsity competitions a year, and (2) the "Network Agreement," which provides an even steeper discount if the gyms agree to purchase their competition apparel from Varsity exclusively, attend at least five Varsity events per year, and spend at least $30,000 on Varsity registration fees.  (Id. at PageID 412-13.)  Because gyms typically attend five to eight competitions a year, these agreements mean that gyms will attend only or primarily Varsity events.  (Id.)

Plaintiffs, a group of gyms and parents who purchased Varsity products or paid Varsity competition entry fees,[3] brought the Amended Complaint, alleging that Varsity has dominated the All-Star Cheer competition and apparel markets using anticompetitive means, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  (ECF No. 56.)  They claim that Varsity engaged in anticompetitive conduct when it: (1) acquired Independent Event Producers, (2) set up exclusionary apparel contracts, and (3) conspired with co-Defendant U.S. All-Star Federation to

---

[2] It is not clear that this failure to accommodate competitors is actionable under prevailing antitrust law, which generally does not require firms to share their advantage or resources with others.  Because this allegation is not necessary to the Court's resolution of this Motion, the Court will not discuss whether it could constitute an antitrust violation.

[3] Plaintiffs seek to represent a class of all purchasers of Varsity products and all entrants into Varsity or All-Star Cheer Competitions.

exclude competitors.  (Id.)  Plaintiffs argue that this conduct allowed Varsity to raise prices above competitive levels in the All-Star Cheer and Apparel markets, and that the increased prices constitute damages.  (ECF No. 56 at PageID 426.)

Varsity Defendants filed their Motion to Dismiss, arguing that Varsity did not engage in anticompetitive conduct.  (ECF No.  83.)  Specifically, they contend that Plaintiffs have not alleged (1) appropriate markets, (2) Varsity's monopoly power, (3) anticompetitive conduct, or (4) conspiracy.  Varsity argues that it dominates the All-Star competitions and apparel markets because it pioneered the sport and has a reputation superior to that of any competitor.  (Id.)

Defendant USASF filed its Motion to Dismiss, adopting the "entirety" of Varsity Defendants' arguments contained in its Motion, and additionally contending that Plaintiffs have not alleged a conspiracy to monopolize against USASF.  (ECF No. 84-1 at PageID 637.)

Defendants' contentions as to how Varsity and USASF came to be in a central position in the world of competitive cheer may be true.  However, at the Motion to Dismiss stage, the Court must accept all allegations in the Amended Complaint as true.  Considering those allegations, the Court finds that Plaintiffs did state a plausible claim for violation of the Sherman Act.  Thus, the Motions to Dismiss the Varsity Defendants and Defendant USASF are **DENIED**.

## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).  A pleading must contain more than "an unadorned, the-defendant-unlawfully-harmed-me accusation," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), and should "nudge [a

plaintiff's] claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570.

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a

sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678.

In ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court

must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as

true, and draw all reasonable inferences in favor of the plaintiff." DirecTV, Inc. v. Treesh, 487

F.3d 471, 476 (6th Cir. 2007). Even so, the complaint "must contain either direct or inferential

allegations respecting all the material elements [of the claim] to sustain a recovery under some

viable legal theory." First Am. Title Co. v. Devaugh, 480 F.3d 438, 444 (6th Cir. 2007).

## ANALYSIS

Plaintiffs assert claims of monopolization and conspiracy to monopolize against

Defendants. To survive a motion to dismiss for a monopoly claim, Plaintiffs must plausibly

allege that (1) Defendants have monopoly power in a certain market (2) obtained or maintained

through willful anticompetitive conduct (3) that caused rising prices or lowering of output. See

Conwood Co., L.P. v. U.S. Tobacco Co., 290 F.3d 768, 782 (6th Cir. 2002). To survive a motion

to dismiss for a conspiracy to monopolize claim, Plaintiffs must allege "both an existence of

conspiracy and specific intent to monopolize." Richter Concrete Corp. v. Hilltop Concrete

Corp., 691 F.2d 818, 827 (6th Cir. 1982).

"Unfortunately, there is no general agreement on the exact standards to use when

resolving antitrust cases." In re Se. Milk Antitrust Litig., 739 F.3d 262, 270 (6th Cir. 2014).

However, the Court will consider both that "summary procedures should be used sparingly in

complex antitrust litigation" due to the fact-heavy nature of the claims, and that discovery in an

antitrust action carries high costs. Poller v. Columbia Broad. Sys., Inc., 368 U.S. 464, 473

(1962); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 558 (2007) (cautioning courts to remember that "proceeding to antitrust discovery can be expensive").

