# EXHIBIT 2

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

| | |
|---|---|
| **JESSICA JONES**, **MICHELLE VELOTTA**, and **CHRISTINA LORENZEN** on Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>**VARSITY BRANDS, LLC; VARSITY SPIRIT, LLC; VARSITY SPIRIT FASHION & SUPPLIES, LLC; U.S. ALL STAR FEDERATION, INC.; JEFF WEBB; CHARLESBANK CAPITAL PARTNERS LLC; and BAIN CAPITAL PRIVATE EQUITY,**<br><br>Defendants. | Case No. 2:20-cv-02892-SHL-cgc<br><br><br><br><br><br>**JURY DEMAND** |

## DECLARATION OF RONNIE S. SPIEGEL IN SUPPORT OF PLAINITFFS' JOINT MOTION TO MODIFY SCHEDULING ORDERS

I, Ronnie S. Spiegel, declare:

1. I am an attorney licensed in the State of Washington and admitted to practice in the Western District of Tennessee *pro hac vice*. I am a Partner at The Joseph Saveri Law Firm, LLP ("JSLF") and am counsel for the indirect purchaser plaintiffs in the above-captioned action ("*Jones*" or "*Jones* Plaintiffs"). I have worked on this action since I joined JSLF in June 2021. I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently to them.

2. This Declaration is submitted in support of Plaintiffs' Joint Motion to Modify Scheduling Orders, submitted herewith.

3. This action is coordinated with two related actions: *Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al.*, Case No. 2:20-cv-2782-SHL-tmp (W.D. Tenn.) ("*Fusion Elite*") and *American Spirit and Cheer Essentials, Inc. et al. v. Varsity Brands, LLC*, Case No. 2:20-cv-2782-SHL-tmp (W.D. Tenn.) ("*American Spirit*") (together, "Related Actions"). Each case is large and complex, with many revolving issues, parties, and claims. *Jones* involves state and federal antitrust claims brought on behalf of indirect purchasers (parents and families of athletes who participate in the sport of competitive cheer through gyms and schools). The Jones claims relate to both All Star cheer and school cheer, in each of three relevant markets – competitions, camps, and schools. While there is some overlap between the claims and parties in *Jones* and the Related Actions, there are many differences, and each case must make a showing as to its own burdens of proof.

4. In March 2021 and April 2021, *Jones* Plaintiffs served Defendants in *Jones*[1] with a first set of requests for production of ("RFPs"), focusing on the claims particular to *Jones* and seeking to supplement what had been sought in *Fusion Elite*. After many months of negotiations, correspondence, and good faith attempts to come to agreement, the production of responsive documents has been meager, with most still outstanding.

5. On September 18, 2021, *Jones* Plaintiffs filed motions to compel against Defendants Varsity, Charlesbank, Bain, and Jeff Webb. No. 20-cv-02892, Dkts.100 through 103.[2] The motions to compel against Charlesbank, Bain, and Webb are still pending and the items that remain in dispute are scheduled for hearing by the Court on November 19, 2021. No. 20-cv-

---

[1] Defendants in *Jones* include: Varsity Brands, LLC, Varsity Spirit, LLC, Varsity Spirit Fashion & Supplies LLC (collectively "Varsity"); U.S. All Star Federation ("USASF"); Jeff Webb; Charlesbank Capital Partners LLC ("Charlesbank"); and Bain Capital Private Equity ("Bain").

[2] All docket numbers referenced herein relate to *Jones*, unless otherwise noted.

02892, Dkt. 146. Document requests related to school competitions, All Star and school camps, and school apparel, as well as other *Jones*-specific topics have not yet been resolved. For Charlesbank and Bain, certain requests, custodians, search terms, and the time period for production still remain in dispute. Even assuming a quick ruling on the pending motions to compel, in practical terms, it will likely be some time before production is received and before *Jones* Plaintiffs and their experts will be able to review and analyze any such productions.

6. While Jeff Webb has produced some documents in *Fusion Elite*, to date, Mr. Webb has made only a very limited production in *Jones*. While other items have been agreed the relevant time period for search and production of Mr. Webb's documents remains pending with hearing on this item set for November 19, 2021. Dkt. 146. Search terms are still being finessed between the parties and production will depend on the ruling by the Court on the appropriate time period to be searched.

