# EXHIBIT 3

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| **FUSION ELITE ALL STARS**, et al., | |
| Plaintiffs, | |
| v. | Declaration of Hal J. Singer, Ph.D. |
| **REBEL ATHLETIC INC.**, | |
| Non-Party. | |

## ASSIGNMENT AND SUMMARY OF CONCLUSIONS

1. Plaintiffs here are what I understand to be All Star Gyms and parents of All Star Cheer athletes ("Plaintiffs"). Defendants are Varsity Brands, LLC ("Varsity Brands"), Varsity Spirit, LLC ("Varsity Spirit"), Varsity Spirit Fashion & Supplies, LCC ("Varsity Fashion") (collectively "Varsity"), and U.S. All Star Federation, Inc. ("USASF").[1] Plaintiffs attended Varsity's All Star Competitions and purchased All Star Apparel (terms defined below), paying Varsity directly. Plaintiffs seek to represent a class (the "Class") of similarly situated Gyms and parents who paid Varsity directly for All Star Competitions and All Star Apparel from May 26, 2016 to the present (the "Class Period").[2] Counsel for Plaintiffs have subpoenaed a third-party to this lawsuit, Rebel Athletic Inc. ("Rebel"), to produce relevant documents relating to Rebel's interactions with Defendants, as well as transactional sales data of All Star Apparel from January 2013 to the present.[3]

2. Counsel for Plaintiffs have asked me (an economist) to explain the importance of transactional data from Rebel, which appears to be Varsity's principal competitor in the All Star Apparel market. Transactional data is the lifeblood of a typical antitrust class action.[4] It generally reflects (1) all sales transactions between a given party and consumers in the relevant markets at issue, including all prices net of discounts, price adjustments, and returns; and (2) the incremental cost to the seller for those sales (e.g., selling costs, labor costs, cost of materials, etc.). These data allow an economist to test for the potential presence of anticompetitive effects in a market.

---

1. Complaint at 1.
2. *Id.* ¶31.
3. Subpoena to Produce Documents, Information or Objects or to Permit Inspection of Premises in a Civil Action, served on Rebel by Plaintiffs on November 12, 2020.
4. *See, e.g.,* ABA SECTION OF ANTITRUST LAW, PROVING ANTITRUST DAMAGES 71 (3rd ed. 2017) ("An important source of data for analyzing antitrust damages claims are the administrative records kept by firms. These can include detailed transaction-level data that can amount to millions of individual records. These records typically record information on individual transactions by customer and by specific product. Frequently, there can be hundreds or thousands of customers and hundreds or thousands of specific products, all with differing characteristics").

3.  My understanding is that Varsity has agreed to produce its own transactional data regarding All Star Apparel from January 2011 through December 2020. Plaintiffs have requested that Rebel produce similar data covering a similar time period. This third-party transactional data will be used for an analysis comparing Varsity's All Star Apparel cost and prices to Rebel's All Star Apparel cost and prices. Data regarding Rebel's sales, costs, and pricing is relevant to analyzing if Varsity's alleged anticompetitive conduct affected Rebel's prices or its costs. The acquisition and use of transactional data from third parties is typical in antitrust cases. Transactional data carries a low burden of production, given that Plaintiffs request a direct extraction of data stored in Rebel's systems in the ordinary course of business.

4.  This declaration is organized as follows: In Part I, I describe the Plaintiffs, the proposed Class, and the relevant markets. In Part II, I explain the nature of the challenged conduct. In Part III, I explain the economic rationale for Rebel's transactional data.

## QUALIFICATIONS

5.  I am a managing director at Econ One, a senior fellow at the George Washington Institute of Public Policy, and an adjunct professor at the McDonough School of Business at Georgetown University, where I teach advanced pricing to MBA candidates.

6.  I am an applied microeconomist with an emphasis on industrial organization and regulation. In an academic capacity, I have published several books and book chapters, spanning a range of industries and topics, and my articles have appeared in dozens of legal and economic journals. My competition-related articles have appeared in multiple American Bar Association (ABA) Antitrust Section journals, and I have been a panelist at several ABA Antitrust events. In a consulting capacity, I have been nominated for antitrust practitioner of the year among economists by the American Antitrust Institute (AAI) for my work in *Tennis Channel v. Comcast*, and AAI named me as co-Honoree in the same category in 2018 for my work *In Re Lidoderm Antitrust Litigation*.

