# **<u>EXHIBIT 2</u>**

**VARSITY BRANDS HOLDING CO., INC.**

**Employee Confidentiality, Non-Solicitation, Non-Competition and Invention Assignment Agreement**

In consideration and as a condition of (a) my employment or continued employment by Varsity Brands Holding Co., Inc. (the "Company") and/or any of its affiliates (the Company or any direct or indirect parent or subsidiary entity of the Company, a "Company Entity") (b) my receipt on or about the date hereof of an award under the Varsity Brands Holding Co., Inc. Phantom Unit Plan (the "Phantom Plan") and (c) my access to Proprietary Information (defined below), I agree as follows:

**1.      Proprietary Information.** I agree that all information, whether or not in writing, concerning the Company Entities' business, technology, business relationships or financial affairs that the Company Entities have not released generally within the industry or industries in which they operate (collectively, "Proprietary Information") is and will be the exclusive property of the Company Entities. By way of illustration, Proprietary Information may include information or material which has not been made generally available to the public, such as: (a) *corporate information*, including plans, strategies, methods, policies, resolutions, negotiations or litigation; (b) *marketing information*, including strategies, methods, customer identities or other information about customers, prospect identities or other information about prospects, or market analyses or projections; (c) *financial information*, including cost and performance data, debt arrangements, equity structure, investors and holdings, purchasing and sales data and price lists; and (d) *operational and technological information*, including plans, specifications, manuals, forms, templates, software, designs, methods, procedures, formulas, discoveries, inventions, improvements, concepts and ideas; and (e) *personnel information*, including personnel lists, reporting or organizational structure, resumes, personnel data, compensation structure, performance evaluations and termination arrangements or documents. Proprietary Information also includes information received in confidence by the Company Entities from their respective customers or suppliers or other third parties.

**2.      Recognition of Company's Rights.** I will not, at any time, without the Company's prior written permission, either during or after my employment, disclose any Proprietary Information to anyone outside of the Company Entities, or use or permit to be used any Proprietary Information for any purpose other than the performance of my duties as an employee of the Company Entity; provided, however, in no case shall I disclose or provide any Proprietary Information in connection with, or as part of, any "expert network" interview with any third party. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure of all Proprietary Information. I will deliver to the Company all copies of Proprietary Information in my possession or control upon the earlier of a request by the Company or termination of my employment.

**3.      Rights of Others.** I understand that the Company Entities are now and may hereafter be subject to non-disclosure or confidentiality agreements with third persons which require the Company Entities to protect or refrain from use of such third persons' proprietary information. I agree to be bound by the terms of such agreements in the event I have access to such proprietary information and know or would reasonably be expected to know of such agreements.

**4.      Commitment to Company; Avoidance of Conflict of Interest.** While an employee of the Company Entity, I will devote my full-time efforts to the business of the Company Entities and I will not engage in any other business activity that reasonably conflicts with my duties to the Company Entities. I will advise the Board of Directors of the Company or the president of the Company or his or her nominee at such time as any activity of either the Company Entities or another business presents me with a conflict of interest or the appearance of a conflict of interest as an employee of the Company Entity. Upon reasonable notice and an opportunity to cure, I will take whatever action is reasonably requested of me by the Company to resolve any conflict or appearance of conflict which it finds to exist.

**5.      Developments.** I will make full and prompt disclosure to the Company of all inventions, discoveries, designs, developments, methods, modifications, improvements, processes, algorithms, databases, computer programs, formulae, techniques, trade secrets, mask works, graphics or images, and audio or visual works and other works of authorship (collectively "Developments"), whether or not patentable or copyrightable, that are created, made, conceived or reduced to practice by me (alone or jointly with others) or under my direction during the period of my employment. I acknowledge that all work performed by me is on a "work for hire" basis, and I hereby do assign and transfer and, to the extent any such assignment cannot be made at present, will assign and transfer, to the Company and its successors and assigns all my right, title and interest in all Developments that (a) relate to the business of any Company Entity or any customer of or supplier to any Company Entity or any of the products or services being researched, developed, manufactured or sold by any Company Entity or which may be used with such products or services; or (b) result from tasks assigned to me by a Company Entity; or (c) result from the use of premises or personal property (whether tangible or intangible) owned, leased or contracted for by the Company Entity ("Company-Related Developments"), and all related patents, patent applications, trademarks and trademark applications, copyrights and copyright applications, and other intellectual property rights in all countries and territories worldwide and under any international conventions ("Intellectual Property Rights").

To preclude any possible uncertainty, I have set forth on Exhibit A attached hereto a complete list of Developments that

1

I have, alone or jointly with others, conceived, developed or reduced to practice prior to the commencement of my employment with a Company Entity that I consider to be my property or the property of third parties and that I wish to have excluded from the scope of this Agreement ("Prior Inventions"). If disclosure of any such Prior Invention would cause me to violate any prior confidentiality agreement, I understand that I am not to list such Prior Inventions in Exhibit A but am only to disclose a cursory name for each such invention, a listing of the party(ies) to whom it belongs and the fact that full disclosure as to such inventions has not been made for that reason. I have also listed on Exhibit A all patents and patent applications in which I am named as an inventor, other than those which have been assigned to the Company ("Other Patent Rights"). If no such disclosure is attached, I represent that there are no Prior Inventions or Other Patent Rights. If, in the course of my employment with the Company, I incorporate a Prior Invention into a Company product, process or machine or other work done for the Company, I hereby grant to the Company a nonexclusive, royalty-free, paid-up, irrevocable, worldwide license (with the full right to sublicense) to make, have made, modify, use, sell, offer for sale and import such Prior Invention. Notwithstanding the foregoing, I will not incorporate, or permit to be incorporated, Prior Inventions in any Company-Related Development without the Company's prior written consent.

