**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**
**MEMPHIS DIVISION**

| | | |
|---|---|---|
| **FUSION ELITE ALL STARS, et al.,** | § | **Case No. 2:20-cv-02600-SHL-cgc** |
| *Plaintiffs*, | § | |
| | § | **Judge Sheryl H. Lipman** |
| **v.** | § | |
| | § | **ORAL ARGUMENT REQUESTED** |
| **VARSITY BRANDS, LLC, et al.,** | § | |
| *Defendants.* | § | |

---

**NON-PARTY REBEL ATHLETIC'S MEMORANDUM IN SUPPORT OF MOTION TO
RECONSIDER REBEL'S MOTION FOR PROTECTION AND MOTION TO COMPEL
PRODUCTION OF THIRD PARTY DOCUMENTS**

---

TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

SUMMARY OF ARGUMENT .......................................................................................... 1

STANDARD FOR MOTION TO RECONSIDER ............................................................ 2

STATUS OF THE DOCUMENTS PRODUCED ............................................................. 3

DILIGENCE TO DISCOVER NEW EVIDENCE ........................................................... 4

BACKGROUND ................................................................................................................ 5

NEW EVIDENCE ............................................................................................................. 6

ARGUMENT ................................................................................................................... 11

   **I.**     **Rebel Has Met the Standard in Federal Rule 59 and Local Rule 7.3 ..................... 11**

   **II.**    **The Evidence Establishes That the Rebel Transactional Data is Not Necessary... 12**

   **III.**   **The New Evidence of Dr. Sherman's Declaration (Even with the Singer Unsworn Statement) Demonstrates the Rebel Transactional Data is Not Necessary for Fusion to Calculate Damages. ................................................................................................. 14**

   **IV.**   **It Would Constitute a Manifest Injustice to Ignore the New Evidence, Dr. Sherman's Declaration. ........................................................................................... 17**

   **V.**    **Rebel Should be Permitted to Argue New Law (Sixth Circuit) that is Controlling Following the Case's Transfer from Texas to Tennessee. ................................... 19**

CONCLUSION ................................................................................................................ 20

## TABLE OF AUTHORITIES

**Cases**

*Apotex Corp.*, 2017 WL 4230124, at *2 ..................................................................... 15

*Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 657 (6th Cir. 2005). ........................ 19

*Buell v. Security General Life Ins. Co.,* 987 F.2d 1467, 1472 (10th Cir. 1993), *cert. denied,* 510
   U.S. 916 (1993) ........................................................................................................... 2, 12

*Comprehensive Sec. v. Metro Gov't of Nashville & Davidson County*, 2022 Fed. App. 0102N,
   2022 U.S. App. LEXIS 6050, 2022 WL 670135, at *15-16 (6th Cir. 2022). ........................ 20

*FTC v. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 59, 2018 U.S. Dist. LEXIS 169049, *52,
   2018-2 Trade Cas. (CCH) P80,509, 2018 WL 4705816. ...................................................... 18

*GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999) .............................. 2

*Intera Corp. v. Henderson*, 428 F.3d 605, 620 (6th Cir. 2005) .................................................. 2, 13

*Novartis,* 2019 WL 5722055, at *2 ............................................................................................ 15

*R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010) ...................... 1, 19

*RGI, Inc. v. Unified Industries, Inc.,* 963 F.2d 658, 662 (4th Cir. 1992) ................................... 2, 12

*Roberts v. Galen of Virginia, Inc.*, 325 F.3d 776, 782 (6th Cir. 2003 ........................................ 20

*Russ v. International Paper Co.,* 943 F.2d 589, 593 (5th Cir. 1991) ............................................. 2

*Seegert v. Rexall Sundown, Inc.,* No. 17-cv-01243-JAH(JLB), 2019 WL 12044514, at *8 n.6
   (S.D. Cal. Mar. 26, 2019) .......................................................................................... 15

*United States v. Aluminum Co. of America (Alcoa)*, 148 F.2d 416, 424, 429 (2d Cir. 1945), ...... 20

**Statutes**

Fed. R. Civ. P. 59 ......................................................................................................... 1, 4

Fed. R. Civ. P. 37(c)(1) ................................................................................................... 22

## INTRODUCTION

Non-party Rebel Athletic Inc. ("Rebel") respectfully submits this Memorandum in Support of its Motion to Reconsider Rebel's Motion for Protection and Fusion's Motion to Compel Third Party Documents related to the third party subpoena served upon Rebel by Fusion Elite All Stars ("Fusion") and the Order Granting in Part Fusion's Motion to Compel Against Rebel ("the Order"), pursuant to Local Rule 7.3 and Federal Rule of Civil Procedure 59.

## SUMMARY OF ARGUMENT

Pursuant to Local Rule 7.3 (b)(1), (2) and Federal Rule of Civil Procedure 59, Rebel requests that the Court reconsider the issues raised in Rebel's Motion for Protection and in its briefing related to Fusion's Motion to Compel Third Party Documents for the following reasons:

(1) There are new material facts that did not exist and were not discovered by Rebel before the Order was issued. The Declaration of Joshua Sherman, Ph.D., establishes that the Rebel data is not necessary and explains the background and foundation of economic damage models and what an economic expert needs to use such a model. These new facts are presented in the Declaration of Joshua Sherman, Ph.D., which is attached hereto as Exhibit 2. Rebel did not begin to discover this new evidence until May 11, 2022, and did not have the final declaration of Dr. Sherman until June 14, 2022.

