**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

|  |  |
|---|---|
| FUSION ELITE ALL STARS, et al., | |
| Plaintiffs, | |
| v. | Civ. Action No. 2:20-cv-02600 |
| VARSITY BRANDS, LLC, et al., | |
| Defendants. | |

**DIRECT PURCHASER PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR AN AWARD OF ATTORNEYS' FEES, FOR REIMBURSMENT OF EXPENSES, AND FOR SERVICE AWARDS FOR THE CLASS REPRESENTATIVES**

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ................................................................................ 1

II.    HISTORY OF THE LITIGATION ..................................................... 4

    A.     Complaints and Motions to Dismiss ...................................... 4

    B.     Fact Discovery ......................................................................... 5

    C.     Expert Discovery .................................................................... 6

    D.     Work Related to the Settlement .............................................. 7

    E.     Total Time and Expense ......................................................... 7

III.   THE REQUESTED ATTORNEYS' FEES ARE REASONABLE UNDER
      CONTROLLING LAW ...................................................................... 8

    A.     The Settlement Creates a Common Fund from Which Percentage-of-the-
          Fund Is the Appropriate Method for Awarding Attorneys' Fees ........... 9

    B.     Class Counsel's One-Third Fee Request Is Within the Range of Fees
          Awarded in Similar Cases ....................................................... 11

    C.     Sixth Circuit Factors Support the Fee Request ...................... 13

         1.     The Value of the Benefit Rendered to the Settlement Classes. ............... 13

         2.     Society's Stake in Rewarding Plaintiffs' Counsel's Work ...................... 15

         3.     The Contingency Fee Basis of Class Counsel's Work ............................ 16

         4.     The Lodestar Cross-Check ...................................................... 17

         5.     The Complexity of the Litigation ............................................ 19

         6.     The Quality of the Representation .......................................... 20

IV.    CLASS COUNSEL'S REQUEST FOR REIMBURSEMENT OF LITIGATION
      EXPENSES IS REASONABLE .......................................................... 21

V.     THE CLASS REPRESENTATIVES SHOULD RECEIVE SERVICE AWARDS ........ 23

VI.    CONCLUSION ................................................................................... 25

i

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Ballatore v. Comm'r of Soc. Sec.*,
    2015 WL 5830836 (E.D. Mich. Aug. 5, 2015)........................................................ 17

*Barnes v. City of Cincinnati*,
    401 F.3d 729 (6th Cir. 2005) ....................................................................... 18

*Bldg. Serv. Local 47 Cleaning Contractors Pension Plan v. Grandview Raceway*,
    46 F.3d 1392 (6th Cir. 1995) ....................................................................... 17

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980) .................................................................................... 10

*Brown v. Pro Football, Inc.*,
    839 F. Supp. 905 (D.D.C. 1993)................................................................. 22

*Daoust v. Maru Restaurant,.LLC*,
    2019 WL 2866490 (E.D. Mich. July 3, 2019)............................................. 12

*Fidel v. Farley*,
    534 F.3d 508 (6th Cir. 2008) ....................................................................... 12

*Fitzgerald v. P.L. Mktg., Inc.*,
    2020 WL 3621250 (W.D. Tenn. July 2, 2020)............................................ 12

*Gascho v. Glob. Fitness Holdings*, LLC,
    822 F.3d 269 (6th Cir. 2016) ................................................... 10, 13, 15, 17

*Gokare, P.C. v. Fed. Express Corp.*,
    2013 WL 12094887 (W.D. Tenn. Nov. 22, 2013)...................................... 12

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983) .................................................................................... 13

*Hosp. Auth. Of Metro. Gov't of Nashville v. Momenta Pharms., Inc.*,
    2020 WL 3053468 (M.D. Tenn. May 29, 2020) .................................. 11, 25

*In re Auto. Parts Antitrust Litig., Wire Harness & Occupant Safety Sys.*,
    2016 WL 8201516 (E.D. Mich. Dec. 28, 2016) ........................................ 12

*In re Brand Name Prescription Drugs Antitrust Litig.*,
    2000 WL 204112 (N.D. Ill. Feb. 10, 2000)............................................... 18

*In re Cardinal Health Inc. Sec. Litig.*,
    528 F. Supp. 2d 752 (S.D. Ohio 2007)........................................... 13, 16, 17

*In re Cardizem CD Antitrust Litig.*,
    218 F.R.D. 508 (E.D. Mich. 2003)........................................ 15, 19, 21, 25

*In re Cast Iron Soil Pipe and Fittings Antitrust Litig.*,
    2017 WL 11681193 (E.D. Tenn. May 26, 2017) ...................................... 11

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   2016 WL 3648478 (N.D. Cal July 7, 2016) ................................................................ 14

*In re Corel Corp., Inc. Secs. Litig.*,
   293 F. Supp. 2d 484 (E.D. Pa. 2003) ........................................................................ 14

*In re Delphi Corp. Sec., Derivative & "ERISA" Litig.*,
   248 F.R.D. 483 (E.D. Mich. 2008) ........................................................................... 21

*In re Linerboard Antitrust Litig.*,
   2004 WL 1221350 (E.D. Pa. June 2, 2004) ........................................................ 17, 24

*In re Lithium Ion Batteries Antitrust Litig.*,
   2020 WL 7264559 (N.D. Cal. Dec. 10, 2020) .......................................................... 14

*In re Marsh ERISA Litig.*,
   265 F.R.D. 128 (S.D.N.Y. 2010) ............................................................................. 17

*In re Packaged Ice Antitrust Litig.*,
   2011 WL 6209188 (E.D. Mich. Dec. 13, 2011) .................................................. 11, 19

*In re Polyurethane Foam Antitrust Litig.*,
   168 F. Supp. 3d 985 (N.D. Ohio 2016) .................................................................... 25

*In re Prandin Direct Purchaser Antitrust Litig.*,
   2015 WL 1396473 (E.D. Mich. Jan. 20, 2015) ................................................... 12, 19

*In re Puerto Rican Cabotage Antitrust Litig.*,
   815 F. Supp. 2d 448 (D.P.R. 2011) .......................................................................... 17

*In re Regions Morgan Keegan Sec., Derivative & ERISA Litig.*,
   2014 WL 12808031 (W.D. Tenn. Dec. 24, 2014) ..................................................... 17

*In re Se. Milk Antitrust Litig.*,
   2013 WL 2155387 (E.D. Tenn. May 17, 2013) ................................................... Passim

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
   2014 WL 2946459 (E.D. Tenn. June 30, 2014) ................................................... Passim

*In re Sonic Corp. Customer Data Sec. Breach Litig.*,
   2019 WL 3773737 (N.D. Ohio Aug. 12, 2019) ........................................................ 12

*In re Trans Union Corp. Priv. Litig.*,
   629 F.3d 741 (7th Cir. 2011) .................................................................................... 17

*In re UnumProvident Corp. Derivative Litig.*,
   2010 WL 289179 (E.D. Tenn. Jan. 20, 2010) .......................................................... 18

*In re: AT&T Corp. Sec. Litig.*,
   455 F.3d 160 (3d Cir. 2006) ..................................................................................... 14

*Johnson v. W2007 Grace Acquisition I, Inc.*,
   2015 WL 12001269 (W.D. Tenn. Dec. 4, 2015) ...................................................... 22

*Jones v. H&J Restaurants, LLC*,
   2020 WL 6877577 (W.D. Ky. Nov. 23, 2020) .......................................................... 12

*Lonardo v. Travelers Indemnity Co.*,
   706 F. Supp. 2d 766 (N.D. Ohio 2010) ................................................................. 23

*McHugh v. Olympia Entm't, Inc.*,
   37 Fed. Appx. 730 (6th Cir. 2002) ....................................................................... 18

*Mills v. Electric Auto-Lite Co.*,
   396 U.S. 375 (1970) .............................................................................................. 21

*Missouri v. Jenkins*,
   491 U.S. 274 (1989) .............................................................................................. 22