In their Motions to Dismiss, Defendants argue that the monopoly claim is not adequately alleged because, as to the first element, Plaintiffs do not allege monopoly power or a proper market. (ECF Nos. 83, 84.)  In addition, Defendants contend that there are not sufficient allegations of anticompetitive conduct by Defendants to establish a claim.  (Id.)  Finally, Defendants argue that the conspiracy claim cannot proceed because all of the alleged conspirators are one entity, and a single entity cannot conspire with itself.  Further, because of the failure to state a claim for monopolization, Defendants argue that Plaintiffs cannot allege a conspiracy to monopolize against USASF.  (Id.)  Because the Court finds that Plaintiffs allege sufficient facts to state claims for both monopolization and conspiracy to monopolize, these Motions are **DENIED**.  Each argument is addressed separately below.

## I.      Monopoly Power

Monopoly power is "a power of controlling prices or unreasonably restricting competition."  United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 389 (1956) (quoting Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 85 (1911)).  Generally, a high market share may establish monopoly power.  United States v. Grinnell Corp., 384 U.S. 563, 571 (1966).  "[C]ourts have been quick to find monopoly power where the market share is 75-80% or greater."  Byars v. Bluff City News Co., 609 F.2d 843, 850 (6th Cir. 1979).  Here, there are two markets at issue: All-Star competitions and All-Star apparel.

Plaintiffs allege that "Varsity collectively controlled approximately 90% of the All-Star Competition Market and 80% of the All-Star Apparel Market."  (ECF No. 56, ¶ 16.)  Further, they allege that prices went up after Varsity established a controlling market share.  (ECF No.

56, ¶ 16.)  Thus, they argue, Varsity's large market share allows it to control market prices, the hallmark of monopoly power.

Defendants argue that Varsity does not have monopoly power because other competitors remain in both the competition and apparel markets, and thus it has no way to control market prices.  (ECF No. 83-1 at PageID 601-02.)  They argue that "there are at least ten other providers" in the All-Star Competitions market and "several other suppliers" in the All-Star Apparel market.  (Id.)  According to Defendants, because Varsity has any number of competitors, it could not have monopoly power.

Considering the allegations in the light most favorable to Plaintiffs as is required at this stage, they have sufficiently alleged monopoly power.  The high number of competitors, which Defendants argue defeats any allegation of monopoly power, is not the critical factor in the monopoly power analysis.  Instead, Defendants' market share in the relevant markets is key to its ability to control prices.  Defendants' market share is allegedly large, around 80-90%.  (See ECF No. 56 at PageID 386.)  Further, Plaintiffs' allegation that prices went up once Varsity dominated the market supports the inference that Varsity does have the power to control prices.  (Id. at PageID 409-10.)  Thus, Varsity has sufficiently alleged monopoly power.[4]

## II.    Relevant Markets

In making out the first element of a monopoly claim, plaintiffs must plead both the geographic and product markets they contend are subject to defendants' monopoly power.  Total Benefits Plan v. Anthem Blue Cross and Blue Shield, 552 F.3d 430, 437 (6th Cir. 2008).  Here,

---

[4] Defendants also state that some of Plaintiffs' allegations, such as the allegation that Varsity competition judges favor Varsity-affiliated teams over more deserving teams, are "fantastical" and should not be considered.  (ECF No. 83-1 at PageID 602; see also ECF No. 96 at PageID 798.)  These allegations were not necessary in the analysis of the allegations of monopoly power, so the Court need not decide their plausibility.

because Plaintiffs contend that Defendants illegally monopolize two areas of this industry, All-Star Cheer competitions and All-Star Apparel, they must establish plausible geographic and product markets for each.

      A.  <u>Geographic Markets</u>

A geographic market is "an area of effective competition." <u>Conwood Co., L.P. v. U.S. Tobacco Co.</u>, 290 F.3d 768, 782 (6th Cir. 2002) (quoting <u>Re/Max Int'l, Inc. v. Realty One, Inc.</u>, 173 F.3d 995, 1016 (6th Cir.1999)). It is the area to which consumers could turn for alternatives if a defendant raised its prices. <u>In re Se. Milk Antitrust Litig.</u>, 739 F.3d 262, 277 (6th Cir. 2014). Outlining a geographic market is often "fact-intensive." <u>Id</u>.