7. Regarding Defendants Bain and Charlesbank, little to no substantive production has yet occurred in *Jones* on pending RFPs. Counsel for Bain and Charlesbank has indicated that they do not wish to negotiate or discuss production further at this time, maintaining that they believe that Charlesbank and Bain will be dismissed in *Jones*. This will likely result in additional delay in obtaining such discovery from those parties.

8. It is also contemplated that *Jones* Plaintiffs will need to serve a second set of requests for production to address issues that may arise when *Jones* Plaintiffs have had an opportunity to review Defendants' productions, or as follow up to depositions. Likewise, Plaintiffs will likely wish to serve interrogatories once discovery can inform what areas of information will need to be requested.

9. Third party and non-party discovery is also very important in *Jones*. As indirect purchaser plaintiffs, *Jones* Plaintiffs must not only show that there was an initial illegal overcharge in each market alleged (i.e., an illegal overcharge from Varsity to gyms and schools in each market), but also that those overcharges were passed through to *Jones* Plaintiffs (i.e., gyms and schools passed through the overcharge to parents and families of athletes). Data is the primary way in which those overcharges and the pass on of those overcharges are assessed by experts in antitrust class actions. While some data has been produced in *Fusion Elite* as to All Star cheer competitions and All Star cheer and school apparel, transactional data related to school competitions, All Star cheer camps and school camps, and rebates and price data related to those markets remains to be produced. Plaintiffs' experts will also consider documents and testimony, and data from Defendants and third parties to assess each market, its scope, and likely comparison markets or "benchmarks."

10. *Jones* Plaintiffs' experts have stated that optimally they will need a minimum of six months from the receipt of usable transactional data to work with that data, with the amount of time depending on the volume and quality of the data and the degree of responsiveness from Defendants and the third parties from whom data is sought. *Jones*' experts have fleshed out the usual steps from the time data and documents are received until a final expert report can be prepared. Analysis of produced data in antitrust actions typically follows a similar pattern:

   a. <u>Data is received and uploaded to experts' system:</u> Once data is produced, it needs to be loaded into the experts' systems. The basic upload process sometimes fails due to corrupted files, encrypted files, or other hard drive or hardware errors, requiring additional time to solve the upload failure issues.

   b. <u>Data files must be loaded into statistical software:</u> Once the data is loaded, it takes additional time to load the data files into statistical software (so that the dataset can be analyzed). In some instances, the data is provided as multiple Excel, .csv, or other delimited text files. The build process sometimes fails due to delimiter errors during data file creation. While experts have developed methods to minimize these errors, data providers do not always follow such requests,

typically resulting in poorly delimited files that will not load correctly. Sometimes experts can resolve these problems in-house, but frequently data providers are asked to produce replacement data files, a process which can take weeks or even months. Another common issue is that data is sometimes received with a series of text files that comprise the different tables in a relational database. Data providers frequently fail to provide adequate documentation to allow experts to properly link the various tables to create the same relationships that exist in the data on their original systems, again requiring the experts to request additional information to proceed.

c. <u>Preliminary examination of the dataset begins:</u>  A preliminary examination for completeness is made (e.g., assessment of years of coverage, pinpointing gaps in time or geographic coverage, missing key economic variables, assessing fields provided). Depending on the quality of documentation provided with the data and the manner in which the data are provided, this process often requires returning to the data provider for either more information about the data or for additional or alternative data.

d. <u>Review and understanding of data:</u> Experts begin reviewing the data and begin to understand it. At this stage, experts assess such items as whether products and customers can be identified and whether the data are raw or aggregated. Experts also assess whether they have the information needed to link the data to data from other sources. Experts also need time to assess the various fields in the data and begin to identify which fields relate to potentially relevant attributes of the particular transactions. Experts also need to determine which fields contain coded values or have other issues that require specific additional information from the data provider.

e. <u>Questions about data:</u> Typically, experts produce a significant and detailed set of questions about the data to be submitted back to the data provider. The time period from submitting the first round of questions to the data provider to receiving answers varies, as does the quality of the answers. At times, wrong answers have been received, and further delay ensues. Sometimes, experts are able to continue working while questions about the dataset are pending. However, in some cases work on the dataset must halt pending answers to initial questions or replacement data.

f. <u>Second round of questions:</u> After initial work is done, there can be a second round of questions sent to the data provider. Second round questions tend to be more focused. There can be delays of uncertain length waiting for answers to second round questions.

g. <u>Work begins to combine diverse data:</u> Once a preliminary level of understanding is developed, work can begin on planning for combining diverse data that will be needed for modeling. Experts will need to link various files for analysis.