7.  I have testified as an economic expert in state and federal courts, as well as before regulatory agencies. I also have testified before Congress on the interplay between antitrust and sector-specific regulation. With respect to exclusive dealing cases, I have served as an expert for a class of mixed martial arts fighters in *Cung Le et al. v. Zuffa*,[5] in which the court also relied on my proof of impact in indicating that it would grant class certification; courts have relied on my work in certifying seven classes in antitrust matters.[6]

---

5.  *Cung Le, et al. v. Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC*, Case No. 2:15-cv-01045, U.S. District Court, District of Nevada.
6.  *See* Kevin Draper, *Fighters Win Key Ruling in Case That Could Upend U.F.C.'s Business*, NEW YORK TIMES, December 10, 2020 ("A federal judge said on Thursday that he would make an important procedural ruling in favor of a group of mixed martial artists who are suing the Ultimate Fighting Championship, accusing it of abusing monopoly power to suppress fighter pay. The lawsuit, which will be granted class action status, could eventually cost the U.F.C. billions of dollars, fundamentally alter the world of mixed martial arts and establish new antitrust case law."). As of the time of this declaration, the court has not issued the written opinion. *See also Meijer, Inc. v. Abbott Laboratories*, No. C 07-5985 CW, 2008 WL 4065839 (N.D. Cal. Aug. 27, 2008) (Order Granting Plaintiffs' Motion for Class Certification); *Natchitoches Parish Hosp. Serv. Dist. v. Tyco Intl., Ltd.*, 262 F.R.D. 58 (D. Mass. 2008)

## I. PLAINTIFFS, CLASS, RELEVANT MARKETS AND REBEL ATHLETIC INC.

8. The Plaintiffs in this case are three All Star Gyms ("Gyms") and three parents of current and former All Star Cheerleaders.[7]

9. The relevant markets asserted in the Complaint are All Star Competitions ("Competitions") and All Star Apparel ("Apparel"). All Star Competitions are events at which teams of All Star Cheerleaders compete against one another in the choreographed performance of routines comprised of combinations of stunts, pyramids, dismounts, tosses, and/or tumbling.[8] All Star Apparel includes uniforms, clothing, shoes, accessories, and equipment purchased for use by All Star Cheerleaders at Competitions and during practices and training.[9] This market involves at least $300 million in sales, annually.[10]

10. I understand that Rebel has competed against Varsity in the Apparel market since at least 2013.[11] Rebel, like Varsity, sells uniforms, clothing, shoes, accessories, and equipment purchased for use by All Star Cheerleaders at Competitions and during practices and training.

11. The Plaintiffs seek to represent a proposed Class of entities and natural persons that directly paid Varsity for: (a) registration, entrance, spectator, or other fees and expenses associated with participation in or attendance at one or more All Star Competitions or (b) All Star Apparel.[12] As indicated above, the Class Period is defined as May 26, 2016 through the present.[13]

## II. THE NATURE OF THE CHALLENGED CONDUCT

12. The Complaint challenges several aspects of Varsity's conduct as being part of an anticompetitive scheme harming competition in the two related but distinct markets described above, Competitions and Apparel.

13. Varsity's challenged conduct includes: (1) acquiring, on more than two occasions, its largest rival and many of its smaller rivals and potential rivals;[14] (2) causing certain Gyms to agree to exclusivity or near exclusivity to avoid penalty pricing in Competition fees and, as part of these exclusionary arrangements, requiring Gyms in its allegedly market-dominant events to buy its Apparel exclusively or nearly exclusively from Varsity (in arrangements that Varsity has called

---

(granting motion to certify class); *In re Delta/AirTran Baggage Fee Antitrust Litig.,* 317 F.R.D. 665 (N.D. Ga. 2016) (same); *Johnson v. Arizona Hosp. and Healthcare Assoc.* No. CV 07-1292-PHX-SRB, 2009 WL 5031334 (D. Ariz. July 14, 2009) (granting in part motion for class certification); *Southeast Missouri Hospital and St. Francis Medical Center v. C.R. Bard*, No. 1:07cv0031 TCM, 2008 WL 4372741 (E.D. Mo. Sept. 22, 2008) (granting in part motion for class certification); and *In re Lidoderm Antitrust Litig.*, No. 12-md-02521, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017) (Order Granting Motions for Class Certifications and Denying Daubert Motions).