This Agreement does not obligate me to assign to the Company any Development which, in the sole judgment of the Company, reasonably exercised, is developed entirely on my own time and does not relate to the business efforts or research and development efforts in which, during the period of my employment, the Company actually is engaged or reasonably would be engaged, and does not result from the use of premises or equipment owned or leased by the Company. However, I will also promptly disclose to the Company any such Developments for the purpose of determining whether they qualify for such exclusion. I understand that to the extent this Agreement is required to be construed in accordance with the laws of any state which precludes a requirement in an employee agreement to assign certain classes of inventions made by an employee, this paragraph 5 will be interpreted not to apply to any invention which a court rules and/or the Company agrees falls within such classes. I also hereby waive all claims to any moral rights or other special rights which I may have or accrue in any Company-Related Developments.

**6.      Documents and Other Materials.** I will keep and maintain adequate and current records of all Proprietary Information and Company-Related Developments developed by me during my employment, which records will be available to and remain the sole property of the Company at all times.

All files, letters, notes, memoranda, reports, records, data, sketches, drawings, notebooks, layouts, charts, quotations and proposals, specification sheets, program listings, blueprints, models, prototypes, or other written, photographic or other tangible material containing Proprietary Information, whether created by me or others, which come into my custody or possession, are the exclusive property of the Company to be used by me only in the performance of my duties for the Company. Any property situated on a Company Entity's premises and owned by any Company Entity, including without limitation computers, disks and other storage media, filing cabinets or other work areas, is subject to inspection by the Company at any time with or without notice. In the event of the termination of my employment for any reason, I will deliver to the Company all files, letters, notes, memoranda, reports, records, data, sketches, drawings, notebooks, layouts, charts, quotations and proposals, specification sheets, program listings, blueprints, models, prototypes, or other written, photographic or other tangible material containing Proprietary Information, and other materials of any nature pertaining to the Company or any Company Entity or to my work, and will not take or keep in my possession any of the foregoing or any copies.

**7.      Enforcement of Intellectual Property Rights.** I will cooperate fully with the Company, both during and after my employment with a Company Entity, with respect to the procurement, maintenance and enforcement of Intellectual Property Rights in Company-Related Developments. I will sign, both during and after the term of this Agreement, all papers, including without limitation copyright applications, patent applications, declarations, oaths, assignments of priority rights, and powers of attorney, which the Company may deem necessary or desirable in order to protect its rights and interests in any Company-Related Development. If the Company is unable, after reasonable effort, to secure my signature on any such papers, I hereby irrevocably designate and appoint each officer of the Company as my agent and attorney-in-fact to execute any such papers on my behalf, and to take any and all actions as the Company may deem necessary or desirable in order to protect its rights and interests in any Company-Related Development.

**8.      Non-Competition and Non-Solicitation.**

In order to protect the Company's and the Company Entities' Proprietary Information and good will, during my employment and for a period of twelve (12) months following the termination of my employment for any reason, I will not directly or indirectly, whether as owner, partner, shareholder, director, manager, consultant, agent, employee, co-venturer or otherwise, engage, participate or invest in any business activity, anywhere in any Territory (as defined below), that competes with any business (for profit or not-for-profit) conducted or engaged in by any Company Entity or with any business that any Company Entity is considering conducting or engaging in, including, without limitation, (i) the design, marketing or sales of cheerleader and dance team uniforms and accessories and the design, operation or marketing or sales of cheerleader and dance team camps, clinics, competitions or tours, (ii) the manufacture, marketing or sales of class rings, recognition jewelry, yearbooks, caps, gowns and similar regalia, diplomas, announcements and related fine paper products, digital printing and social media content related to any of the foregoing, including software applications or (iii) the manufacture, sourcing, merchandising, designing, marketing, licensing, distributing, selling or installing durable or non-durable products related to sports, physical activity or leisure activity, including, without limitation, equipment, apparel, games, toys, uniforms, soft goods, hard goods,

2

physical education products and/or supplies; provided that this shall not prohibit any possible investment in publicly traded stock of a company representing less than one percent of the stock of such company. In addition, during my employment and for a period of twelve (12) months following the termination of my employment for any reason, I will not, directly or indirectly, or by action in concert with others (a) hire, solicit, entice or attempt to persuade any other employee or consultant of the Company Entities to leave the Company Entities for any reason or otherwise participate in or facilitate the hire, directly or through another entity, of any person who is employed or engaged by any Company Entity or who was employed or engaged by any Company Entity within one (1) year of any attempt to hire such person, and/or (b) call upon, solicit, divert, take away, accept or conduct any business from or with any of the individual and/or institutional customers or prospective customers of the Company or any of its suppliers. I acknowledge and agree that if I violate any of the provisions of this paragraph 8, the running of the applicable period will be extended by the time during which I engage in such violation(s). "Territory" means any country, state, county, city or other territory or jurisdiction in which any Company Entity is actively engaged in, or conducting, business or has an interest in a business entity which is actively engaged in, or conducting, business; provided, however, that I understand that in connection with the termination of my employment, Territory shall only include such countries, states, counties, cities or other territories or jurisdictions in which any Company Entity is actively engaged in, or conducting, business or has an interest in a business entity which is actively engaged in, or conducting, business as of the date of the termination of my employment.