Rebel requests the Declaration of its economic expert, Joshua Sherman, Ph.D., be considered by this Court. The facts and understanding of the economic analysis that is necessary in this case were not known by Rebel in July 2021 when it submitted its Motion for Protection and Response to the Motion to Compel in the Northern District of Texas.

(2) The law cited by the Parties in the original briefing in the Northern District of Texas is not the law that was relied upon by the Court in its Order (following transfer of this case to the Western District of Tennessee). Rebel should be afforded the opportunity to brief these critical issues using the law that will be relied upon by the Court.

(3) A manifest injustice will occur if Rebel and its new Tennessee counsel are not afforded the opportunity to present arguments with the law of the new jurisdiction and the new facts that are now available and known. Rebel had to retain Tennessee counsel in light of the Order, and requests the Court take judicial notice of its arguments that were raised by Tennessee counsel on this matter (including Docs. 258 and 276). Manifest injustice will result if the new law and evidence attached to and included in this Motion are not

considered by this Court.  The Order was premised on a finding that Rebel's data was necessary for Fusion to calculate damages and assess market shares, and that is not accurate, based on the declaration of Dr. Sherman.

## STANDARD FOR MOTION TO RECONSIDER

A motion to reconsider may be granted if there is a clear error of law, newly discovered evidence, an intervening change in controlling law, or to prevent manifest injustice. *Intera Corp. v. Henderson*, 428 F.3d 605, 620 (6th Cir. 2005) (citing *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999)).   Evidence is "unavailable," so as to justify its late submission by way of a motion under Rule 59(e), only if it could not, in the exercise of reasonable diligence, have been submitted previously.  *See Buell v. Security General Life Ins. Co.,* 987 F.2d 1467, 1472 (10th Cir. 1993), *cert. denied,* 510 U.S. 916 (1993) ("When supplementing a Rule 59(e) motion with additional evidence, the movant must show either that the evidence is newly discovered [and] if the evidence was available at the time of the decision being challenged, that counsel made a diligent yet unsuccessful effort to discover the evidence"); *RGI, Inc. v. Unified Industries, Inc.,* 963 F.2d 658, 662 (4th Cir. 1992) (supplemental affidavit may be considered in support of Rule 59(e) motion only for justified reason); *Russ v. Int'l Paper Co.,* 943 F.2d 589, 593 (5th Cir. 1991) (consideration of supplemental evidence must be justified by showing of earlier unavailability).  In exercising its discretion to determine whether the new expert materials should be considered, the Court must strike a proper balance between the need to uphold the integrity of pretrial schedules and procedures, the need to uphold the finality of decisions made, and the need to render just decisions on the basis of all the pertinent facts.  This issue burdening a foreign non-party should also weigh into the fairness and exercise of justice.  That Rebel is a non-party that

has been forced to retain an expert to learn what is truly necessary to calculate damages should be given considerable weight.

## STATUS OF THE DOCUMENTS PRODUCED

The Order requires Rebel to produce documents responsive to Request Nos. 23, 24, 25, and 26 for All Star Apparel goods only for the period of January 1, 2013 to December 31, 2020. The new evidence (Dr. Sherman's Declaration) explains that Rebel's transactional data is not necessary and, instead, high level revenue data is the only information that could be deemed "necessary" for Fusion's expert to assess market shares.  In good faith, Rebel has produced the following high level revenue data pursuant to the Court's Order (Doc. 252):

**Request No. 23 –** Rebel has produced responsive documents including statements that demonstrate revenue for All Star Apparel for years 2018, 2019, and 2020 by quarter, by year, and in summary form.

**Request No. 24** – Rebel has not produced documents related to costs on a purchaser by purchaser basis for every single transaction in the eight year period.  As set forth in the new evidence—Dr. Sherman's declaration—this detailed transactional information is not necessary for Fusion to perform an economic analysis.  This information is highly confidential trade secret information. Further, this request will cause an undue burden on Rebel as a non-party, requiring Rebel's entire executive team to stop performing their business duties to search for and gather every transaction in its business for All Star for an eight year period, causing the harm of completely ceasing the business operations for Rebel.

**Request No. 25** – Rebel has not produced documents related to purchasers on a "granular basis," for every single transaction in the period of 2013-2020.  As set forth in the new evidence—Dr. Sherman's declaration— detailed transactional information is not necessary for Fusion to perform an economic model or analysis.  This request will require Rebel's entire executive team to stop performing their business duties to search for, gather, and review such data, causing the harm of completely ceasing the business operations for Rebel, a non-party.  Further, the name, contact information, and details of customers are not relevant to the financial data related to an economic analysis, and these are protected trade secrets.

**Request No. 26** – Rebel has not produced documents for every transaction or receipt for each purchaser over the eight year period of 2013 to 2020. As is the case for Request No. 25, the new evidence of Dr. Sherman's declaration sets forth that detailed transactional information is not necessary for Fusion to perform an economic analysis.  This request will require Rebel's entire

executive team to stop performing their business duties to search for, gather, and review such data, causing the harm of completely ceasing the business operations for Rebel, a non-party.  Further, the name, contact information, and details of customers are not relevant to the financial data related to an economic analysis, and these are protected trade secrets.

## DILIGENCE TO DISCOVER NEW EVIDENCE

Following issuance of the Court's Order on April 28, 2022, in which Rebel was ordered to produce "transactional data" based on a finding of necessity stemming from the unsworn statement of Fusion's expert, Dr. Singer, Rebel sought out information from an economist expert to verify the necessity of producing its highly confidential trade secrets.  Wilson Decl., July 27, 2022, attached as Exhibit 1 ("Wilson Decl.") ¶ 3.  Rebel contacted Charles River and Associates on or about May 8, 2022.  *Id.*  Rebel spoke to Joshua Sherman, Ph.D., on May 11, 2022, seeking to understand what is standard, required, and necessary to perform an economic damage model in an antitrust case. *Id.* at ¶ 4.