*New England Health Care Emps. Pension Fund v. Fruit of the Loom, Inc.*,
   234 F.R.D. 627 (W.D. Ky. 2006) .......................................................................... 12

*Ohio Pub. Int. Campaign v. Fisher Foods, Inc.*,
   546 F. Supp. 1 (N.D. Ohio 1982) ......................................................................... 13

*Pillsbury Co. v. Conboy*,
   459 U.S. 248 (1983) .............................................................................................. 15

*Ramey v. Cincinnati Enquirer, Inc.*,
   508 F.2d 1188 (6th Cir. 1974) ....................................................................... 13, 15

*Reiter v. Sonotone Corp.*,
   442 U.S. 330 (1979) .............................................................................................. 15

*Robles v. Comtrak Logistics, Inc.*,
   2022 WL 17672639 (W.D. Tenn. Dec. 14, 2022) ................................................. 23

*Ross v. Jack Rabbit Servs., LLC*,
   2016 WL 7320890 (W.D. Ky. Dec. 15, 2016) ....................................................... 23

*Walls v. J.P. Morgan Chase Bank, N.A.*,
   2016 WL 6078297 (W.D Ky. Oct. 14, 2016) ......................................................... 19


**Rules**

Rule 23(b)(3) of the Federal Rules of Civil Procedure .................................................. 1

Rule 23(h) of the Federal Rules of Civil Procedure ......................................... 8, 9, 21


**Other Authorities**

Manual for Complex Litigation Fourth §14.121 ........................................................ 11

## I.    INTRODUCTION

The claims of the provisionally certified Settlement Classes[1] of direct purchaser Gyms and Spectators against Defendants Varsity Brands, LLC, Varsity Spirit, LLC, and Varsity Spirit Fashion & Supplies, LLC (collectively, "Varsity") and U.S. All Star Federation, Inc. ("USASF") (Varsity and USASF together, "Defendants") have been settled for (a) aggregate cash payments totaling $43,500,000.00 (the "Settlement Fund") and (b) significant prospective relief that unwinds key conduct on the part of Defendants that Direct Purchaser Plaintiffs[2] ("DPPs") have challenged as anticompetitive in this case (together, the "Settlement"). Unlike the many civil antitrust cases that follow governmental investigations and prosecutions, this case emanated exclusively from Class Counsel's[3] own extensive, independent investigation into All Star Cheer.

---

[1] On April 25, 2023, the Court granted Direct Purchaser Plaintiffs' Motion for Preliminary Approval of Settlement, Provisional Certification of Proposed Settlement Classes, Approval of Notice Plan, and Approval of the Proposed Schedule for Completing the Settlement Process and Scheduling a Final Approval Hearing ("Preliminary Approval Order"). ECF No. 336. In its Order, the Court provisionally certified the following Classes under Rule 23(b)(3) of the Federal Rules of Civil Procedure:

**Gym Class**: All entities that paid registration or related fees and expenses directly to Varsity to participate in Varsity All Star Events from May 26, 2016 through March 15, 2023 (the "Class Period").

**Spectator Class**: All persons who paid entrance (admission) or other fees and expenses directly to Varsity to observe Varsity All Star Events during the Class Period.

Excluded from the Classes are Defendants, their parent companies, subsidiaries, affiliates, franchisees, officers, executives, and employees; any entity that is or has been partially or wholly owned by one or more Defendants or their respective subsidiaries; States and their subdivisions, agencies and instrumentalities; and any judicial officer presiding over this matter and his or her staff, except that officers of USASF who are not employees of any of Defendants, their parent companies, subsidiaries, affiliates, or franchisees shall not be excluded from the Classes.

[2] The Direct Purchaser Plaintiffs, also referred to as Class Representatives, are: Fusion Elite All Stars ("Fusion Elite"); Spirit Factor LLC d/b/a Fuel Athletics ("Spirit Factor"); Stars and Stripes Gymnastics Academy Inc. d/b/a Stars and Stripes Kids Activity Center ("Stars and Stripes"); Kathryn Anne Radek ("Radek"); Lauren Hayes ("Hayes"), and Janine Cherasaro ("Cherasaro").

[3] "Class Counsel" includes the three firms appointed as Co-Lead Class Counsel, Berger Montague PC, DiCello Levitt LLP, and Cuneo Gilbert & LaDuca, LLP (hereinafter, "Co-Lead

In zealously litigating this case from inception through the conclusion of fact and expert discovery (during a global pandemic) and ultimately to the achievement of the Settlement, Class Counsel committed substantial time and money with no guarantee of recovery. In fact, Class Counsel incurred a total of $1,690,929.43 in out-of-pocket expenses and $16,411,459.00 of attorney and other legal professional time at historical rates (collectively devoting a total of 24,600.95 hours to the matter). Joint Decl. ¶¶ 67-75. The $43.5 million recovery and significant prospective relief that commits Defendants to a range of reforms comes in a Section 2 monopolization case layered with risk from start to finish, beginning with Defendants' filing motions to dismiss the complaint. Class Counsel conducted extensive discovery, reviewing more than 1.5 million documents, taking 32 fact depositions, defending eight fact depositions, and exchanging four lengthy expert reports with depositions of each expert.

In the end, Co-Lead Class Counsel secured the Settlement only after lengthy negotiations, overseen by highly-respected mediators, with large and sophisticated Defendants represented by highly-experienced law firms. Settlement discussions initially commenced in January 2021 with a mediation before Hon. Layn Phillips, former U.S. District Court Judge, but did not conclude until more than two years later after a full-day mediation before Judge Phillips and his colleagues, and subsequent negotiations in the following weeks.

Since negotiating and executing a Memorandum of Understanding, Co-Lead Class Counsel negotiated and prepared the Settlement Agreement; drafted the preliminary approval

---

Class Counsel"), as well as the other firms representing the DPP Settlement Classes that assisted with the prosecution of this litigation. *See* Joint Declaration of Eric L. Cramer, Karin E. Garvey, and Victoria Sims in Support of Direct Purchaser Plaintiffs' Motion for An Award of Attorneys' Fees, for Reimbursement of Expenses, and Service Awards for the Class Representatives ("Joint Decl."), filed herewith.

motion, including supporting documents (*e.g.*, class notice and an allocation plan); and prepared a supplemental memorandum with declarations from all Class Representatives. Upon receiving preliminary approval from the Court on April 25, 2023, Co-Lead Class Counsel oversaw the timely implementation of the Court-approved notice plan, including the issuance of the long-form notice via first class mail, the establishment of the Settlement website (https://allstarcheerantitrustsettlement.com), and publication of Court approved summary notices. Co-Lead Class Counsel continue to expend time supervising the Settlement administration process, and Co-Lead Class Counsel anticipate spending many additional hours preparing for the September 26, 2023 Fairness Hearing and overseeing the processing of claims and distribution of Settlement funds to members of the Settlement Classes. Joint Decl. ¶ 71.

As discussed further below, the record supports Co-Lead Class Counsel's requests here. First, the request for a fee award of one-third of the $43.5 million Settlement Fund (plus interest)—*i.e.*, $14,500,000.00, plus interest accruing through the date the fee is paid to Class Counsel—is consistent with fee awards in other antitrust class actions in this Circuit. In fact, in an antitrust class action, where the fees are typically fully contingent and the result achieved brings excellent benefits to the classes, Class Counsel would normally be entitled to a substantial multiplier on their lodestars (hourly rates x hours billed). This Circuit has authorized multipliers in the range of 1.3 to 4.5. Although a significant multiplier would have been appropriate here, Class Counsel seek no multiplier here at all. In fact, the sought fee amounts to a more than 12% *discount* off of the collective lodestar in the case based on historical rates. *Id*. at ¶ 67. Second, the litigation expenses in the amount of $1,690,929.43, for which Class Counsel seek reimbursement, were reasonably necessary to advance the interests of the Settlement Classes and to obtain the favorable result. The vast majority of those expenses went to DPPs' two highly

3

regarded economic experts and their teams—without whose work and efforts these results would not have been possible. *Id*. at ¶ 73. Third, the Class Representatives were instrumental to the success of this litigation and deserve the requested service awards: $20,000 for each of the three Gym Class Representatives and $5,000 for each of the three Spectator Class Representatives (totaling $75,000).