For both the competition and apparel markets, Plaintiffs allege that the geographic market is the United States as a whole. (ECF No. 91 at PageID 724.) They state that all of the All-Star Cheer competitions take place within the United States, and competitors travel across the country to attend those competitions, especially championship events. (<u>Id</u>.) Further, they argue that the "area of effective competition" is the United States because there are few competitors in foreign markets. (<u>Id</u>.) In support, they contend that the culture of All-Star Cheer is unique to the United States. (<u>Id</u>.) According to Plaintiffs, the competitions and apparel are thus not reasonably interchangeable with those of other countries, and Varsity does not effectively compete with foreign cheer events or apparel companies.

Varsity Defendants, on the other hand, initially argue that the United States is too broad a market for competitions. (ECF No. 83-1 at PageID 600.) They argue that teams would not travel farther than necessary within the United States to get to cheaper competitions because their travel costs would be prohibitive. (<u>Id</u>.) In other words, Defendants contend that a team from Los Angeles, California, would not travel to Dallas, Texas, for an All-Star competition if there were

an alternative All-Star competition in San Diego, California, even if the alternative competition were more expensive.  Thus, they state that the competition markets are likely more local, though they do not suggest any specific boundaries for relevant markets.  On the other hand, Defendants also argue that a national geographic market is too narrow if it excludes international competitions.  (Id. at 600-601.)   They contend that it makes no sense to exclude international competitions based on travel costs, if Plaintiffs ignore domestic travel costs when defining the national geographic market.  (ECF No. 83-1 at PageID 600-601; see also ECF No. 84-1 at PageID 641.)

As for apparel, Defendants argue that gyms could acquire apparel from any sports brand, including international brands.  (ECF No. 83-1 at PageID 599; ECF No. 84-1 at PageID 642.)  Thus, they argue that the apparel market of the United States is too narrow.  In their joint Reply, Defendants add that Plaintiffs' geographic market fails "[a]t the other extreme"—that a geographic market is not defined by the location of consumers of a product, and thus that Plaintiffs cannot identify a geographic market based on where customers for All Star Apparel reside.  (ECF No. 96 at PageID 787.)

Plaintiffs have alleged a geographic market of the United States sufficient to survive a motion to dismiss.  The geographic market analysis is fact specific, and it may require additional support at later phases of litigation.  In re Se. Milk Antitrust Litig., 739 F.3d at 277.  However, at the pleadings stage, the allegation that the culture of competitive cheer within the United States is distinct for both the competition and apparel markets is sufficient to make the United States a plausible geographic market.  See Re/Max Int'l, Inc. v. Realty One, Inc., 173 F.3d 995, 1016 (6th Cir. 1999).  Plaintiffs' allegations, if true, establish that there are no effective competition or

apparel competitors outside of the United States, and the area of competition in these markets spans the United States as a whole.

### B. Product Markets

A product market is a group of competitive products or services. To constitute a product market, products or services must be "reasonably interchangeable" in both (1) function and (2) consumer response or "cross-elasticity." Kentucky Speedway, LLC v. Nat'l Ass'n Stock Car Racing, Inc., 588 F.3d 908, 917 (6th Cir. 2009). The proposed market should encompass all interchangeable substitute products.

Multiple product submarkets can make up a broader market where they are related, like supplies for a certain purpose—together they may constitute a proper product market for purposes of alleging a monopoly claim. See, e.g., FTC v. Staples, Inc., 970 F. Supp. 1066 (1997) (recognizing "consumable office supplies" as a market, with individual products ranging from legal pads to CDs). A submarket may be part of a broader market that has comparable products, yet maintain its status as a separate market. Id. at 1074. The "practical indicia" for determining whether a submarket exists include "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." Id. at 1075 (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962)). Realistically, most markets will have smaller submarkets, and they will also themselves be submarkets. See id. (staplers, e.g., are a submarket within the office supply store market, which is itself a submarket of office supplies market which includes sales at non-specialized stores like Wal-Mart).

1. <u>All-Star Cheer Competitions</u>

As for the All-Star Cheer competitions market, Plaintiffs contend that competitions regulated by USASF are an appropriate market because there are no substitutes.  (ECF No. 91 at PageID 719-20.)  They argue that such competitions are different in kind from any other cheer competition—they can cost thousands of dollars a season per athlete, well above the cost of less competitive "sidelines" cheerleading, and they lead to consideration for Worlds, the championship of the sport.