    h. <u>Cleaning the data:</u> Once the data are sufficiently understood, experts begin cleaning the data and combining the diverse data sources into a single dataset for analysis.

    i. <u>Modeling and analysis begins:</u> With the combined dataset, modeling and analysis can begin. It is only at this point that important modeling decisions can be made. This is because modeling choices depend on: (1) what reliable information is actually available in the data; (2) completeness of information; (3) how to account for data limitations; and (4) the structure of the economic relationships revealed by the data. Additionally, as the data become better understood, the modeling is refined. This is an iterative process.

    j. <u>Writing the report:</u> Writing and finalizing an expert report takes time as well. The time estimated to produce a report after all modeling is done is approximately one month.

11. At the time of this filing, *Jones* Plaintiffs had served (or attempted to serve) approximately 40 subpoenas on gyms (with approximately 30 more to be served). Despite best efforts, the process server has only confirmed 20 as served with required proof of service. The subpoenas specifically seek data related to the pass on of the alleged illegal overcharges from gyms to athletes (and their parents). Plaintiffs expect to serve a total of approximately 70 All Star Gyms with subpoenas. Gyms are often smaller businesses and may be unfamiliar with the subpoena process. Some require an extensive level of outreach and follow up. Such follow up may involve phone calls, requesting sample data and meet and confer on the structure and fields of how the data will be produced. Some gyms have been hard to locate, as many are smaller businesses with addresses and corporate agents who are not easily found. Some of the gyms who have been successfully served with subpoenas have already asked for extensions. Some gyms have indicated that they do not have the data sought in a form that it easily produced, and *Jones* Plaintiffs anticipate substantial delay in receiving the data sought. Plaintiffs also expect that some gyms may challenge the subpoenas, creating the possibility of extensive delay. *Jones* Plaintiffs also plan to serve subpoenas on schools seeking similar downstream data as to gyms but hope to first receive the structured data from Varsity related to schools sought in *Jones* to locate the

correct subpoena recipients for the pass on level of data. Such structured data related to schools has not yet been produced by Varsity, although production was recently agreed. Once the data is produced by Varsity, there may be questions related to its completeness, fields, or even just glitches in accessing the data that may need to be ironed out.

12. Prior to October 25, 2021, *Jones* Plaintiffs completed their productions to Defendants for all three named plaintiffs and depositions are now scheduled or being scheduled for *Jones* Plaintiffs.

13. On November 10, 2021, in anticipation of upcoming depositions, *Jones* Plaintiffs sent a proposed a deposition protocol to Defendants in *Jones*, seeking a stipulation to define the total number of depositions in *Jones*, and the protocol for how to address any depositions first noticed in *Jones*. Defendants have not yet responded. *Jones* Plaintiffs have proposed an additional 15 depositions (beyond the 55 allowed for in *Fusion Elite,* Dkt. 89) to cover the additional defendants in *Jones* (Defendants Jeff Webb, Charlesbank, and Bain). Defendants have not yet responded to that proposal.

14. As lead counsel in *In re Capacitors Antitrust Litigation*, No. 3:14-cv-03264-JD (N.D. Cal.), Joseph Saveri, the founder of JSLF and the lead attorney also in *Jones*, is set to begin a multi-week trial on November 29, 2021. The trial had originally been set for March 4, 2020 but came to a sudden halt as a result of the pandemic. *Id.* at Dkts. 2809, 2618, 2644-1. The trial was eventually terminated, and the retrial was set on June 8, 2021, eight months after the scheduling order in *Fusion Elite* was entered and two months after the scheduling order in *Jones* was entered. As a result, Mr. Saveri will be focused on the *Capacitors* trial and will not be able to devote as much time to depositions in the instant case as previously hoped.

15. Depositions are now being noticed and the first depositions are taking place without a full set of documents in hand in *Jones*. For Bain and Charlesbank, where essentially no custodial or substantive documents have yet been produced, and where those Defendants are taking the position that they will not even engage in discussion prior to rulings on motions to dismiss, depositions cannot even be noticed. Varsity's production of data related to camps and schools has been agreed but has not yet occurred. *Jones* Plaintiffs seek sufficient time to receive and analyze documents and data prior to depositions and to be able to work with that evidence to support their burdens of proof and to allow enough time for experts to work with data and evidence to prepare their reports.

By: */s/ Ronnie S. Spiegel*
Ronnie S. Spiegel