7. Complaint ¶¶29-39.
8. *Id.* ¶¶6-7, 81-88, 111-15.
9. *Id.* ¶¶6, 102-06, 140-42.
10. *See, e.g.,* Leigh Buchanan, "The Battle for Cheerleading-Uniform Industry is Surprisingly Cutthroat and Appropriately Glittery," Slate (Feb. 22, 2016), https://slate.com/business/2016/02/rebel-wants-to-disrupt-the-surprisingly-entrenched-cheerleader-uniform-industry.html.
11. *Id.*
12. Complaint ¶40.
13. *Id.*
14. *Id.* ¶¶156-69.

the Family Plan and the Network Agreement);[15] and (3) using its alleged market power and control of cheerleading's governing bodies, such as USASF, to create insurmountable obstacles to other potential rivals, forcing some of them out of business and permanently relegating the rest to "B-league status."[16]

### III. ECONOMIC RATIONALE FOR REBEL'S TRANSACTIONAL DATA

14. Transactional data is the lifeblood of economic analyses presented in all or almost all antitrust cases. My understanding is that Varsity has agreed to produce their own transactional data from 2011 through the present. Varsity's transactional data allows me to determine the prices, quantities sold, revenues, and costs for each of its 160+ Apparel products over time—both during the period of the challenged conduct and in the relatively clean period before the challenged conduct when Varsity had less market power and market share. This kind of data is critical for antitrust analysis, such as evaluating the impact of Defendants' conduct on prices over time and to quantify the aggregate damages to the proposed Class of Gyms and parents.

15. To aid in these analyses, Plaintiffs have requested that Rebel, who appears to be a Varsity's principal competitor in the Apparel market, produce the following categories of data: (1) transactional sales data for Apparel; (2) Apparel cost data; and (3) data relating to prices, fees, rebates, discounts, terms of sale, or any other financial arrangement regarding Apparel. This transactional data is analogous to what Varsity has agreed to produce.

16. An analysis of a variable (such as price or cost) over time, or "time-series analysis," is a standard econometric tool designed to analyze how changes in one variable (the "treatment variable") over the course of a specific time period are associated with changes in some outcome variable (the "dependent variable"). In other words, analyses over time tell us how two variables move in conjunction with one another, accounting for other relevant variables as appropriate.

17. In the instant case, Rebel's transactional data may be used, inter alia, to determine whether Varsity was able to successfully leverage its market power in the Apparel market to either (1) inflate the price of its own All Star Apparel prices above competitive levels, or (2) raise the costs of its rivals by, for example, denying Rebel economies of scale.[17] *First*, Varsity's allegedly inflated All Star Apparel prices can be compared to Rebel's All Star Apparel prices, given that Rebel appears not to have engaged in similarly anticompetitive conduct. If I determine that Rebel's prices were not affected by the alleged anticompetitive conduct, comparing Rebel's and Varsity's prices over time would allow Plaintiffs to assess whether changes in Varsity's Apparel prices were due to industry-wide changes (say, from increased raw material or shipping costs) or due to Varsity's alleged anticompetitive conduct. This sort of comparison is analogous to controlling for inflation or unemployment when studying changes in wages. *Second*, Rebel's cost data can also be used to determine whether Varsity's alleged anticompetitive conduct raised Rebel's costs by,

---

15. *Id.* ¶¶170-85.
16. *Id.* at ¶¶195-222, 226.
17. *See, e.g.,* Einer Elhauge, *Defining Better Monopolization Standards,* 52(2) STANFORD LAW REVIEW 253-344 (2003), at 321 ("In most industries, there are economies of scale at low output levels, so that firms can lower their costs by expanding until they reach the output level that minimizes their costs, which is called the minimum efficient scale. If foreclosure prevents a competitive number of rivals from maintaining this scale, or from expanding their operations to reach it, then it impairs their efficiency.").

among other reasons, impairing their ability to reach efficient scale. It may be the case that the challenged conduct increased Varsity's long-term profitability by denying Rebel the ability to reach efficient cost scale.[18]

18.    In my experience, it is common practice for Plaintiffs in large antitrust cases such as this one to subpoena and receive detailed transactional data from third parties to better inform their expert's economic analyses. I have successfully applied this style of analysis in several class certification cases, including, most recently, in *Cung Le, et al. v. Zuffa, LLC*, where I had access to a competing third-party firm's detailed wage data in addition to the defendant's wage data. This data allowed me to compare the defendant firm's anticompetitively suppressed wages to the uncontaminated wages of its competitor (after in fact determining that the rivals' wages were not otherwise affected by the alleged monopolist's misconduct).

19.    Plaintiffs' counsel has requested Rebel's full transactional data as it is stored in Rebel's ordinary course of business. Retrieval of this data would constitute a direct extraction from Rebel's data repository, which in my experience involves a relatively low burden to produce. Indeed, extraction frequently involves nothing more than the push of a button. In this case, it would *not* be appropriate to receive aggregated or average data over the relevant periods. Because Varsity sells over 160 different Apparel products, any sort of aggregated figures from Rebel would impede Plaintiffs' efforts to accurately compare prices for like goods over time. Having Rebel's actual transactional dataset allows for an apples-to-apples comparison.