9.  **Government Contracts**. I acknowledge that the Company may have from time to time agreements with other persons or with the United States Government or its agencies which impose obligations or restrictions on the Company regarding inventions made during the course of work under such agreements or regarding the confidential nature of such work. I agree to comply with any such obligations or restrictions upon the direction of the Company. In addition to the rights assigned under paragraph 5, I also assign to the Company (or any of its nominees) all rights which I have or acquired in any Developments, full title to which is required to be in the United States under any contract between the Company and the United States or any of its agencies.

10. **Prior Agreements**. I hereby represent that, except as I have fully disclosed previously in writing to the Company, I am not bound by the terms of any agreement with any previous employer or other party to refrain from using or disclosing any trade secret or confidential or proprietary information in the course of my employment with the Company or to refrain from competing, directly or indirectly, with the business of such previous employer or any other party, or to refrain from soliciting any previous employer's or other party's employees or customers. I further represent that my performance of all the terms of this Agreement as an employee of the Company does not and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by me in confidence or in trust prior to my employment with the Company. I will not disclose to the Company or induce the Company to use any confidential or proprietary information or material belonging to any previous employer or others.

11. **Remedies Upon Breach**. I understand that the restrictions contained in this Agreement are necessary for the protection of the business and goodwill of the Company and I consider them to be reasonable for such purpose. Any breach of this Agreement is likely to cause the Company substantial and irrevocable damage and therefore, in the event of such breach, the Company, in addition to such other remedies which may be available, will be entitled to specific performance and other injunctive relief, without the posting of a bond. If I violate this Agreement, in addition to all other remedies available to the Company at law, in equity, and under contract, I agree that I am obligated to pay all the Company's attorneys' fees and expenses in connection with any enforcement action by the Company against me in which the Company is the prevailing party and the Company shall pay all of my attorney's fees and expenses in connection with any enforcement action by me against the Company in which I am the prevailing party.

12. **Publications and Public Statements**. I will obtain the Company's written approval before publishing or submitting for publication any material that relates to my work at the Company and/or incorporates any Proprietary Information. To ensure that the Company delivers a consistent message about its products, services and operations to the public, and further in recognition that even positive statements may have a detrimental effect on the Company in certain securities transactions and other contexts, any statement about the Company which I create, publish or post during my period of employment and for six (6) months thereafter, on any media accessible by the public, including but not limited to social media and networking services and sites, electronic bulletin boards and Internet-based chat rooms, must first be reviewed and approved by an officer of the Company before it is released in the public domain.

13. **No Employment Obligation**. I understand that this Agreement does not create an obligation on the Company or any other person to continue my employment. I acknowledge that, unless otherwise agreed in a formal written employment agreement signed on behalf of the Company by an authorized officer, my employment with the Company is at will and therefore may be terminated by the Company or me at any time and for any reason, with or without cause.

14. **Survival and Assignment by the Company**. I understand that my obligations under this Agreement will continue in accordance with its express terms regardless of any changes in my title, position, duties, salary, compensation or benefits or other terms and conditions of employment. I further understand that my obligations under this Agreement will continue following the termination of my employment regardless of the manner of such termination and will be binding upon my heirs, executors and administrators. The Company will have the right to assign this Agreement to its affiliates, successors and assigns. I expressly consent to be bound by the provisions of this Agreement for the benefit of the Company or any Company Entity or any of their

respective parents, subsidiaries or affiliates to whose employ I may be transferred without the necessity that this Agreement be resigned at the time of such transfer.

**15.    Exit Interview.**  If and when I depart from the Company, I may be required to attend an exit interview and sign an "Employee Exit Acknowledgement" to reaffirm my acceptance and acknowledgement of the obligations set forth in this Agreement.  For twelve (12) months following termination of my employment, I will notify the Company of any change in my address and of each subsequent employment or business activity, including the name and address of my employer or other post-Company employment plans and the nature of my activities.

**16.    Severability.**  In case any provisions (or portions thereof) contained in this Agreement shall, for any reason, be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect the other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.  If, moreover, any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, it shall be construed by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law as it shall then appear.

**17.    Interpretation.**  This Agreement will be deemed to be made and entered into inTennessee, and will in all respects be interpreted, enforced and governed under the laws of the Tennessee.  I hereby agree to consent to personal jurisdiction of the state and federal courts situated within Tennessee for purposes of enforcing this Agreement, and waive any objection that I might have to personal jurisdiction or venue in those courts.

**18.    Integration**.  I hereby acknowledge and agree that my obligations under this Agreement are in addition and supplementary to any prior understandings and agreements between me and any Company Entity relating to the subject matter hereof, including without limitation any other prior understandings and agreements with any Company Entity relating to confidentiality and restrictive covenant obligations.  This Agreement and any other confidentiality and restrictive covenant obligations I have to any Company Entity shall be interpreted and enforced together so that the maximum restriction applies.

4

**I UNDERSTAND THAT THIS AGREEMENT AFFECTS IMPORTANT RIGHTS. BY SIGNING BELOW, I CERTIFY THAT I HAVE READ IT CAREFULLY AND AM SATISFIED THAT I UNDERSTAND IT COMPLETELY.**

IN WITNESS WHEREOF, the undersigned has executed this agreement as a sealed instrument as of the date set forth below.

Signed: _Marlene Cota_ (DocuSigned by: D834EAAB8DC5487...) _____

Type or print name: Marlene Cota

Date: 1/4/2016

State of Residence: TN

1

**EXHIBIT A**

To: Varsity Brands Holding Co., Inc.