On or about May 11, 2022, Dr. Sherman explained that there were several methods for an economist to perform a damage model in an antitrust case, and none of those methods would require granular, transaction by transaction detail from a third party like Rebel.  *Id.* at ¶¶ 6, 8. Based on this new information, Rebel retained Dr. Sherman to assist in explaining to the Court that Rebel's transactional data was not, in fact, necessary for Fusion to perform an economic damage model.  *Id.* at ¶ 7.  May 11, 2022 was the first day that is new information was available to Rebel.  *Id.* at ¶ 8. Rebel has been diligent in pursuing and defending its rights under the law. *See id.* at ¶ 9. Rebel did not expect (nor is it reasonable for a non-party) to be forced to retain an economic expert to defend itself related to an overly broad third party subpoena. *See id.* at ¶ 10.

It was not until April 28, 2022 that Rebel first learned that the Court was relying on the Fusion expert's unsworn statement to support a finding that Rebel's highly confidential trade

secrets (the transactional data) was necessary and must be produced. *See id.* at ¶ 11. As soon as Rebel digested the Court's Order issued on April 28, 2022, it pursued counsel and advice from an expert economist. *See id.* at ¶ 12. When Rebel realized that it would have to retain an expert to defend itself, it immediately did that. *See id.* at ¶ 13. At no time prior to April 28, 2022 did Rebel anticipate that it would need to retain an expert to defend itself in proceedings related to a third party subpoena. *See id.* at ¶ 14. After being retained, Dr. Sherman required reasonable time to review the case materials, such that he could provide a declaration. As soon as he could practically do that, he did. Dr. Sherman's declaration was first available on June 14, 2022, when it was filed along with Rebel's Reply to its Rule 72 Objection. *See id.* at ¶ 15. The District Court declined to consider the Declaration of Dr. Sherman, and Rebel then filed this Motion for Reconsideration, requesting the Court consider this important evidence. *See id.* at ¶ 16.

## **BACKGROUND**

The legal dispute regarding the Rebel subpoena began in the Northern District of Texas. Rebel was represented by a Texas lawyer who briefed the issues based on Fifth Circuit and Texas law. The Parties were not provided any information by the Court in the Western District of Tennessee related to a submission date, nor were they afforded the opportunity to submit briefing citing the controlling law in the new district. Rebel acknowledges that "new law" has not been handed down since the Order was issued. However, the Order relied on different law than the Parties understood would apply when they filed their briefs in the Northern District of Texas. The Parties should be afforded the opportunity to brief the Court on applicable Sixth Circuit law, which was not addressed or cited in the Parties' briefing when the case was pending in the Northern District of Texas.

## NEW EVIDENCE

Joshua Sherman, Ph.D., was asked whether Rebel transactional data was necessary to prove damages and whether Rebel's transactional data was necessary to determine market shares of the All Star Apparel Market.  *See* Sherman Decl. at ¶ 10.  The Order states that "Varsity itself has produced transactional data, and Fusion Elite's comparative analyses necessary to prove damages require data of similar detail."  The Order also states, "[a]s Rebel implicitly concedes in their brief, data demonstrating that Rebel possesses a larger share of the Apparel market is highly relevant to Fusion Elite's claims that Varsity has managed to monopolize that market," adding, "[n]ot only does Rebel's transactional data allow Singer to perform his analyses of potential damages, but it could prove to be almost dispositive as to Fusion Elite's claim regarding the Apparel market."  *See* Order (Doc. 252) at pp. 18-19.

Dr. Sherman explains that there are multiple approaches to estimate prices related to the anticompetitive conduct.  *See* Sherman Decl. at ¶ 16.  The two most common approaches to evaluating damages involve the use of yardsticks and benchmarks;  the benchmark approach has been most commonly used.  *Id.*  The benchmark approach (also called "before-during or "before-during-after" or "during-after") evaluates prices only in the market at issue, comparing prices in the impact period to available prices before and/or after the alleged period of impact.  *Id.* at ¶ 17.

Dr. Sherman quotes Dr. Singer's statement, "My understanding is that Varsity has agreed to produce their own transactional data from 2011 through the present.  Varsity's transactional data allows [sic] me to determine the prices, quantities sold, revenues, and costs for each of its 160+ Apparel products over time–both during the period of the challenged conduct and in the relatively clean period before the challenged conduct when Varsity had less market power and market share.  This kind of data is critical for antitrust analysis, such as evaluating the impact of

Defendants' conduct on prices over time and to quantify the aggregate damages to the proposed Class of Gyms and parents." *Id*. at ¶18.

Dr. Sherman explains that is not clear from Dr. Singer's statement, using the Varsity data from 2011, why the before-during/ benchmark approach could not be implemented. *Id*. at ¶ 19. As set forth by Dr. Sherman, "Dr. Singer states that he can determine prices, quantities sold, revenues, and costs for each of Apparel's products both during 'the relatively clean period before the challenged conduct' as well as 'during the period of the challenged conduct.' This information will yield a reliable measure of an overcharge if supply and demand factors that are unrelated to the challenged conduct are properly accounted for." *Id*. at ¶ 19.  Further, in Dr. Sherman's professional experience, "variables such as defendants' cost data and publicly available data on market demand have served as controls." *Id*. at ¶¶ 19-20.