Finally, the long-form class notice mailed to thousands of members of the Settlement Classes on or before May 25, 2023, as well as the Settlement website and publication notice, informed all members of the Settlement Classes that Co-Lead Class Counsel would seek these fees, expenses, and service awards. *Id*. at ¶ 50. Although the deadline to object to any aspect of the Settlement is August 3, 2023, at present not a single member of either Settlement Class has lodged an objection and only one Gym has sought to exclude itself. *Id*.

## II.    HISTORY OF THE LITIGATION

### A.    Complaints and Motions to Dismiss

Class Counsel initiated this action with the filing of a detailed complaint in the Northern District of California on May 26, 2020, and it was re-filed in this Court on August 13, 2020. *Id*. at ¶ 7. The action was filed only after Class Counsel expended substantial time, studying industry documents, conferring with industry consultants and economists, and performing extensive legal research to evaluate potential direct purchaser claims. *Id*. at ¶ 6.

After appointment of Interim Co-Lead Class Counsel,[4] DPPs filed a Consolidated Class Action Complaint on October 2, 2020 (ECF No. 56), which Defendants then moved to dismiss

---

[4] On September 18, 2020, the Court appointed Berger Montague PC, Labaton Sucharow LLP, and Cuneo Gilbert & LaDuca, LLP as Interim Co-Lead Class Counsel and Branstetter, Stranch & Jennings, PLLC as Interim Liaison Class Counsel for the proposed DPP Classes. ECF No. 37. On March 7, 2022, the Court granted DPPs' Motion to Amend the leadership appointment to

4

arguing, *inter alia*, that (a) the statute of limitations precludes consideration of a large portion of

the challenged conduct; (b) the relevant market was not national, as DPPs allege, but regional;

(c) the challenged acquisitions were procompetitive; (d) the loyalty programs that DPPs

challenge as anticompetitive purportedly involved discounts that benefitted Gyms; and (e)

Defendants acted independently and in procompetitive ways. ECF Nos. 83, 84. DPPs' opposition

to the motion to dismiss explained how the Consolidated Complaint plausibly alleged that: (a)

Varsity had monopoly power in the All Star Cheer Events Market; (b) Varsity obtained or

maintained that monopoly power through willful anticompetitive conduct; (c) Defendants'

anticompetitive conduct caused rising prices or lowering of output; and (d) Varsity and USASF

had conspired to maintain and enhance Varsity's monopoly power in the All Star Cheer Events.

The motion to dismiss was largely denied on August 26, 2021. ECF No. 141.[5]

### B.      Fact Discovery

Co-Lead Class Counsel negotiated a comprehensive protocol for electronically stored

information produced by all parties (ECF No. 72) and a Stipulated Protective Order governing

confidential information (ECF No. 77). At Co-Lead Class Counsel's urging, several months after

the start of discovery, the Court imposed a discovery coordination committee including Co-Lead

Class Counsel and counsel for two other plaintiff groups proceeding with similar antitrust claims

on behalf of different types of claimants against Defendants (and other parties). ECF Nos. 92-93.

Co-Lead Class Counsel drafted and served discovery requests on Defendants—109

requests for production on Varsity and 117 requests for production on USASF, and 15

---

substitute DiCello Levitt LLP for Labaton Sucharow LLP when the attorneys principally
working on the case switched law firms. ECF No. 206.

[5] Defendants also filed a motion to strike DPPs' class allegations, ECF No. 82, which the parties
fully briefed. The Court denied that Motion as moot, given the parties' Settlement. ECF No. 326.

interrogatories to Varsity and 16 interrogatories to USASF—and then participated in extensive meet-and-confers to negotiate the parameters of those requests, ultimately securing the production of 1,629,324 documents. Joint Decl. ¶¶ 19-20. Class Counsel also worked with the Class Representatives to identify, collect, review, and produce thousands of pages of documents, as well as transactional data, in response to Defendants' discovery requests. *Id.* at ¶¶ 27-32. In addition, Class Counsel prepared and served discovery requests on various non-parties, securing approximately 89,754 documents. *Id.* at ¶ 25. Class Counsel also created a database for reviewing and analyzing the produced documents. *Id.* at ¶ 20. Armed with this valuable information, Class Counsel then took, participated in, or defended 40 Plaintiff, Defendant, and non-party depositions of fact witnesses. *Id.* at ¶¶ 37-38. Class Counsel also filed multiple motions to compel and coordinate discovery and responded to motions for protective orders. *Id.* at ¶ 33.[6]

### C.     Expert Discovery

Given the importance of economic issues in this monopolization case, Co-Lead Class Counsel devoted substantial efforts to strategizing during discovery and briefing, including working with their primary retained economic expert, Hal J. Singer, Ph.D. (and consultants working with Dr. Singer), to assess whether economic analyses and common evidence would be capable of addressing (a) monopoly power, (b) substantial foreclosure, (c) common impact, (d) aggregate damages, and (e) anticompetitive effects. Additionally, Co-Lead Class Counsel worked with their other retained expert, sports economist Stefan Szymanski, Ph.D.

Subsequently, each side submitted lengthy reports from their experts (including opening and rebuttal reports from each of the DPPs' experts), and each of the four experts was deposed.

---

[6] *See, e.g.*, ECF Nos. 102, 105, 110, 126, 129, 154, 199 and 228; *Fusion Elite All Stars, et al. v. Rebel Athletic Inc.,* 2:21-mc-00028 (W.D. Tenn.), ECF No. 1.

*Id*. at ¶ 39. These pursuits would be critical to demonstrating liability, establishing the foundations for class certification, opposing Defendants' anticipated summary judgment and *Daubert* motions, preparing for a jury trial in this matter, and defending any judgment on appeal. DPPs' class certification motion was finalized and prepared for filing on the day the material terms of the Settlement were agreed upon.

### D.   Work Related to the Settlement

In addition to the litigation work described above, Co-Lead Class Counsel performed the following tasks on behalf of the DPP Classes in connection with the Settlement:

- Participated in a mediation before the Judge Phillips in January 2021 (*id*. at ¶ 44);

- Participated in a mediation before Judge Phillips on January 10, 2023 (*id*.);

- Negotiated in the weeks after the full-day mediation with the assistance of Miles N. Ruthberg, Esq. of Phillips ADR, resulting in an agreement-in-principle (*id*. at ¶ 45);

- Worked with defense counsel to prepare a Memorandum of Understanding (*id*.);

- Worked with defense counsel to prepare the Settlement Agreement (*id*. at ¶¶ 45-46);

- Selected and worked with a Settlement Administrator to establish a Settlement website for and to prepare notices to the Classes regarding the Settlement (*id*. at ¶ 49);

- Selected and worked with an escrow agent to prepare the necessary paperwork to facilitate and securely hold Settlement payments (*id*.); and

- Prepared DPPs' motion for preliminary approval and supporting papers regarding the Settlement, and presented that motion to the Court (*id*. ¶ 43).

### E.   Total Time and Expense

In total, Class Counsel devoted 24,600.95 hours and $16,411,459.00 in professional time to prosecute the claims on behalf of the Settlement Classes, all of which time and effort was advanced on a fully contingent basis with no guarantee of recovery. *Id*. at ¶ 4. The requested one-third fee award of $14.5 million (plus one-third of any accrued interest) is thus substantially less

than total hourly fees expended by counsel in prosecuting the action and represents a 0.88

multiplier (which is sometimes referred to as a "negative multiplier" or "deflator") over Class

Counsel's total hourly fees at historical rates (or "lodestar") for time expanded from inception

through June 9, 2023.[7]

     In connection with the prosecution of DPPs' claims, Class Counsel have paid

$1,690,929.43 for costs and expenses that were reasonable and necessary to the successful

prosecution of this action. *Id.* at ¶¶ 72-75. Generally, antitrust litigation is complex and requires

the involvement of economic and industry experts in connection with proving liability and

damages and, of course, demonstrating that class certification is appropriate. The instant case is

no exception. Class Counsel have worked with their experts, who have prepared multiple expert

reports and been deposed by Defendants' counsel. Other critical elements of Class Counsel's

efforts that have resulted in unreimbursed expenses include: the creation and maintenance of an

electronic document database; mediation; travel and lodging; court reporters and transcripts;

computerized legal research; and copying. *Id.*

## III.   THE REQUESTED ATTORNEYS' FEES ARE REASONABLE UNDER CONTROLLING LAW

     In its order preliminarily approving the Settlement, the Court approved the dissemination

of notice (by mail, email, and publication) to member of the Settlement Classes (the "Notice").