Defendants, however, contend that this market is too limited because it excludes potential alternatives, including non-USASF sanctioned competitions, such as recreational programs and events as well as other types of competitive cheerleading.  (ECF No. 83-1 at PageID 599; ECF No. 84-1 at PageID 641.)  They also argue that a single brand cannot constitute a market, and, because all All-Star Cheer competitions are governed by one company, USASF, they are a single brand.  (ECF No. 84-1 at PageID 640.)  Alternatively, Defendants argue that the market is too broad because it includes both championship-qualifier competitions and non-qualifier competitions, which Defendants believe are not reasonably interchangeable as they purportedly exist in the same market.  (ECF No. 84-1 at PageID 641.)

The Court concludes that Plaintiffs have adequately alleged a product market for All-Star Cheer competitions.  The standard required for a product market requires that the goods be "reasonably" interchangeable, not perfectly or exactly interchangeable.  <u>Kentucky Speedway, LLC v. Nat'l Ass'n Stock Car Racing, Inc.</u>, 588 F.3d 908, 917 (6th Cir. 2009).  Plaintiff alleges that All-Star Cheer is a unique set of competitions, which is supported by the Defendant's own description of the sport.  (<u>See</u> ECF No. 83-1 at PageID 593 ("Varsity invented a new form of cheerleading.").)  Although Defendants attempt to argue, without proper support, that the market

cannot consist of a single brand, (Id. at PageID 599 ("[A] single-brand market . . . is not cognizable as a matter of law.")), a single brand can indeed make up a product market.  Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 481 (1992) ("Kodak also contends that, as a matter of law, a single brand of a product or service can never be a relevant market under the Sherman Act. We disagree."); Tarrant Serv. Agency, Inc. v. Am. Standard, Inc., 12 F.3d 609, 614 (6th Cir. 1993) ("one brand of a product can constitute the relevant market when the product is unique and no reasonable substitutes exist.").  Plaintiffs contend that All-Star Cheer competitions are reasonably interchangeable with one another, but not with less competitive cheer competitions.  Thus, at this preliminary stage, Plaintiffs have sufficiently alleged a product market of All-Star Cheer competitions.

　　　　2.  All-Star Apparel

　　　As for the All-Star Apparel market, Plaintiffs allege a market of specialized apparel for cheer including uniforms, warm-ups, jerseys, hair bows, headbands, backpacks, and shoes.  (ECF No. 91 at PageID 720.)  They argue that All-Star Apparel is distinct from general sports apparel for several reasons.  First, there are USASF requirements "govern[ing] every detail of apparel," such as the requirement that athletes wear "specific 'soft-soled shoes.'"  (Id.)  Second, each item of All-Star Apparel is "team- or gym-branded."  (Id.)  Finally, teams are required to wear matching sets of All-Star Apparel.  (Id.)  Thus, Plaintiffs argue that All-Star apparel makes up a cohesive product market, especially because strong culture in the cheer market both binds the products together and requires athletes to have All-Star Apparel to be competitive.

　　　Defendants argue that this market is not appropriately bounded, as it excludes some substitute products but also includes products that are not interchangeable.  First, they argue that Plaintiffs' alleged market is too limited, as it excludes potential alternatives like non-cheer-

specific sports gear, (ECF No. 83-1 at PageID 598), and other major companies in the athletic industry that sell similar apparel and equipment.  (ECF No. 84-1 at PageID 642.)  They also argue that it is "sprawling," and not an appropriate market, as certain cheer items are not interchangeable in function, like shoes and pom-poms.  (ECF No. 83-1 at PageID 598; ECF No. 84-1 at PageID 642.)

Plaintiffs have sufficiently alleged an All-Star Apparel market.  Again, reasonable interchangeability is what is required, not perfect interchangeability.  Kentucky Speedway, 588 F.3d at 917.  It is true that certain products, like shoes and pom-poms, are not directly interchangeable.  However, the same is true within the market of "consumable office supplies," which the Supreme Court approved in FTC v. Staples, Inc., 970 F. Supp. 1066, 1080 (1997).  A stapler and a pen do not have the same functionality, yet they are included in the same product market because they share similar characteristics.  See also ProMedica Health Sys., Inc. v. F.T.C., 749 F.3d 559, 565 (6th Cir. 2014) ("clustering" distinct products into workable markets).  Similarly, Plaintiffs allege that All-Star Apparel has distinct customers, price sensitivity, and a unique culture.  See Staples, Inc., 970 F. Supp. at 1075 (listing factors for defining product market).  Further, while there may be a larger overall marketplace in which Defendants have other competitors, "the mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes."  See id.; see also Fed. Trade Comm'n v. Sysco Corp., 113 F. Supp. 3d 1, 31 (D.D.C. 2015).  These allegations are sufficient to establish an All-Star Apparel market at this preliminary stage.