## CONCLUSION

20.    Plaintiffs' economists' ability to develop an econometric model demonstrating Varsity's impact in the Apparel market depends in part on the availability of high quality, third-party data. Due to the significant variation of All Star Apparel items sold, Plaintiffs require Rebel's actual transactional data to perform an accurate analysis comparing Rebel's prices for All Star Apparel to Varsity's.

\*  \*  \*

Hal J. Singer, Ph.D.:

*/s/ Hal Singer*

Executed on July 8, 2021

---

18. *Id.* at 286 ("[T]he firm seeking to create or maintain a monopoly by offering such a future discount need not sacrifice any short-term profits at all. Indeed, even when a firm couples its exclusionary policy with a fixed price, that price may not entail any sacrifice of short-term profits. This is because buyers will accept that fixed price as long as it reflects a discount from the expected future supracompetitive price.").

## EXHIBIT 1: CURRICULUM VITAE OF HAL J. SINGER



**Hal J. Singer**

>Econ One Research
>Suite 510 805 15th St., N.W.
>Washington, D.C. 20005
>Phone: 202.312.3065
>hsinger@econone.com

**Education**

>Ph.D., The John Hopkins University, 1999; M.A. 1996, Economics
>
>B.S., Tulane University, *magna cum laude*, 1994, Economics. Dean's Honor Scholar (full academic scholarship). Senior Scholar Prize in Economics.

**Current Positions**

>ECON ONE, Washington, D.C.: Managing Director 2018-present.
>
>GEORGETOWN UNIVERSITY, MCDONOUGH SCHOOL OF BUSINESS, Washington, D.C.: Adjunct Professor 2010, 2014, 2016, 2018, 2019, 2020, 2021.
>
>GEORGE WASHINGTON UNIVERSITY, SCHOOL OF PUBLIC POLICY, GEORGE WASHINGTON INSTITUTE FOR PUBLIC POLICY, Washington, D.C.: Senior Fellow 2016-present.

**Employment History**

>ECONOMISTS INCORPORATED, Washington, D.C.: Principal 2014-2018.
>
>NAVIGANT ECONOMICS, Washington, D.C.: Managing Director, 2010-2013.
>
>EMPIRIS, L.L.C., Washington, D.C.: Managing Partner and President, 2008-2010.
>
>CRITERION ECONOMICS, L.L.C., Washington, D.C.: President, 2004-2008. Senior Vice President, 1999-2004.
>
>LECG, INC., Washington, D.C.: Senior Economist, 1998-1999.

U.S. SECURITIES AND EXCHANGE COMMISSION, OFFICE OF ECONOMIC ANALYSIS, Washington, D.C.: Staff Economist, 1997-1998.

THE JOHNS HOPKINS UNIVERSITY, ECONOMICS DEPARTMENT, Baltimore: Teaching Assistant, 1996-1998.

**Honors**

Honoree, Outstanding Antitrust Litigation Achievement in Economics, American Antitrust Institute, *In re Lidoderm Antitrust Litigation,* Oct. 9, 2018.

Finalist, Outstanding Antitrust Litigation Achievement in Economics, American Antitrust Institute, *Tennis Channel v. Comcast*, Dec. 4, 2013.

**Authored Books and Book Chapters**

*Do Municipal Broadband Networks Stimulate or Crowd Out Private Investment? An Empirical Analysis of Employment Effects*, in THE IMPACT OF THE INTERNET ON JOBS (Lorenzo Pupillo, ed. Palgrave 2017).

THE NEED FOR SPEED: A NEW FRAMEWORK FOR TELECOMMUNICATIONS POLICY FOR THE 21ST CENTURY, co-authored with Robert Litan (Brookings Press 2013).

*Net Neutrality Is Bad Broadband Regulation*, co-authored with Robert Litan, in THE ECONOMISTS' VOICE 2.0: THE FINANCIAL CRISIS, HEALTH CARE REFORM AND MORE (Aaron Edlin and Joseph Stiglitz, eds., Columbia University Press 2012).

*Valuing Life Settlements as a Real Option*, co-authored with Joseph R. Mason, in LONGEVITY TRADING AND LIFE SETTLEMENTS (Vishaal Bhuyan ed., John Wiley & Sons 2009).

*An Antitrust Analysis of the World Trade Organization's Decision in the U.S.-Mexico Arbitration on Telecommunications Services*, co- authored with J. Gregory Sidak, in HANDBOOK OF TRANS-ATLANTIC ANTITRUST (Philip Marsden, ed. Edward Elgar 2006).

BROADBAND IN EUROPE: HOW BRUSSELS CAN WIRE THE INFORMATION SOCIETY, co-authored with Dan Maldoom, Richard Marsden and J. Gregory Sidak (Kluwer/Springer Press 2005).