From: Marlene Cota

Date: 1/4/2016

SUBJECT: **Prior Inventions**

    The following is a complete list of all inventions or improvements relevant to the subject matter of my employment by the Company that have been made or conceived or first reduced to practice by me alone or jointly with others prior to my engagement by the Company:

    X    No inventions or improvements

        See below:

        _____

        _____

        _____

        Additional sheets attached

The following is a list of all patents and patent applications in which I have been named as an inventor:

    X    None

        See below:

        _____

        _____

        _____

**Performance Vesting
Award Agreement
under the
Varsity Brands Holding Co., Inc.
Phantom Unit Plan**

| | |
|---|---|
| **Name of Participant:** | Marlene Cota (the "<u>Participant</u>") |
| **Number of Units:** | ▮ |
| **Per-Unit Distribution Threshold:** | (see Section 2, below) |
| **Aggregate Distribution Threshold:** | (see Section 2, below) |
| **Award Date:** | December 15, 2014 |
| **Award Expiration Date:** | December 14, 2024 |
| **Company Parent Common Stock Factor:** | N/A |
| **HJ Parent Common Stock Factor:** | N/A |

  Pursuant to the Varsity Brands Holding Co., Inc. Phantom Unit Plan (as amended from time to time, the "<u>Plan</u>"), Varsity Brands Holding Co., Inc. (together with all successors thereto, the "<u>Company</u>"), hereby awards to the Participant named above the number of Units specified above. Capitalized terms used but not defined herein shall have the meanings given to such terms in the Plan, and this Award Agreement shall be subject to and governed by all the terms and conditions of the Plan in all respects. The applicable Per-Unit Distribution Threshold, Aggregate Distribution Threshold and number of Units shall be subject to adjustment in accordance with the terms and conditions of the Plan. This Award and the Participant's rights hereunder shall terminate and expire on the Award Expiration Date.

  *This award of Units under the Plan is conditioned upon the Participant's execution and delivery to the Company of a confidentiality, non-competition, non-solicitation and assignment of rights/inventions agreement in the form provided by the Company (the "Confidentiality Agreement"). The Confidentiality Agreement addresses confidentiality of Company information, post-employment restrictions on solicitation of employees and customers or clients and other similar matters and should be reviewed carefully by the Participant. If the Participant has not or does not execute the Confidentiality Agreement and deliver the Confidentiality Agreement to the Company within 30 days of the Award Date, the Participant shall forfeit all Units awarded hereunder.*

1.   **Definitions.**  For the purposes of this Agreement, the following terms shall have the following respective meanings.

(a)   "Aggregate Investment" means $300,000,000, increased by the amount of any additional equity contribution and/or investment made by the Investors to or with respect to the Company Parent or HJ Parent after the Award Date.

(b)   "Investor Liquidation Event" means any event (including but not limited to any Distribution, Sale Event, sale of securities in an Initial Public Offering or other public offering, non-public sale of securities or other liquidity event) as a result of which the Investors receive Proceeds from the Company Parent, HJ Parent or from a third party in respect of Company Parent Common Stock or HJ Parent Common Stock beneficially owned by the Investors.

(c)   "Investors" means Charlesbank Equity Fund VII Limited Partnership, Charlesbank Offshore Equity Fund VII, L.P., Charlesbank Parallel Fund VII Limited Partnership, Charlesbank Equity Coinvestment Fund VII Limited Partnership, Charlesbank Equity Fund VIII Limited Partnership, Charlesbank Offshore Equity Fund VIII, L.P., Charlesbank Parallel Fund VIII Limited Partnership and Charlesbank Equity Coinvestment Fund VIII Limited Partnership.

(d)   "IRR" means the discount rate (expressed as an annualized percentage rounded to the nearest three decimal places and compounded on an annual basis in accordance with accepted financial practice) which, when used to calculate the net present value, as of December 12, 2014, of the difference between (i) all Proceeds received by the Investors from all Investor Liquidation Events (taking into account the date of receipt) minus (ii) the Aggregate Investment (taking into account the date such investment(s) is (are) made), causes such net present value to equal zero ($0).  The "XIRR" function of Microsoft Excel may be used to determine net present value under this definition.

(e)   "Liquid Securities" means freely tradable securities of a company listed on the Nasdaq Global Market or the New York Stock Exchange having a public float with a market value in excess of $3,000,000,000.

(f)   "Performance Hurdle" means, as of the date of any Investor Liquidation Event, an IRR of at least 15 percent on the Aggregate Investment.

(g)   "Proceeds" means any amounts actually paid to an Investor in respect of Company Parent Common Stock and/or HJ Parent Common Stock to the extent such amounts consist of cash and/or Liquid Securities.  For purposes of this Agreement, to the extent Proceeds consist of Liquid Securities, such proceeds shall be valued (i) using the same methodology set forth in definitive documentation governing the applicable Investor Liquidation Event or (ii) if there is no such methodology, using the average of the closing prices of the Liquid Securities over the 30-day period ending three (3) days prior to the consummation of such Investor Liquidation Event.  For the avoidance of doubt, Proceeds shall not include any cash or non-cash proceeds (including Liquid Securities) paid to an Investor by the Company Parent or HJ Parent or any third party (as applicable) that are not directly in respect of Company Parent Common

2

Stock or HJ Parent Common Stock beneficially owned by such Investor (such as management fees, consulting fees, repayment of debt or reimbursement of expenses).