Dr. Sherman explains further:

> Given that the Class Period in this matter begins in May 2016, and given that Dr. Singer states that he can determine prices, quantities sold, revenues, and costs for each of Apparel's products both during 'the relatively clean period before the challenged conduct' as well as 'during the period of the challenged conduct,' there is no apparent reason to believe that Varsity data from January 2011 until December 2020 would not be sufficient for a 'before-during' analysis.  For example, in the matter In re: Urethane Antitrust Litigation, the plaintiffs' damages expert relied on a 'during-after' regression model that employed five years of data during the damages period and five years of data after the damages period, for a total of approximately 10 years, which is comparable to the time period for which I understand Varsity has produced its data.

*Id*. at ¶ 21.

Dr. Sherman explains further that while it may be "possible to use more than one approach to estimate damages, an ability to use the "before-during" approach would imply that Rebel's data are not necessary to prove damages." *Id*. at ¶ 22.  Dr. Sherman explains that based on Dr. Singer's statement, he has what is needed to perform a damages model without Rebel's data.

Dr. Sherman also addresses two additional possible econometric approaches for providing damages. Dr. Sherman assesses the statements by Dr. Singer and explains that Rebel's data is not necessary for Dr. Singer to perform a damages model using any of the three approaches. Dr. Sherman sets forth:

> Statements in Dr. Singer's declaration suggest he might rely on two alternative approaches to prove damages (in addition to, or instead of, the "before-during" approach). This section describes these alternative approaches, referred to as the 'yardstick' approach and the 'difference-in-differences' approach, and the subsequent section explains why it would be unnecessary or unsuitable to implement either approach using Rebel's data.

> First, Dr. Singer suggests he will prove damages by comparing Varsity's All Star apparel prices with Rebel's All Star apparel prices. Note that '[i]n a typical yardstick approach, one compares prices during the period in which the antitrust violation is believed to have had an effect (the 'impact period') to prices in other markets that are deemed to be reasonably comparable to the market at issue.'

> Second, Dr. Singer suggests he will prove damages by comparing changes in Varsity's apparel prices with changes in Rebel's apparel prices. Note that the 'difference-in-differences' approach 'compares the changes in the prices in the relevant market to the changes in the benchmark market.'

*Id*. at ¶¶ 23-25.

Dr. Sherman then explains what is required when implementing the "yardstick" or "differences-in-differences" approaches:

> When implementing the 'yardstick' or 'differences-in-differences' approaches, it is necessary to control for supply and demand factors affecting price that are unrelated to the alleged anticompetitive conduct, as I discussed when using a 'before-during' approach.

> As an example of the 'yardstick' approach, in order to estimate an overcharge resulting from anticompetitive conduct relating to a product that occurred in a particular geographic area, one could analyze contemporaneous prices of the same product in a different geographic area in which the alleged anticompetitive conduct did not occur, if one were able to successfully control for supply and demand factors affecting price that differed across the two geographic areas and that were unrelated to the alleged anticompetitive conduct.

> As an example of the 'difference-in-differences' approach, returning to the example in the previous paragraph, if data also exist during the alleged conduct period as well as before or after the alleged conduct period in both geographic areas, one can compare the change in prices for the product in the affected geographic area with the change in prices for the product in the unaffected geographic area.

*Id.* at ¶¶ 26-28.  Dr. Sherman further explains that the yardstick or differences-in-differences approaches require a competitive benchmark that was <u>not</u> affected by the challenged conduct.  Dr. Sherman points out that Dr. Singer acknowledged this:

> When applying the 'yardstick' or 'difference-in-differences' approach to prove damages, it is necessary to select a competitive benchmark that was not affected by the challenged conduct.  If benchmark prices were not impacted by the challenged conduct, one could use them to approximate what prices would have been but for the challenged conduct.  Dr. Singer agrees with this condition, stating '[i]f I determine that Rebel's prices were not affected by the alleged anticompetitive conduct, comparing Rebel's and Varsity's prices over time would allow Plaintiffs to assess whether changes in Varsity's Apparel prices were due to industry-wide changes (say, from increased raw material or shipping costs) or due to Varsity's alleged anticompetitive conduct.'

*Id.* at ¶ 29. Dr. Sherman then explains that Rebel's data is not necessary to prove damages:

> 30.    I explained in Section IV that despite not having Rebel's data, Plaintiffs would appear to have sufficient data from Varsity to implement the 'before-during' approach to prove damages, but it would be incorrect to implement the 'before-during' approach if it is not possible to properly control for supply and demand factors that impact prices differently before and during the period of the challenged conduct.  If this is the case, however, then the question is whether Rebel's prices are necessary and suitable for use as a competitive benchmark using a 'yardstick' approach or a 'difference-in-differences' approach.

> 31.    I explained in Section V that the 'yardstick' and 'difference-in-differences' approaches yield a reliable estimate of the overcharge only if the benchmark prices used are not affected by the challenged conduct.

> 32.    Dr. Singer implies that one cannot assume that Rebel's prices were 'uncontaminated' by the challenged conduct.  This is correct because the prices of Varsity and Rebel are potentially strategically interrelated.  Therefore, if one were to consider using Rebel's prices as a competitive benchmark, one would need to determine that Rebel's prices were not directly affected by the challenged conduct, as noted by Dr. Singer.

33.    This raises the question of how one would determine Rebel's prices but for the alleged conduct.  Notice that making this determination is analogous to the exercise required to determine Varsity's prices but for the alleged conduct.