ECF No. 336. As required by Fed. R. Civ. P. 23(h), the Notice informs them that Co-Lead Class

---

[7] The effective multiplier will decrease as Class Counsel continue to work towards fully resolving this litigation, including seeking final approval, responding to inquiries from members of the Settlement Classes, and working with the Settlement Administrator on claims processing and distributing funds to members of the Settlement Classes. None of that time, or time spent on this fee motion, is reflected in the total lodestar amount of $16,411,459.00, and Class Counsel will not be seeking any additional fees from the Settlement Fund in connection with such future work.

Counsel expect to request attorneys' fees not to exceed one-third of the Settlement Fund,

reimbursement of litigation expenses, and service awards for each Class Representative. *See* ECF

No. 329-4, Notice (Question 19). The Notice also explains how member of the Settlement

Classes can object, by August 3, 2023, to Class Counsel's fee, expense, and service award

requests. *Id*. (Question 16). The Settlement Administrator disseminated the notices on or before

May 25, 2023. Joint Decl. ¶ 50. To date, zero objections are pending, and only one entity has

sought to be excluded. *Id*.[8] Consistent with the Notice, Class Counsel seek attorneys' fees in the

amount of one-third ($14,500,000.00) of the Settlement Fund (plus one-third of any accrued

interest) to be paid following Defendants' second payment (out of three) into the Settlement

escrow account.[9] Class Counsel have prosecuted this case for more than three years with zero

compensation and have achieved an excellent result. So that the allocation process can be done

once and efficiently, Co-Lead Class Counsel expect to be able to distribute the Settlement,

through the Settlement Administrator, to members of the Settlement Classes beginning in

December 2024, after Varsity's final payment. Nothing about Class Counsel being paid their full

fee at the end of 2023 will affect the distribution process to members of the Settlement Classes

and they will benefit from the prospective relief immediately after Settlement approval.

A.    **The Settlement Creates a Common Fund from Which Percentage-of-the-Fund Is the Appropriate Method for Awarding Attorneys' Fees**

Class Counsel's request for their fee to be set as a percentage of the Settlement Fund is

appropriate. Under Fed. R. Civ. P. 23(h), "[i]n a certified class action, the court may award

---

[8] After the applicable deadline passes and prior to the Fairness Hearing, Co-Lead Class Counsel will file a report with the Court regarding any objections that may be filed.

[9] Varsity agreed to pay $43,500,000.00 in three installments to create a Settlement Fund for the benefit of the Settlement Classes: (1) $2 million, which was paid within 30 days of preliminary approval; (2) $28 million, which shall be paid on or before December 1, 2023; (3) $13.5 million, which shall be paid on or before December 1, 2024. *See* ECF No 329-2, at § 26.

reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." As the Supreme Court recognized, "[A] lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). When awarding attorneys' fees in a class action, "a court must make sure that counsel is fairly compensated for the amount of work done as well as for the results achieved." *Gascho v. Glob. Fitness Holdings, LLC*, 822 F.3d 269, 298 (6th Cir. 2016) (internal quotation marks and citation omitted).

In the Sixth Circuit, courts may use either of two methods to calculate attorneys' fees: (1) the "lodestar" method (in which the court "multiplies the number of hours reasonably expended on the litigation by a reasonable hourly rate") or (2) the "percentage of the fund" method (in which the court "determines a percentage of the settlement to award to class counsel"). *Gascho*, 822 F.3d at 279 (internal quotation marks and citation omitted). Courts within the Circuit have recognized that the "trend in common fund cases has been toward use of the percentage method." *In re Skelaxin (Metaxalone) Antitrust Litig.*, 2014 WL 2946459, at *1 (E.D. Tenn. June 30, 2014) (internal quotation marks and citation omitted); *see also In re Se. Milk Antitrust Litig.*, 2013 WL 2155387, at *2 (E.D. Tenn. May 17, 2013) ("The percentage[-]of-the-fund method, however, clearly appears to have become the preferred method in common fund cases") (citation omitted)).

The advantages of the percentage-of-the-fund method are that it "more accurately reflects the results achieved" and that "it is easy to calculate; it establishes reasonable expectations on the part of plaintiffs' attorneys as to their expected recovery; and it encourages early settlement, which avoids protracted litigation." *Gascho*, 822 F.3d at 279 (internal quotation marks and citation omitted). This method directly "aligns the interests of the class and its counsel and provides a powerful incentive" to maximize recovery as efficiently as possible. *Se. Milk*, 2013

WL 2155387, at *2 (internal quotation marks and citation omitted). By contrast, "the lodestar method is difficult to apply, time-consuming to administer, inconsistent in result, and capable of manipulation" and "creates inherent incentive to prolong the litigation." *Se. Milk*, 2013 WL 2155387, at *2 (quoting Manual for Complex Litigation Fourth §14.121).

### B.      Class Counsel's One-Third Fee Request Is Within the Range of Fees Awarded in Similar Cases

Class Counsel's requested fee award is fair and reasonable under the percentage-of-the-fund approach.[10] Indeed, district courts in this Circuit have routinely found that an award of one-third of a common fund is within the range of reasonable percentage awards for antitrust class action settlements. *See, e.g.*, *Skelaxin*, 2014 WL 2946459, at *1 ("The Court finds that the requested counsel fee of one third [of the settlement recovery] is fair and reasonable and fully justified. The Court finds it is within the range of fees ordinarily awarded."); *Se. Milk*, 2013 WL 2155387, at *8 (awarding one-third fee from $158.6 million settlement). As shown in the following chart, recent antitrust class actions in this Circuit have awarded one-third of the common fund in attorneys' fees.

**Recent Sixth Circuit Antitrust Class Action Settlements
Awarding One-Third Attorneys' Fees**

| Case | Date | Settlement Amount |
|------|------|-------------------|
| *Hosp. Auth. of Metro. Gov't of Nashville v. Momenta Pharms., Inc.*, 2020 WL 3053468, at *2 (M.D. Tenn. May 29, 2020) | May 29, 2020 | $120 million |
| *In re Cast Iron Soil Pipe and Fittings Antitrust Litig.*, 2017 WL 11681193, at *1 (E.D. Tenn. May 26, 2017) | May 26, 2017 | $30 million |

---

[10] This percentage should be applied to the Settlement Fund before deducting unreimbursed expenses, service awards to the Class Representatives, and the costs of notice and Settlement administration. *See, e.g.*, *In re Packaged Ice Antitrust Litig.*, 2011 WL 6209188, at *17 (E.D. Mich. Dec. 13, 2011) ("The fee percentage is applied to the settlement fund before the separate award of litigation costs and expenses are deducted from the fund.").

| *In re Auto. Parts Antitrust Litig., Wire Harness & Occupant Safety Sys.*, 2016 WL 8201516, at *2 (E.D. Mich. Dec. 28, 2016) | Dec. 28, 2016 | $4.6 million |
|---|---|---|
| *In re Prandin Direct Purchaser Antitrust Litig.*, 2015 WL 1396473, at *4 (E.D. Mich. Jan. 20, 2015) | Jan. 20, 2015 | $19 million |
| *In re Skelaxin (Metaxalone) Antitrust Litig.*, 2014 WL 2946459, at *1 (E.D. Tenn. June 30, 2014) | June 30, 2014 | $73 million |
| *In re Se. Milk Antitrust Litig.*, 2013 WL 2155387, at **15-16 (E.D. Tenn. May 17, 2013) | May 17, 2013 | $158.6 million |
| *In re Foundry Resins Antitrust Litig.*, No. 04-md-1638, (S.D. Ohio Mar. 31, 2008) (ECF No. 247) | Mar. 31, 2008 | $14.1 million |