### III.     Willful Anticompetitive Conduct

Acquisition of market power, even monopoly power, is not *per se* a violation of the Sherman Act, absent willful anticompetitive conduct.  Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP, 540 U.S. 398, 407-08 (2004).  Firms may lawfully establish monopoly power simply by having a superior product or reputation.  Id.  A court should not compel such firms to share the source of their advantage.  Id.  However, if the monopoly power was obtained by anticompetitive means, it may be actionable under the Sherman Act.

In their Motions to Dismiss, Defendants allege that their monopoly power, if any, was obtained because of their superior products and reputation.  (ECF No. 83-1 at PageID 602-03.)  Plaintiffs respond that Defendants obtained market dominance using three main anticompetitive strategies: (1) acquisitions of competitors, (2) exclusive dealing, and (3) conspiracy with the standard-setting organization, USASF.  The Court will address each of these arguments individually, but it will also consider the cumulative effect of all alleged anticompetitive conduct, rather than compartmentalizing each alleged violation.  See Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699 (1962).  In doing so, the Court concludes that there are adequate allegations of willful anticompetitive conduct to survive these Motions to Dismiss.

A. Acquisitions of Competitors

Acquisitions constitute willful anticompetitive conduct where they lead to monopoly and exclude competition.  United States v. Grinnell Corp., 384 U.S. 563, 576 (1966).  "The 'ultimate inquiry in merger analysis' is . . . 'whether the merger is likely to create or enhance market power or facilitate its exercise.'"  ProMedica Health Sys., Inc. v. F.T.C., 749 F.3d 559, 570 (6th Cir. 2014) (quoting Carl Shapiro, The 2010 Horizontal Merger Guidelines: From Hedgehog to Fox in Forty Years, 77 Antitrust L.J. 49, 57 (2010)).  If a firm has dominant market power, it has

the ability to harm consumers by raising prices, reducing output, or diminishing innovation "as a result of diminished competitive constraints or incentives." Id. at 565 (quoting Horizontal Merger Guidelines (2010) ("Merger Guidelines") § 1 at 2).

Plaintiffs allege that Defendants "systematically acquired" twelve IEPs, ten outside and two within the Sherman Act's four-year statute of limitations. (ECF No. 91 at PageID 727.) Specifically, when Defendants acquired competitor Epic Brands in 2018, Plaintiffs allege that they eliminated the "largest presence in . . . the Northeast" and the second largest IEP in the United States. (ECF No. 56 at PageID 411.) Moreover, they argue that price increases in the past four years are "continuing" violations, stemming from those ten mergers outside the statute of limitations. (Id. at PageID 408-11; see also ECF No. 91 at PageID 726.) Thus, Plaintiffs contend, all of the mergers should be considered. According to Plaintiffs, Defendants have engaged in "mergers to monopoly," increasing their market share and control by buying up competitors. (ECF No. 91 at PageID 726.)

In their Motion, Varsity Defendants first argue that the ten acquisitions outside the statute of limitations cannot be considered because Plaintiffs' theory of price increases does not extend the statute of limitations. (ECF No. 96 at PageID 794.) Further, they argue that even the two acquisitions within the statute of limitations are not actionable because they did not decrease output or increase prices. (ECF No. 83-1 at PageID 605.) Finally, they respond to Plaintiffs' argument that they engaged in "mergers to monopoly" by pointing out that there are still ten other competing event producers. (ECF No. 96 at PageID 795.)

Defendants are correct that "price increases in the merger-acquisition context do not extend the statute of limitations," unless the claim is for conspiracy to monopolize, not monopolization. Z Techs. Corp. v. Lubrizol Corp., 753 F.3d 594, 599 (6th Cir. 2014). Thus, the

Court considers the ten acquisitions completed outside the statute of limitations only as to the conspiracy to monopolize claim, which is discussed in further detail below.