*Are Vertically Integrated DSL Providers Squeezing Unaffiliated ISPs (and Should We Care)?*, co-authored with Robert W. Crandall, in ACCESS PRICING: THEORY, PRACTICE AND EMPIRICAL EVIDENCE (Justus Haucap and Ralf Dewenter eds., Elsevier Press 2005).

**Journal Articles**

*Competing Approaches to Antitrust: An Application in the Payment Card Industry,* 27(3) GEORGE MASON LAW REVIEW (2020), co-authored with Kevin Caves.

*Understanding the Economics in the Dispute Between the Writers' Guild of America and the Big Four Talent Agencies,* COMPETITION POLICY INTERNATIONAL ANTITRUST CHRONICLE (2020), co-authored with Ted Tatos.

*Antitrust Out of Focus: The FTC's Myopic Pursuit of 1-800 Contacts' Trademark Settlements,* ANTITRUST SOURCE (2019), co-authored with Geoff Manne and Josh Wright.

*Countervailing Coordination Rights in the News Sector Are Good for the Public (A Response to Professor Yun),* COMPETITION POLICY INTERNATIONAL ANTITRUST CHRONICLE (2019), co-authored with Sanjukta Paul.

*When the Econometrician Shrugged: Identifying and Plugging Gaps in the Consumer Welfare Standard,* 26 GEORGE MASON LAW REVIEW (2019), co-authored with Kevin Caves.

*Applied Econometrics: When Can an Omitted Variable Invalidate a Regression?,* ANTITRUST SOURCE (2017), co-authored with Kevin Caves.

*Paid Prioritization and Zero Rating: Why Antitrust Cannot Reach the Part of Net Neutrality Everyone Is Concerned About,* ANTITRUST SOURCE (2017).

*The Curious Absence of Economic Analysis at the Federal Communications Commission: An Agency in Search of a Mission,* INTERNATIONAL JOURNAL OF COMMUNICATIONS (2017), co-authored with Gerald Faulhaber and Augustus Urschel.

*On the Utility of Surrogates for Rule of Reason Cases,* COMPETITION POLICY INTERNATIONAL ANTITRUST CHRONICLE (2015), co-authored with Kevin Caves.

*Analyzing High-Tech Employee: The Dos and Don'ts of Proving (and Disproving) Classwide Antitrust Impact in Wage Suppression Cases,"* ANTITRUST SOURCE (2015), co-authored with Kevin Caves.

*Econometric Tests for Analyzing Common Impact,* 26 RESEARCH IN LAW AND ECONOMICS (2014), co-authored with Kevin Caves.

*Life After Comcast: The Economist's Obligation to Decompose Damages Across Theories of Harm,* ANTITRUST (Spring 2014), co-authored with Kevin Caves.

*Is the U.S. Government's Internet Policy Broken?*, 5 POLICY AND INTERNET (2013), co-authored with Robert Hahn.

*Avoiding Rent-Seeking in Secondary Market Spectrum Transactions*, 65 FEDERAL COMMUNICATIONS LAW JOURNAL (2013), co-authored with Jeffrey Eisenach.

*Vertical Integration in Multichannel Television Markets: A Study of Regional Sports Networks*, 12(1) REVIEW OF NETWORK ECONOMICS (2013), co-authored with Kevin Caves and Chris Holt.

*Assessing Bundled and Share-Based Loyalty Rebates: Application to the Pharmaceutical Industry*, 8(4) JOURNAL OF COMPETITION LAW AND ECONOMICS (2012), co-authored with Kevin Caves.

*Lessons from Kahneman's Thinking Fast and Slow: Does Behavioral Economics Have a Role in Antitrust Analysis?*, ANTITRUST SOURCE (2012), co-authored with Andrew Card.

*Assessing Competition in U.S. Wireless Markets: Review of the FCC's Competition Reports*, 64 FEDERAL COMMUNICATIONS LAW JOURNAL (2012), co-authored with Gerald Faulhaber and Robert Hahn.

*An Empirical Analysis of Aftermarket Transactions by Hospitals*, 28 JOURNAL OF CONTEMPORARY HEALTH LAW AND POLICY (2011), co-authored with Robert Litan and Anna Birkenbach.

*Economic Evidence of Common Impact for Class Certification in Antitrust Cases: A Two-Step Analysis*, ANTITRUST (Summer 2011).

*Addressing the Next Wave of Internet Regulation: Toward a Workable Principle for Nondiscrimination*, 4 REGULATION & GOVERNANCE (2010), co-authored with Robert Hahn and Robert Litan.

*Class Certification in Antitrust Cases: An Economic Framework*, 17 GEORGE MASON LAW REVIEW (2010), co-authored with Robert Kulick.