2.  **Per-Unit Distribution Threshold and Aggregate Distribution Threshold.**  50 percent of the Units awarded hereunder shall have an Aggregate Distribution Threshold equal to $803,302,500 and a Per-Unit Distribution Threshold equal to $1.956986102.  The remaining 50 percent of the Units awarded hereunder shall have an Aggregate Distribution Threshold equal to $1,147,575,000 and a Per-Unit Distribution Threshold equal to  $2.795694431.

3.  **Vesting and Settlement of Units.**  The Units awarded hereunder shall be eligible to vest if and only to the extent that the Performance Hurdle is achieved as of the Vesting Date, subject to the Participant's continued employment or other service relationship with the Company through the Vesting Date.  Units that vest on the Vesting Date shall be settled in accordance with Section 7 of the Plan.  Units that do not vest on the Vesting Date shall terminate without payment of consideration therefor.  Satisfaction of the Performance Hurdle is a Secondary Vesting Condition under the Plan.

4.  **Termination of Employment or Service Relationship.**  Unless otherwise determined by the Administrator in its sole discretion, if the Participant's employment or other service relationship with the Company or its subsidiaries terminates for any reason, including by reason of the Participant's death or disability, prior to the Vesting Date, the Participant shall immediately forfeit, without payment of consideration, any and all Units granted hereunder.

5.  **Additional Payments**.  Within 30 days of any payment under the Plan pursuant to Sections 7 and/or 8.1 of the Plan with respect to the Units granted hereunder (but in any event, within the same calendar year in which such payment is made to the Participant), the Participant shall be entitled to an amount (a "Gross-Up Payment") equal to (i) (A) the amount of U.S. income taxes imposed on the Participant in respect of such payment, less (B) the hypothetical amount of U.S. income taxes that would have been imposed on the Participant in respect of such payment had such payment been taxed at applicable capital gains rates, plus (ii) the amount of any U.S. income taxes imposed on the Participant in respect of the amount received under clause (i) and this clause (ii).  For purposes of determining the amount of the Gross-Up Payments, the Participant shall be deemed to pay U.S. federal income tax at the highest marginal ordinary or capital gains tax rate, as applicable, in the calendar year in which the Gross-Up Payment is to be made and U.S. state and local income taxes at the highest marginal tax rate in the state and locality of the Participant's residence for income tax purposes on the date the Gross-Up Payment is made, net of the maximum reduction in U.S. federal income taxes that may be obtained from the deduction of such U.S. state and local taxes.  For purposes of determining the amount in clause (i)(B) above, the applicable capital gains rate (including long-term or short-term) shall be determined by reference to the number of days beginning on the day immediately following the Award Date through and including the date on which the applicable payment is paid to the Participant.  Further, for purposes of clarification and for purposes of determining the amount of the Gross-Up Payment, the term "U.S. income taxes" shall not include any tax imposed by Code sections 1411 or 3101.

6.  **Confidentiality**.  As a condition to the award, the Participant agrees to keep the existence and terms of this Award Agreement in the strictest confidence and not reveal this

3

information to any persons other than the Participant's spouse or financial advisor. Failure to comply with the confidentiality requirement will result in forfeiture of the Units hereunder.

       7.      **Non-Transferability of Units**.  This Award Agreement and the Units granted hereunder are personal to the Participant and are not transferable or assignable by the Participant.

       8.      **Incorporation of Plan**.  This Award Agreement shall be subject to and governed by the terms and conditions of the Plan.  In the event of any discrepancy or inconsistency between this Award Agreement and the Plan, the terms and conditions of the Plan shall control.

       9.      **Withholding Taxes**.  Participant shall, not later than the date as of which any payment hereunder or under the Plan becomes a taxable event for United States Federal income tax purposes, to the extent necessary, pay to the Company or make arrangements satisfactory to the Company for payment of any United States Federal and local taxes required by law to be withheld on account of such taxable event.  Participant acknowledges and agrees that the Company has the right to deduct from all payments hereunder any taxes required by law to be withheld with respect to such payments.

       10.      **Additional Limitation**.  Anything in this Agreement or in the Plan to the contrary notwithstanding, in the event that any compensation, payment or distribution by the Company to or for the benefit of the Participant, whether paid or payable or distributed or distributable pursuant to the terms of the this Agreement, the Plan or otherwise (the "Parachute Payments"), would be subject to the excise tax imposed by Section 4999 of the Code, then (a) any amounts payable to the Participant under this Plan shall be reduced (but not below zero) to the extent necessary so that the maximum Parachute Payments shall not exceed the Threshold Amount (the "Reduction Amount") and (b) the Company shall use reasonable efforts to satisfy the shareholder approval requirements set forth in Q/A 7 of Treasury Regulations Section 1.280G-1 with respect to such Reduction Amount, and if such requirements are satisfied then such Reduction Amount shall become payable hereunder as if subsection (a) above had not applied thereto.  For purposes of this Section, "Threshold Amount" shall mean three times the Participant's "base amount" within the meaning of Section 280G(b)(3) of the Code and the regulations thereunder, less one dollar.

       11.      **Miscellaneous Provisions.**

         (a)      **Change and Modifications**.  This Award Agreement may not be orally changed, modified or terminated, nor shall any oral waiver of any of its terms be effective.  This Award Agreement may be changed, modified or terminated only by an agreement in writing signed by the Company and the Participant.

         (b)      **Entire Agreement**.  This Award Agreement together with the Plan (the terms of which are hereby incorporated by reference) are intended to be a final expression of the agreement between the Participant and the Company and are intended to be a complete and exclusive statement of the agreement and understanding between the Participant and the Company with respect to the subject matter contained herein.  There are no restrictions, promises, representations, warranties, covenants or undertakings relating to such subject matter other than those referred to herein and in the Plan.