34.    One could consider using Rebel's data to run a 'before-during' analysis of whether Rebel's prices were affected by the alleged anticompetitive conduct, all else equal.  But if this were possible, there would be no need for Rebel's data because it would follow that one could also apply the 'before-during' approach to Varsity's prices (precisely because Rebel is described as Varsity's 'rival' and 'principal competitor').  Instead, the same uncontrolled demand and supply factors that prevent application of the 'before-during' approach to Varsity's prices would render inappropriate the application of the 'before-during' approach to Rebel's prices.

35.    Alternatively, Dr. Singer might intend to use the 'yardstick' approach or 'difference-in-differences' approach to examine whether Rebel's prices are an appropriate competitive benchmark for Varsity's prices.  For example, he could implement these approaches by comparing Rebel's data with an alternative viable competitive benchmark outside of the alleged relevant market.

36.    But again, in this case, it would follow that the same competitive benchmark could also be used to assess whether Varsity's prices were elevated above competitive levels (precisely because Rebel is described as Varsity's 'rival' and 'principal competitor').

37.    Finally, suppose that one were to claim that 1) a 'before-during' analysis using Varsity's data is not feasible and 2) the only competitive benchmark that could be used for a 'yardstick' analysis or 'difference-in-differences' analysis is Rebel.  In such a case, it would be incorrect to run a 'yardstick' or 'difference-in-differences' analysis using Rebel because no competitive benchmark would exist to determine whether Rebel was affected by the alleged anticompetitive conduct.

38.    In sum, whether Dr. Singer plans to use a 'before-during,' 'yardstick,' or 'difference-in-differences' approach, Rebel's data would be unnecessary to prove damages or unsuitable to prove damages.

*Id.* at ¶¶ 30-38.

Dr. Sherman finally explains that Rebel's transaction data is not necessary to determine shares of the All Star Apparel Market.  The Order suggests that Rebel's transactional data will be very useful for purposes of determining market shares in the All Star Apparel Market, however, Rebel's transactional data is not *necessary* to establish market shares.  Instead, to determine market

shares, the only thing that is needed is total revenues of the All Star Apparel sold in the U.S. in the given time period. *Id.* at ¶¶ 39-41. Rebel's transaction-level data is unnecessary or unsuitable to prove damages. *See id.* at ¶ 41.

As set forth by Dr. Sherman, Rebel's transactional data is not necessary for Fusion's expert to calculate damages, no matter which of the three possible methods is employed. To the contrary, the only thing that would be needed from Rebel is overall revenue data to calculate market share. Rebel has produced the revenue data that could be necessary for Fusion's expert to perform the market share analysis.

## **ARGUMENT**

### I.   **Rebel Has Met the Standard in Federal Rule 59 and Local Rule 7.3.**

As set forth in the Declaration of Jessica Brown Wilson, at Exhibit 1, Rebel has been diligent in this matter. The declaration of Dr. Sherman contains new evidence that was not known to Rebel at the time the Order was issued or at the time Rebel submitted its briefing. *See Buell,* 987 F.3d at 834. A new expert declaration may be considered when justified. *RGI*, 963 F.2d at 662. It is reasonable and justified that Rebel did not discover and obtain Dr. Sherman's declaration until after the Order was entered. It is unusual that a non-party would be required to engage an expert to defend itself and protect itself from burdensome unnecessary production of its highly confidential trade secret information, but this is what Rebel has had to do. As soon as practicable, following the Order entered on April 28, 2022, Rebel took actions to retain its own expert regarding Fusion's damages calculations. Within two weeks, Rebel had discussed the issues with Dr. Joshua Sherman, who explained that Fusion Elite did not need Rebel's data to perform its damage calculations. Based on this new information, Rebel took swift action, retained Dr. Sherman, and

obtained his declaration – new evidence – which explains the most widely used methods to calculate damages and what an economist needs to perform those calculations.

Rule 59 was intended for situations just like the one at hand.  Rebel has established that it was diligent and that the new evidence is essential to the Court's fair and just disposition of the third party subpoena.  As a non-party, Rebel diligently pursued and defended its rights.  It filed a motion for protection and opposed the motion to compel production of documents pursuant to the third party subpoena.

Furthermore, there is an intervening change in controlling law. The case was originally pending in the Northern District of Texas, and it was briefed there, with the parties understanding the Fifth Circuit and Northern District of Texas law applied.  *See Intera Corp.*, 428 F.3d at 620. The case was transferred to the Western District of Tennessee, and the Order utilized law and cases that were not cited by the Parties.  This constitutes an intervening change in controlling law that therefore justifies the Court reconsidering its Order and entering a new Order based on the new law and evidence that has been presented by Rebel.

## II.  The Evidence Establishes That the Rebel Transactional Data is <u>Not</u> Necessary.

Dr. Sherman sets forth three recognized econometric models that Fusion's expert could utilize, and explains that with any of these methods, the Rebel transactional data is not necessary to conduct the analysis or calculate damages. *See* Sherman Decl., at ¶¶ 15-41.

Both Fusion and Dr. Singer neglected to inform this Court that there are other accepted methods to prove antitrust damages that would not require expansive, costly discovery from a non-party.  Fusion has not made clear why it cannot prove damages using a before-and-after approach

(also known as the "before-during" approach).  *See* Sherman Decl., at ¶¶ 15-22.  Dr. Sherman explains:

> Given that the Class Period in this matter begins in May 2016, and given that Dr. Singer states that he can determine prices, quantities sold, revenues, and costs for each of Apparel's products both during 'the relatively clean period before the challenged conduct' as well as 'during the period of challenged conduct,' there is no apparent reason to believe that Varsity data from January 2011 until December 2020 would not be sufficient for a 'before-during' analysis.  For example, in the matter *In re: Urethane Antitrust Litigation*, the plaintiffs' damages expert relied on a 'during-after' regression model that included five years of data during the damages period and five years of data after the damages period, for a total of approximately 10 years, which is comparable to the time period for which I understand Varsity has produced its data.  In principle, while it may be possible to use more than one approach to estimate damages, an ability to use the 'before-during' approach would imply that Rebel's data are not necessary to prove damages.