The requested award is also consistent with a wealth of authority from courts in the Sixth Circuit in non-antitrust class actions awarding fees of one-third of a common fund.[11]

Moreover, as set forth above, the relief afforded by the Settlement is not limited to the Settlement Fund. The Settlement's structural relief elements confer additional economic and practical benefits on the Settlement Classes. Co-Lead Class Counsel do not seek an upward

---

[11] *See, e.g.*, *Zaller v. Fred's Inc., et al.*, No. 2:19-cv-02415 (W.D. Tenn. July 6, 2022) (ECF No. 105) (Lipman, J.) (awarding one-third of the gross amount of the $7.25 million settlement fund as attorneys' fees); *Jones v. H&J Restaurants, LLC*, 2020 WL 6877577, at *5 (W.D. Ky. Nov. 23, 2020) ("[D]istrict courts in this Circuit have found a one-third fee award to be appropriate"); *Fitzgerald v. P.L. Mktg., Inc.*, 2020 WL 3621250, at *10 (W.D. Tenn. July 2, 2020) (awarding one-third of the gross amount of the settlement fund as attorneys' fees and finding that it "accords with general practice in common fund class action settlements"); *In re Sonic Corp. Customer Data Sec. Breach Litig.*, 2019 WL 3773737, at *11 (N.D. Ohio Aug. 12, 2019) (finding attorneys' fees of one-third of aggregate settlement amount was reasonable and "typical" in class actions in the Sixth Circuit); *Daoust v. Maru Restaurant, LLC*, 2019 WL 2866490, at *5 (E.D. Mich. July 3, 2019) (citation omitted) (finding class counsels' request for attorneys' fees of one-third of settlement fund was "fair and reasonable using the 'percentage-of-recovery' method, [and] consistent with the 'trend in this Circuit'"); *Gokare, P.C. v. Fed. Express Corp.*, 2013 WL 12094887, at *4 (W.D. Tenn. Nov. 22, 2013) (collecting cases in which courts in this Circuit have approved attorney's fee awards in common fund cases ranging from 30% to 33% of the total fund); *New England Health Care Emps. Pension Fund v. Fruit of the Loom, Inc.*, 234 F.R.D. 627, 635 (W.D. Ky. 2006) ("[A] one-third fee from a common fund case has been found to be typical by several courts[.]") (citations omitted), *aff'd*, *Fidel v. Farley*, 534 F.3d 508 (6th Cir. 2008).

adjustment of the percentage of the common fund beyond one-third but rather believe that the value of the nonmonetary relief should be considered as another indicator that the requested award is appropriate.

### C.     Sixth Circuit Factors Support the Fee Request

The Sixth Circuit has identified six factors to determine the reasonableness of a fee request: "(1) the value of the benefit rendered to the [the plaintiffs], (2) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others, (3) whether the services were undertaken on a contingent fee basis, (4) the value of the services on an hourly basis [*i.e.,* the lodestar cross-check], (5) the complexity of the litigation, and (6) the professional skill and standing of counsel involved on both sides." *Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188, 1196 (6th Cir. 1974). These factors have since become the standard Sixth Circuit metric for evaluating the reasonableness of attorneys' fee requests in class actions. *See Gascho*, 822 F.3d at 280 (applying same factors). Each of the *Ramey* factors supports the reasonableness of the requested fee award here.

### 1.     The Value of the Benefit Rendered to the Settlement Classes.

"District courts in this Circuit widely regard the first *Ramey* factor as the most important." *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 764 (S.D. Ohio 2007); *see also Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) (explaining that "the most critical factor is the degree of success obtained"). Class Counsel's efforts here obtained a sizeable recovery for the Classes of $43.5 million. This represents nearly 22% of the *maximum*, best-case, or nearly 25% of the lower end, aggregate recoverable single damages[12] estimated by DPPs' damages

---

[12] *See Ohio Pub. Int. Campaign v. Fisher Foods, Inc.,* 546 F. Supp. 1, 9 (N.D. Ohio 1982) ("Although the amount of proven damages would be trebled in the event that defendants were

expert. Joint Decl. ¶ 46.[13] Moreover, the relief is not limited to the Settlement Fund. The structural relief elements confer additional economic and practical benefits to the Settlement Classes. For instance, DPPs charged that Varsity's alleged control over, and alleged collusion with, USASF—including purportedly by controlling the majority of USASF's board and key committees and by paying USASF's top executives—facilitated Varsity's monopolization of the All Star Cheer Events Market. The Settlement would untangle the two organizations and allow for a truly independent governing body. Additionally, DPPs alleged that Varsity's loyalty programs were effectively exclusive deals because they required, according to DPPs, that Gyms devote virtually their entire All Star Cheer season to Varsity (*i.e.*, attending at least six Varsity Events) to receive discounts or rebates. The Settlement would bar Varsity from requiring "attendance at more than three All Star Events during a single regular season as a condition of receiving Varsity's lowest tier of rebates or discounts." ECF No. 329-2, at § 30(a)(2).

Notably, the Settlement Classes would have no recovery at all for the wrongs alleged in this action but for the efforts of Class Counsel. Unlike in some antitrust cases, the commencement of this action did not follow a government lawsuit or investigation with the Department of Justice narrowing complex issues through prior pleas, agreements, or lawsuits against Defendants.[14] This factor further supports the fee request.

---

judged liable therefor, the sufficiency of an antitrust settlement may properly be evaluated by comparison to possible single damages.").

[13] *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 3648478, at *7 & n.19 (N.D. Cal July 7, 2016) (approving settlement representing 20% of single damages and cited a survey of 71 settled antitrust cases which showed a weighted mean recovery of 19% of single damages); *see also In re Lithium Ion Batteries Antitrust Litig.*, 2020 WL 7264559, at **19-20, *23 (N.D. Cal. Dec. 10, 2020). (describing recovery of 11.7% of single damages as an "excellent" result); *In re Corel Corp., Inc. Secs. Litig.*, 293 F. Supp. 2d 484, 489-90, 498 (E.D. Pa. 2003) (one-third fee awarded from settlement fund comprising about 15% of single damages).

[14] *See In re: AT&T Corp. Sec. Litig.*, 455 F.3d 160, 173 (3d Cir. 2006) (that "class counsel was not aided by the efforts of any governmental group, and the entire value of the benefits accruing

## 2.       Society's Stake in Rewarding Plaintiffs' Counsel's Work.

The Supreme Court has long recognized that prosecution of private antitrust actions helps ensure compliance with the antitrust laws and performs an important societal function. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979).[15] The Sixth Circuit has likewise explained that "class actions . . . have value to society more broadly, both as deterrents to unlawful behavior—particularly when the individual injuries are too small to justify the time and expense of litigation—and as private law enforcement regimes that free public sector resources." *Gascho*, 822 F.3d at 287. As the court further explained in *Se. Milk*:

> Finally, failing to fully compensate class counsel for the excellent work done and the various substantial risks taken would undermine society's interest in the private litigation of antitrust cases. Society's interests are clearly furthered by the private prosecution of civil cases which further important public policy goals, such as vigorous competition by marketplace competitors.

2013 WL 2155387, at *5 (citing *Pillsbury Co. v. Conboy*, 459 U.S. 248, 262-63 (1983) ("This court has emphasized the importance of the private action as a means of furthering the policy goals of certain federal regulatory statutes, including the federal antitrust laws.")).

To obtain the "value to society" of these private rights of action, class counsel must be adequately compensated. *See Ramey*, 508 F.2d at 1196 (explaining that an important factor is "society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others"). The need for adequate compensation for achieving a settlement is heightened by the fact that attorneys for plaintiffs in these cases almost always work on contingent basis and therefore assume the risk of not being compensated at all. *See Se. Milk*,

---

to class members is properly attributable to the efforts of class counsel . . . strengthens the District Court's conclusion that the fee award was fair and reasonable").