As for the monopolization claim, considering only the two mergers within the statute of limitations, Plaintiffs have sufficiently alleged that they increased Defendants' market power and caused higher prices.  It is true that other firms remain in the market, so Defendants have not engaged in a literal "merger to monopoly"—their alleged practice is more akin to "merger to monopoly power."  But contrary to Defendants' argument, an absolute monopoly is not required for an acquisition to constitute anticompetitive conduct.  See ProMedica Health Sys., Inc. v. F.T.C., 749 F.3d 559, 570 (6th Cir. 2014).  The Court finds that, based on the two actionable acquisitions, Plaintiffs have alleged a pattern of acquiring market share and then raising prices, hallmarks of anticompetitive conduct.  Whether this alone will ultimately be sufficient to establish anticompetitive conduct is unclear.  However, the Court must view all alleged anticompetitive conduct in the aggregate, without "tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."  Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699 (1962).  Thus, the Court will consider these acquisitions as part of the aggregate of Defendants' alleged anticompetitive conduct.

B.  Exclusive Dealing[5]

Exclusive dealing is an agreement between a supplier and a consumer that the consumer will only purchase a product from the supplier.  Exclusionary contracts may be considered in deciding claims under § 2 of the Sherman Act.  LePage's Inc. v. 3M, 324 F.3d 141, 157 (3d Cir.

---

[5] Defendants also argue that Plaintiffs cannot state a claim for unlawful "bundling," or grouping discounts for different products, under the Sherman Act.  However, Plaintiffs do not allege that Defendants' conduct is improper bundling.  (ECF No. 91 at PageID 728 n.23.)  Instead, they contend that Defendants' conduct is improper exclusive dealing.  Thus, the Court will not discuss whether Defendants' conduct constitute improper bundling of discounts.

2003).  Rebates and discounts may also rise to the level of exclusive dealing, even if they do not

carry an explicit requirement to deal exclusively, if they are designed to induce consumers to

award business to a defendant to the exclusion of the plaintiff.  Id. at 158.  Exclusive dealing

may violate the Sherman Act if "the court believes it probable that performance of the contract

will foreclose competition in a substantial share of the line of commerce affected."  Tampa Elec.

Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1961).  "[F]oreclosure levels are unlikely to be of

concern where they are less than 30 or 40 percent."  B & H Med., L.L.C. v. ABP Admin., Inc.,

526 F.3d 257, 266 (6th Cir. 2008) (citing Stop & Shop Supermarket Co. v. Blue Cross & Blue

Shield of R.I., 373 F.3d 57, 68 (1st Cir. 2004)).

Plaintiff has alleged two exclusionary contracts: Varsity's Network Agreement and its

Family Plan.  (ECF No. 91 at PageID 729.)  The Network Agreements are explicitly

exclusionary, as they require consumers to buy apparel only from Varsity.  (Id.)  Plaintiffs argue

that both agreements are exclusionary in practice, as they each require gyms to attend five to six

Varsity events per year.  (Id. at PageID 729-30.)  Because events are very expensive to attend

and gyms only attend five to eight events a year, Plaintiffs argue that the Family Plan is

effectively an exclusionary agreement.  (Id. at PageID 730.)  According to Plaintiffs, because all

gyms are eligible for these exclusionary agreements and Defendants control 80-90% of the

market, at least 30-40% of the market is foreclosed by these agreements.  (Id. at PageID 731-32;

see also Compl. at ¶¶ 223, 225 ("[T]he vast majority of the participants and customers in both

Relevant Markets," from 80-90% are foreclosed.").)  Plaintiffs emphasize that exact market

share is not necessary to find that Defendants acted anticompetitively.

Defendants argue that Plaintiffs do not sufficiently allege that 30-40% of the market is

tied up in these exclusionary contracts, as Plaintiffs do not state precisely what market share is

involved.  Defendants emphasize that exclusive dealing, even by a monopolist, is not *per se* a violation of the Sherman Act unless there is substantial market foreclosure.  (ECF No. 83-1 at PageID 604; ECF No. 96 at PageID 794.)  They argue that, because Plaintiffs cannot show how many gyms are tied up in these exclusive agreements, they cannot sufficiently allege that the agreements are anticompetitive.  Moreover, Defendants argue that Varsity's Network Agreements and Family Plans should not be considered together to allege market foreclosure, as Family Plans are not "exclusionary" as a matter of law.  (ECF No. 96 at 794.)