*The Economic Impact of Eliminating Preemption of State Consumer Protection Laws*, 12 UNIVERSITY OF PENNSYLVANIA JOURNAL OF BUSINESS LAW 781 (2010), co-authored with Joseph R. Mason and Robert B. Kulick.

*Net Neutrality Is Bad Broadband Regulation*, THE ECONOMISTS' VOICE, Sept. 2010, co-authored with Robert Litan.

*Why the iPhone Won't Last Forever and What the Government Should Do to Promote its Successor*, 8 JOURNAL ON TELECOMMUNICATIONS AND HIGH TECHNOLOGY LAW 313 (2010), co-authored with Robert W. Hahn.

*What Does an Economist Have to Say About the Calculation of Reasonable Royalties?*, 14 INTELLECTUAL PROPERTY LAW BULLETIN 7 (2010), co-authored with Kyle Smith.

*Is Greater Price Transparency Needed in the Medical Device Industry?*, HEALTH AFFAIRS (2008), co-authored with Robert W. Hahn and Keith Klovers.

*Evaluating Market Power with Two-Sided Demand and Preemptive Offers to Dissipate Monopoly Rent*, 4 JOURNAL OF COMPETITION LAW & ECONOMICS (2008), co-authored with J. Gregory Sidak.

*Assessing Bias in Patent Infringement Cases: A Review of International Trade Commission Decisions*, 21 HARVARD JOURNAL OF LAW AND TECHNOLOGY (2008), co-authored with Robert W. Hahn.

*The Effect of Incumbent Bidding in Set-Aside Auctions: An Analysis of Prices in the Closed and Open Segments of FCC Auction 35*, 32 TELECOMMUNICATIONS POLICY JOURNAL (2008), co-authored with Peter Cramton and Allan Ingraham.

*A Real-Option Approach to Valuing Life Settlement Transactions*, 23 JOURNAL OF FINANCIAL TRANSFORMATION (2008), co-authored with Joseph R. Mason.

*The Economics of Wireless Net Neutrality*, 3 JOURNAL OF COMPETITION LAW AND ECONOMICS 399 (2007), co-authored with Robert W. Hahn and Robert E Litan.

*Vertical Foreclosure in Video Programming Markets: Implication for Cable Operators*, 3 REVIEW OF NETWORK ECONOMICS 348 (2007), co-authored with J. Gregory Sidak.

*The Unintended Consequences of Net Neutrality*, 5 JOURNAL ON TELECOMMUNICATIONS AND HIGH TECH LAW 533 (2007), co-authored with Robert E. Litan.

*Does Video Delivered Over a Telephone Network Require a Cable Franchise?*, 59 FEDERAL COMMUNICATIONS LAW JOURNAL 251 (2007), co-authored with Robert W. Crandall and J. Gregory Sidak.

*The Competitive Effects of a Cable Television Operator's Refusal to Carry DSL Advertising*, 2 JOURNAL OF COMPETITION LAW AND ECONOMICS 301 (2006).

*Uberregulation without Economics: The World Trade Organization's Decision in the U.S.-Mexico Arbitration on Telecommunications Services*, 57 FEDERAL COMMUNICATIONS LAW JOURNAL 1 (2004), co-authored with J. Gregory Sidak.

*The Secondary Market for Life Insurance Policies: Uncovering Life Insurance's "Hidden" Value*, 6 MARQUETTE ELDER'S ADVISOR 95 (2004), co-authored with Neil A. Doherty and Brian A. O'Dea.

*Do Unbundling Policies Discourage CLEC Facilities-Based Investment?*, 4 TOPICS IN ECONOMIC ANALYSIS AND POLICY (2004), co-authored with Robert W. Crandall and Allan T. Ingraham.

*Foreign Investment Restrictions as Industrial Policy*, 3 CANADIAN JOURNAL OF LAW AND TECHNOLOGY 19 (2004), co- authored with Robert W. Crandall.

*Regulating the Secondary Market for Life Insurance Policies*, 21 JOURNAL OF INSURANCE REGULATION 63 (2003), co- authored with Neil A. Doherty.

*Interim Pricing of Local Loop Unbundling in Ireland: Epilogue*, 4 JOURNAL OF NETWORK INDUSTRIES 119 (2003), co-authored with J. Gregory Sidak.

*The Benefits of a Secondary Market for Life Insurance*, 38 REAL PROPERTY, PROBATE AND TRUST JOURNAL 449 (2003), co- authored with Neil A. Doherty.

*The Empirical Case Against Asymmetric Regulation of Broadband Internet Access*, 17 BERKELEY TECHNOLOGY LAW JOURNAL 954 (2002), co-authored with Robert W. Crandall and J. Gregory Sidak.