(c)  <u>No Obligation to Continue Employment or Service</u>.  Neither the Company, HJ nor any of their subsidiaries is obligated by or as a result of the Plan or this Award Agreement to continue the Participant in employment or other service and neither the Plan nor this Award Agreement shall interfere in any way with the right of the Company, HJ or any of their subsidiaries to terminate the employment or service of the Participant at any time.

(d)  <u>Governing Law</u>.  This Award Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to principles of conflict of laws of such state.

(e)  <u>Headings</u>.  The headings are intended only for convenience in finding the subject matter and do not constitute part of the text of this Award Agreement and shall not be considered in the interpretation of this Award Agreement.

(f)  <u>Saving Clause</u>.  If any provision(s) of this Award Agreement shall be determined to be illegal or unenforceable, such determination shall in no manner affect the legality or enforceability of any other provision hereof.

(g)  <u>Counterparts</u>.  This Award Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same document.

5

The foregoing Award Agreement is hereby accepted and the terms and conditions thereof hereby agreed to by the undersigned as of the date first above written.

VARSITY BRANDS HOLDING CO., INC.

By: *Burton Brillhart* (DocuSigned, F08156E00CB14B7...)

Name: Burton Brillhart
Title: Secretary

Address:

Varsity Brands Holding Co. Inc.
4625 West 62nd Street
Indianapolis, Indiana 46268

The foregoing Award Agreement is hereby accepted and the terms and conditions thereof hereby agreed to by the undersigned as of the date first above written.

PARTICIPANT:

*Marlene Cota* (DocuSigned, D834EAAB8DC5487...)

Name: Marlene Cota

Address:

[redacted]

_____

_____

[SIGNATURE PAGE TO COTA PERFORMANCE AWARD GRANT]

**Time Vesting
Award Agreement
under the
Varsity Brands Holding Co., Inc.
Phantom Unit Plan**

| | |
|---|---|
| **Name of Participant:** | Marlene Cota (the "Participant") |
| **Number of Units:** | ▮ |
| **Per-Unit Distribution Threshold:** | $1.118277772 |
| **Aggregate Distribution Threshold:** | $459,030,000 |
| **Award Date:** | December 15, 2014 |
| **Award Expiration Date:** | December 14, 2024 |
| **Company Parent Common Stock Factor:** | N/A |
| **HJ Parent Common Stock Factor:** | N/A |

Pursuant to the Varsity Brands Holding Co., Inc. Phantom Unit Plan (as amended from time to time, the "Plan"), Varsity Brands Holding Co., Inc. (together with all successors thereto, the "Company"), hereby awards to the Participant named above the number of Units specified above. Capitalized terms used but not defined herein shall have the meanings given to such terms in the Plan, and this Award Agreement shall be subject to and governed by all the terms and conditions of the Plan in all respects. The Per-Unit Distribution Threshold, the Aggregate Distribution Threshold and number of Units shall be subject to adjustment in accordance with the terms and conditions of the Plan. This Award and the Participant's rights hereunder shall terminate and expire on the Award Expiration Date.

*This award of Units under the Plan is conditioned upon the Participant's execution and delivery to the Company of a confidentiality, non-competition, non-solicitation and assignment of rights/inventions agreement in the form provided by the Company (the "Confidentiality Agreement"). The Confidentiality Agreement addresses confidentiality of Company information, post-employment restrictions on solicitation of employees and customers or clients and other similar matters and should be reviewed carefully by the Participant. If the Participant has not or does not execute the Confidentiality Agreement and deliver the Confidentiality Agreement to the Company within 30 days of the Award Date, the Participant shall forfeit all Units awarded hereunder.*

1.  **Definitions.** For the purposes of this Agreement, the following terms shall have the following respective meanings.

    (a) "Cause" for any Participant has the meaning set forth in a written agreement between such Participant and the Company or any subsidiary of the Company. If

there is no such agreement or definition, "Cause" means if the Board shall determine in good faith that the Participant has (i) demonstrated continued incompetence or dereliction of his or her duties, including unsatisfactory attendance, as determined by the Board; (ii) committed a material violation of the rules, regulations and/or procedures related to the conduct of employees of the Company or any of its subsidiaries (only after written notice has been provided, and the Participant has failed or refused to cure the deficiencies within a reasonable, prescribed period of time (provided, however, that a Participant shall only be entitled to one such notice and opportunity to cure)); (c) breached any fiduciary obligation owed to the Company or any of its subsidiaries; or (d) been indicted or convicted of a felony or other crime involving moral turpitude.

    (b)    "Good Reason" means the Participant has complied with the Good Reason Process following the occurrence of any of the following events: (i) a material adverse change in the nature or scope of the Participant's responsibilities, authorities, powers, functions or duties; (ii) a material reduction in the Participant's annual base salary except for across-the-board salary reductions similarly affecting all or substantially all similarly-situated employees; or (iii) the relocation of the office at which the Participant is principally employed to a location more than 50 miles from such office (each, a "Good Reason Condition").

    (c)    "Good Reason Process" means: (i) the Participant determines in good faith that a Good Reason Condition has occurred; (ii) the Participant notifies the Company in writing of the occurrence of the Good Reason Condition within 60 days of the occurrence of such condition; (iii) the Participant provides the Company with a period not less than 30 days following such notice to cure the Good Reason Condition; (iv) notwithstanding such efforts, the Good Reason Condition continues to exist; and (v) the Participant terminates employment within 60 days after the end of the period to cure such Good Reason Condition. If the Company cures the Good Reason Condition during the 30-day period, Good Reason shall be deemed not to have occurred.