*Id.* at ¶¶ 21-22.  Dr. Sherman further explains, even if Fusion could use Rebel's data to run a "before-during" analysis for purposes of determining whether Rebel's prices could be used as a competitive benchmark for Varsity's prices, "there would be *no need* for Rebel's data because it would follow that one could also apply the 'before-during' approach to Varsity's prices."  *Id.* at ¶ 34 (emphasis added).

Equally important, Dr. Sherman observes that Dr. Singer appears to suggest that he might rely on two alternative approaches to prove damages in addition to or instead of the before-during approach.  *See id.* at ¶¶ 23-29.  Dr. Sherman observes that Fusion could utilize the "yardstick approach," or the "differences-in-differences" approach.  *See id.* at ¶¶ 23, 29.  According to Dr. Sherman, under these approaches, either Rebel's data would not be necessary, or it would not be suitable as a competitive benchmark.  For instance, if Dr. Singer uses the "yardstick" or "difference-in-differences" approach to determine whether Rebel's prices are an appropriate competitive benchmark, "it would follow that the same competitive benchmark could also be used

---

to assess whether Varsity's prices were elevated above competitive levels." *Id.* at ¶ 36. In sum, Dr. Sherman concludes that "whether Dr. Singer plans to use a 'before-during,' 'yardstick,' or 'difference-in-differences' approach, Rebel's data would be unnecessary to prove damages or unsuitable to prove damages." *Id.* at ¶ 38.

This new evidence, explaining the econometric models and what is entailed in performing such analyses, should be considered because it significantly affects whether the Rebel transactional data is necessary. The necessity of the data is fundamental in deciding whether to compel production of such data. Finally, the equities favor Rebel under the circumstances because it is a non-party. The Court should consider Dr. Sherman's declaration because this involves production of Rebel's highly confidential trade secrets to its competitor (Varsity) and its customer (Fusion).

### III. The New Evidence of Dr. Sherman's Declaration (Even with the Singer Unsworn Statement) Demonstrates the Rebel Transactional Data is Not Necessary for Fusion to Calculate Damages.

The Order relies heavily on Singer's unsworn expert statement to support a finding of necessity. However, nothing in that unsworn statement actually says that the Rebel data is necessary for Fusion to complete an econometric damages model. To the contrary, Dr. Singer's statement merely provides that Rebel's data may "aid" in its analysis, and states in conclusory fashion that data is the "lifeblood" of economic analysis. *See* Singer Decl., at ¶¶ 14, 15. From those generalized statements, the Order held:

> The undersigned finds that Fusion Elite has shown that Rebel's transactional data is both relevant and necessary. Fusion Elite's expert declares that 'it is common practice for Plaintiffs in large antitrust cases such as this one to subpoena and receive detailed transactional data from third parties to better inform their expert's economic analyses,' a statement supported by his CV and a review of the case law. (ECF No. 3-1 at 133); see Novartis, 2019 WL 5722055, at *2-3 (granting discovery of third party transactional data to allow for experts to conduct a 'before and after' pricing analysis); Seegert v. Rexall Sundown, Inc., No. 17-cv-01243-JAH(JLB),

2019 WL 12044514, at *8 n.6 (S.D. Cal. Mar. 26, 2019) (noting that plaintiffs had served multiple third party subpoenas searching for sales data in order to establish class damages); Apotex Corp., 2017 WL 4230124, at *2 (granting discovery of third party transactional data to determine effects of defendant's conduct on pricing). Varsity itself has produced transactional data, and Fusion Elite's comparative analyses, necessary to prove damages, require data of similar detail. As Singer notes, 'it would *not* be appropriate to receive aggregated or average data over the relevant periods' as this would harm "Plaintiffs' ability to accurately compare prices for like goods over time." (ECF No. 3-1 at 137.) In the next paragraph, Singer states the need clearly: 'Plaintiffs' economists' ability to develop an econometric model demonstrating Varsity's impact in the Apparel market depends in part on the availability of high quality, third party data that was uncontaminated by the challenged conduct.' (Id. at 6.)

*See* Order at pp. 17-18.

Dr. Singer's generalized statement that it "is common practice for Plaintiffs in large antitrust cases such as this one to subpoena and receive detailed transactional data from third parties to better inform their expert's economic analyses," does not establish necessity of Rebel's transactional data. Singer Decl., at ¶ 18. Likewise, Dr. Singer's statement that his "ability to develop an econometric model demonstrating Varsity's impact depends in part on high quality, third party data" does not say it depends on Rebel's transactional data. *Id.* at ¶ 20. Singer does not state that he must have Rebel's data. That is because Dr. Singer does not need Rebel's data to perform an econometric damages model. *See* Sherman Dec., at ¶ 39. No matter what econometric model Dr. Singer uses, the Rebel data is not necessary:

> [W]hether Dr. Singer plans to use a 'before-during,' 'yardstick,' or 'difference-in-differences' approach, Rebel's data would be unnecessary to prove damages or unsuitable to prove damages.

*See* Decl. Sherman at ¶ 38.