[15] *See also In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 534 (E.D. Mich. 2003) ("Society also benefits from the prosecution and settlement of private antitrust litigation[.]").

2013 WL 2155387, at *5 ("Awards of substantial attorneys' fees in cases like this are necessary
to incentivize attorneys to shoulder the risk of nonpayment to expose violations of the law and to
achieve compensation for injured parties.").

That was the case here. Class Counsel have now worked more than three years, on a fully
contingent basis, spending a collective 24,600.95 hours on this case without any guarantee of
being compensated. This case was a massive undertaking, and the volume of work supporting the
requested fee is substantial. Moreover, this case is a paramount example of private enforcement
of the antitrust laws: there was no governmental action that this case followed. Class Counsel
and their clients conducted the investigation themselves and identified the social problem
themselves: an industry patronized by families allegedly monopolized by a single-actor
supported by its allegedly captured governing body. The case not only recovers cash to
compensate the members of the Settlement Classes for the overcharges they incurred but
achieves a significant, forward-looking benefit that unwinds the governing body from its alleged
control by Varsity and mitigates the allegedly exclusionary nature of Varsity's former
contracting practices. Society gains by compensating Class Counsel for the excellent results that
were achieved in this case, particularly considering the risks encountered in reaching them.

### 3.    The Contingency Fee Basis of Class Counsel's Work.

As noted above, Class Counsel undertook this case on a wholly contingent basis—with
no upfront retainer fees or allowance for expenses—and ran a substantial risk of no recovery
whatsoever. The contingent nature of Class Counsel's engagement incentivized counsel to both
achieve excellent results for the Classes and to do so as efficiently as possible. The risk of
receiving little or no recovery—which was magnified here because there was no preceding
governmental investigation or prosecution—is an important factor courts consider when
awarding attorneys' fees and "stands as a proxy for the risk that attorneys will not recover

compensation for the work they put into a case." *Cardinal*, 528 F. Supp. 2d at 766.[16] Indeed, "within the set of colorable legal claims, a higher risk of loss does argue for a higher fee." *In re Trans Union Corp. Priv. Litig.*, 629 F.3d 741, 746 (7th Cir. 2011); *see also Ballatore v. Comm'r of Soc. Sec.*, 2015 WL 5830836, at *5 (E.D. Mich. Aug. 5, 2015) ("[T]he contingent fee [] may be high because the risk of default (*i.e.*, losing the case) is high"). Since 2020, Class Counsel have undertaken significant financial risks in prosecuting this case. Co-Lead Class Counsel ultimately obtained the Settlement, but Defendants spared no effort in challenging DPPs' allegations from the initial complaints all the way through completion of fact and expert discovery.

### 4.   The Lodestar Cross-Check.

Courts often supplement their analysis of the percentage-of-fund method with the lodestar cross-check. *See In re Regions Morgan Keegan Sec., Derivative & ERISA Litig.*, 2014 WL 12808031, at *5 (W.D. Tenn. Dec. 24, 2014). "To determine the lodestar figure, the court multiplies the number of hours 'reasonably expended' on the litigation by a 'reasonable hourly rate.'" *Gascho*, 822 F.3d at 279 (quoting *Bldg. Serv. Local 47 Cleaning Contractors Pension Plan v. Grandview Raceway*, 46 F.3d 1392, 1401 (6th Cir. 1995)). "Unlike the situation when the Court employs the lodestar method in full, the hours documented by counsel need not be exhaustively scrutinized by the district court where a lodestar cross-check is used." *Se. Milk*, 2013 WL 2155387, at *2 n.3 (internal quotation marks and citation omitted).

---

[16] *See, e.g.*, *In re Puerto Rican Cabotage Antitrust Litig.*, 815 F. Supp. 2d 448, 460-61 (D.P.R. 2011) (noting that preceding DOJ investigation and FBI raids mitigated counsel's risk); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 147 (S.D.N.Y. 2010) ("Risk is not uniform in all class actions" and for "certain antitrust class actions filed in the wake of a Department of Justice consent decree . . . . the risk is limited."); *In re Linerboard Antitrust Litig.*, 2004 WL 1221350, at *11 (E.D. Pa. June 2, 2004) (recognizing there is a greater risk of nonpayment where an antitrust class action "did not benefit from the fruits of a prior government investigation").

A lodestar cross-check here easily supports the requested fee. Despite the complexities, risks, and challenges posed by this litigation, Class Counsel invested 24,600.95 hours of attorney and other professional time on behalf of the Classes through June 9, 2023. Joint Decl. ¶ 4. Class Counsel's work was non-duplicative and performed at the direction of Co-Lead Class Counsel, who also audited and confirmed the validity of Class Counsel's time and expense submissions and removed unapproved hours and expenses where appropriate. *Id*. at ¶ 57.[17]

The historical hourly rates charged by Class Counsel are reasonable, based on each person's position, experience level, and location, and have been approved by multiple courts in similar antitrust class actions. *Id*.[18] These rates are comparable to the rates charged by other law firms with similar experience, expertise, and reputation, for similar services in the nation's leading legal markets.[19] Based on Class Counsel's lodestar of $16,411,459.00, one-third of the

---

[17] Co-Lead Class Counsel made every effort to work the case efficiently and, in Co-Lead Class Counsel's considerable experience, the total reported lodestar is reasonable for a multi-defendant case of this nature. *See, e.g., Se. Milk*, 2013 WL 2155387, at *5, 7 (lodestar over $53 million after five years of litigation); *In re Brand Name Prescription Drugs Antitrust Litig.*, 2000 WL 204112, at *3 (N.D. Ill. Feb. 10, 2000) (lodestar of $84 million after approximately six years of litigation).

[18] To be conservative, Co-Lead Class Counsel elected to use lower, historical rates even though cases in the Sixth Circuit have deemed it appropriate to use current rates to account for the risk and delay in payment. *See In re UnumProvident Corp. Derivative Litig.*, 2010 WL 289179, at *6 (E.D. Tenn. Jan. 20, 2010) (using the current billing rate is appropriate to "compensate for the delay in payment during the pendency of the litigation") (citing *Barnes v. City of Cincinnati*, 401 F.3d 729, 745 (6th Cir. 2005)).

[19] In a complex litigation, reasonable hourly rates may be determined with reference "to national markets, an area of specialization, or any other market [the court] believe[s] is appropriate to fairly compensate attorneys in individual cases." *McHugh v. Olympia Entm't, Inc.*, 37 Fed. Appx. 730, 740 (6th Cir. 2002) ("A court's choice not to apply local market rates for attorney fees is not an abuse of discretion."); *see also UnumProvident*, 2010 WL 289179, at *6 (approving rates charged by out-of-town counsel where the case involved complex questions of law and defendants were represented by "large New York firms"). The hourly rates charged by Class Counsel in this case are reasonable and appropriate for complex, antitrust litigation. Joint Decl. ¶ 57. Class Counsel's rates also likely compare favorably with those of Varsity's lead counsel, global law firm Cleary Gottlieb Steen & Hamilton LLP based in Washington, DC. *See In re: Canadian Nortel Debtors,* 1:09-BK-10138, Dkt. 18931 (Bnkr. D. Del.) (listing hourly rates

Settlement Fund would result in a fee award of $14,500,000 (plus interest), which would be a multiplier of 0.88. Consideration of the lodestar cross-check confirms the reasonableness of the requested fee. Typically, courts award multipliers on lodestars in contingent fee cases ranging from 1.3 to 4.0.[20] Here, Class Counsel are not only foregoing a multiplier but are seeking to be paid an amount lower than their collective historical lodestar despite the monetary and prospective relief achieved in the Settlement.[21]

### 5. The Complexity of the Litigation.

Courts in this Circuit have recognized that "[a]ntitrust class actions are inherently complex." *Cardizem*, 218 F.R.D. at 533.[22] This case is no exception. It did not follow investigations and prosecutions by any governmental entity. Rather, this case came exclusively from Co-Lead Class Counsel's own independent investigation. And DPPs' liability theories challenged core principles of Defendants' business models, presenting complex issues of antitrust law that would have to be proved under the Section 2 framework.