Based on Plaintiffs' allegation that 100% of the gyms are "subject to," that is, eligible for, the exclusive contracts, and given Defendants' alleged market share of 80-90%, it is plausible that at least 30-40% of gyms have entered into one of Defendants' exclusionary contracts, which provide discounts that often make it impractical for gyms to opt out of an exclusive contract. (ECF No. 91 at PageID 730.)  At this stage, when the exact information at issue is within Defendant's exclusive control and there are sufficient allegations of high levels of exclusive agreements, dismissal is not appropriate.  See, e.g., In re Text Messaging Antitrust Litig., 630 F.3d 622, 629 (7th Cir. 2010) ("The plaintiffs have conducted no discovery.  Discovery may reveal the smoking gun or bring to light additional circumstantial evidence that further tilts the balance in favor of liability."); Commonwealth of Kentucky v. Marathon Petroleum Co., LP, 191 F. Supp. 3d 694, 702 (W.D. Ky. 2016) ("It would be improper to dismiss this claim at the pleading stage for a failure to show substantial foreclosure.").  Plaintiffs have made it plausible that a substantial share of the market is tied up—they have alleged that Defendants have a vast majority of the market power, and that it would be impracticable for most gyms to operate without the discounts that come when they agree to purchase exclusively from Varsity.  (ECF No. 91 at PageID 730-31.)  Thus, Plaintiffs' allegations support denial of these Motions.

C.  Conspiracy with USASF

Conspiracy with a standard-setting organization can constitute willful anticompetitive conduct, a necessary element to allege a case for monopolization.  See Am. Soc. of Mech. Engineers, Inc. v. Hydrolevel Corp., 456 U.S. 556, 571 (1982) ("[A] standard-setting organization . . . can be rife with opportunities for anticompetitive activity.").  Because it is also the basis of a separate Sherman Act claim, conspiracy to monopolize, the Court will discuss the allegations that Varsity conspired with USASF below.

**IV.     Conspiracy to Monopolize**

Conspiracy to monopolize, a separate claim under the Sherman Act, requires (1) the existence of a conspiracy and (2) specific intent to monopolize.  Richter Concrete Corp. v. Hilltop Concrete Corp., 691 F.2d 818, 827 (6th Cir. 1982).  "Proof of specific intent to monopolize 'may be shown by direct evidence or inferred from anticompetitive acts.'"  Re/Max Int'l v. Realty One, Inc., 900 F. Supp. 132, 153 (N.D. Ohio 1995) (quoting Richter, 691 F.2d at 826.  "[N]o monopolist monopolizes unconscious of what he is doing."  Conwood Co., L.P. v. U.S. Tobacco Co., 290 F.3d 768, 782 (6th Cir. 2002) (quoting Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 602 (1985)).  Thus, "[i]mproper exclusion (exclusion not the result of superior efficiency) is always deliberately intended."  Id. (quoting Aspen, 472 U.S. at 603).  The Court initially turns to the first requirement of this claim, the existence of a conspiracy.

A.  Existence of Conspiracy

Defendants argue that Varsity and USASF are "essentially one and the same" and therefore incapable of conspiring.[6]  (ECF No. 84-1 at PageID 645.)  They argue that "the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act."  Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752, 771 (1984).  Because Varsity created and maintains control of USASF, Defendants argue that the two entities must be viewed as a single enterprise, incapable of conspiring with itself.  (ECF No. 84-1 at 645-46.)  Indeed, according to Defendants, if Plaintiffs' allegations are taken as true, then USASF and Varsity cannot be considered "separate economic actors pursuing separate economic interests," see Copperweld, 467 U.S. at 769, and instead USASF must be an extension of Varsity.  (ECF 84-1 at PageID 647.)  Thus, they argue, as a matter of law, there is no conspiracy to monopolize.  (Id.)  Defendants further contend that any rule-setting done by USASF is not actionable, even if it has the effect of benefitting Varsity.  (ECF No. 83-1 at PageID 606-07.)

Plaintiffs argue in response that, while the Varsity Defendants and USASF may act as one enterprise, their *lawful* economic interests are not the same.  (ECF  No. 91 at PageID 737-38.)  The Varsity Defendants are affiliated for-profit corporations that seek to compete in the market and maximize profits.  (ECF No. 56, ¶¶ 30-39.)  USASF, on the other hand, is a non-profit organization established for the mutual benefit of all its members, which include event producers like Varsity, but also "gym owners/coaches, and the USASF" itself.  (ECF No. 56,

---

[6] Defendants do not seem to dispute that if Varsity and USASF are capable of conspiring, Plaintiffs sufficiently allege that they have done so.  (See ECF No. 96 at PageID 796 ("The actual allegations in the Complaint are that Varsity created USASF and has run it since the beginning.").)