*How Can Regulators Set Nonarbitrary Interim Rates? The Case of Local Loop Unbundling in Ireland*, 3 JOURNAL OF NETWORK INDUSTRIES 273 (2002), co-authored with J. Gregory Sidak.

*Vertical Foreclosure in Broadband Access*, 49 JOURNAL OF INDUSTRIAL ECONOMICS (2001) 299, co-authored with Daniel L. Rubinfeld.

*Open Access to Broadband Networks: A Case Study of the AOL/Time Warner Merger*, 16 BERKELEY TECHNOLOGY LAW JOURNAL 640 (2001), co-authored with Daniel L. Rubinfeld.

*Cable Modems and DSL: Broadband Internet Access for Residential Customers*, 91 AMERICAN ECONOMICS ASSOCIATION PAPERS AND PROCEEDINGS 302 (2001), co-authored with Jerry A. Hausman and J. Gregory Sidak.

*Residential Demand for Broadband Telecommunications and Consumer Access to Unaffiliated Internet Content Providers*, 18 YALE JOURNAL ON REGULATION 1 (2001), co-authored with Jerry A. Hausman and J. Gregory Sidak.

*Determining the Source of Inter-License Synergies in Two-Way Paging Networks*, 18 JOURNAL OF REGULATORY ECONOMICS 59 (2000).

*A General Framework for Competitive Analysis in the Wireless Industry*, 50 HASTINGS LAW REVIEW 1639 (2000), co- authored with J. Gregory Sidak and David Teece.

*Capital Raising in Offshore Markets*, 23 JOURNAL OF BUSINESS AND FINANCE 1181 (1999), co-authored with Ian Gray and Reena Aggarwal.

**Expert Testimony Since 2012**

In Re: Juul Labs, Inc. Marketing, Sales Practices, and Products Liability Litigation, Case No. 19-md-02913-WHO (N.D. Ca)

Paul Weidman et. al v. Ford Motor Company, Case No. 18-cv-12719 (E.D. Mich.)

Leinani Deslandes et al v. McDonald's USA, LLC, Case No. 17-cv-04857 (N.D. IL)

In Re: Macbook Keyboard Litigation, Case No.: 5:18-cv-02813-EJD (N.D. Ca)

Estate of Beverly Berland v. Lavastone Capital LLC, Case No. 1:18-cv-02002-CFC (D. Del.)

Donald Conrad et al. v. Jimmy John's Franchise LLC, et al., No. 3:18-cv-00133-NJR (S.D. Ill.)

Zydus Pharmaceuticals Inc. and Cadila Healthcare Limited v. Takeda Pharmaceutical Company Limited et al., No. 18-01994 (FLW)(TJB) (D. N.J.).

In Re GSE Bonds Antitrust Litigation, No. 1:19-cv-01704-JSR (S.D. N.Y.).

beIN Sports, LLC v. Comcast Cable Communications, LLC, File No. CSR-8972-P (FCC).

Chelsea Jensen, et al. v. Samsung Electronics et al., Court File No. T-809-18

(Federal Court in Canada).

Estate of Phyllis Malkin v. Wells Fargo Bank, N.A., No. 17-cv-23136 (S.D. Fl.).

In Re Capacitors Antitrust Litigation, Master File No. 3:14-cv-03264-JD (N.D. Cal.)

In re Foreign Exchange Benchmark Rates Antitrust Litigation (S.D. N.Y.), Case No. 1:13-cv-07789-LGS.

Massachusetts Technology Park Corporation v. Axia Netmedia Corporation, KCST USA, Inc., No. 01-17-0004-3049 (American Arbitration Association).

Cung Le et al. v. Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC, Case No.: 2:15-cv-01045-RFB-(PAL) (D. Nev.).

The Ohio State University v. New Par D/B/A Verizon Wireless, Case No. 2:15-cv-2866 (S.D. Oh.).

Authenticom, Inc. v. CDK Global, LLL; and The Reynolds And Reynolds Company, Case No. 17-cv-318 (W.D. Wis.).

Manmohan Dhillon et al. v. Anheuser-Busch, LLC et al. Case No. 14CECG03039 MBS (Cal. Fresno).

In re Lidoderm Antitrust Litigation, MDL Dkt. No. 14-md-02521-WHO (N.D. Cal.).

Maxon Hyundai Mazda et al. v. Carfax Inc., Case No. CV 2680 (AJN) (RLE) (S.D. N.Y.).

Philip R. Loy and Sharon Loy v. Womble Carlyle Sandridge & Rice, et al., Case No. 2014-cv-254012 (Ga. Super.).

In re MyFord Touch Consumer Litigation, Case No. 13-cv-3072-EMC (N.D. Cal.).