    (d)    "Secondary Time-Vested Percentage" means (i) zero percent prior to the first anniversary of the Award Date, (ii) 20 percent, on or after the first anniversary of the Award Date and prior to the second anniversary of the Award Date, (ii) 40 percent, on or after the second anniversary of the Award Date and prior to the third anniversary of the Award Date, (iii) 60 percent on or after the third anniversary of the Award Date and prior to the fourth anniversary of the Award Date, (iv) 80 percent on or after the fourth anniversary of the Award Date and prior to the fifth anniversary of the Award Date and (v) 100 percent on or after the fifth anniversary of the Award Date.

## 2. Vesting and Settlement of Units.

    (a)    Except as provided herein, the Units awarded hereunder shall vest (and the Secondary Vesting Condition shall be deemed satisfied) on the Vesting Date in accordance with and pursuant to Section 6 of the Plan, subject to the Participant's continued employment or other service relationship with the Company through the Vesting Date. Units that vest on the Vesting Date shall be settled in accordance with Section 7 of the Plan.

2

(b) Notwithstanding the definition of "Per-Unit Value" set forth in the Plan, if the Vesting Date occurs prior to and not in conjunction with an HJ Parent Sale Event, then the Per-Unit Value as of the Vesting Date for purposes of the Units awarded hereunder shall be (i) the sum of (x) (1) the Company Parent Common Stock Value multiplied by (2) the Company Parent Common Stock Factor and (y) the product of (1) the HJ Parent Common Stock Value and (2) the HJ Parent Common Stock Factor multiplied by the Secondary Time-Vesting Percentage as of such date, minus (ii) the Per-Unit Distribution Threshold.

(c) For the purposes the Plan, the Secondary Time-Vested Percentage is a Secondary Vesting Condition for determining any Units granted pursuant to this Agreement that may be eligible to receive payments pursuant to Section 8 of the Plan.

3. **Termination of Employment or Service Relationship**.

(a) Subject to Section 3(b), below and unless otherwise determined by the Administrator in its sole discretion, if the Participant's employment or other service relationship with the Company or its subsidiaries terminates for any reason, including by reason of the Participant's death or disability or in connection with such Participant's breach of the Confidentiality Agreement or any of such Participant's obligations under any other confidentiality, inventions and assignment, non-competition and/or non-solicitation agreement in effect between the Participant and the Company or any of its subsidiaries (such termination in connection with such breach, a "Breach Termination"), prior to the Vesting Date, the Participant shall immediately forfeit, without payment of consideration, any and all Units granted hereunder.

(b) Notwithstanding Section 3(a), above, in the event that the Participant's employment or other service relationship with the Company or its subsidiaries is terminated either (i) by the Company without Cause (other than in connection with a Breach Termination which will be governed by Section 3(a) above) or (ii) by the Participant with Good Reason, then subject to the Participant signing a separation agreement containing, among other provisions, a general release of claims in favor of the Company and its Affiliates, confidentiality, return of property and non-disparagement, in a form and manner satisfactory to the Company (the "Separation Agreement and Release") and the Separation Agreement and Release becoming irrevocable, all within 60 days after the date of the Participant's termination, the Company shall pay to the Participant a lump-sum amount in cash, subject to the proviso below, equal to the product of (x) (i) the number of Units awarded hereunder, multiplied by (ii) the Secondary Time-Vested Percentage and (z) the Per-Unit Value as of the date of such termination (the "Termination Value"); provided, however, that in lieu of paying the Participant the Termination Value in cash, the Administrator, in its sole discretion, may instead elect to pay the Participant some or all of the Termination Value in the form of shares of Company Parent Common Stock and/or HJ Parent Common Stock that have an aggregate Company Parent Common Stock Value or HJ Parent Common Stock Value (as applicable) equal to the applicable portion of the Termination Value being paid in shares of Company Parent Common Stock or HJ Parent Common Stock as of the date of such termination of employment or service (and as a requirement to the receipt of such shares of Company Parent Common Stock such Participant shall be required to execute and become a party to the Stockholders Agreement of the Company Parent and/or HJ Parent). Such payment shall be made on the first regular payroll date of the Company that is 60 days after the date of such qualifying termination of employment or service.

3

4. **Additional Payments.**

(a) The Participant shall be eligible to receive the payments described in Section 8 of the Plan, if any, with respect to such number of Units equal to (i) the number of Units awarded hereunder, multiplied by (ii) the Secondary Time-Vested Percentage applicable as of the date such payments are made, subject to the Participant's continued employment or service relationship through the applicable date(s) specified in Section 8 of the Plan.