The Order also holds the Rebel data "could prove" dispositive as to Fusion's claim regarding the monopolization, focusing on Rebel's testimony that it holds more market share than

Varsity and finding that since Rebel admitted it holds more market share, then it should therefore

be required to produce transactional data:

> Rebel admits that they compete in the All Star Apparel market and describes
> Varsity as their 'most powerful competitor.' (ECF No. 8 at 9.) Rebel further states
> that they have had a 'greater share of that market than Varsity since at least 2019.'
> (Id. at 6.) As Rebel implicitly concedes in their brief, data demonstrating that Rebel
> possesses a larger share of the Apparel market is highly relevant to Fusion Elite's
> claims that Varsity has managed to monopolize that market. (ECF No. 7 at 15)
> (citing U.S. Dep't of Justice Guide/Report, Competition and Monopoly: Single-
> Firm Conduct Under Section 2 of the Sherman Act, 2008 WL 4606679 (2008)
> (noting that 'as a practical matter, a market share greater than fifty percent has been
> necessary for courts to find the existence of monopoly power.')). Not only does
> Rebel's transactional data allow Singer to perform his analyses of potential
> damages, but it **could prove** to be almost dispositive as to Fusion Elite's claim
> regarding the Apparel market.

Order at p. 19 (emphasis added).  This premise is flawed because granular, transactional data is

not required to prove monopolization power related to market share.  *See* Sherman Decl., at ¶¶ 39-

40.  It would be a manifest injustice and contrary to law and evidence to require Rebel to produce

such data.

Rebel's transactional data is simply not necessary for Fusion to calculate damages or

market share.  Fusion may want Rebel's transactional data, but desire does not equal necessity.

Dr. Singer admits that he has the data necessary to perform a before and after analysis (without

Rebel's data).  *See* Singer Decl., Doc. 3-1, p. 132 at ¶ 14 ("Varsity's transaction data allows [him]

to determine the prices, quantities sold, revenues, and costs for each of its 160+ Apparel products

over time—*both during the period of the challenged conduct and in the relatively clean period

before the challenged conduct when Varsity had less market power and market share*.") (emphasis

added).  That it may be ideal or desirable to use a separate econometric approach does not provide

a sufficient basis to impose an enormous burden on Rebel when either model is accepted.

The definition of necessity is "the quality or state of being necessary."  Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/necessity.  "Necessary" is defined as "absolutely needed: required." *See id*. https://www.merriam-webster.com/dictionary/necessary. Dr. Sherman's declaration, together with Dr. Singer's admission that he already has the data he needs to perform a damages calculation, establishes that Rebel's transactional data is not absolutely needed or required and is, thus, not a "necessity".

Finally, although the Order noted that Rebel's market share may be relevant to the underlying litigation, there is no evidence or law that granular data spanning eight years is necessary to calculate market shares.  A simple analysis does not, in any way, necessitate obtaining the underlying granular sales data from Rebel, which would come at an immense cost that is not proportional to the countervailing marginal benefit.  *Cf.  FTC v. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 59, 2018 U.S. Dist. LEXIS 169049, *52, 2018-2 Trade Cas. (CCH) P80,509, 2018 WL 4705816. The Sixth Circuit accepts circumstantial evidence to prove market share. A sworn declaration from a Rebel executive would suffice to provide what is needed related to market share. *See id.* Notably, nothing in the Singer affidavit speaks to the contrary.  Singer does not once state that he requires granular data to calculate market shares.  Thus, rather than take Singer's unsworn statement as the only evidence related to necessity, the Court should also consider Dr. Sherman's declaration, which establishes that Rebel's data is not needed to calculate damages or assess market shares.

### IV. It Would Constitute a Manifest Injustice to Ignore the New Evidence, Dr. Sherman's Declaration.

After issuance of the Order, Rebel has learned new facts that are important and essential to the outcome of these subpoena issues, namely, understanding how econometric analysis will be

performed by experts in this case.  Rebel retained Dr. Joshua Sherman to understand these issues, and Dr. Sherman's declaration provides the Court with material facts regarding how the economic damage model will be created in this case, and what is needed to perform such model.

The Order gives considerable weight to the unsworn Fusion expert statement, relying on the statement to support a finding of necessity.  Given that this issue is tantamount to Rebel and its business, and given the extreme burden and costs it potentially will incur, equities support that Rebel should be able to provide a responsive expert declaration and be entitled to what Rule 26(a) affords parties.  The Court would not permit Fusion to set forth an expert report or expert testimony without permitting Varsity to put forth a responsive expert report.  And in this instance, Rebel is asking for the same fair treatment in resolution of the subpoena issues.

While Dr. Singer's statement is not his official report, for Rebel, his statement is dispositive of these critical subpoena issues.  The general, conclusory statements should not be the sole basis for determination of this important issue.  The Sixth Circuit has held, "an expert opinion must 'set forth facts' and, in doing so, outline a line of reasoning arising from a logical foundation." *Brainard v. Am. Skandia Life Assur. Corp*., 432 F.3d 655, 657 (6th Cir. 2005).  The lack of reasoning describing why Rebel's transactional data is necessary to complete Fusion's damages model demonstrates the statement failed to meet the requirements of Rule 26(a).  *See R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010).

Under Rule 26(a), a "report must be complete such that opposing counsel is not forced to depose an expert in order to avoid an ambush at trial; and the report must be sufficiently complete so as to shorten or decrease the need for expert depositions and thus to conserve resources."  *Id*.  "Expert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions."  *Id*.  Fusion's expert statement failed to clear this hurdle.