---

for Cleary Gottlieb in bankruptcy matter as $1,535 per hour for work performed by a partner with 26 years of experience, $1,185 per hour for work performed by a counsel with 23 years of experience, and $890 per hour for work performed by an associate with three years of experience, for the period of November 1, 2021 through December 9, 2021).

[20] *See, e.g.*, *Se. Milk*, 2013 WL 2155387, at *4 (using a lodestar crosscheck and finding that a multiplier of 1.90 was "clearly within, but in the bottom half of, the range of typical lodestar multipliers"); *Cardizem*, 218 F.R.D. at 533 (noting that direct purchaser class plaintiffs received a 30% fee award that equated to lodestar multiplier of 3.7); *In re Prandin Direct Purchaser Antitrust Litig.*, 2015 WL 1396473, at *4 (awarding 3.01 multiplier); *Skelaxin*, 2014 WL 2946459, at *2 (awarding one-third of the common fund which equated to a lodestar multiplier up to 2.5).

[21] Sixth Circuit courts have recognized that negative lodestar multipliers, such as the one here, are plainly reasonable. *See, e.g.*, *Walls v. J.P. Morgan Chase Bank, N.A.*, 2016 WL 6078297, at *6 (W.D Ky. Oct. 14, 2016) (finding that the lodestar cross-check resulting in a 0.83 multiplier "indicates that the fee award sought by Class Counsel is reasonable").

[22] *See also Packaged Ice*, 2011 WL 6209188, at *19 ("This antitrust litigation, like all litigation of its species, promises to be extremely complex and time intensive and there is no question that if settlement fails, the Defendants will mount a strong defense.").

Class Counsel bore the following risks, among others: (a) that some or all of the matter would be dismissed via a Rule 12(b)(6) motion; (b) that a large portion of the challenged conduct would be barred by the statute of limitations; (c) the difficulties of demonstrating that the relevant market was national, and not regional, as Defendants asserted; (d) that the loyalty programs that DPPs challenge as anticompetitive purportedly involved discounts that benefitted Gyms; and (e) that Varsity and USASF acted independently and in procompetitive ways, as Defendants asserted.

Significantly, at the time of Settlement, DPPs had not passed the class certification threshold (DPPs' class certification motion was finalized and prepared for filing on the day the material terms of the Settlement were agreed upon). Although Co-Lead Class Counsel believe that the strength of their experts' reports and depositions is one factor that led to the excellent monetary and nonmonetary relief obtained by the Settlement, they understood from experience that class certification is never certain and that if the Court had denied it, the likelihood of obtaining significant monetary or structural relief would vastly decrease.

### 6. The Quality of the Representation.

On each and every issue raised by Defendants—from the motion to dismiss stage, to major discovery disputes, to expert discovery—Co-Lead Class Counsel argued their case professionally and effectively. Co-Lead Class Counsel also attempted to minimize the number of disputes requiring Court involvement by meeting and conferring exhaustively (and typically productively) with defense counsel. Co-Lead Class Counsel respectfully submit that their representation has been vigorous, efficient, and effective, and that the facts, arguments, and credibility they developed throughout the litigation were key to achieving the Settlement. The

creation of the $43.5 million Settlement Fund and significant prospective relief is a testament to the quality of the work.[23]

## IV.   CLASS COUNSEL'S REQUEST FOR REIMBURSEMENT OF LITIGATION EXPENSES IS REASONABLE

Class Counsel's request for reimbursement of their expenses is reasonable and appropriate. Under the common fund doctrine, class counsel customarily is entitled to reimbursement of reasonable expenses incurred in the litigation. Fed. R. Civ. P. 23(h); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 392 (1970) (recognizing the right to reimbursement of expenses where a common fund has been produced or preserved for the benefit of a class); *see also Se. Milk*, 2013 WL 2155387, at *8 ("[e]xpense awards are customary" in common fund cases) (internal citation omitted).[24] "In determining whether the requested expenses are compensable in this common fund, the Court has considered whether the particular costs are the type routinely billed by attorneys to paying clients in similar cases." *Cardizem*, 218 F.R.D. at 535.[25]

---

[23] Further, courts often evaluate the quality of the work performed by class counsel in light of the quality of the opposition's representation. *See, e.g.*, *In re Delphi Corp. Sec., Derivative & "ERISA" Litig.*, 248 F.R.D. 483, 504 (E.D. Mich. 2008) ("The ability of Co-Lead Counsel to negotiate a favorable settlement in the face of formidable legal opposition further evidences the reasonableness of the fee award requested."). Here, Defendants were represented by highly-skilled and experienced antitrust litigators from some of the leading defense law firms. It was in the face of such skilled and vigorous opposition that Co-Lead Class Counsel obtained the benefits for the Classes that they did. This weighs in favor of the requested fee award.

[24] *Cardizem*, 218 F.R.D. at 535 (E.D. Mich. 2003) ("[C]lass counsel is entitled to reimbursement of all reasonable out-of-pocket litigation expenses and costs in the prosecution of claims and in obtaining settlement, including expenses incurred in connection with document productions, consulting with experts and consultants, travel and other litigation-related expenses.").

[25] *See also Delphi*, 248 F.R.D. at 504-05 (approving reimbursement of $1.3 million in costs and expenses for "such items as accounting and damages expert and consultant fees, management and photocopying of documents, on-line research, messenger service, postage, express mail and overnight delivery, long distance and facsimile expenses, transportation, meals, travel and other incidental expenses directly related to the prosecution of this action").

A large component of the expenses here is fees paid to experts and consultants who were instrumental in, among other things, preparing expert reports for class certification and to establish the Classes' damages—which, Co-Lead Class Counsel believe, ultimately led to this favorable Settlement. Joint Decl. ¶¶ 39, 73-74. Other expenses include costs relating to mediation; travel in connection with this litigation for depositions and meetings with potential witnesses and consultants; data/document hosting; court reporters; and computerized legal research.[26] *Id*. at ¶¶ 72-75. All expenses are reasonable and were necessarily incurred in obtaining this result for the Classes. *See Johnson v. W2007 Grace Acquisition I, Inc.*, 2015 WL 12001269, at *14 (W.D. Tenn. Dec. 4, 2015) (awarding expenses in class action for "research costs, expert fees, and administrative costs").

In the Notice, Co-Lead Class Counsel advised that they would seek repayment of such litigation expenses not to exceed $2,250,000. Class Counsel's expenses total $1,690,929.43 and consist of the following three categories of expenses: (1) expenses incurred individually by each firm; (2) expenses paid by the common Litigation Fund; and (3) invoiced but as-yet unpaid amounts relating to expert and consultant costs, database expenses, and class notice as directed by the Court. Joint Decl. ¶¶ 72-75. Class Counsel have paid expenses to date—individually and into the common Litigation Fund—totaling $1,405,613.35. *Id*. at ¶¶ 72-73. Outstanding invoices not yet paid are $284,341.08. *Id*. at ¶ 74. Expenses in each of these categories are described in detail in the Joint Declaration and its exhibits. Accordingly, DPPs respectfully request that the Court approve these expenses in their total amount of $1,690,929.43.  The Court-appointed

---

[26] *See Brown v. Pro Football, Inc*., 839 F. Supp. 905, 916 (D.D.C. 1993) (for the proposition that "[p]laintiffs' out-of-pocket costs for telephone, telecopier, air and local couriers, postage, photocopying, WESTLAW research, secretarial overtime, and counsels' travel expenses are routinely billed to fee-paying clients, and thus are all compensable as part of a reasonable attorney's fee") (citing *Missouri v. Jenkins*, 491 U.S. 274, 285 (1989)).

Settlement Administrator (Angeion Group) (ECF 336 at 19, ¶7) estimates that the costs for the notice plan and the claims administration process will be approximately $433,985. A request for those expenses to be paid from the Settlement Fund will be submitted. Joint Decl. ¶ 77.