¶ 30.)  Although Varsity, due to its pattern of acquisitions, currently holds a majority control of the board of USASF, (see ECF No. 56 at PageID 419), such control does not change the lawful purpose of USASF to solely benefit Varsity.  As for USASF's rule-setting role, Plaintiffs agree that it has the authority and purpose to establish rules for competitive cheerleading.  However, it argues that if those rules have the *purpose* of reducing competition in the market and increasing Varsity's monopoly power, then the rules are the result of a conspiracy to monopolize the competitive cheer market.  (ECF No. 91 at PageID 734.)

      B.  Specific Intent

Defendants also argue that Plaintiffs do not allege specific intent to monopolize by any defendants.  (ECF No. 83-1 at PageID 610.)  Specifically, Defendant USASF argues that Plaintiffs fail to allege any conduct from which the Court could infer USASF's specific intent to monopolize to support the claim under the Sherman Act.  (ECF No. 84-1 at Page ID 643.)  USASF argues that its policies referenced by Plaintiffs do not suggest specific intent.  For instance, while Plaintiffs protest the manner in which Varsity and USASF award bids to Worlds, the existence of a mechanism to determine competition qualifications does not in and of itself suggest a specific intent to monopolize on the part of the USASF.  (Id. at PageID 643).  Moreover, Defendants argue that neither USASF's "remarkably generic" uniform rules, nor USASF's liability insurance requirement, raises an inference of USASF's specific intent.  (Id.)

In response, Plaintiffs argue that Defendants make an internally inconsistent argument.  Defendants cannot claim "unity of purpose" between two affiliates to avoid liability for conspiracy, while also "disavowing the anticompetitive intent" of one of the affiliates.  (ECF No. 91 at Page ID 740 (quoting Arandell, 900 F.3d at 631-32).)  Thus by admitting it lacks independent decision-making or economic purpose and is "beholden" to Varsity, USASF

"confirm[ed] . . . specific intent to support the Scheme." (Id. at PageID 740.) Alternatively, if the Court were to find that Varsity and USASF did constitute a single entity, Plaintiffs argue that USASF would still be liable for its furtherance of the alleged anticompetitive scheme, just as a "wholly owned subsidiary could for acts committed to aid its parent company." (Id. at PageID 741.) In response to Defendant USASF's arguments, Plaintiffs argue that USASF collaborated with Varsity in limiting the number of available bids and preventing other bodies from forming their own partnerships. (Id.) Plaintiffs also call out USASF's insurance requirements, and specifically describe USASF's rule requiring that Bid-qualifying events be over 500 miles from each other as "particularly egregious," by either preventing competition with Varsity's existing events or closing the market to newcomers. (Id. at 741.)

   C. Analysis of Factors

   Analyzing both factors together, the Court agrees that Plaintiffs have alleged, at this preliminary stage, that Varsity and USASF conspired to monopolize the competitive cheer market. Because Varsity and USASF have divergent economic purposes, they are capable of engaging in a conspiracy with one another. See Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752, 771 (1984). USASF, as a standard-setting organization, may generally set rules governing competitive cheer. However, when those rules have the purpose and effect of reducing competition and increasing the monopoly power of one corporation, they may violate antitrust principles. See Am. Soc. of Mech. Engineers, Inc. v. Hydrolevel Corp., 456 U.S. 556, 571 (1982) ("[A] standard-setting organization . . . can be rife with opportunities for anticompetitive activity."). Plaintiffs allege facts that, if taken as true, assert a viable existence of conspiracy.

Moreover, the Court, as discussed <u>supra</u>, finds that Varsity has monopoly power plausibly obtained by anticompetitive acts, which is sufficient to show specific intent at this preliminary stage.  As for USASF, the Court also finds that Plaintiffs allege coordinated anticompetitive activities between USASF and Varsity that, when taken as true, demonstrate specific intent on the part of USASF sufficient to survive a motion to dismiss.

Thus, Plaintiffs have stated a claim for conspiracy to monopolize.

## CONCLUSION

Taking all allegations in the Amended Complaint as true and viewing those allegations in the light most favorable to Plaintiffs, the Court finds that they have stated claims for both monopolization and conspiracy to monopolize under the Sherman Act.  Thus, the Court **DENIES** the Motions to Dismiss for Varsity and USASF Defendants.

**IT IS SO ORDERED,** this 26th day of August, 2021.

s/ Sheryl H. Lipman
SHERYL H. LIPMAN
UNITED STATES DISTRICT JUDGE