Sun Life Assurance Company of Canada v. U.S. Bank National Association, Case No. NO. 2:14-cv-04703-SJF-GRB (E.D. N.Y.).

Sun Life Assurance Company of Canada v. U.S. Bank National Association and Larry Bryan, Case No. 14-CIV-62610-BLOOM/VALLE (S.D. Fla.).

In the Matter of Flat Wireless, LLC, for and on behalf of its Operating Subsidiaries, v. Cellco Partnership d/b/a Verizon Wireless, and its Operating Subsidiaries, File No. EB-15-MD-005 (Federal Communications Commission).

Omni Healthcare et al. v. Health First Inc. et al, Case No. 6:13-CV-01509-RBD-DAB (M.D. Fla.).

Schuylkill Health System et al. v. Cardinal Health 200, LLC & Owens & Minor Distribution, Inc., Case No. 12-cv-07065-JS (E.D. Pa.).

Meda Pharmaceuticals Inc. v. Apotex, Inc and Apotex Corp., Case No. 01-14-0001-6315 (Am. Arbitration Ass'n).

Mark S. Wallach, et al v. Eaton Corporation, et al, Case No. 10-260-SLR (D. Del.).

STB Ex Parte No. 722 Railroad Revenue Adequacy (Surface Transportation Board).

In the Matter of 2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, MB Docket No. 14-50 (Federal Communications Commission).

Lindsay Kamakahi and Justine Levy, et al v. American Society for Reproductive Medicine and Society for Assisted Reproductive Technology, Case No.: 3:11-CV-1781 JCS (N.D. Cal.).

Salud Services, Inc. et al v. Caterpillar, Inc., Case No.: 1:12-cv-23927 (S.D. Fla.).

Gnanh Nora Krouch v. Wal-Mart Stores, Inc., Case No. CV-12-2217 (N.D. Cal.).

In the Matter of Petition for Rulemaking to Eliminate the Sports Blackout Rule, MB Docket No. 12-3 (Federal Communications Commission).

In the Matter of Review of Wholesale Services and Associated Policies, File No. 8663-C12-201313601 (Canadian Radio-Television and Telecommunications Commission).

Crafting a Successful Incentive Auction: Stakeholders' Perspectives (U.S. Senate, Committee on Commerce, Science, and Transportation).

Altergy Systems v. Enersys Delaware, Inc., Case No. 74-198-Y-001772-12 JMLE (American Arbitration Association).

In re New York City Bus Tour Antitrust Litigation, Master Case File No. 13-CV-07I1 (S.D. N.Y.).

SOCAN Tariff 22.A (Online Music Services, 2011-2013), CSI Online Music Services (2011-2013), SODRAC Tariff 6 - Online Music Services, Music Videos (2010-2013) (Copyright Board Canada).

Imperial Premium Finance, LLC, v. Sun Life Assurance Company of Canada (S.D. Fla.).

The Satellite Television Law: Repeal, Reauthorize, or Revise? (U.S. House of Representatives, Committee on Energy and
Commerce).

Marchbanks Truck Service, et al. v. Comdata Network Inc., et al., Civil Action No. 07-1078-JKG (E.D. Pa.).

Patricia Reiter v. Mutual Credit Corporation, et al., Case No. 8:09-cv-0081 AG (RNBx) (C.D. Cal.).

In re Photochromic Lens Antitrust Litigation, MDL Docket No. 2173 (M.D. Fla.).

In the Matter of the Arbitration Between Washington Nationals Baseball Club v. TCR Sports Broadcasting Holdings, L.L.P. (Major League Baseball Revenue Sharing Definitions Committee).

Miguel V. Pro and Davis Landscape et al. v. Hertz Equipment Rental Corporation, No. 2:06-CV-3830 (DMC) (D.N.J.).

Game Show Network, LLC v. Cablevision Systems Corp., File No. CSR-8529-P (Federal Communications Commission).

Apotex, Inc., v. Cephalon, Inc., Barr Laboratories, Inc., Mylan Laboratories, Inc., Teva Pharmaceutical Industries, Ltd., Teva Pharmaceuticals USA, Inc., Ranbaxy Laboratories, Ltd., and Ranbaxy Pharmaceuticals, Inc., Case No. 2:06-cv-02768-MSG (E.D. Pa.).

In Re Airline Baggage Fee Antitrust Litigation, Civil Action No. 1:09-Md-2089-Tcb (N.D. Ga.).

**Memberships**

American Economics Association

American Bar Association Section of Antitrust Law

**Reviewer**

Journal of Risk and Insurance

Journal of Competition Law and Economics

Journal of Risk Management and Insurance Review

Journal of Regulatory Economics

Managerial and Decision Economics

Telecommunications Policy