(b) Within 30 days of any payment under the Plan pursuant to Section 7 or Section 8.1 of the Plan or Section 3 of this Agreement with respect to the Units granted hereunder (but in any event, within the same calendar year in which such payment is made to the Participant), the Participant shall be entitled to an amount (a "Gross-Up Payment") equal to (i) (A) the amount of U.S. income taxes imposed on the Participant in respect of such payment, less (B) the hypothetical amount of U.S. income taxes that would have been imposed on the Participant in respect of such payment had such payment been taxed at applicable capital gains rates, plus (ii) the amount of any U.S. income taxes imposed on the Participant in respect of the amount received under clause (i) and this clause (ii).  For purposes of determining the amount of the Gross-Up Payments, the Participant shall be deemed to pay U.S. federal income tax at the highest marginal ordinary or capital gains tax rate, as applicable, in the calendar year in which the Gross-Up Payment is to be made and U.S. state and local income taxes at the highest marginal tax rate in the state and locality of the Participant's residence for income tax purposes on the date the Gross-Up Payment is made, net of the maximum reduction in U.S. federal income taxes that may be obtained from the deduction of such U.S. state and local taxes.  For purposes of determining the amount in clause (b)(i)(B) above, the applicable capital gains rate (including long-term or short-term) shall be determined by reference to the number of days beginning on the day immediately following the Award Date through and including the date on which the applicable payment is paid to the Participant.   Further, for purposes of clarification and for purposes of determining the amount of the Gross-Up Payment, the term "U.S. income taxes" shall not include any tax imposed by Code sections 1411 or 3101.

5. **Confidentiality**.  As a condition to the award, the Participant agrees to keep the existence and terms of this Award Agreement in the strictest confidence and not reveal this information to any persons other than the Participant's spouse or financial advisor.  Failure to comply with the confidentiality requirement will result in forfeiture of the Units hereunder.

6. **Non-Transferability of Units**.  This Award Agreement and the Units granted hereunder are personal to the Participant and are not transferable or assignable by the Participant.

7. **Incorporation of Plan**.  This Award Agreement shall be subject to and governed by the terms and conditions of the Plan.  In the event of any discrepancy or inconsistency between this Award Agreement and the Plan, the terms and conditions of the Plan shall control.

8. **Withholding Taxes**.  Participant shall, not later than the date as of which any payment hereunder or under the Plan becomes a taxable event for United States Federal income tax purposes, to the extent necessary, pay to the Company or make arrangements satisfactory to the Company for payment of any United States Federal and local taxes required by law to be withheld on account of such taxable event.  Participant acknowledges and agrees that the

Company has the right to deduct from all payments hereunder any taxes required by law to be withheld with respect to such payments.

       9.     **Additional Limitation**.  Anything in this Agreement or in the Plan to the contrary notwithstanding, in the event that any compensation, payment or distribution by the Company to or for the benefit of the Participant, whether paid or payable or distributed or distributable pursuant to the terms of the this Agreement, the Plan or otherwise (the "Parachute Payments"), would be subject to the excise tax imposed by Section 4999 of the Code, then (a) any amounts payable to the Participant under this Plan shall be reduced (but not below zero) to the extent necessary so that the maximum Parachute Payments shall not exceed the Threshold Amount (the "Reduction Amount") and (b) the Company shall use reasonable efforts to satisfy the shareholder approval requirements set forth in Q/A 7 of Treasury Regulations Section 1.280G-1 with respect to such Reduction Amount, and if such requirements are satisfied then such Reduction Amount shall become payable hereunder as if subsection (a) above had not applied thereto.  For purposes of this Section, "Threshold Amount" shall mean three times the Participant's "base amount" within the meaning of Section 280G(b)(3) of the Code and the regulations thereunder, less one dollar.

       10.     **Miscellaneous Provisions.**

         (a)     Change and Modifications.  This Award Agreement may not be orally changed, modified or terminated, nor shall any oral waiver of any of its terms be effective.  This Award Agreement may be changed, modified or terminated only by an agreement in writing signed by the Company and the Participant.

         (b)     Entire Agreement.  This Award Agreement together with the Plan (the terms of which are hereby incorporated by reference) are intended to be a final expression of the agreement between the Participant and the Company and are intended to be a complete and exclusive statement of the agreement and understanding between the Participant and the Company with respect to the subject matter contained herein.  There are no restrictions, promises, representations, warranties, covenants or undertakings relating to such subject matter other than those referred to herein and in the Plan.

         (c)     No Obligation to Continue Employment or Service.  Neither the Company, HJ nor any of their subsidiaries is obligated by or as a result of the Plan or this Award Agreement to continue the Participant in employment or other service and neither the Plan nor this Award Agreement shall interfere in any way with the right of the Company, HJ or any of their subsidiaries to terminate the employment or service of the Participant at any time.

         (d)     Governing Law.  This Award Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to principles of conflict of laws of such state.

         (e)     Headings.  The headings are intended only for convenience in finding the subject matter and do not constitute part of the text of this Award Agreement and shall not be considered in the interpretation of this Award Agreement.

DocuSign Envelope ID: 57130201-0F2B-4644-84A0-6B80BC0A32A4

    (f) <u>Saving Clause</u>.  If any provision(s) of this Award Agreement shall be determined to be illegal or unenforceable, such determination shall in no manner affect the legality or enforceability of any other provision hereof.

    (g) <u>Counterparts</u>.  This Award Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same document.

The foregoing Award Agreement is hereby accepted and the terms and conditions thereof hereby agreed to by the undersigned as of the date first above written.

VARSITY BRANDS HOLDING CO., INC.

By: *Burton Brillhart* (DocuSigned, F08156E00CB14B7...)

Name: Burton Brillhart
Title: Secretary

Address:

Varsity Brands Holding Co. Inc.
4625 West 62nd Street
Indianapolis, Indiana 46268

The foregoing Award Agreement is hereby accepted and the terms and conditions thereof hereby agreed to by the undersigned as of the date first above written.

PARTICIPANT:

*Marlene Cota* (DocuSigned, D834EAAB8DC5487...)

Name: Marlene Cota

Address:

███████████████████████████
███████████████

_____

_____

[SIGNATURE PAGE TO COTA TIME AWARD GRANT]