Federal Rule of Civil Procedure 37(c)(1) states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Singer's statement fails to comply with Rule 26(a), and this Court should not consider it without affording Rebel an opportunity to respond with its own expert declaration. *See* Fed. R. Civ. P. 37(c)(1); *R.C. Olmstead*, 606 F.3d at 271-272 (citing *Roberts v. Galen of Virginia, Inc.*, 325 F.3d 776, 782 (6th Cir. 2003)).

## V. Rebel Should be Permitted to Argue New Law (Sixth Circuit) that is Controlling Following the Case's Transfer from Texas to Tennessee.

Rebel requests the Court permit it the opportunity to argue applicable Sixth Circuit Law.[1] The Order cited and relied on law that was not cited by either party. The Sixth Circuit recognizes two ways to prove monopoly power: (1) direct evidence showing exercise of control of prices; and (2) circumstantial evidence of monopoly by showing a high market share. *See Comprehensive Sec. v. Metro Gov't of Nashville & Davidson County*, 2022 Fed. App. 0102N, 2022 U.S. App. LEXIS 6050, 2022 WL 670135, *15-16 (6th Cir. 2022). "The second approach involves 'presenting circumstantial evidence of monopoly power by showing a high market share within a defined market.'" *Id.* "Under that approach, famously employed by Judge Learned Hand in the seminal case *United States v. Aluminum Co. of America (Alcoa)*, 148 F.2d 416, 424, 429 (2d Cir. 1945), courts rely on economic analysis that *estimates* market share." *Id.* Accordingly, there is no basis for a finding of necessity for Rebel to produce the transactional data to prove market share. Market share is widely recognized and can be proven with simple circumstantial evidence.

---

[11] As set forth above, Rebel was not afforded the opportunity to argue Sixth Circuit law because this case was briefed when the case was pending in the N.D. of Texas. Rebel requests the law set forth here and in Doc. 258 and 276 be considered by the Court, giving the intervening change of controlling law.

As Dr. Sherman explains, Rebel's revenue regarding All Star Apparel would be sufficient.  *See* Sherman Decl. at ¶¶ 39-40. The Court's Oder that Rebel, a non-party, produce data related to every sales transaction that it has ever completed since the inception of its business is unjust and not supported by the law or evidence.  This Court should consider the new law and factual information presented by Rebel to avoid a manifest injustice.

## <u>CONCLUSION</u>

For the reasons stated, Rebel respectfully requests the Court grant its motion to reconsider and issue a revised order compelling Rebel to only produce the high level revenue data that is necessary for Fusion and its expert to perform a market share assessment, responsive to Request No. 23.  Rebel requests that the Court grant its motion for protection as to the remaining three Requests for Production (Nos. 24, 25, and 26) that seek granular transactional data of every All Star sales transaction completed by Rebel in an eight year period because this information and data is not necessary, and for any other relief this Court deems necessary.

Dated: July 27, 2022

RESPECTFULLY SUBMITTED,

/s/ Elizabeth G. Hart
THE SWAFFORD LAW FIRM, PLLC
Thomas Anthony Swafford, BPR # 17578
Tara L. Swafford, BPR # 17577
Elizabeth G. Hart, BPR # 30070
321 Billingsly Court, Suite 19
Franklin, Tennessee 37067
Telephone: (615) 599-8406
Facsimile: (615) 807-2355
tony@swaffordlawfirm.com
tara@swaffordlawfirm.com
betsy@swaffordlawfirm.com

Jessica Renee Brown
FisherBroyles LLP
Texas State Bar No. 24048975
4514 Cole Avenue, Suite 600
Dallas, Texas 75206
Phone: 469.586.6861
Jessica.wilson@fisherbroyles.com

**ATTORNEYS FOR NON-PARTY
REBEL ATHLETIC INC.**

## CERTIFICATE OF SERVICE

I certify that on July 27, 2022, the foregoing document was served via the Court's Electronic Case Filing (ECF) and/or electronic mail on the following:

Lynette S. Byrd
OBERHEIDEN, P.C.
E-mail: lsb@federal-lawyer.com

Charles Barrett
Neal & Harwell, PLC
cbarrett@nealharwell.com

Eric L. Cramer
Mark R. Suter
BERGER MONTAGUE PC
hlmontague@bm.net
ecramer@bm.net
msuter@bm.net

*Attorneys for Plaintiffs*

Victoria Sims
CUNEO GILBERT & LADUCA, LLP
jonc@cuneolaw.com
kvandyc@cuneolaw.com
vicky@cuneolaw.com

Gregory S. Asciolla
Karin E. Garvey
Veronica Bosco
LABATON SUCHAROW LLP
gasciolla@labaton.com
kgarvey@labaton.com
vbosco@labaton.com

Adam S. Baldridge
Matthew S. Mulqueen
BAKER DONELSON BEARMANN
CALDWELL & BERKOWITZ
abaldridge@bakerdonelson.com
mmulqueen@bakerdonelson.com
*Attorneys for Varsity Defendants*

George S. Cary
Mark W. Nelson
Alexis Collins
Steven J. Kaiser
CLEARY GOTTILEB STEEN & HAMILTON LLP
gcary@cgsh.com
mnelson@cgsh.com
alcollins@cgsh.com
skaiser@cgsh.com

Grady M. Garrison
Nicole D. Berkowitz
BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, P.C.
ggarrison@bakerdonelson.com
nberkowitz@bakerdonelson.com

*Attorneys for U.S. All Star Federation, Inc.*

/s/      *Jessica Renee Brown*
Jessica Renee Brown