## V.      THE CLASS REPRESENTATIVES SHOULD RECEIVE SERVICE AWARDS

Co-Lead Class Counsel also request approval for service awards to be paid from the Settlement Fund totaling $75,000, with the three Gym Class Representatives[27] each to receive $20,000 and the three Spectator Class Representatives[28] each to receive $5,000. Courts in the Sixth Circuit recognize that "in common fund cases . . . class representatives who have had extensive involvement in a class action litigation deserve compensation above and beyond amounts to which they are entitled to by virtue of class membership alone." *Lonardo v. Travelers Indemnity Co.*, 706 F. Supp. 2d 766, 787 (N.D. Ohio 2010).

The Sixth Circuit has not laid out a general framework under which a proposed service award should be assessed, but district courts in this Circuit have considered three factors when considering a request: (1) actions taken by Class Representatives to protect the interests of Class members and others and whether these actions resulted in substantial benefit to Class members; (2) whether the Class Representatives assumed substantial direct and indirect financial risk; and (3) the amount of time and effort spent by the Class Representatives in pursing the litigation. *See Robles v. Comtrak Logistics, Inc.*, 2022 WL 17672639, at *12 (W.D. Tenn. Dec. 14, 2022) (citing *Ross v. Jack Rabbit Servs., LLC*, 2016 WL 7320890, at *5 (W.D. Ky. Dec. 15, 2016)).

---

[27] Fusion Elite All Stars ("Fusion Elite"); Spirit Factor LLC d/b/a Fuel Athletics ("Fuel"); Stars and Stripes Gymnastics Academy Inc. d/b/a Stars and Stripes Kids Activity Center ("Stars and Stripes").

[28] Kathryn Anne Radek; Lauren Hayes; and Janine Cherasaro.

As set forth in the Supplemental Memorandum of Law in Support of DPPs' Unopposed Motion for Preliminary Approval, *see* ECF No. 333, and incorporated here, all three factors weigh in favor of the requested service fee awards. *First*, the Class Representatives were key in ensuring that this case came to fruition as they, not a government agency, helped initiate this case.[29] Put simply, this case would not exist without the Class Representatives, all of whom spent significant time assisting this case. By stepping forward and diligently performing their duties as Class Representatives, they have performed a valuable public service that will benefit thousands of All Star Cheer gyms and tens of thousands of All Star Cheer Event spectators.

*Second*, the Class Representatives assumed direct and indirect financial risk by being named plaintiffs in a lawsuit in the public record and risking potential retaliation for their participation. The Gym Class Representatives spent considerable time—Fusion Elite spent at least 70 hours, Fuel spent at least 115 hours, and Stars and Stripes spent at least 120 hours—pursuing this litigation, time that otherwise would have been spent running their businesses. ECF Nos. 333-2, 333-3, and 333-4. The three Spectator Class Representatives each spent more than 40 hours advancing this litigation on behalf of the Spectator Class. ECF Nos. 333-5, 333-6, and 333-7.[30]

---

[29] *See In re Linerboard*, 2004 WL 1221350, at *18 (noting that service awards were "particularly appropriate in this case because there was no preceding governmental action alleging a conspiracy").

[30] The Class Representatives perceived a risk of retaliation by filing and litigating this case. *See*, *e.g.*, ECF Nos. 333-2 (Fusion Elite), ¶ 3 ("I was concerned about possible retaliatory treatment of Fusion Elite at All Star Events . . . as a result of its participation in this lawsuit. I was also concerned about having the gym's All Star Teams penalized in scoring at All Star Events. This would have affected the gym's ability to maintain its All Star Teams, and operate a successful All Star Cheer business"); 333-6 (Hayes), ¶ 3 ("I was concerned that the close relationship between the owner of World Cup All Stars and Varsity … could result in my daughter not making a team or not being placed in as good a role in routines as she deserves").

*Third*, as set forth in their previously filed declarations, the Class Representatives: (1) responded to written discovery and collected, reviewed, and produced documents and data relating to their claims; (2) prepared and sat for lengthy depositions by defense counsel; (3) reviewed and approved the original and consolidated complaints and other substantive pleadings; and (4) considered and approved the Settlement. ECF Nos. 333-2, 333-3, 333-4, 333-5, 333-6, 333-7.

The requested service awards are in line with (or less than) those approved in other antitrust class actions in this Circuit. *See, e.g.*, *Se. Milk*, 2013 WL 2155387, at *8 (awarding $10,000 to each of the 16 class representatives); *Skelaxin*, 2014 WL 2946459, at *4 (awarding $50,000 to each of the five class representatives); *Hosp. Auth. of Metro. Gov't of Nashville*, 2020 WL 3053468, at *2 (awarding $200,000 to each of the two class representatives); *Cardizem*, 218 F.R.D. at 535-36 (awarding $75,000 to each of the two corporate class representatives and $2,500 to each of the individual plaintiffs); *In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d 985, 999-1000 (N.D. Ohio 2016) (awarding $35,000 to each of the two corporate plaintiffs and $10,000 to each of the 13 individual plaintiffs).

## VI.   CONCLUSION

For all of the reasons discussed above, DPPs respectfully request that the Court: (1) award Class Counsel one-third of the gross Settlement Fund, or an attorneys' fee of $14,500,000.00 plus accrued interest; (2) order reimbursement of litigation expenses incurred by Class Counsel in the amount of $1,690,929.43; (3) award a total of $75,000 for service awards for the six Class Representatives; (4) delegate to the three Co-Lead Class Counsel firms the role of allocating the total fee award to the various Class Counsel participating in the case, based on those firms' respective contributions to the case.

Dated: July 10, 2023

Respectfully submitted,

*/s/ Eric L. Cramer*
Eric L. Cramer*
Michael J. Kane*
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19106
Tel: (215) 875-3000
ecramer@bm.net
mkane@bm.net

Joshua P. Davis*
**BERGER MONTAGUE PC**
505 Montgomery Street, Suite 625
San Francisco, CA 94111
Tel: (415) 689-9292
jdavis@bm.net

Gregory S. Asciolla*
Karin E. Garvey*
**DICELLO LEVITT LLP**
485 Lexington Avenue, 10th Floor
New York, NY 10017
Tel: (646) 933-1000
gasciolla@dicellolevitt.com
kgarvey@dicellolevitt.com

Jonathan W. Cuneo*
Victoria Sims*
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Avenue NW, Suite 200
Washington, DC 20016
Tel: (202) 789-3960
jonc@cuneolaw.com
vicky@cuneolaw.com

*Co-Lead Class Counsel for the Proposed Settlement Classes*

Benjamin D. Elga*
**JUSTICE CATALYST LAW, INC.**
81 Prospect Street
Brooklyn, NY 11201
Tel: (518) 732-6703
belga@justicecatalyst.org

Roberta D. Liebenberg*
Jeffrey S. Istvan*
Mary L. Russell*
**FINE KAPLAN AND BLACK, R.P.C.**
One South Broad St., 23rd Floor
Philadelphia, PA 19107
Tel: (215) 567-6565
rliebenberg@finekaplan.com
jistvan@finekaplan.com
mrussell@finekaplan.com

Aubrey B. Harwell, Jr. (TN BPR #002559)
Charles Barrett (TN BPR #020627)
Aubrey B. Harwell III (TN BPR #017394)
**NEAL & HARWELL, PLC**
1201 Demonbreun St., Suite 1000
Nashville, TN 37203
Tel: (615) 244-1713
aharwell@nealharwell.com
cbarrett@nealharwell.com
tharwell@nealharwell.com

*Additional Counsel for the Proposed
Settlement Classes*

J. Gerard Stranch, IV (TN BPR #23045)
**BRANSTETTER, STRANCH &
JENNINGS, PLLC**
223 Rosa Parks Ave. Suite 200
Nashville, TN 37203
Tel: (615) 254-8801
gerards@bsjfirm.com
beng@bsjfirm.com

*Liaison Counsel for the Proposed Settlement
Classes*

*Admitted pro hac vice*